UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ELINOR HILTON and COLLEEN FAGAN, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>KRISTI NOEM, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>      Defendants. | Case No.<br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER WITH INCORPORATED MEMORANDUM OF LAW**<br><br>**REQUEST FOR IMMEDIATE RELIEF** |

## Introduction

Like many Mainers, Plaintiffs Elinor Hilton and Colleen Fagan are two concerned citizens who have exercised their First Amendment right to lawfully observe, record, and report on Defendants' immigration enforcement activities in Maine. In response, Defendants have scanned Plaintiffs' faces and vehicles, added their names to a government database, and leveled explicit and chilling threats—telling Plaintiff Fagan, "We have a nice little database. And now you're considered a domestic terrorist, so have fun with that," and warning Plaintiff Hilton, "If you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight."

By placing them in a government database or watchlist, labeling them "domestic terrorists," and threatening further harassment, Defendants have violated Plaintiffs' First Amendment rights. Despite their continued desire to bear witness and bring transparency to immigration enforcement operations in their communities, Plaintiffs now must choose between facing government retaliation and abandoning their constitutional rights. Plaintiffs therefore ask this Court to issue a temporary restraining order against Defendants to permit Plaintiffs to continue their lawful exercise of First Amendment rights.[1]

## Background

Defendants have deployed thousands of federal agents across the country in coordinated immigration enforcement efforts orchestrated by the U.S. Department of Homeland Security ("DHS") and its various agencies, most notably U.S. Immigration and Customs Enforcement ("ICE"). In late January 2026, DHS and ICE initiated Operation "Catch of the Day" in Maine, resulting in a surge of federal agents into the state for the purpose of capturing 1,400 "targets" for

---

[1] While Plaintiffs later intend to seek relief on a classwide basis consistent with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), Plaintiffs presently are only seeking temporary relief on behalf of themselves under Fed. R. Civ. P. 65.

removal. Hewey Decl. ¶ 3, Ex. 1. More than 200 Maine residents have been arrested to date, and enhanced immigration enforcement in the state continues. *Id.*, Ex. 2.

## I.  Defendants' Targeting of Plaintiffs and Others Observing and Recording Immigration Operations in Maine.

As immigration enforcement operations take place across Maine, concerned residents, including Plaintiffs, have exercised their constitutional right to observe and document public law enforcement operations. *Id.*, Exs. 1-2; Fagan Decl. ¶¶ 2, 11; Hilton Decl. ¶¶ 3, 6-7. In direct response to Plaintiffs' constitutionally protected activity, Defendants have engaged in retaliatory record collection, threats, and other acts of intimidation designed to identify and catalog Plaintiffs and chill their exercise of their First Amendment rights.

***Record Collection and Maintenance***. Defendants have collected and maintained Plaintiffs' biometric and license plate data in response to their exercise of First Amendment rights. In one videotaped incident, one agent (identified in the Complaint as Agent 1) used a smartphone to scan Plaintiff Fagan's face while Fagan was recording immigration enforcement activity in a public space on January 23, 2026. Fagan Decl. ¶¶ 11, 15. Agent 1 never claimed Fagan was interfering with law enforcement; on the contrary, Agent 1 expressly acknowledged that Fagan was engaging in protected activity and indicated he had targeted Fagan *because* she was exercising her First Amendment right to record his conduct. Fagan Decl. ¶ 17. Similarly, in a separate videotaped incident, two different agents (Agents 3 and 8 in the Complaint) used smartphones to scan Plaintiff Hilton's face and vehicle while Hilton was observing and recording an ICE operation in South Portland. Hilton Decl. ¶¶ 10, 13, 19-20.

Based on the agents' videotaped actions, Defendants likely used facial recognition technology, one of various advanced surveillance tools that Defendants have recently deployed to field agents involved in immigration enforcement. Hewey Decl., Ex. 3 (detailing ICE's recent

expenditures on such technologies, including facial recognition software and other tools to help locate and track individuals). Defendants have reportedly used one facial recognition tool ("Mobile Fortify") more than 100,000 times in the field as of January 2026, including on protestors and lawful observers. *Id*. ¶¶ 6-7, Exs. 4, 5. All scans taken using Mobile Fortify are retained in DHS's Automated Targeting System for 15 years. *Id*. ¶ 8, Ex. 6.

Defendants also recorded Plaintiffs' license plates using smartphones. Fagan Decl. ¶ 16; Hilton Decl. ¶¶ 10, 20; *see* Hewey Decl., Exs. 7, 8. Again, Defendants appear to be leveraging relatively new technologies. In November 2025, public reporting confirmed that ICE had begun deploying a mobile app called Mobile Companion, allowing agents to scan a license plate in the field using a smartphone. *Id*., Exs. 9-10. The agent is then able to access significant data about both the vehicle and its driver. *Id*.

***Threats to Add Plaintiffs to a Database or Watchlist***. Defendants have also threatened Plaintiffs, including threatening to add them to a "domestic terrorist" "database" or "watchlist." After agents conspicuously scanned her face and vehicle, one agent (Agent 2) told Plaintiff Fagan, "[W]e have a nice little database, and now you're considered a domestic terrorist." Fagan Decl. ¶ 17, Ex. 1. After agents scanned Plaintiff Hilton, one agent (Agent 3) told her, "If you keep coming to things like this, you are going to be on a domestic terrorist watchlist," and then a different agent (Agent 5) told her, "Just so you know, for a warning, we're putting you into a watchlist." Hilton Decl. ¶¶ 21-23, 26, Exs. 1-2. Agent 5 can be heard on film speaking to at least two other agents about adding Hilton to a "domestic terrorist watchlist." *Id*.

***Threats to Drive to Plaintiff Hilton's Residence***. In addition to threatening to add Plaintiff Hilton to a "domestic terrorist watchlist," a federal agent (wearing a protective vest with the initials "HSI" on it) threatened to use the information he had collected to bring agents to Hilton's

residence: "[W]e're going to come to your house later tonight." Hilton Decl. ¶¶ 8, 21, Exs. 1-2. The threat to come to an observer's or other protestor's house is not an empty one—multiple other Maine residents have reported agents driving by their homes in retaliation for observing immigration enforcement activities. *E.g.*, Hewey Decl., Exs. 11-14.

## II.     Defendants' Actions Are Part of a Deliberate Campaign to Quell Dissent.

Defendants' retaliatory actions follow a deliberate policy and practice set and directed by Defendants. Defendant Noem publicly claimed that "videotaping" federal agents "where they're at, when they're out on operations" was "violence" and "threatening their safety." *Id.*, Ex. 15. In September 2025, DHS said in an official statement that "videotaping ICE law enforcement and posting photos and videos of them online is doxxing our agents." *Id*., Ex. 16. Defendants have also repeatedly labeled observers and other protestors as "domestic terrorists." *E.g.*, *id*., Exs. 17-20.

Agents' recorded statements about adding Plaintiffs to a government database are consistent with other public reporting. *Id*., Ex. 21. Federal officials have repeatedly confirmed in news articles that the government is collecting and maintaining information about protestors. *Id*., Exs. 5, 21-23. Leaked documents and screenshots appear to show federal agents using a database (IRS-NG) to document protected activity. *Id*., Ex. 8. Additionally, a February 2026 article reported that for several months, ICE "has been tracking the names of protesters in an internal database," including the names and photos of protestors, their location and license plates, and other data. *Id*., Ex. 21. As with other federal records systems, information entered into IRS-NG is disseminated to other interconnected government databases and accessible by a range of federal personnel. *Id*., Exs. 7, 8.

Courts have already found that violating the rights of observers who monitor and videotape public immigration enforcement operations is an established DHS practice. In September 2025, a Los Angeles federal court found that an "avalanche of evidence . . . suggests that federal agents

4

acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." *L.A. Press Club v. Noem*, 709 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025), *appeal docketed*, No. 25-5975 (9th Cir. Sept. 19, 2025). In January 2026, the same court found plausible allegations of a DHS policy "to treat photography and videorecording of DHS officers in public as 'threats' or 'doxxing' that DHS officers may respond to with force and address as crimes." *L.A. Press Club v. Noem*, 2026 WL 103972, at *8-9 (C.D. Cal. Jan. 8, 2026).[2]

## Legal Standard

A district court may grant a temporary restraining order when movants show (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018). When the government is the opposing party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A movant's likelihood of success is the most significant factor, *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009), particularly in First Amendment cases, *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

## Argument

All four factors weigh heavily in favor of Plaintiffs. *First*, Plaintiffs will succeed on the merits of their First Amendment claims. Plaintiffs engaged in constitutionally protected activity

---

[2] *See also Tincher v. Noem*, 2026 WL 125375, at *19 (D. Minn. Jan. 16, 2026) ("Defendants have made, and will continue to make, a common practice of conduct that chills observers' and protesters' First Amendment rights."), *appeal docketed*, No. 26-1105 (8th Cir. Jan. 20, 2026); *Chi. Headline Club v. Noem*, 2025 WL 3240782, at *73 (N.D. Ill. Nov. 20, 2025) ("Defendants have engaged in an officially sanctioned common practice of violating the First and Fourth Amendment rights of protesters, journalists, and religious practitioners."); *Dickinson v. Trump*, 2026 WL 279917, at *5 (D. Or. Feb. 3, 2026) (finding "ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press and peaceful protestors" (cleaned up)).

and were targeted by Defendants in response (Counts I and III); and Defendants' targeting of Plaintiffs unconstitutionally discriminates on the basis of content and viewpoint (Counts II and IV). *Second*, Plaintiffs face severe, imminent, and irreparable harm in the absence of preliminary relief. Defendants' collection of Plaintiffs' data and entry into a database or watchlist chills their protected activity and subjects them to significant collateral risks. Defendants' threats also impair Plaintiffs' ability to exercise their constitutionally protected rights without placing themselves in jeopardy. *Third and fourth*, the balance of the equities and the public interest support protecting Plaintiffs' constitutional right to document law enforcement operations.

## I. Plaintiffs Are Likely to Prevail on the Merits of Their Claims.

On both their retaliation and free speech claims, Plaintiffs are likely to prevail on the merits.

### A. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Retaliation Claims (Counts I and III).

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To demonstrate retaliation under the First Amendment, plaintiffs must show (1) they engaged in constitutionally protected conduct; (2) they were subjected to an adverse action; and (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

#### 1. Plaintiffs Engaged in Constitutionally Protected Activity.

The First Amendment is concerned not only with "fostering individual self-expression," but also with "affording the public access to discussion, debate, and the dissemination of information and ideas." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). "Gathering information about government officials in a form that can be readily disseminated to others serves a cardinal First Amendment interest in protecting and promoting the 'free discussion of

governmental affairs.'" *Glik v. Cunniffe,* 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). The "right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." *Glik,* 655 F.3d at 85; *see Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014). And peacefully expressing dissent is an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

Plaintiffs are observers and recorders of law enforcement activity conducted in public for the purpose of registering their disagreement with those activities and sharing information regarding those activities. Fagan Decl. ¶¶ 2, 11; Hilton Decl. ¶¶ 3, 6-7. Plaintiffs did not obstruct, interfere with, or impede law enforcement. Fagan Decl. ¶¶ 10, 12; Hilton Decl. ¶¶ 11, 12, 30. Plaintiffs conducted their observations in a manner that gave the agents no reasonable basis to believe that they were engaged in criminal activity. Fagan Decl. ¶¶ 10, 12; Hilton Decl. ¶¶ 6, 11. Defendants even acknowledged the lawfulness of Plaintiffs' activity. Fagan Decl. ¶¶ 10, 12; Hilton Decl. ¶ 6. Each Plaintiff observed or filmed from a public place that did not trespass on private property. *Id.*

The First Circuit has stated that observers' right to record an officer may be limited under the First Amendment "only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties." *Gericke*, 753 F.3d at 8. But here, each Plaintiff intentionally placed herself at a safe distance from the law enforcement encounter. Fagan Decl. ¶¶ 10, 12; Hilton Decl. ¶¶ 6-7, 11-12. And no agent told Plaintiffs they were engaging in unlawful conduct. *Id.* Accordingly, Plaintiffs were engaged in prototypical constitutionally protected activity. *Gericke*, 753 F.3d at 7.

### 2. Defendants Took Adverse Actions That Would Chill Persons of Ordinary Firmness from Engaging in Protected Activity.

Plaintiffs must also show that Defendants took an adverse "action that would deter a reasonably hardy individual from exercising his constitutional rights." *Barton v. Clancy*, 632 F. 3d 9, 29 (1st Cir. 2011). The bar is low: an adverse action "need only be more than 'de minimis,'" meaning sufficient to chill "a reasonably hardy person" or "person of ordinary firmness" from continuing to exercise their constitutional rights. *Huffman v. City of Boston*, 2022 WL 2308937, at *4 (D. Mass. June 27, 2022) (citing *Barton*, 632 F.3d at 29); *see also Ortolano v. City of Nashua*, 766 F. Supp. 3d 328, 335 (D.N.H. 2025). There is no requirement that the retaliatory conduct itself be independently unlawful, and a plaintiff need not show that the alleged retaliation actually deterred them, only that a reasonably hardy person would be chilled. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 n.11 (1st Cir. 2012).

Defendants here retaliated against Plaintiffs for exercising their constitutional rights in two respects. *First*, Defendants collected Plaintiffs' information and added it to government systems, watchlists, or databases (Count I). *Second*, Defendants made verbal threats and otherwise harassed Plaintiffs, including by labeling them "domestic terrorists" (Count III).

### i. Collecting and maintaining Plaintiffs' information chills First Amendment activity (Count I).

Defendants have collected and logged Plaintiffs' information through facial recognition and other tools that would chill a person of ordinary firmness from exercising First Amendment rights. For example, Agent 1 scanned Plaintiff Fagan's face while she was merely recording immigration enforcement activity on a public road. Fagan Decl. ¶¶ 11, 13, 15. Defendants then entered Plaintiffs' information into a government "database," *id*. ¶ 17, or "watchlist," Hilton Decl. ¶¶ 21-23, 26; *see also* Hewey Decl., Exs. 5, 7-8, 21-22. Because of the interconnected nature of federal databases, Defendants' entering of an individual's information into one system often

8

disseminates that information more broadly, exposing it to federal personnel who access those connected systems. *Id.*, Exs. 7, 8.

These practices easily exceed the First Circuit's "more than 'de minimis'" standard. The use of advanced surveillance tools to monitor protected activity communicates a clear message: *we know who you are, and we are watching*. That message "would certainly be enough to chill others" from exercising their rights, *Garcia v. Montgomery Cnty.*, 145 F. Supp. 3d 492, 515 (D. Md. 2015), particularly in light of Defendants' recent documented violations of rights. Hewey Decl., Exs. 24-25; *see* Fagan Decl. ¶¶ 20, 22-24; Hilton Decl. ¶¶ 34, 36-40. Courts have long recognized that "sheer fear 'that the government may be watching chills associational and expressive freedoms.'" *United States v. Moore-Bush*, 36 F.4th 320, 358 (1st Cir. 2022) (Barron, C.J., concurring) (quoting *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring)).[3] That is particularly true in today's world, where "[t]he government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." *Jones*, 565 U.S. at 416. The advanced tools now available to Defendants allow them to obtain significant details about perceived opponents or critics. Those details can then be used to harass or engage in other forms of reprisal—a concern borne out by the experiences of other observers whose data Defendants have collected. *Supra* pp. 3-5.

The inclusion of Plaintiffs' data in a database or watchlist is also objectively chilling. *Adlerstein v. United States Customs and Border Protection*, 2020 WL 5846600, at \*12 (D. Ariz.

---

[3] *See also Anderson v. Davila*, 125 F.3d 148, 153, 163 (3d Cir. 1997) (plaintiff likely to prevail on First Amendment retaliation claim based on police's "visual surveillance" and photographing of plaintiff); *NAACP v. City of Minneapolis,* 2024 WL 1886759, at \*8 (D. Minn. 2024) (plaintiffs adequately alleged adverse action based on social media surveillance because of their advocacy); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 325 (S.D.N.Y. 2018) (plaintiff pled plausible First Amendment retaliation claim based on social media and other surveillance because of participation in Black Lives Matter); *Garcia*, 145 F. Supp. 3d at 515 ("gratuitous show of uninvited law enforcement interest . . . would certainly be enough to chill others from lodging complaints against police officers").

2020) (CBP maintaining records of plaintiffs' activities would chill a person of ordinary firmness). By maintaining information about Plaintiffs in a form accessible by a vast array of other federal agents, Defendants have exposed them to a greater risk of harassment, investigation, and other adverse actions based on their protected activity.[4] *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 261-62 (E.D.N.Y. 2021).

### ii.    Threatening and harassing Plaintiffs chills First Amendment activity (Count III).

Defendants have also subjected Plaintiffs to verbal threats and other harassment that would similarly chill a person of ordinary firmness from exercising First Amendment rights. Defendants have approached Plaintiffs, filmed them at close range, called them "domestic terrorists," threatened to place them in a database or watchlist, *e.g.*, Fagan Decl. ¶ 17, and even threatened, "[W]e're going to come to your house tonight." Hilton Decl. ¶ 21. The "domestic terrorist" label is not mere rhetoric. A person could reasonably fear grave legal consequences, including interference with their ability to travel, find employment, and complete financial transactions. Such intimidation chills constitutionally protected activity by leveraging the government's power to brand citizens as terrorists. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963).

Defendants' threats violate the First Amendment, regardless of whether a specific "domestic terrorist" database or watchlist exists: Defendants are either placing observers and other protestors in such a database or watchlist, or they are deliberately lying about doing so to intimidate lawful observers for exercising their First Amendment activity. Courts have found similar threats of severe government-imposed consequences sufficient to chill protected activity. *E.g.*, *Mattei v.*

---

[4] The Court need not credit Defendants' recent efforts (including in congressional testimony) to distance themselves from the idea that Plaintiffs' information has been added to a government database or watchlist. Hewey Decl., Ex. 34. There is extensive evidence to the contrary, including the federal agents' *own* statements during their encounters with Plaintiffs. Fagan Decl. ¶ 17; Hilton Decl. ¶¶ 21-23, 26.

*Dunbar*, 217 F. Supp. 3d 367, 377 (D. Mass. 2016) (threats of groundless legal action can constitute adverse action "if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct"); *Bantam Books*, 372 U.S. at 68 ("People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around[.]"). And the context of Defendants' actions is again important: Plaintiffs were threatened with the "domestic terrorist" label just weeks after the Attorney General identified "opposition to law and immigration enforcement" as a hallmark of domestic terrorism and promised that alleged acts of domestic terrorism "will be zealously investigated and prosecuted." Hewey Decl., Exs. 26-27.

### 3. Plaintiffs' Protected Activity Was the But-For Cause of Defendants' Adverse Actions.

Finally, Plaintiffs must show "a causal connection between the protected activity and the adverse action." *Smith v. Evangelidis*, 2022 WL 847479, at *7 (D. Mass. Mar. 22, 2022). "[C]lose temporal proximity between a plaintiff's protected activity and the state's retaliatory conduct can raise an inference of causation." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 226 (1st Cir. 2015); *see also Huffman,* 2022 WL 2308937 at *5.

Here, the causal connection is self-evident and confirmed by Defendants' own words. For example, when Agent 1 scanned Plaintiff Fagan's face and license plate, another agent (Agent 2) told Fagan that because she was recording federal law enforcement, she was "*now* [] considered a domestic terrorist." Fagan Decl. ¶ 17 (emphasis added). Agents 1 and 2's collection and maintenance of biometric data, threats, and other intimidation were all direct consequences of Plaintiff Fagan's protected activity. Agent 3's response to Plaintiff Hilton was similarly immediate: Agent 3 warned her *while she was recording* that "if you keep coming to things like

this, you are going to be on a domestic terrorist watchlist" and then threatened "we're going to come to your house tonight." Hilton Decl. ¶ 21.

Plaintiffs' experiences are reinforced by a broader documented pattern of First Amendment retaliation by Defendants. As just two examples, Defendants reportedly have expressly directed agents to keep records on "protestors," Hewey Decl., Exs. 22-23, and senior administration officials, including Defendants Lyons and Noem, have publicly described other individuals engaged in protected activity as "domestic terrorists" and "professional agitators." *Id.*, Exs. 17-18, 20, 28. The Court may assess such "contemporaneous statements to determine retaliatory motive," *ABA v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 245 (D.D.C. 2025), particularly where statements by field agents reflect the same but-for causal retaliatory motivation as the official statements of Defendants' agency heads. Plaintiffs are therefore likely to succeed on their retaliation claims.

### B. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Free Speech Claims (Counts II and IV).

Plaintiffs are also likely to succeed on the merits of their claims that Defendants' conduct unconstitutionally burdens Plaintiffs' rights to free speech. Compl. ¶¶ 181-190; 198-208 (Counts II and IV). These claims do not depend on proof that Defendants "intended to punish or coerce" or acted with a retaliatory motive. *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984). Instead, Plaintiffs need only show that Defendants imposed an unjustified burden on Plaintiffs' exercise of their core First Amendment freedoms. *Id.* Here, Defendants' selective targeting of Plaintiffs constitutes content- and viewpoint-based discrimination.

Government restrictions on speech that discriminate on the basis of content are "presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Where the government engages in viewpoint discrimination by "target[ing] not subject matter but particular *views* taken by speakers on a subject," it has engaged in a "blatant"

12

and "egregious form" of content discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added). To survive strict scrutiny for such targeting, the government must demonstrate its discrimination is narrowly tailored to serve a compelling government interest. *Reed*, 576 U.S. at 163.

Defendants' policy of collecting and maintaining records about Plaintiffs and other observers (challenged in Count II) is, at minimum, content-discriminatory. Defendants are "singl[ing] out specific subject matter for differential treatment," *id*. at 169—*i.e.*, collecting and keeping records on Plaintiffs' protected activity because it concerns the observation and documentation of immigration enforcement operations. And Defendants' other actions, including labeling Plaintiffs "domestic terrorists" and threatening further harassment, constitute paradigmatic viewpoint discrimination: they are directed solely at observers perceived to be opposed to their actions, not those perceived as supporting the Administration. *E.g.*, Hewey Decl., Exs. 8, 17, 18, 20, 27, 28; Hilton Decl. ¶ 27. The government here is singling out and burdening disfavored speech, while permitting and encouraging speech that endorses its preferred viewpoint. *Reed*, 576 U.S. at 163-64; *Rosenberger*, 515 U.S. at 829; *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (a government official "cannot . . . use the power of the State to punish or suppress disfavored expression"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (government can "no more silence unwanted speech by burdening its utterance than by censoring its content").

Defendants' conduct fails strict scrutiny. Defendants cannot offer any interest, let alone a compelling one, for tracking or threatening nonviolent public observers or protesters who pose no threat to law enforcement operations. Defendants "may well prefer to have every [observer's] information close at hand, just in case," but "the prime objective of the First Amendment is not

efficiency." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 614-15 (2021). To the extent Defendants intend to argue any purported interest in agent safety, Defendants' challenged conduct is far from narrowly tailored to that end because it sweeps in nonviolent observers for whom there is no reasonable suspicion of criminal conduct or interference with active law enforcement operations. Hewey Decl., Exs. 8, 11, 13, 29-31; *e.g.*, Hilton Decl. ¶¶ 6, 11-12, 30; Fagan Decl. ¶¶ 10, 12; *Fortuño*, 699 F.3d at 13 (content-based restriction would fail strict scrutiny "[e]ven if . . . justified by a compelling interest," given insufficient tailoring to achieve that end).

## II.    Plaintiffs Will Be Irreparably Harmed Absent a Temporary Restraining Order.

Irreparable harm necessarily follows a First Amendment violation. *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 19 (1st Cir. 2025) (holding that "in the First Amendment context, [] if the movants are likely to succeed, then irreparable injury is presumed"); *Fortuño*, 699 F.3d 1, 10-11 ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Smith v. Trump*, 791 F. Supp. 3d 90, 99 (D. Me. 2025). Courts have repeatedly applied this principle to retaliatory government conduct like Plaintiffs challenge here. *E.g.*, *Chicago Headline Club*, 2025 WL 3240782, at *87 (finding irreparable harm from ongoing constitutional violations by DHS agents against observers, recorders, and other protestors); *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1155-56 (D. Or. 2020) (granting injunctive relief against DHS for First Amendment violations against legal observers based on a finding of irreparable harm); *Tincher*, 2026 WL 125375 at *22-23 (same).

Here, the threat of harm to Plaintiffs is imminent and not speculative. Aggressive immigration enforcement remains ongoing. *E.g.*, Hewey Decl., Exs. 32, 41, 43. Plaintiffs wish to continue observing and recording these operations, Hilton Decl. ¶ 37; Fagan Decl. ¶ 22, an activity

that is at the very core of First Amendment protection. *Glik*, 655 F.3d at 82. Absent injunctive relief, Plaintiffs must either abandon their constitutional right to observe and record federal agents in public spaces, or accept being cataloged and labeled as "domestic terrorists." That is a choice the Constitution does not require Plaintiffs, or anyone, to make.

Furthermore, the severe harm to Plaintiffs cannot be remedied by monetary damages. The collection and maintenance of Plaintiffs' data are actively chilling Plaintiffs' First Amendment rights. *See infra* pp. 17-18. And no damages award can meaningfully remedy the consequences of the "domestic terrorist" label. *Id.* Moreover, Defendants show no sign of ceasing their chilling activity. *E.g.*, Hewey Decl., Ex. 32. Thus, the threat of imminent future constitutional violations persists, and injunctive relief is warranted. *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 119-20 (D. Minn. 2021) (finding imminent harm where (1) defendant officers had repeatedly violated plaintiffs' rights, (2) the operations were ongoing, and (3) plaintiffs intended to continue their protected activity).

### III.    The Balance of Harms Favors Plaintiffs, and a TRO Is in the Public Interest.

Where the government is the party opposing injunctive relief, the third and fourth factors—balance of the equities and the public interest—merge. *Doe v. Trump*, 157 F.4th 36, 78 (1st Cir. 2025). And where a plaintiff demonstrates a likelihood of success on the merits of a First Amendment claim, these two factors are generally satisfied. *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019); *cf. Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (holding "it is always in the public interest to prevent the violation of a party's constitutional rights"); *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022) (crediting strong public interest in "protecting constitutional rights" in granting preliminary injunction).

Here, these two factors decisively favor Plaintiffs. At stake is the fundamental constitutional right to observe and document the actions of federal agents conducting operations

15

in public. *Glik*, 655 F.3d at 82-83; *Gericke*, 753 F.3d at 7-8. Recent events across the country have underscored the public's vital interest in supporting Plaintiffs' ability to observe the conduct of federal agents—an interest that reaches its apex when the government is engaged in large-scale operations with profound consequences for civil rights. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (plurality opinion) (emphasizing the importance of public access and observation as a check on government action); *Glik*, 655 F.3d at 82-83 ("Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally.") (internal citations omitted).

The relief Plaintiffs seek will also in no way impair Defendants' interest in conducting lawful immigration enforcement. Plaintiffs seek an order prohibiting Defendants and their agents from collecting, maintaining, and disseminating data about observers based on their protected activity and from threatening, harassing, and otherwise retaliating against them for the same reason. It does not constitute irreparable harm to require the government to honor the constitutional rights of those who peacefully protest and observe law enforcement activities. *Doe*, 157 F.4th at 79 ("The Government is not irreparably harmed by an injunction" that "bars enforcement of an unlawful" government action). Defendants cannot explain why retaliation against peaceful observers like Plaintiffs is necessary to conduct lawful immigration enforcement—because it plainly is not. *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (the government "cannot claim that being required to comply with the Constitution is harmful.")

Likewise, Defendants cannot credibly assert an interest in maintaining (or threatening to maintain) a database, watchlist or any other such repository of Plaintiffs' data because those

individuals have engaged in constitutionally protected activity. As DHS previously acknowledged in an apparently rescinded 2019 memorandum, such record-keeping is prohibited by the Privacy Act, 5 U.S.C. § 552a(e)(7), Hewey Decl., Ex. 42, and Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *accord Mohammed H. v. Trump*, 2025 WL 1170448, at *4 (D. Minn. Apr. 22, 2025).

## IV.     Plaintiffs Have Standing and Should Not Be Required to Post a Substantial Bond.

With respect to standing, Plaintiffs "ha[ve] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks omitted). Plaintiffs Fagan and Hilton have been (and, absent relief, will continue to be) indisputably injured by Defendants' actions, which have caused significant emotional distress and well-founded fears that they will continue to be targeted by the government for adverse action. Fagan Decl. ¶¶ 20-24; Hilton Decl. ¶¶ 33-45. Both Plaintiffs have standing to seek injunctive relief on their claims.

### A.  Plaintiffs Have Standing to Challenge Defendants' Policy and Practice of Collecting and Maintaining Records of Their First Amendment Activity.

Plaintiffs' exercise of their First Amendment rights has been and continues to be chilled by Defendants' policy of collecting their personal data and maintaining that information in some form (and thereby disseminating it to other federal actors). *E.g.,* Fagan Decl. ¶ 22 (anxious about ability to protest in the form of observing and recording law enforcement officers in public); Hilton Decl. ¶¶ 36-37, 39-45 (reduced observation of law enforcement activity; no longer using her own car to observe or protest; limiting social media presence). This self-censorship is a sufficient injury-in-fact. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 58-59 (1st Cir. 2003) (journalist who curtailed investigative activities in response to government threats had standing to challenge criminal

statute); *Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 176-78 (D. Mass. 2025).

Plaintiffs also reasonably fear (based on the experiences of similarly situated individuals across

the country) that the existence of government records describing their protected activity exposes

them to a range of adverse consequences, including harassment by federal agents, interference

with their ability to travel, and potential criminal investigation. *See supra* p. 4; Hewey Decl., Exs.

11, 12, 13, 14, 21, 23, 29, 30, 44; Hilton Decl. ¶¶ 36-45; Fagan Decl. ¶¶ 22-24. In other words,

Plaintiffs are experiencing "continuing, present adverse effects" from Defendants' conduct, which

supports injunctive relief. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *see also Ozonoff v.*

*Berzak*, 744 F.2d 224, 228-29 (1st Cir. 1984) (self-censorship injury was "likely augmented by

whatever disruption, delays, or reputational harms might flow" from the government's actions).

This case is therefore entirely unlike *Laird v. Tatum*, 408 U.S. 1 (1972)*, which denied

standing to individuals who "allege[d] that the exercise of [their] First Amendment rights [was]

being chilled by *the mere existence*, *without more*, of a governmental investigative and data-

gathering activity." *Id.* at 10 (emphasis added). As the First Circuit has explained, the key limiting

principle "lies in the key words 'without more'": that is, "the plaintiffs in *Laird* did not claim that

the information-gathering activities were directed against them specifically or that the gathered

data could be directly used against them in any foreseeable way." *Ozonoff*, 744 F.2d at 229. Here,

both Plaintiffs Fagan and Hilton were specifically and directly targeted by Defendants'

surveillance operation, and they have now been added to a government database and labeled

"domestic terrorists" because of their constitutionally protected conduct. Hilton Decl. ¶¶ 10, 13,

19-20; Fagan Decl. ¶¶ 15-17; *cf.* Hewey Decl., Exs. 3, 9, 10. And Plaintiffs reasonably fear the

information will be used directly against them in foreseeable ways, particularly since Defendants'

efforts to harass and punish observers and other protesters remain ongoing. *Supra* p. 12. These harms are all directly traceable to Defendants and would be redressed by the relief Plaintiffs seek.

### B. Plaintiffs Have Standing to Challenge Defendants' Pattern and Practice of Threatening Plaintiffs Because of Their First Amendment Activity.

Plaintiffs also have standing to seek injunctive relief prohibiting Defendants and their agents from threatening or harassing Plaintiffs because of their First Amendment activity, including but not limited to specifically threatening to add them to a "domestic terrorist" watchlist or database (Counts III and IV). These threats expose Plaintiffs to reputational harm and other real injuries, and Plaintiffs' self-censorship in response constitutes an ongoing injury to their First Amendment rights. *Supra* pp. 8-10.

Moreover, the evidence establishes "a sufficient likelihood that [they] will again be wronged in a similar way," making injunctive relief appropriate. *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (citation omitted). A plaintiff can make this showing by pointing to "a pattern of officially sanctioned behavior violative of the plaintiffs' federal rights." *Nordstrom v. Ryan*, 762 F. 3d 903, 911 (9th Cir. 2014) (internal quotation marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 110 n.9 (1983). Here, Plaintiffs have demonstrated a well-documented pattern or practice of Defendants and their agents threatening and harassing observers because of their protected activity. The record includes multiple incidents in which federal agents have labeled observers as "domestic terrorists," used personal information they collected to follow observers to their homes, and engaged in other threatening conduct designed to deter First Amendment activity. Hilton Decl. ¶¶ 21-23, 26; Fagan Decl. ¶¶ 17, 20, 22; Hewey Decl., Exs. 11-14. This pattern reflects "officially sanctioned behavior," as Defendants and other high-ranking officials have repeatedly characterized observers as criminals and domestic terrorists. *Id.*, Exs. 26, 28. The threats and harassment Plaintiffs have experienced thus reflect a deliberate pattern and practice by Defendants,

not the whims of rogue agents. Plaintiffs' injuries are sufficiently likely to recur absent injunctive relief. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (a "history of past enforcement against nearly identical conduct" establishes a "credible threat" of substantially likely recurring injury); *see also supra* p. 5 & n.2.

### C.  No Substantial Bond is Required.

Relief will "do the defendant[s] no material damage," such that the Court should "dispense with any security requirement." *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024) (citation omitted). If the Court requires a bond, Plaintiffs respectfully request it be nominal, consistent with the Court's standard practice. *E.g.*, *Maine v. Dep't of Agric.*, 778 F. Supp. 3d 200, 236-38 (D. Me. 2025) (collecting cases).

### Conclusion

Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order that prohibits Defendants, their officers, agents, and all persons acting in concert or participation with them, from engaging in the unconstitutional policies and practices challenged here, by taking any of the following actions against Plaintiffs:

1. Collecting data, including biometric data such as facial scans or photographs of faces, license plate photographs or scans, or other personally identifying information, about Plaintiffs because of their First Amendment-protected activity, including observing or recording immigration enforcement operations in public;

2. Maintaining or disseminating records of Plaintiffs' unlawfully collected information in any database, watchlist, or similar system;

3. Threatening Plaintiffs with placement in any database, watchlist, or similar system, based on their First Amendment-protected activity; or

4. Otherwise retaliating against Plaintiffs because of their constitutionally protected activity.

Dated: February 23, 2026

Respectfully submitted,

/s/ Melissa A. Hewey
Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

JoAnna Suriani*
Janine M. Lopez*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
510 Meadowmont VIII. Cir. No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*
Yotam Barkai*
John Paredes*
Benjamin J. Cabranes*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004

(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com

*Pro hac vice application forthcoming.*