UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ELINOR HILTON and COLLEEN FAGAN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>    Defendants. | Case No.<br><br><br>**DECLARATION OF COLLEEN FAGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

I, Colleen Fagan, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am 30 years old and a current resident of Portland, Maine. I was born and raised in Maine, and I have lived here my entire life.

2. Early on January 23, 2026, I decided to drive around my neighborhood and watch for ICE activity. I had heard that ICE was patrolling early in the day in order to detain people when they left their homes to travel to their places of employment, so I left my home around 5:30 A.M. I intended to observe and record the activity of ICE agents in my community.

3. I had two encounters with federal agents that morning. The first encounter occurred at about 5:45 A.M. While driving on Westbrook Street in South Portland, I saw three people gathered by two cars stopped on the road near an apartment building. I knew this to be an apartment building with a lot of immigrant residents. I drove my car to the opposite side of the street and parked in a public parking spot.

4. The first car was bluish-gray and there was a woman sitting in it. She did not look like law enforcement. There was a black SUV parked behind her.

5. There were several people gathered outside the woman's car. I believe these were ICE or other DHS agents based on their uniforms, vehicle, and the fact that it looked like they had pulled the woman over. Two of the agents wore what looked like bulletproof vests over their coats, and all of the agents wore masks.

6. I remained in my car while the agents questioned the woman, and after about 20 seconds, I began recording using my cell phone.

7. While I recorded, the agents began physically removing the woman from her car. The woman repeatedly screamed and cried for help and looked terrified. The agents restrained her before placing her in their SUV. I was shocked by the way they were arresting the woman and shouted at the agents from my car. Once the agents had placed the woman in their SUV, they drove away.

8. Witnessing this encounter made me feel shocked and disturbed. Hearing the woman scream for help in particular made me feel angry.

9. After a few minutes, I continued driving through South Portland. I drove through the Cortland Courts apartment complex on Westbrook Street. Shortly after 6:40 A.M I pulled towards the Cortland Courts entrance, where I saw at least two large black SUVs. Based on other

types of cars I had observed being driven by federal agents earlier, I thought these vehicles could be ICE or other DHS vehicles.

10. I parked my car about 20 feet from the agents' vehicles. Two agents (Agents 1 and 2 in the Complaint) stood outside of one of the SUVs. The agents wore vests with patches identifying them as "POLICE." An additional agent stood on the far side of the SUVs.

11. I began to record a video of the agents using my cell phone and exited my car. I began recording in order to help document and spread awareness about what was happening in my town. I hoped to help protect people who were being questioned and detained. A true and correct copy of the video I recorded is being provided with the filing of this Declaration.

12. I walked towards the agents, but I stayed about 15 feet away from them. I recorded two additional agents sitting inside an SUV. When I began recording, they closed their door and drove back from the other vehicles.

13. After I began recording, Agents 1 and 2 began walking towards me. They took out their phones and appeared to begin recording me.

14. Another observer, who had been in a black car near the leasing office, also got out of his vehicle and began recording the agents.

15. Agents 1 and 2 walked close to me. Agent 1 came within a couple of feet in front of me and held his phone up to my face. After seeming to record my face, he returned to his vehicle.

16. Agent 2 walked behind me and towards my car. Agent 2 stopped in front of my car and appeared to record or scan my license plate. Agent 2 then turned away from my car and began walking back towards me and the other agents and their vehicles. He passed within a couple of feet in front of me. Agent 2 also appeared to record the other observer who was present.

17. As he walked in front of me, I told Agent 2 that it was not illegal for me to record him. He replied "Exactly, that's what we're doing." I asked Agent 2 why he was recording my face and license plate. He replied, "Cause we have a nice little database and now you're considered a domestic terrorist, so have fun with that."

18. This made me nervous, and caused me to laugh and ask, "For videotaping you? Are you crazy? I'm a domestic terrorist?" I also sarcastically asked if the agent needed therapy and told him to go away.

19. Agents 1 and 2 returned to their vehicles along with the third agent.

20. I returned to my car and tried to collect myself. After a few minutes, I called my sister to tell her what had happened because I was in shock. This interaction left me feeling overwhelmed and concerned about what would happen next. The agent telling me that I would be placed on a domestic terrorist watchlist made me afraid that I may be retaliated against for observing and recording ICE activity in my community.

21. After a few minutes, I left the parking lot in my car and continued to drive through the nearby neighborhoods for a period of time in an attempt to observe any additional ICE agents. Not long after, I stopped and then drove to work.

22. Since my interactions with federal agents on January 23, 2026, I have not observed or recorded any further ICE activity. If I hear reports of ICE in my community in the future, I would like to be able to observe and record them again, and I am anxious about how I might be treated by agents now that they have recorded me.

23. I am scared that because of this interaction I will be put on a "no-fly" list or a similar watchlist that could affect my ability to travel.

24. I am concerned that being labeled a domestic terrorist will affect my job. I also worry that this could be surfaced by a background check and affect my future employment.

25. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on February 22, 2026.

*/s/ Colleen Fagan*
Colleen Fagan
