# EXHIBIT 24

Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
  declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
  gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice* forthcoming)
  opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
  peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
  jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
  awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
  mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
  slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
  jreisberg@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
  peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>        Plaintiffs,<br><br>        v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>        Defendants. | Case No. 2:25-cv-05563<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

Case No. 2:25-cv-05563

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel, Esq. (SBN: 84483)
  carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN: 327599)
  rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
  hoffpaul@aol.com
Michael Seplow, Esq. (SBN: 150183)
  mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
  jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 717-7373

i                                    Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................II

TABLE OF AUTHORITIES ....................................................................................III

INTRODUCTION .....................................................................................................1

FACTUAL BACKGROUND.....................................................................................2

    A.    Plaintiffs' Claims .................................................................................2

    B.    Notice ..................................................................................................4

ARGUMENT ............................................................................................................4

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................5

    A.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims...5

        1.    DHS Is Systematically Violating the Rights of Journalists and Legal Observers to Report on, and Observe the Protests ...........5

        2.    DHS Is Systematically Retaliating Against Plaintiffs for Exercising Their First Amendment Rights ...............................8

            a.    Plaintiffs Are Engaged in Constitutionally Protected Activities.........................................................................8

            b.    Federal Agents' Use of Force Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity ...............................................................9

            c.    Plaintiffs' Protected Activity Was a Substantial Motivating Factor in Federal Agents' Conduct ...............................10

    C.    Plaintiffs Are Likely to Succeed on the Merits of Their Excessive Force Claims........................................................................................14

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION...........................................19

III.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS................................20

CONCLUSION........................................................................................................22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ...................................................................................5

*Allee v. Medrano,*
416 U.S. 802 (1974)...................................................................................................5

*Am. Beverage Ass'n v. City & Cty. of S.F.,*
916 F.3d 749 (9th Cir. 2019) ...................................................................................20

*Anti Police-Terror Project v. City of Oakland,*
No. CV 20-03866-JCS, 2020 WL 4584185 (N.D. Cal., Aug. 10, 2020) ..............15

*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents,*
824 F.3d 858 (9th Cir. 2016) ...................................................................................10

*Berg v. Cnty. of Los Angeles,*
No. CV 20-7870 DMG (PDX), 2021 WL 4691154 (C.D. Cal. May 28, 2021)....15, 17

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't,*
466 F. Supp. 3d 1206 (W.D. Wash. 2020) .......................................................16, 19

*Brown v. Entm't Merch. Ass'n,*
564 U.S. 786 (2011).................................................................................................20

*Bryan v. MacPherson,*
630 F.3d 805 (9th Cir. 2010) ...................................................................................15

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010).................................................................................................21

*Cmty. House, Inc. v. City of Boise,*
490 F.3d 1041 (9th Cir. 2007) .................................................................................20

*Collins v. Jordan,*
110 F.3d 1363 (9th Cir. 1996) ...............................................................................8, 9

*Courthouse News Serv. v. Planet,*
947 F.3d 581 (9th Cir. 2020) ...................................................................................19

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019) ...................................................................................19

*Deorle v. Rutherford,*
272 F.3d 1272 (9th Cir. 2001) .................................................................................17

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) .....................................................................................5

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) .................................................................................20

Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................ 19

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995) ............................................................................. 8

*Galvin v. Hay*,
374 F.3d 739 (9th Cir. 2004) ........................................................................... 9

*Globe Newspaper*,
457 U.S. ......................................................................................................... 21

*Goldman, Sachs & Co. v. City of Reno*,
747 F.3d 733 (9th Cir. 2014) ........................................................................... 4

*Hague v. Comm. for Indus. Org.*,
307 U.S. 496 (1939)......................................................................................... 9

*Hartman v. Moore*,
547 U.S. 250 (2006).......................................................................................... 8

*Index Newspapers LLC v. United States Marshals Service*,
977 F.3d 817 (9th Cir. 2020) ................................................................... passim

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018).................................................................................... 21

*LaRocca v. City of Los Angeles*,
No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908 (C.D. Cal., Mar. 14, 2024) ... 15

*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) ......................................................................2, 8

*Melendres v. Arpaio*,
695 F.3d (9th Cir. 2012) ................................................................................ 20

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
192 F.3d 1283 (9th Cir. 1999) ......................................................................... 8

*Mills v. Alabama*,
384 U.S. 214 (1966)........................................................................................ 21

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012) .................................................................... 15, 16

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................................ 21

*Puente v. City of Phoenix*,
123 F.4th 1035 (9th Cir. 2024) ...................................................................... 17

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002) ......................................................................... 19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........................................................................... 4

*Terminiello v. Chicago*,
337 U.S. 1 (1949).............................................................................................. 9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Turner v. Lieutenant Driver*,
848 F.3d 678 (5th Cir. 2017) .................................................................................21
*Ulrich v. City & Cty. of S.F.*,
308 F.3d 968 (9th Cir. 2002) ................................................................................ 10
*Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*,
460 F. Supp. 2d 1165 (C.D. Cal. 2006) .................................................................. 19
*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .............................................................................5, 19
*Winter*,
555 U.S. ................................................................................................................... 19

Rules

Federal Rule of Civil Procedure 65 ...............................................................................ii

Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs respectfully submit this memorandum in support of their motion for a temporary restraining order ("TRO").

## **INTRODUCTION**

Plaintiffs are reporters, legal observers, and protesters who were assaulted by federal agents from Defendant Department of Homeland Security ("DHS") at the recent protests over immigration raids even though they pose no threat to law enforcement. Plaintiffs respectfully seek a TRO before the weekend to stop DHS from indiscriminately and excessively using unnecessary force against reporters, legal observers and protesters at events within the Los Angeles area. Such relief is necessary to protect the First Amendment rights of the press and peaceful protesters and to prevent catastrophic injuries resulting from Defendant's dangerous violence.

In *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), the Ninth Circuit affirmed an injunction preventing DHS from intimidating or dispersing reporters and legal observers. As documented in numerous declarations attached to this motion, DHS is doing the exact same thing now. The journalist Plaintiffs are likely to succeed on the merits of their First Amendment right-to-access claim and will suffer irreparable harm for the same reasons the Ninth Circuit gave in *Index Newspapers*. DHS should be enjoined from attacking or dispersing press for the same reasons now.

As shown in the Declaration of Gil Kerlikowske, the former police chief of Seattle and former head of Customs and Border Patrol, DHS is also using unnecessary, excessive and indiscriminate violence against protesters as well. His detailed declaration, based on substantial video evidence and numerous declarations, shows a repeated pattern of excessive force, including shooting multiple people in the head, attacking people who do not pose any threat to law enforcement, firing indiscriminately into crowds, retaliation, and failure to give warnings. The only reasonable inference to be drawn is that DHS is retaliating against Plaintiffs for

1                                      Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

exercising their First Amendment rights to disagree with the government. As intended, this violence has chilled the constitutional rights of Plaintiffs and others who are peacefully protesting, reporting and observing, and has the possibility of causing death and permanent disability if unchecked. Because Plaintiffs are likely to succeed on their First Amendment retaliation claims, the Court should enjoin this illegal conduct as well.

Plaintiffs are also likely to prevail on their excessive force claims. There is a mountain of evidence showing that DHS is responding to the protests with unnecessary, indiscriminate and excessive violence. DHS should be enjoined from such conduct, as well.

As detailed in Mr. Kerlikowske's declaration, the relief Plaintiffs are seeking is safe and workable. The balance of equities thus tilts heavily in favor of Plaintiffs. The public interest also weighs strongly in Plaintiffs' favor. The free press and peaceful protest are the cornerstones of our democracy, and the Courts are the guardians that must defend this public interest. *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012)

## FACTUAL BACKGROUND

### A.    Plaintiffs' Claims

On June 6, 2025, the Trump administration began an ongoing series of indiscriminate and terrifying immigration enforcement actions across Southern California. (Compl. ¶¶ 2.) DHS officers came in masks, wearing paramilitary gear, brandishing rifles, and started abducting community members from churches, carwashes, and ordinary places of business. (Id. ¶ 2.) As word of these attacks spread, protests began. Californians concerned about their family members, congregation members, union members, and neighbors showed up at sites of reported raids to document what was happening, to remind the targeted community members of their legal rights, and to peacefully protest the federal government's invasion of their neighborhoods and violent separation of their families. (Id. ¶¶ 3.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

DHS has responded to these protests with unnecessary and excessive force, as promised by Secretary of DHS, Kristi Noem and President Trump. (Id. ¶¶ 4.) They used the violent spectacle created by DHS as a reason to commandeer the National Guard and send the United States Marines into California, which has itself generated widespread protests. (Id. ¶ 4.)

At each protest, DHS officers have unnecessarily and indiscriminately targeted, assaulted with rubber bullets and other munitions, tear-gassed, and shot protesters exercising their rights to assemble to display their disagreement with the government and reporters who seek to cover these events. DHS is misusing crowd control weapons in manners that needlessly imperil everyone present to deter people from reporting and protesting. (Kerlikowske Decl. ¶¶ 13-50.) While it is trying to suppress speech, the government is broadcasting its own messages about the protests and immigration raids. (Compl. ¶ 5.)

The protests are ongoing, and protesters have vowed to continue protesting against DHS's immigration raids and policies until they end. For example, interfaith leaders called for a 30-day action plan of gatherings.[1] Per Fox News LA, "protests appear far from over as Southern California continues to be a target of federal raids as ordered by President Donald Trump."[2] At the same time, the Trump administration and Defendant Noem have vowed to continue their immigration raids in Los Angeles. For example, President Trump posted a message on social media stating: "ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History." In order to achieve this, we must expand efforts to

---

[1] https://www.theguardian.com/us-news/2025/jun/18/los-angeles-faith-leaders-ice-raid#:~:text=fighting%20against%20local%20economic%20and,demand%20the%20reunification%20of%20families.

[2] https://www.foxla.com/news/los-angeles-ice-protests-day-13.

3                                            Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles …"[3] Just yesterday, the Northern Command issued a release stating: "By direction of the Secretary of Defense and in coordination with U.S. Northern Command, about 2,000 additional California Army National Guard soldiers have been activated in a Title 10 status to support the protection of federal functions, personnel, and property in the greater Los Angeles area."[4]

**B.     Notice**

Plaintiffs' gave Defendants' notice of their intention to seek a Temporary Restraining Order and OCS re Preliminary Injunction and ask the Court to rule by close of business Friday June 20, 2025 by sending an email to Joanne Osinoff, Assistant United States Attorney and Chief of the Complex and Defensive Litigation Section of the U.S. Attorneys Office for the Central District of California at Joanne.Osinoff@usdoj.gov at 2:47 pm on June 18, 2025, and then followed up with a phone call to Ms. Osinoff at 3 pm. Ms. Osinoff stated that her clients would oppose the Ex Parte Application and would seek additional time to submit their opposition.  Plaintiffs stated that they would oppose any application for additional time. (Declaration of Peter Eliasberg ¶¶ 1-7 and Ex. 1 & 2.)

## ARGUMENT

The standard for issuing a TRO is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Under the traditional four-factor test, plaintiffs may obtain a TRO or preliminary injunction if they show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738

---

[3] https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[4] https://www.northcom.mil/Newsroom/Press-Releases/Article/4219651/usnorthcom-statement-on-additional-military-personnel-in-los-angeles-area/.

4                                    Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

(9th Cir. 2014). Alternatively, in the Ninth Circuit, plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotation marks omitted)).

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are likely to succeed on the merits of all their claims because DHS's dangerous, sweeping, and unnecessary use of rubber bullets, tear gas, grenades and impact munitions to suppress and retaliate against newsgathering and protest is patently unconstitutional for at least the following reasons: (1) it violates the journalist Plaintiffs' right of access; (2) it is being done in retaliation for all Plaintiffs' exercise of their First Amendment rights, and (3) it violates Plaintiffs' Fourth and Fifth Amendment rights to be free of excessive force.

### A. Plaintiffs Are Likely to Succeed on Their First Amendment Claims

Preliminary injunctions based on the First Amendment are appropriate when law enforcement actions "chill[] the willingness of people to exercise their First Amendment rights." *Allee v. Medrano*, 416 U.S. 802, 810 (1974). To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying the restriction on Plaintiffs' speech. *Id.*

#### 1. DHS Is Systematically Violating the Rights of Journalists and Legal Observers to Report on, and Observe the Protests

In *Index Newspapers*, 977 F.3d 817, the Ninth Circuit upheld an injunction against DHS for attacking and dispersing journalists and legal observers. DHS is doing the same thing here. Thus, the Journalist Plaintiffs are likely to succeed on the merits.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

In *Index Newspapers*, journalists and legal observers covering the 2020 protests in Portland obtained an injunction against DHS, the U.S. Marshals, and local police, which provided that as long as they did not impede law enforcement, DHS could not subject them to force or arrest. *Id*. at 823. In affirming the injunction, the Ninth Circuit held that reporters and legal observers have a right of access that allows them to report on and observe protests, and that this "access plays a significant positive role in the functioning of our democracy." *Id*. at 830-31. The Ninth Circuit rejected DHS's argument that dispersing the press when a dispersal order was issued was "essential to protecting the government's interest," and found, instead that plaintiff's expert—the same expert who has provided testimony in this case—had credibly established that "trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control." *Id*. at 832-33. And it pointed out, as Mr. Kerlikowske does in his declaration in this case in ¶ 28, that Portland police followed the injunction in *Index Newspapers* without danger to law enforcement. *Index Newspapers*, 977 F.3d at 833.

Here, as in *Index Newspapers*, there is a "mountain of evidence" that DHS is interfering with the journalist and legal observer Plaintiffs' right of access. For example, DHS violated Jonathan Alcorn's right of access by shooting him with a tear gas grenade, when he was wearing a press pass, carrying professional photography equipment, including a foot-long lens, was standing away from protesters, and had passed by the group of officers who shot him so that they could see he was a professional photojournalist. (Alcorn Decl. ¶¶ 8, 13, 15-16, 20, 24.)

DHS similarly tear-gassed and fired pepper balls at Lexis-Olivier Ray when he was clearly marked as press. (Ray Decl. ¶ 8.) Video shows that DHS also indiscriminately fired pepper balls at other reporters to disperse them. (*Id*. ¶ 23.) When Mr. Ray was standing with TV crews and other members of the press, off to

Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

the side from the protests, DHS fired an "enormous volley" of pepper balls at the group of journalists. (*Id*. ¶¶ 26, 27.) DHS was "targeting journalists instead of others." (*Id*. ¶ 35.)

Michael Horowicz observed DHS officers shoot teargas cannisters at news trucks and journalists across the street from where they were, and the journalists were clearly identifiable by their TV cameras and other equipment and posed no threat whatsoever. (Horowicz Decl. ¶ 12.) He further concluded: "Considering that all of the protestors were either gone or fleeing when the officers started firing tear gas at the news trucks, I can't figure out any possible justification for what the officers did other than that they wanted to explicitly punish the media or deter the journalists and media personnel from doing more reporting on the ICE raids and the federal response to the protests." (Id. ¶ 15.)

Reporter Ryanne Mena was subjected to force even though she was clearly marked "press." (Mena Decl. ¶¶ 8, 22.) Ms. Mena was shot with a pepper ball when she was physically distant from protesters and not doing anything threatening. (Id. ¶ 16-18, 22.) The next day she went out to report, DHS shot her in the head with a rubber bullet. (Id. ¶ 31.)

DHS shot Sean Beckner-Carmitchel in the head with a teargas cannister even though he was a clearly-marked journalist who was away from protesters trying to record an encounter between DHS officers and protestors. (Beckner-Carmitchel Decl. ¶ 13.)

DHS also violated legal observers' right of access. DHS tear-gassed Chelsea Bell when she was approaching from quite a distance wearing a green legal observer hat and while she was not posing any threat or taking any aggressive actions. (Bell Decl. ¶¶ 16-17 and Ex 1.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

DHS treated Plaintiff Charles Xu similarly. When Mr. Xu, a legal observer with the National Lawyers Guild of Los Angeles, was attempting to record DHS's arrest of a protester, DHS shot him in the leg with a pepper ball. (Xu Decl. ¶ 12.)

These examples are not random acts. They are systemic attempts to prevent the press from reporting on the protests and ICE raids. Videos, such as the ones taken by Mr. Ray, and numerous declarants show that DHS is targeting news trucks, reporters with tripods and people far away from protesters to clear them out. There is no possible government justification for this, much less an "overriding interest" that DHS would have to prove to overcome Plaintiffs' right of access. *Index Newspapers*, 977 F.3d at 829. As in *Index Newspapers*, "the public's interest is served by the role the press plays, the district court had strong support for its conclusion that plaintiffs demonstrated a likelihood of success on the merits of their First Amendment right-of-access claim." 977 F.3d at 831; *see also Leigh, 677 F.3d at 900* (government could not demonstrate compelling interest to block plaintiff's right to access "horse gathers"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (government had no compelling interest to block plaintiff's right to film police).

**2. DHS Is Systematically Retaliating Against Plaintiffs for Exercising Their First Amendment Rights**

Plaintiffs are likely to prevail on their First Amendment retaliation claims. The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). These elements are easily satisfied here.

**a. Plaintiffs Are Engaged in Constitutionally Protected Activities**

8          Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

As explained above, the journalist and legal observer Plaintiffs have a right of access guaranteed by the First Amendment. Protesters likewise have a right to assemble and peacefully protest. *See*, *e.g.*, *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). The traditional public forum consists of streets, sidewalks, and parks—places that have "immemorially been held in trust for use of the public . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). Moreover, "there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004).

Criticism of the government is no less protected when it is angry or even inflammatory. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Indeed, angry and inflammatory protests are predictable "when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the [public]. The more controversial the occurrence, the more likely people are to demonstrate." *Collins*, 110 F. 3d at 1372. Courts have frequently "emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events."

> **b.** **Federal Agents' Use of Force Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity**

As detailed in the attached declarations and the Expert Declaration of Mr. Kerlikowske, DHS's unnecessary, excessive and indiscriminate force would deter Plaintiffs from engaging in speech and activities that are protected by the First Amendment —or would chill a person of ordinary firmness from exercising their

9 Case No. 2:25-cv-05563

rights. Being shot with less-lethal munitions like pepper balls, tear gas, and paint-marking munitions, being pepper sprayed at close range, or being shoved by a law enforcement officer would chill a person of ordinary firmness from continuing to exercise their First Amendment rights." *Index Newspapers*, 977 F3d. at 827 n.4. (discussing federal agents' inability to contest district court findings that use of less lethal munitions would chill a person of ordinary firmness from continuing their First Amendment activities). Moreover, as detailed in the Expert Declaration of Dr. Rohini Haar, M.D., the chemical irritants, kinetic projectile munitions, and flashbang grenades being used by DHS have been linked "to lasting physical symptoms, such as allergic reactions, respiratory damage, mental distress, anxiety and post-traumatic stress" (Haar Decl. ¶¶ 16-20) and misuse of those weapons can be fatal. (*Id*. ¶ 17.)

### c. Plaintiffs' Protected Activity Was a Substantial Motivating Factor in Federal Agents' Conduct

The last element of a retaliation claim is that a plaintiff's protected activity must be "a substantial motivating factor" in federal agents' conduct—that is, there must be some "nexus between [federal agents'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). In *Index Newspapers*, 977 F.3d at 827, the Court found that the numerous instances of unnecessary attacks gave rise to a strong interference of retaliation. This case is even more compelling because such facts similarly exist here, alongside direct proof of retaliation.

Here, there is repeated evidence of DHS misusing crowd control weapons. For example, DHS shot Mr. Alcorn with a tear gas cannister when "teargas canisters should never be fired at people. The canisters are made to break open on the ground to release teargas. Using them as projectile weapons is extremely dangerous, as shown from Mr. Alcorn's injuries, as they can cause serious injury or potentially

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

death. Officers who receive training on the use of teargas launchers are trained never to fire teargas as an impact munition." (Kerlikowske Decl. ¶ 17.) DHS similarly shot Sean Beckner-Carmitchel in the head with a tear gas cannister when he was away from protesters trying to record an encounter between DHS and protestors. (Beckner-Carmitchel Decl. ¶ 13.) It shot Mr. Climer with a tear gas cannister. (Climer Decl. ¶ 8.) It shot Chase Carbonati with a tear gas cannister. (Carbonati Decl. ¶ 2.) And it fired a teargas cannister that exploded above a crowd. (Ray Decl. ¶ 26.) Research has shown "that direct trauma from canisters and grenades is the number one cause of death from chemical irritants" (Haar Decl. ¶ 17.)

DHS shot Ms. Olmeda and shot her in the head with a rubber bullet. (Olmeda Decl. ¶¶ 17-20.) "Firing rubber bullets above waist-level is particularly dangerous, contrary to DHS policies on how such weapons should be used, and known to cause serious harm. For example, at the 2020 protests in Portland, a federal agent shot protester Donovan Labella in the head, fracturing his skill and leaving him permanently disabled." (Kerlikowske Decl. ¶ 40.) DHS has been firing volleys of rubber bullets at people far from any dangerous activity. (Alcorn Decl. ¶ 19.)

DHS repeatedly targeted Abigail Olmeda in extremely dangerous ways, when she was not engaged in any threatening activity and was 40-50 feet away from them. First, it shot her near the head with a pepper ball. (Olmeda Decl. ¶ 9.) "Pepper balls are not supposed to be shot at people; they are supposed to be shot near people to release the irritant inside." (Kerlikowske Decl. ¶ 27.) "The dangers of shooting pepper balls at people became widespread public knowledge in 2004, after Victoria Snelgrove was killed by a pepper ball fired by a Boston police officer after the Red Sox beat the Yankees in the American League Playoffs." (Id.) *Index Newspapers* found such misuses of pepper balls to be strong evidence of retaliation. 977 F.3d at 828 ("journalists' injuries were caused by the improper use of force, including shooting people who were not engaged in threatening acts, and the Federal

11                    Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

Defendants' misuse of crowd-control munitions" supports finding of retaliation). The evidence shows that DHS repeatedly shot pepper balls at protesters and reporters—both at Plaintiffs and other people at the protests. (E.g., Climer Decl. ¶ 7; Soqui Decl. ¶ 7 (shot in face with pepper ball); Mena Decl. ¶¶ 13-14, 29 (DHS fired "volleys of less-lethals"); Ray Decl. ¶ 29 (DHS firing "volleys of pepper balls" at people); (Xu Decl. ¶ 8 ("a staccato of pepper balls")).)

The Ninth Circuit has also found that attacking people who are not near anyone who poses a threat is strong evidence of retaliation. *Index Newspapers*, 977 F.3d at 829 ("Because the district court's findings include so many instances in which plaintiffs were standing nowhere near protesters while photographing and observing the Federal Defendants' actions, they provide exceptionally strong evidentiary support for the district court's finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights."). DHS has done that here, repeatedly. (*E.g.*, Alcorn Decl. ¶¶ 8, 13, 15-16, 20, 24; Ray Decl. ¶¶ 8, 22, 26, 27; Olmeda Decl. ¶ 9; Bell Decl. ¶¶ 16-17 and Ex 1; Horowicz Decl. ¶¶ 5, 10, 16; Mena Decl. ¶¶ 8, 22; Carbonati Decl. ¶ 2; Ochoa Decl. ¶ 2; Lopez Decl. ¶ 2.) Indeed, "CPB officers have had extensive marksmanship training, and if an officer is firing projectiles at people, they are likely to hit their targets." (Kerlikowske Decl. ¶ 17.)

There is also evidence of DHS indiscriminately firing into crowds and shooting people in the back, all in violation of its own rules. (*E.g.*, Kerlikowske Decl. ¶ 44; Alcorn Decl. ¶ 17, 24-26; Bell Decl. ¶ 17; Ray Decl. ¶ 29; Howell-Egan Decl. ¶¶ 9-10; Petrosian Decl. ¶ 15.)

DHS also has repeatedly not given warnings before its attacks, which also violate its own rules. (*E.g.*, Kerlikowske Decl. ¶¶ 37, 39, 43, 46.)

As the Ninth Circuit found in *Index Newspapers*, all these acts give rise to a strong inference of retaliation. But here, there is also direct evidence of retaliation.

12  Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

DHS shot Plaintiff Xu with a pepper ball when he was trying to record federal agents tackling a protester. (Xu Decl. ¶ 12.) DHS shot Ms. Olmeda again when she was holding up a sign that said: "Raids don't teach Justice – they teach fear. Education thrives on inclusion, not intimidation." (Olmeda Decl. ¶ 11.) This is similar to DHS shooting a protestor who was carrying an American flag, who was not engaged in any threatening conduct. (Alcorn Decl. ¶ 18) or DHS shooting at reporters or news trucks that did not pose any immediate threat to DHS. No reason other than retaliation could explain why DHS targeted these individuals.

Moreover, President Trump and Secretary Noem, who are ultimately in charge of operations, have repeatedly professed their hatred of reporter and protesters and have vowed to use "big force" against protesters.[5] In a Truth Social post from June 7, 2025, President Trump wrote, "If Governor Gavin Newscum, of California, and Mayor Karen Bass, of Los Angeles, can't do their jobs, which everyone knows they can't, then the Federal Government will step in and solve the problem, RIOTS & LOOTERS, the way it should be solved!!!"[6] On the same day, President Trump threatened, "These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED."[7] In a post from June 8, he threatened to take "all such actions necessary" to stop the protests, writing, "Now violent, insurrectionist mobs are swarming and attacking our Federal Agents to try and stop our deportation operations — But these lawless riots only strengthen our resolve. I am directing Secretary of Homeland Security Kristi Noem, Secretary of Defense Pete Hegseth, and Attorney General Pam Bondi, in coordination with all other relevant Departments and Agencies, to take all such action necessary to liberate Los Angeles

---

[5] New York Times https://www.nytimes.com/2025/06/10/us/politics/trump-military-parade-protests.html.

[6] https://truthsocial.com/@realDonaldTrump/posts/114644899133296098.

[7] https://truthsocial.com/@realDonaldTrump/posts/114646378582957392

13                                      Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

from the Migrant Invasion, and put an end to these Migrant riots."[8] On the same day, he added, "ARREST THE PEOPLE IN FACE MASKS, NOW!"[9] DHS Secretary Kristi Noem stated, "We're going to hit them back and hit them back harder than we have before...The more that they protest and commit acts of violence against law enforcement officers the harder ICE is going to come after them."[10] This constitutes further proof of retaliatory intent.

In sum, the sheer number of incidents documented in the declarations submitted with Plaintiffs' motion "provide[s] exceptionally strong evidentiary support for" determining "that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights." *Index Newspapers*, 977 F.3d at 829.

### C. Plaintiffs Are Likely to Succeed on the Merits of Their Excessive Force Claims

Plaintiffs are likely to win on their excessive force claims. DHS's use of force against reporters, legal observers, and protestors is unconstitutionally excessive in multiple ways.

*First*, DHS uses powerful and dangerous weapons against people who present no threat, and thus cannot justifiably be subjected to use of force at all. As Mr. Kerlikowske concludes from his extensive review of the evidence: "It does not appear that DHS has followed these protocols and has instead used teargas and less-lethal munitions, excessively, improperly and indiscriminately in ways that are highly dangerous to everyone present." (Kerlikowske Decl. ¶ 15.) Specifically, DHS fires projectile weapons—rubber bullets, pepperballs, tear gas canisters, and flash-bang grenades—to indiscriminately strike and incapacitate protesters, reporters, and legal observers. As shown above, this has happened so frequently and pervasively, it

---

[8] https://truthsocial.com/@realDonaldTrump/posts/114649780431129598

[9] https://truthsocial.com/@realDonaldTrump/posts/114651482271002772

[10] https://x.com/bulwarkonline/status/1932248255041064965?s=42.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

cannot be an accident. Even if the highly-trained marksmen at DHS were actually trying to shoot someone who posed a threat, its use of crowd control weapons would still be excessive. (*See* Kerlikowske Decl. ¶ 14 ("An individual who is the threat from hurling objects, or using fireworks as weapon, should be specifically identified. Any less-lethal projectile should be directed to them and not fired generally into the crowd. Even when the individual is identified it may not be possible to fire the less-lethal projectile because of that person's use of the general crowd as cover.").)

As courts widely recognize, the projectiles DHS launches cause serious harm and lasting trauma that can only be justified by grave threats against officers or public safety.[11] *See, e.g., Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (pepperballs); *LaRocca v. City of Los Angeles*, No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908, at *7 (C.D. Cal., Mar. 14, 2024) (rubber bullets); *Anti Police-Terror Project v. City of Oakland*, No. CV 20-03866-JCS, 2020 WL 4584185, at *13 (N.D. Cal., Aug. 10, 2020) (flashbang grenades); *Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154, at *11 (C.D. Cal. May 28, 2021) (collecting cases); *see also* Declaration of Dr. Rohini Haar ("Haar Decl.") ¶¶ 17, 44, 71 (firing tear gas canisters and grenades at individuals or dense crowds can cause severe injury and death); Kerlikowske Dec. ¶¶ 14, 19 (people have been killed by rubber bullets fired in the manner DHS shoots them). Similarly, DHS sprays pepper spray out of cannons directly at and onto the bodies of protestors and press (including at

---

[11] Indeed, the potential for supposedly non-lethal weapons to have tragic consequences when used inappropriately during protests is well known in Los Angeles, where journalist Ruben Salazer was killed when a Los Angeles sheriff's deputy fired a tear gas canister that struck him in the head while he was covering the National Chicano Moratorium Against the Vietnam War, fifty-five years ago. As one commentator has written, the use of purportedly "less-lethal" weapons in Los Angeles and Paramount today is a "haunting echo" of the killing of Mr. Salazar. John D'Anna, "Why the Death of Reporter Ruben Salazar 55 Years Ago Resonates With Journalists Covering LA Protests Today," *CalMatters*, June 11, 2025, https://calmatters.org/justice/2025/06/ruben-salazars-death-journalists-protests/.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

the same time that they are shooting at them with projectiles), another painful assault that courts recognize is so seriously intrusive that it must be justified by a serious government need. *Nelson*, 685 F.3d at 878 (citations omitted); *Bryan v. MacPherson,* 630 F.3d 805, 824 (9th Cir. 2010) (noting that a jury could conclude "pepper spray was more than a minimal intrusion as it caused intense pain, involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx).

Yet the evidence incontrovertibly establishes that DHS shoots such weapons directly at protestors, reporters, and legal observers who pose *no threat at all*, let alone a threat serious enough to justify the severity of injuries they can and do inflict. (Olmeda Decl. ¶ 2, 9, 12-14, 16, 17, 18 (protestor struck in the head); Sean Beckner-Carmitchel Decl. ¶ 9, 10, 13, 14, 15 (journalist hit just above eye with tear gas canister); Carbonati Decl. ¶ 2, 6, 7, 8, 9 (protester hit with tear canister in leg which caused serious burn); Mena Decl. ¶ 13, 14, 15, 18, 19, 26, 29, 30, 31, 32 (journalist hit in head and concussed); *see also* Supp. Sean Beckner-Carmitchel Decl. ¶ 8; Climer Decl. ¶ 2, 6, 7, 8; Xu Decl. ¶ 5, 12; Bell Decl. ¶ 18, 24, 26, 28, 36, 37; Cruz Decl. ¶ 13; Howell-Egan Decl. ¶ 8, 9, 10, 13, 20; Lopez Decl. ¶ 9, 10, 11; Alcorn Decl. ¶ 3, 23, 28; Ray Decl. ¶ 19, 20, 22, 27, 29; Paz Decl. ¶ 14, 15, 16, 21, 22; Reyna Decl. ¶ 2, 5, 14; Soqui Decl. ¶ 7, 12; Petrosian Decl. ¶ 9, 15, 16, 17.) The evidence also demonstrates that DHS deploys these weapons against people without giving them any instruction to move, disperse, or submit to arrest. *Id.* Given that is unconstitutionally excessive to use such dangerous weapons in response to "minor property crimes" or "passive resistance" to officers' instructions, *see Nelson*, 685 F.3d at 880-81, it is evident that DHS's consistent use of force against people engaged in no crime or resistance is unconstitutional and must be enjoined. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1215 (W.D. Wash. 2020) (enjoining police officers from firing projectiles

16            Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

and chemical irritants of any kind against persons peacefully engaging in protests or demonstrations).

*Second,* DHS deploys weapons capable of causing death and serious injury without warning, even when there is plenty of time to provide a warning in advance of the attack. (Mena Decl. ¶¶ 18, 19, 23, 29, 30, 31, 32, 35, 37 (hit with rubber bullet and pepper ball on two different occasions, both without warning); Olmeda Decl. ¶¶ 18, 20, 21, 22 (shot in temple with rubber bullet without warning); Climer Decl. ¶¶ 6, 8, 10, 16.) This, too, makes DHS's use of force against protestors, journalists, and legal observers unconstitutionally excessive. *See Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) ("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."); *see also Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154, at *11 (C.D. Cal. May 28, 2021) (finding no "significant government interest in applying force against peaceful protesters, legal observers, and journalists where no warning was given before the use of less-lethal weapons"). (*See also* Kerlikowske Decl. ¶ 14.)[12]

*Third,* DHS's large-scale deployment of chemical agents against protests through sweeping, indiscriminate, and militarized assaults shocks the conscience. The Ninth Circuit has held that the use of airborne chemical irritants (such as tear gas and pepper spray) and auditory or visual irritants (such as the sound and flash produced by flash-bang grenades) "shocks the conscience" so as to violate the

---

[12] Recognizing the dangers of kinetic energy projectiles and chemical agents when used to disperse public assemblies, protests, or demonstrations, the California Legislature passed legislation requiring law enforcement agencies to give a warning before using such weapons, in addition to limiting their use to circumstances where they are necessary to defend against a serious threat to life or serious bodily injury, or to bring an objectively dangerous and unlawful situation safely under control. Assem. Bill 48, 2021-2022 Reg. Sess. (Cal. 2022) (enacted September 30, 2021).

17                                        Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER

substantive due process rights of the people affected, when it is deployed with "deliberate indifference" to the harm caused, or with "the purpose to harm." *Puente v. City of Phoenix*, 123 F.4th 1035, 1050 (9th Cir. 2024). DHS deploys such chemical, auditory, and visual irritants by firing volley after volley of tear gas, pepper spray, and flash bang grenades at protests, making the air unbreathable for blocks and on at least one occasion –setting the neighborhood on fire. (Reyna Decl. ¶ 6-14; Petrosian Decl. ¶¶ 9, 10, 15, 16, 17, 18, 21; Sean Beckner-Carmitchel Decl. ¶ 9, 17; Bell Decl. ¶¶ 21, 22, 24, 25, 26, 27.) DHS launches these chemical, auditory, and visual attacks without warning, when facing no threat, and with no attempt to spare reporters, legal observers, families with children and elders, reporters, or even elected officials. (*Id.*; *see also* Compl. ¶¶ 39-40 (release of chemical agents against gathered legal advocates, protestors, and elected officials); Haar Decl. ¶ 20 ("The use of flash-bang or stun grenades for crowd control is an example of the inappropriate, inadequately regulated use of military weapons for crowd management. While the stated objective of stun grenades is to cause disorientation and a temporary sense of panic, the potential for severe blast injuries and even death caused by the pressure of the blast or by shrapnel from the fragmentation of plastic and metal constituents of the grenade is disproportionately high. The blinding light and deafening sound they produce can also cause injuries indiscriminately"); ¶ 16 ("the long-term health and environmental threats posed by repeated tear gas exposure are not fully known. Studies have linked tear gas to lasting physical symptoms, such as allergic reactions, respiratory damage, mental distress, anxiety and post-traumatic stress").)

DHS carries out these scorched-earth tactics under the orders of a Secretary openly bent on collectively punishing protesters and causing violent harm to Los Angeles and its residents, who has stated of the city: "Well, they're not a city of immigrants, they're a city of criminals . . . The more that they protest. . . the harder

18                                                    Case No. 2:25-cv-05563

ICE is going to come after them."[13] Under either metric outlined in *Puente,* DHS's punitive, militarized chemical assaults against Los Angeles communities exercising their right to protest "shocks the conscience" and violates the Constitution.

For all of the reasons above, Plaintiffs have proven a likelihood of success on their Fourth Amendment and Fifth Claims.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); "In the Ninth Circuit, 'a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.'" *Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F. Supp. 2d 1165, 1172 (C.D. Cal. 2006) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir.2005) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973-74 (9th Cir. 2002)). Because constitutional violations can often not be adequately remedied through damages, the Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their constitutionally protected rights to protest, gather news, record Government activity in public, and avoid being subjected to excessive force have been infringed, they have satisfied the irreparable-injury requirement. *See id*. As long as the Government is free to shoot and arrest nonviolent journalists and protesters, Plaintiffs' exercise of their First Amendment rights will "surely [be] chilled." *Black Lives Matter*, 2020 WL 3128299, at *3.

---

[13] https://www.youtube.com/watch?v=ymYIXrH9pjg

What is more, in the newsgathering context. the Ninth Circuit has recognized that time is of the essence and that any delay or postponement "undermines the benefit of public scrutiny and may have the same result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020).

## III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Since this case involves government actors, the balance of equities factor merges with the fourth factor, public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). This balance tilts sharply in Plaintiffs' favor because the balance of equities and public interest always favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d at 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); accord, *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). *Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019).

Plaintiffs have shown irreparable and concrete harm because the federal agents' actions block their ability to exercise their First Amendments rights, and violate their Fourth and Fifth Amendment rights. "It is always in the public interest to prevent the violation of a party's constitutional rights. When weighing public interests, courts have consistently recognized the significant public interest in upholding First Amendment principles." *Index Newspapers*, 977 F.3d at 838 (internal citations and quotations omitted). freedom from excessive force. By contrast, the relief Plaintiffs seek does little, if any, harm to Defendants, which can and should pursue less restrictive and more narrowly tailored responses to any unlawful activity that might occur during protests. As explained by Mr. Kerlikowske, "Complying with the relief requested by Plaintiffs under these circumstances would not be unsafe or burdensome for law enforcement trained to deal with situations involving large,

20                                     Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

and sometimes unruly crowds." (Kerlikowske Decl. ¶ 52.) "Police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers or violating any of the other restrictions in the TRO." (*Id.* ¶ 52.) The balance of equities therefore weighs heavily in favor of Plaintiffs.

The public interest also favors Plaintiffs. There is a strong public interest in protecting the rights of journalists, legal observers and protesters. "The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

These rights are further protected by the free press. The "Constitution specifically selected the press … to play an important role in the discussion of public affairs" to serve as a "powerful antidote to any abuses of power" by "keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (citation omitted). "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017). As the Court explained in *Index Newspapers*, "excluding the media from public fora can have particularly deleterious effects on the public interest." 977 F.3d at 830.

Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

In contrast, there is no harm, and certainly no public interest, in allowing federal agents to engage in unrestrained violence against the press, legal observers and protesters.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Motion for a temporary injunction and preliminary injunction be granted.

Dated: June 19, 2025

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:  ___/s/ *Matthew Borden*___
Matthew Borden

*Attorneys for Plaintiffs*

Case No. 2:25-cv-05563

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER