# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ELINOR HILTON and COLLEEN FAGAN, on behalf of themselves and all others similarly situated, <br><br>      Plaintiffs, <br><br>     v. <br><br> KRISTI NOEM, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS, <br><br>     Defendants. | Case No. 2:26-cv-00092-JAW |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR IMMEDIATE RELIEF**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

BACKGROUND ......................................................................................... 3

I.       Procedural History ......................................................................... 3

II.      Factual Background ........................................................................ 4

    A.       Immigration Enforcement Operations in Maine in January 2026 ..................... 4

        1.       January 21 Encounter Involving Plaintiff Hilton.......................... 4

        2.       January 23 Encounter Involving Plaintiff Fagan ........................... 5

    B.       Agents Did Not Place Plaintiffs' Information into a Database or List Based on These Encounters ............................................................................. 5

    C.       The Alleged Agent Statements Do Not Reflect DHS Policy............................. 6

LEGAL STANDARD................................................................................. 6

ARGUMENT ............................................................................................ 7

I.       Plaintiffs Are Unlikely to Prevail on the Merits ..................................... 7

    A.       Plaintiffs' Database-Related Claims Fail Because They Were Not Entered into a Database Following the Encounters ........................................................... 8

    B.       Plaintiffs Lack Standing to Pursue Prospective Relief for their Database and Harassment-Related Claims.................................................................... 9

II.      Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief 15

III.     The Balance of Equities and Public Interest Weigh Against an Injunction.......... 17

IV.      Scope of Relief.................................................................................. 18

CONCLUSION............................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**

*Am. Postal Workers Union v. Frank*, 968 F.2d 1373 (1st Cir. 1992) ............................... 10

*Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011).............................................................. 8, 15

*Campbell v. Miller*, 373 F.3d 834 (7th Cir. 2004) ..................................................... 12, 18

*Chicago Headline Club v. Noem*, No. 25-3023, 2026 WL 622677 (Mar. 5, 2026)... 12, 14, 18

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................. 2, 9, 10, 14

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)......................................................... 13

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................................... 10, 12, 16

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) .................................................. 7

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012) .................................... 8

*Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 564 F. Supp. 2d 63 (D. Me. 2008) ............................................................................................ 7

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014) ................................................................... 13

*Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019)......................................................... 10, 14

*Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999)....................................... 16

*Hussen v. Noem*, Civ. No. 26-cv-324-ECT-ECW, Doc. 191, Findings of Fact and Conclusions of Law (Mar. 9, 2026) ......................................................................... 12, 14

*Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120 (D. Or. 2020)........... 15

*Laird v. Tatum*, 408 U.S. 1 (1972)................................................................................. 15

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).................................................................... 7

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ..................... 15

*Murthy v. Missouri*, 603 U.S. 43 (2024)......................................................................... 16

*Nieves-Márquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003).......................................... 7

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................... 7

*Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) ............................................................. 10

*NuVasive, Inc. v. Day*, 954 F.3d 439 (1st Cir. 2020) ........................................................... 7

*Reporters Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978) ........ 13

*Rizzo v. Goode*, 423 U.S. 362 (1976) ................................................................ 11, 13, 17

*Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) ............................................................ 13

*Sosna v. Iowa*, 419 U.S. 393 (1975) .................................................................................. 16

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .................................................................... 15

*Starr v. Dube*, 334 F. App'x 341 (1st Cir. 2009) ................................................................ 8

*Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026) ............................................................ 19

*Updike v. Multnomah County*, 870 F.3d 939 (9th Cir. 2017) ........................................... 12

**Rules**

Fed. R. Civ. P. 23(b)(2) ...................................................................................................... 3

Fed. R. Civ. P. 65(d)(1)(B)–(C) ....................................................................................... 19

**INTRODUCTION**

In January 2026, the Department of Homeland Security's (DHS) component agencies, U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI), conducted immigrant enforcement operations in Maine as part of a broader nationwide effort to locate individuals subject to removal under federal law.  As often occurs during law-enforcement activity conducted in public places, members of the public were present, and some chose to observe or record the agents' activities.  Plaintiffs Elinor Hilton and Colleen Fagan were among those observers during two such encounters in South Portland in January 2026.

Plaintiffs allege that federal agents collected their biometric data (*i.e.*, facial recognition scans) and entered their personal information into a government database and/or "watchlist" just because they recorded immigration enforcement operations, or at least that federal agents made statements threatening to do so, in retaliation for their First Amendment activity.  But the record at this stage shows that no such entry occurred. DHS has a policy prohibiting its personnel from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." *See* Ex. B, DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019).  While DHS, as do other law enforcement agencies, maintains databases relevant to law enforcement investigations, the officers involved in the encounters with Plaintiffs did not enter their information into a database or watchlist related to those encounters.  Defendants acknowledge that officers on the ground suggested otherwise, however, those statements were contrary to DHS policy.  Indeed, agents throughout Maine have recently been reminded of this First Amendment policy and requested to

1

adhere to the guidance within.  *See* Ex. A, ICE Email re: Information Regarding First Amendment Protected Activities (March 10, 2016).

Accordingly, Plaintiffs cannot demonstrate that they were subjected to any adverse action—let alone one sufficient to chill a person of ordinary firmness from engaging in protected speech.  Plaintiffs also cannot establish standing to obtain the prospective relief they request in this motion, *i.e.*, to enjoin "[t]hreatening Plaintiffs with placement in any database, watchlist, or similar system based on their First Amendment activity; or [o]therwise retaliating against Plaintiffs because of their constitutionally protected activity."  ECF No. 3, TRO Mot. at 20.  Their claims for forward-looking relief depend on speculation that they might encounter immigration officers who might again make similar statements in the future.  That chain of contingencies is precisely the type of speculative future injury the Supreme Court has repeatedly held is insufficient to support injunctive relief, including under the very similar circumstances of *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

For similar reasons, Plaintiffs cannot show irreparable harm.  Plaintiffs remain free to observe and record immigration enforcement operations in public spaces.  As Plaintiffs seek injunctive relief only for themselves in this motion, the knowledge that their information was not in fact put into a database or watchlist should dispel any alleged "chilling effect" from the remote possibility that officers may make similar statements to these plaintiffs in the future.

Emergency injunctive relief is an extraordinary and drastic remedy.  Plaintiffs have not carried the heavy burden required to obtain it.  Because Plaintiffs cannot demonstrate a likelihood of success on the merits, irreparable harm, or that the balance of

2

equities and the public interest favor intervention, their motion for a temporary restraining order should be denied.

## BACKGROUND

### I.      Procedural History

Plaintiffs filed this action on February 23, 2026, asserting constitutional claims against the DHS, several of its component agencies, and several federal officials in their official capacities.  ECF No. 1, Compl.  The complaint alleges that federal agents violated Plaintiffs' First Amendment rights during two encounters in January 2026 while Plaintiffs were observing and recording immigration enforcement operations in Maine. *See generally id.*  The complaint also seeks to certify a class under Rule 23(b)(2), although that request is not ripe at this time.  *See id.* ¶¶ 161–171.

The same day they filed the complaint, Plaintiffs moved for a temporary restraining order under Federal Rule of Civil Procedure 65.  ECF No. 3, TRO Mot.  In their motion, Plaintiffs seek immediate injunctive relief prohibiting Defendants from collecting or maintaining personal information about Plaintiffs based on their observation or recording of immigration enforcement activity and from placing Plaintiffs in any government "database" or "watchlist" associated with domestic terrorism.  *Id.* at 20. Plaintiffs also seek to enjoin Defendants from threatening to place them in any such database or watchlist, or otherwise retaliating against them, based on their First Amendment-protected activity.  *Id.*

Plaintiffs' motion relies on declarations submitted by the two named plaintiffs describing the January 2026 encounters and by a declaration of counsel describing public reporting concerning DHS enforcement operations in Maine.  ECF Nos. 3-1, 3-5, & 4.

Plaintiffs contend that the alleged actions of individual agents, including statements referencing a "database" or "watchlist," constitute retaliation for protected First Amendment activity and warrant immediate injunctive relief.

## II.    Factual Background

### A.    Immigration Enforcement Operations in Maine in January 2026

On or about January 20, 2026, to January 25, 2026, ICE conducted an immigration enforcement operation focused on Portland, Maine, and the surrounding area.  Wells Decl. ¶ 6.  The objective of the operation was targeted enforcement focusing on national security, public safety, and other high-priority targets.  *Id.*  Since January 25, 2026, the enforcement operations in Maine have diminished in scope.  Wells Decl. ¶ 6.

#### 1.    January 21 Encounter Involving Plaintiff Hilton

On January 21, 2026, Plaintiff Elinor Hilton drove to a Home Depot in South Portland where ICE agents were conducting enforcement operations and recorded the agents' activities on her phone.  Hilton alleges that while she was recording the enforcement operation, two agents held up their phones in her direction as if recording her.  Hilton Decl. ¶¶ 10, 13, 17, 19.  She further alleges that one agent asked another which vehicle Hilton had exited and that the other agent responded, "I got 'em."  *Id.* ¶ 10.

Hilton also alleges that one agent told her that if she continued observing enforcement operations, she would be placed on a "domestic terrorist watchlist," and that agents made similar remarks among themselves during the interaction.  *Id.* ¶¶ 21–23.

Plaintiff Hilton never alleges that she was ordered to stop filming, detained, cited, or otherwise subjected to enforcement action.  She remained free to continue observing the operation and ultimately left the scene without further incident.  *Id.* ¶ 32.

4

### 2.    January 23 Encounter Involving Plaintiff Fagan

On January 23, 2026, Plaintiff Colleen Fagan had a separate encounter with agents while observing and recording another enforcement operation in South Portland.

Fagan alleges that two federal officers also held up their phones while interacting with her.  Fagan Decl. ¶¶ 13, 15–16.  Fagan further alleges that one of the officers appeared to "scan" her license plate using his smartphone, referenced the existence of a government "database" and characterized her as a "domestic terrorist."  *Id.* ¶¶ 16–17.

Plaintiff Fagan never alleges that she was ordered to stop recording, detained, cited, or otherwise subjected to enforcement action.  She remained free to continue observing the operation and ultimately left the scene without further incident.  *Id.* ¶ 21.

### B.    Agents Did Not Place Plaintiffs' Information into a Database or List Based on These Encounters

Plaintiffs allege in the Complaint that federal agents collected information about them and added it to a database or watchlist.  Contrary to the allegations, and contrary to the officers' alleged statements, as stated in the attached declarations, ERO and HSI officials have searched their relevant databases and confirmed that Plaintiffs are not under investigation or monitoring by ERO or HSI related to the encounters at issue.  Wells Decl. ¶ 9; Barbero Decl. ¶ 10.  To be clear, certain operational systems exist within DHS for legitimate law-enforcement purposes, including systems used to document enforcement activities or record encounters relevant to immigration enforcement.  Wells Decl. ¶ 9; Barbero Decl. ¶ 8.  DHS agents will investigate people suspected of crimes, including by use of databases, even if those crimes also involve protest activities.  That is basic law enforcement activity.  But, as stated in the declarations submitted by supervisory agents in ERO and HSI, those systems were searched for the plaintiffs and

encounters at issue, and ERO and HSI officials confirmed that neither plaintiff is under investigation or monitoring for the January 21 or 23 encounters.  Wells Decl. ¶ 9; Barbero Decl. ¶ 10.

> ### C.    The Alleged Agent Statements Do Not Reflect DHS Policy

DHS has instructed its employees about the importance of respecting activities protected by the First Amendment.  *See* Ex. A; Ex. B.  DHS policy does not authorize agents to threaten members of the public for observing or recording law enforcement activity.  Ex. B.  DHS policy also does not allow agents to collect or maintain in DHS systems information about an individual's First Amendment activities, except as specifically authorized by law.  *Id.*  To the extent that agents involved in the January 2026 encounters made statements suggesting that Plaintiffs would be placed in a database or watchlist because they were lawfully engaging in First Amendment-protected activity, those statements were not approved or condoned by DHS and were inconsistent with DHS policy.  *Id.*; *see* Wells Decl. ¶ 8; Barbero Decl. ¶ 11.  Agents were told not to make such statements.  Wells Decl. ¶ 8; Barbero Decl. ¶ 11.  And, as already stated, those statements were inaccurate, as Plaintiffs were not placed on a watchlist or database following these encounters.  Wells Decl. ¶ 9; Barbero Decl. ¶ 9.  And ICE has recently issued Maine agents a reminder of—and a request to adhere to—DHS's First Amendment policy.  Ex. A.

## LEGAL STANDARD

Courts generally apply the same substantive standard in assessing motions for a temporary restraining order and motions for a preliminary injunction when the opposing party has notice and an opportunity to be heard.  *See Fairchild Semiconductor Corp. v.*

*Third Dimension (3D) Semiconductor, Inc.*, 564 F. Supp. 2d 63, 66 (D. Me. 2008). Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). The movant must show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). While all four factors are relevant, likelihood of success is the "main bearing wall" of the preliminary injunction framework. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (citation omitted). And the third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Plaintiffs cannot satisfy the demanding standard for emergency injunctive relief, and their motion for a temporary restraining order should be denied. Plaintiffs' claims rest on the premise that DHS (1) placed them in a database or watchlist because they recorded immigration enforcement operations; and/or (2) will threaten or retaliate against them in the future. The current record supports neither proposition.

## I.    Plaintiffs Are Unlikely to Prevail on the Merits

Plaintiffs bring First Amendment retaliation and discrimination claims based on two theories: that Defendants entered their information into a database or watchlist (Counts I and II), and that individual officers allegedly threatened them with such placement (Counts III and IV). Plaintiffs are not likely to succeed under either theory, as

7

the record does not demonstrate that they were actually placed into a database or watchlist based on the First Amendment activities, they identified in the Complaint, and they fail to establish a real and immediate likelihood that they will encounter agents who will make similar statements in the future, or that such statements—now known to be empty threats—would create an objectively reasonable chilling effect if Plaintiffs were to hear them again.

> **A.    Plaintiffs' Database-Related Claims Fail Because They Were Not Entered into a Database Following the Encounters**

Plaintiffs' primary theory—that DHS collected their personal information and added it to a database or watchlist because they recorded enforcement activity on two specific occasions—fails at the threshold because they have not demonstrated that the alleged conduct occurred.

To establish a claim of First Amendment retaliation, a plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). To meet the second prong, an adverse action is one that is sufficient to chill a "reasonably hardy" person, or "a person of ordinary firmness," from continuing to exercise their constitutional rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011); *Starr v. Dube*, 334 F. App'x 341, 342 (1st Cir. 2009).

Plaintiffs cannot satisfy that requirement. Although they allege that federal agents entered their information into a database or watchlist, ERO and HSI officials have searched their internal systems and confirmed that Plaintiffs are not under investigation or monitoring in their systems based upon the encounters at issue. Wells Decl. ¶ 9 ("I

8

requested a search of ERO systems and confirmed that the named Plaintiff Colleen Fagan

is not under investigation or monitoring by ERO related to the January 23, 2026

encounter."); Barbero Decl. ¶ 10 ("I requested the Team Leader of the Special Agents to

search law enforcement systems (used in the regular and customary source) and he

confirmed that the named Plaintiff Elinor Hilton is not under Homeland Security

Investigations investigation or monitoring related to the January 21, 2026 encounter.").

For that reason alone, Plaintiffs' database-based retaliation and discrimination claims

(Counts I and II) cannot succeed.

### B.    Plaintiffs Lack Standing to Pursue Prospective Relief for their Database and Harassment-Related Claims

Plaintiffs' alternative theory of First Amendment retaliation and discrimination

also fails at the threshold, as Plaintiffs lack standing to pursue prospective relief against

Defendants based on past alleged statements. *See Lyons*, 461 U.S. at 111.  Plaintiffs

argue that if DHS did not in fact place them into a database or watchlist, then

immigration officers "are deliberately lying about doing so to intimidate lawful observers

for exercising their First Amendment activity," TRO Mot. at 10, and should therefore be

enjoined from making such statements to Plaintiffs in the future, *id.* at 20.  Plaintiffs also

presume that they will be entered into a database in the future.  Plaintiffs' requested

injunction should be denied, as they fail to establish a real and immediate possibility that

officers will make such statements to them in the future in light of the reminder provided

by ICE officials, *see* Ex. A, and Plaintiffs fail to show how such statements—now known

to be empty threats—would create an injury in fact.  That is doubly so with respect to

their speculation that they will be added to a database in the future solely because of their

First Amendment activities.

9

"Past injury, in and of itself, 'is an insufficient predicate for equitable relief.'"

*Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (quoting *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992)). Standing for prospective relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence. What matters is the '*reality* of the threat of repeated injury,' not 'subjective apprehensions.'" *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in grant of application for stay) (emphasis in original) (quoting *Lyons*, 461 U.S. at 107). Therefore, to have standing to pursue injunctive relief against future unlawful conduct, a plaintiff must "establish a real and immediate threat" resulting in "a sufficient likelihood that [s]he will again be wronged in a similar way." *Am. Postal Workers Union*, 968 F.2d at 1376 (quoting *Lyons*, 461 U.S. at 109, 111). The threatened harm "must be certainly impending"—and not merely rely on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).

The Supreme Court has consistently held that individual plaintiffs lack standing to seek forward-looking and programmatic relief based on isolated incidents of alleged unlawful behavior by law enforcement. In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part," even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.*

10

Similarly, in *Rizzo v. Goode*, 423 U.S. 362 (1976), the Supreme Court held that Article III standing concerns precluded the entry of a broad injunctive order in a class action lawsuit against the city of Philadelphia to reform the conduct of the city police. The plaintiffs alleged widescale illegal and unconstitutional behavior by the police "against all Philadelphia residents in general." *Id.* at 367. The district court issued a sweeping injunction imposing "a comprehensive program for dealing adequately with civilian complaints" about police misconduct. *Id.* at 369. The Supreme Court reversed, holding that the district court's order was "an unwarranted intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions." *Id.* at 366. The Supreme Court criticized the district court for transforming isolated disputes between "individual citizens and certain policemen" into an "attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the petitioning elected and appointed officials" about the way to address police misconduct. *Id.* at 371. The Supreme Court found the lawsuit presented Article III standing concerns because the plaintiffs' asserted basis for injunctive relief was speculation about what a "small, unnamed minority of policemen might do to them in the future." *Id.* at 605.

These precedents foreclose Plaintiffs' standing for prospective relief on their harassment-based First Amendment claims (Counts III and IV), and their database-related claims (Counts I and II) to the extent they are based on the possibility that the Plaintiffs will be entered into a database in the future. Plaintiffs' harassment-based claims arise from two incidents involving alleged statements made by certain agents in January 2026. Allegations about past encounters with a few officers do not establish a

sufficient likelihood that these Plaintiffs will experience the same interactions again. Indeed, Defendants have confirmed that these statements were contrary to policy and issued a reminder of that policy to Maine agents. *See* Ex. A. Moreover, the immigration enforcement operations in Maine have diminished in scope since January 25, 2026, thus lessening further any likelihood of a repeat encounter. Wells Decl. ¶ 6; *see Chicago Headline Club v. Noem*, No. 25-3023, 2026 WL 622677, at *2 (Mar. 5, 2026) (noting that evidence of reduced immigration enforcement activity "could affect both the justiciability of this case and the propriety of injunctive relief"); *Hussen v. Noem*, Civ. No. 26-cv-324-ECT-ECW, Doc. 191, Findings of Fact and Conclusions of Law, at p. 3 (Mar. 9, 2026) (finding that "Plaintiffs have not shown that irreparable injury is likely to befall them in the immediate future . . . largely owing to a significant reduction in the scope of Defendants' Minnesota-based operations.").

The likelihood that Plaintiffs will again encounter immigration enforcement operations in Maine and encounter officers who will again make similar statements (much less actually add them into a database) when Plaintiffs are merely observing and recording such operations without interference, relies on a speculative chain of contingencies, which courts have routinely rejected as a basis to obtain prospective relief. *See, e.g.*, *Clapper*, 568 U.S. at 410; *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) ("Unless the same events are likely to happen again *to him* there is no controversy between [plaintiff] and the City about the City's future handling of other arrests."); *Updike v. Multnomah County*, 870 F.3d 939, 948 (9th Cir. 2017) (rejecting the plaintiff's argument that, because officers had denied him interpretive services during five prior arrests, he was at risk of being denied interpretive services in the future), cert. denied sub

12

nom. *Multnomah County v. Updike*, 586 U.S. 814 (2018).  Indeed, the mere possibility of future misconduct cannot support such sweeping "judicial supervision of [law enforcement] activity."  *Reporters Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1068, 1069–70 (D.C. Cir. 1978) (citing *Rizzo*, 423 U.S. at 373–75).

That is true in the context of First Amendment claims as it is in any other context. *See Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (applying *Lyons* to First Amendment challenge).  Indeed, the highly fact-specific nature of claims arising in this First Amendment context should make it more difficult to presume the likelihood of recurrence.  As Plaintiffs recognize, TRO Mot. at 7, an observer's right to record an officer may be limited under the First Amendment "if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties."  *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014).  Although Defendants do not dispute on the current record that Plaintiffs' alleged conduct in these instances did not interfere with officers' duties, such a fact-specific inquiry would need to be made in every other instance that Plaintiffs claim to have taken place in support of their contention that DHS has a general policy or practice permitting First Amendment infringement.

Plaintiffs have not shown that DHS has such a policy or practice of "officially sanctioned" retaliation.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  To the contrary, DHS expressly prohibits law enforcement personnel from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights."  Ex. B.  Plaintiffs rely on unverified news reports of other incidents, in which they were not present, that include allegations regarding the statements and conduct of federal immigration officers.  *See* TRO Mot. at 19.  But DHS officers have

been faced with many protests while conducting operations in the area, and the record does not reflect an unwritten DHS policy condoning harassment of protestors. *See* Ex. A; Ex. B; Wells Decl. ¶¶ 8–9; Barbero Decl. ¶ 11. Without, at a minimum, specific and sworn statements from other individuals about other alleged incidents, all of which will involve highly fact-specific inquiries to assess, this Court should not credit generalized allegations reported in the media over DHS's sworn statements regarding its own policies. As noted, the officers involved in these encounters were instructed not to make such statements. Wells Decl. ¶ 8; Barbero Decl. ¶ 11. And ICE has issued a reminder of the First Amendment policy to all agents and officers in Maine. Ex. A.

Regardless, *Lyons* makes clear that it is not enough to establish standing for prospective relief to show that allegedly improper conduct occurs "routinely," 461 U.S. at 105, or even pursuant to a government "policy," *id.* at 106. Because Plaintiffs have failed to show "a sufficient likelihood that [*they*] will again be wronged in a similar way," this Court cannot award the prospective relief they seek. *Gray*, 917 F.3d at 19 (citation omitted); *see Lyons*, 461 U.S. at 105-06, 108; *Chicago Headline Club*, 2026 WL 622677, at *5; *see also Hussen*, Civ. No. 26-cv-324-ECT-ECW, Doc. 191, Findings of Fact and Conclusions of Law, at pp. 95–99, 104 (denying preliminary injunctive relief based on the speculative nature of the plaintiffs' alleged future injuries).

Finally, even if Plaintiffs could establish a sufficient and immediate likelihood that they will personally experience a reoccurrence of the January 2026 encounters, there is not a reasonable likelihood that a reoccurrence of those encounters would create an injury in fact. Under the First Amendment retaliation standard, an adverse action must be one that would deter a "reasonably hardy" person, or "a person of ordinary firmness,"

14

from continuing to exercise their constitutional rights. *Barton*, 632 F.3d at 29.

"'Ordinary firmness' is an objective standard." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1142 (D. Or. 2020) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

Plaintiffs argue that the officers' prior statements have created a chilling effect on their speech because they fear collateral consequences arising from their placement on a DHS database or watchlist, such as future harassment by federal agents, interference with their right to travel, or potential criminal investigation. *See* TRO Mot. at 18–19. But, as DHS has determined that Plaintiffs' information was not added to a database or watchlist based on the instances they identified, and that the officers' statements were contrary to policy, it would not be reasonable for Plaintiffs to claim an ongoing chilling effect or a future chilling effect if an officer were to repeat those remarks to Plaintiffs contrary to policy again. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").[1]

## II.    Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief

Plaintiffs will face no harm in the absence of preliminary relief, let alone irreparable harm. Plaintiffs argue that "Defendants' collection of Plaintiffs' data and

---

[1] Plaintiffs' class claims do not save them. As an initial matter, Plaintiffs do not seek class wide relief in the TRO. But Plaintiffs cannot rely on the prospect that federal officers might make similar statements to other protestors in Maine to establish standing for prospective relief in this TRO, where "the district court has not certified" their proposed classes and "may never do so." *Campbell*, 373 F.3d at 836 (citing *Lyons*, 461 U.S. at 95). The fact that Plaintiffs are attempting to bring a class action suit "adds nothing to the question of standing" here, "for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (cleaned up and citations omitted). That

entry into a database or watchlist chills their protected activity and subjects them to significant collateral risks," TRO Mot. at 6, and that "[a]bsent injunctive relief, Plaintiffs must either abandon their constitutional right to observe and record federal agents in public spaces, or accept being cataloged and labeled as 'domestic terrorists,'" *id.* at 15. But Plaintiffs do not face that choice, as Plaintiffs are not under investigation or monitoring by ERO or HSI following these encounters as alleged. Wells Decl. ¶ 9; Barbero Decl. ¶ 10. Nor have they been entered into a database based on such encounters. Wells Decl. ¶ 9; Barbero Decl. ¶ 9. And, indeed, DHS's policy is to the contrary. Ex. B.

Plaintiffs are not at risk of irreparable harm where they are free to continue engaging in First Amendment activity, and where the knowledge that officers made empty threats makes objectively unreasonable any risk of a "chilling effect" in the remote chance these Plaintiffs were to have a similar encounter with officers in the future. Even in the First Amendment context, "plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *Clapper*, 568 U.S. at 416). And as explained, Plaintiffs fail to establish "specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13–14.

---

some unnamed class members might hypothetically be able to demonstrate that *they* have standing is thus irrelevant to whether *Plaintiffs themselves* do. *Id.* And class action or not, Plaintiffs' lack of standing necessarily precludes this Court from adjudicating their harassment-based claims. *See Sosna v. Iowa*, 419 U.S. 393, 402–03 (1975) (ruling that the named plaintiffs must satisfy Article III standards at the time a class is certified); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.").

III.    **The Balance of Equities and Public Interest Weigh Against an Injunction**

The balance of equities and public interest weigh against the extraordinary relief Plaintiffs seek.  The equities and public interest do not weigh in Plaintiffs' favor when the record establishes that Plaintiffs are not under investigation or monitoring because of these encounters.  Wells Decl. ¶ 9; Barbero Decl. ¶ 10.  DHS maintains—and recently reminded ICE officers of—its policy prohibiting law enforcement personnel from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights."  Ex. B; Ex. A.  The officers' alleged threats to place Plaintiffs on a database or watchlist of observers were not only contrary to policy but empty threats, which the specific officers have been instructed not to make.  Wells Decl. ¶ 8; Barbero Decl. ¶ 11.  Plaintiffs offer only speculation that they will have a future encounter with DHS law enforcement officials that will result in an alleged violation of their First Amendment rights.

Plaintiffs remain free to continue observing and recording immigration enforcement operations in public spaces, and denying Plaintiffs' motion does not threaten their First Amendment interests while the Court resolves the merits of their claims.  By contrast, the injunction Plaintiffs seek would harm the government and the public interest by imposing unnecessary burdens on federal immigration enforcement operations.  As the Supreme Court has held, "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees."  *Rizzo*, 423 U.S. at 378.  The government and the public have an interest in ensuring that federal courts do not issue sweeping and vague injunctions based on speculative future harms.

17

## IV.    Scope of Relief

Even if this Court were inclined to grant Plaintiffs any relief, the scope of Plaintiffs' proposed injunction is improper, as they seek orders that are vague and overbroad.  Plaintiffs seeks an injunction against all named Defendants in this case, including components of DHS that had nothing to do with the two individual encounters with Plaintiffs in January 2026.  A request for sweeping injunctive relief against an expansive range of defendants, including the entire Department of Homeland Security, is impermissibly overbroad.  *See, e.g.*, *Chicago Headline Club*, 2026 WL 622677, at *5.

Moreover, an injunction against "[c]ollecting data . . . about Plaintiffs," TRO Mot. at 20, is vague, overbroad, and counterproductive to the extent that ensuring and monitoring compliance with such an injunction would require DHS and its component agencies to provide Plaintiffs' identifying information to all DHS officers in the District of Maine, if not beyond.  Otherwise, Plaintiffs are seeking what is effectively a class-wide injunction, which is improper at this stage when no class has been certified.  *See Campbell*, 373 F.3d at 836 (citing *Lyons*, 461 U.S. at 95).  Moreover, as the information recorded in a video is, at bottom, "data", Plaintiffs appear to seek an unprecedented prohibition against law enforcement officers' collection of video footage while engaged in operations that include interactions with any protestors.  Officers are lawfully permitted to gather information about potentially unlawful conduct, and an injunction preventing them from taking photos or video recordings of protestors, including those who officers reasonably believe may be engaged in unlawful conduct, would be overbroad and unwarranted.

Finally, Plaintiffs request an injunction against "[o]therwise retaliating against Plaintiffs because of their constitutionally protected activity."  TRO Mot. at 20.  That

request is vague and overbroad.  Plaintiffs must allege an imminent threat of a concrete and particularized future injury to establish standing, and any injunction must state its terms specifically and be narrowly tailored to the precise injury that Plaintiffs claim that they are at risk of experiencing.  *See, e.g.*, Fed. R. Civ. P. 65(d)(1)(B)–(C) (requiring every order granting an injunction and every restraining order to "state its terms specifically" and to "describe in reasonable detail . . . the act or acts restrained").  An injunction broadly prohibiting Defendants from "retaliating against Plaintiffs because of their constitutionally protected activity" fails to meet those standards.  *See Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (staying an injunction that directed the government defendants not to "retaliate" against peaceful protestors as insufficiently specific).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a temporary restraining order and immediate relief.

Dated: March 10, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General

                                         JOSEPH E. BORSON
                                         Assistant Branch Director

                                         /s/ *Natalie M. Villalon*
                                         NATALIE M. VILLALON
                                         DC Bar No. 90015127
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Tel: (202) 860-9963
                                         Email: Natalie.M.Villalon@usdoj.gov

*Counsel for Defendants*