UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ELINOR HILTON, et al.,                )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )        No. 2:26-cv-00092-JAW
                                      )
KRISTI NOEM,                          )
in her official capacity              )
as Secretary of the United States     )
Department of Homeland Security,      )
et al.,                               )
                                      )
                Defendants.           )

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

In a putative class action alleging the government violated Mainers' First Amendment right to observe and record immigration enforcement operations in public, the named plaintiffs seek an emergency order from this court, requiring the government, its officers, and agents not to collect, maintain, or disseminate the named plaintiffs' biometric and personal data or otherwise threaten to or retaliate against them in response to exercising their First Amendment rights. Given the current evidence in the record, the court cannot conclude that a temporary restraining order should issue at this time. Furthermore, the scope of relief the named plaintiffs seek at this stage is too broad and too vague and likely unenforceable under the law. The court concludes that this lawsuit raises serious constitutional issues that are better aired and resolved on a nonemergency basis.

## I.    BACKGROUND[1]

### A.    Procedural History

On February 23, 2026, Plaintiffs filed a class action complaint against the U.S. Department of Homeland Security (DHS) and several of its component agencies, officials, and agents, alleging that several unnamed Immigration and Customs Enforcement (ICE) agents (collectively, Defendants) violated their First Amendment rights while Plaintiffs and other class members were observing and recording immigration enforcement operations in Maine, in part by threatening to place them on an alleged "terrorist watchlist." *Class Action Compl. for Decl. and Inj. Relief* (ECF No. 1) (*Compl.*).   That same day, the named Plaintiffs in this action moved for a temporary restraining order (TRO) seeking immediate injunctive relief prohibiting Defendants from (1) collecting, maintaining, or disseminating their biometric and other personal data based on their observation and recording of immigration enforcement activity; (2) placing the named Plaintiffs in any alleged government database or "terrorist watchlist"; and (3) threatening or placing them in any such database or watchlist, or otherwise retaliating against them based on their First Amendment-protected activity. *Mot. for TRO* (ECF No. 3).

On February 27, 2026, the Court held a telephone conference and set an expedited briefing schedule on Plaintiffs' motion for a TRO. *Min. Entry* (ECF No. 17). On March 10, 2026, Defendants filed their response in opposition to the TRO. *Defs.'*

---

[1]    In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored." *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

*Opp'n to Pls.' Mot. for TRO and Req. for Immediate Relief* (ECF No. 18) (*Defs.' Opp'n*).

On March 12, 2026, Plaintiffs filed their reply in support of their motion for a TRO.

*Pls.' Reply Memo. of Law in Supp. of Pls.' Mot. for TRO* (ECF No. 20) (*Pls.' Reply*).

The Court heard oral argument on March 16, 2026.  *Min. Entry* (ECF No. 22).

### B.     Factual Background

For the purposes of the requested TRO, the Court reviews the relevant facts as pleaded in the verified complaint and the declarations submitted by the parties, which the Court takes as true at this stage of the proceeding.

### 1.     The Parties

The named Plaintiffs are Elinor Hilton and Colleen Fagan, residents of Portland, Maine.  *Compl.* ¶¶ 8-9.  Both Plaintiffs allege Defendants, during separate encounters in late January 2026, collected their biometric data and license plate information and made threatening and intimidating remarks to Plaintiffs for observing and recording ongoing immigration enforcement activity in public.  *Id.*

The complaint names as defendants DHS and several of its component agencies, including U.S. Homeland Security Investigations (HSI), U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP), and ICE; several DHS officials, including Kristi Noem in her official capacity as the Secretary of Homeland Security, Todd Lyons in his official capacity as the senior official currently performing the duties of the Director of ICE, John A. Condon in his official capacity as the Acting Executive Associate Director for ICE's HSI directorate, Rodney Scott in his official capacity as the Commissioner of CBP, Michael Banks in his official capacity as the

3

Chief of the USBP, as well as several unidentified federal agencies, departments, or components of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their federal employment and duties, are participating in the allegedly unlawful conduct described in the complaint; and finally, several unidentified federal immigration enforcement agents and officers, acting under color of federal law and within the scope of their federal employment and duties, who are participating in the allegedly unlawful conduct described in the complaint. *Id.* ¶¶ 10-21.

### 2. January 2026 Immigration Enforcement Operations in Portland, Maine

In late January 2026, Defendants conducted immigration enforcement operations focused on Portland, Maine, unceremoniously referred to as Operation "Catch of the Day," in which DHS publicly announced a "target list" of 1,400 individuals to arrest. *Id.* ¶ 25. Defendants arrested more than two-hundred people within the first week of the operation, and immigration enforcement activity has continued into February and March, though Defendants maintain these operations have diminished since January 25, 2026. *Id.*; *Defs.' Opp'n* at 4 & Attach. 2, *Decl. of Assistant Field Off. Dir. Stephen W. Wells* ¶ 6 (*Wells Decl.*).

### a. Plaintiff Colleen Fagan's January 23, 2026, Encounters with Federal Immigration Enforcement Agents

On two separate occasions on the morning of January 23, 2026, Plaintiff Colleen Fagan exercised her First Amendment right to observe and record law enforcement activity in public. *Id.* ¶¶ 31-37. The first of the two encounters on the

morning of January 23, 2026, occurred while Ms. Fagan was driving on Westbrook Street in South Portland during which Ms. Fagan pulled over to the opposite side of the road to observe, and from her own car, began to record on her phone as federal agents questioned and ultimately arrested a woman. *Id.* ¶¶ 35-36. Ms. Fagan reports that she observed the arrest without issue. *Id.* ¶ 35. Ms. Fagan remained in her own car during the arrest and federal agents did not indicate to her that she was obstructing or impeding their arrest. *Id.*

The second encounter began later that same morning in the parking lot of a different apartment complex on Westbrook Street. *Id.* ¶ 37. While driving through the neighborhood, Ms. Fagan noticed at least two large, black vehicles she thought contained federal agents stopped inside the complex and blocking some of its parking spots. *Id.* ¶ 38. Ms. Fagan parked her car several car lengths away from federal agents and began to record. *Id.* ¶¶ 39. Immediately after she began recording, two federal agents, with their smartphones out as if to record video or take photos, approached Ms. Fagan, as well as a second individual who was also observing. *Id.* ¶ 40. One agent (Agent 1) came up close to Ms. Fagan and appeared to film her face before walking back to his vehicle. *Id.* ¶ 41-42. A second agent (Agent 2) walked behind Ms. Fagan to her vehicle and appeared to document her license plate number using his smartphone. *Id.* ¶ 43.

Ms. Fagan perceived the Agents to be recording, scanning, or otherwise capturing her biometrics and license plate information. *Id.* ¶ 42-43. Upon Ms. Fagan's asserting her right to record law enforcement in public, Agent 2 replied

5

"Exactly, that's what we're doing." *Id.* ¶ 44. When Ms. Fagan asked Agent 2, "Why are you taking my information down?", Agent 2 responded, "Cause we have a nice little database. And now you're considered a domestic terrorist, so have fun with that." *Id.* ¶ 45. Like her earlier encounter that morning, the Agents did not tell Ms. Fagan that she was acting unlawfully or that she was obstructing or impeding law enforcement activity. *Id.* ¶ 47.

> **b.    Plaintiff Elinor Hilton's January 21, 2026 Encounter with Federal Immigration Enforcement Agents**

On the morning of January 21, 2026, Plaintiff Elinor Hilton observed and recorded federal agents making an arrest in the South Portland Home Depot parking lot. *Compl.* ¶ 54. Ms. Hilton parked in a public parking spot several rows away from the agents before exiting her vehicle to observe and record the arrest. *Id.* ¶ 55. Ms. Hilton observed two groups of federal agents, a pair of agents (Agents 3 and 4) using their vehicle to block off an area of the parking lot near the store's garden center and a second group of at least four agents farther back in the corner of the parking lot who appeared to be attempting to detain or arrest one or more individuals. *Id.* ¶ 54. Almost immediately after Ms. Hilton began recording, one of the two agents closer to her (Agent 3) began using his smartphone to record Ms. Hilton. *Id.* ¶ 56. Ms. Hilton walked past the two agents to get a better view of the group of agents she believed were making an arrest. *Id.* ¶ 57. Neither Agent 3 nor 4 told Ms. Hilton to stop. *Id.*

As Ms. Hilton moved to a closer vantage point, one of the agents from the arrest group (Agent 5) walked toward Ms. Hilton and ordered her not to move any closer; she complied. *Id.* ¶ 58. While Ms. Hilton was speaking with Agent 5, Agent 3 got

6

into his vehicle, drove around Ms. Hilton, and then swerved right in front of her, blocking her view of the second group of agents. *Id.* ¶ 59. Then, Agent 3 exited his vehicle, stepped in front of Ms. Hilton, and began filming her again. *Id.* ¶¶ 59, 61. Around this time, another agent (Agent 6) reiterated the earlier order not to come closer; again, Ms. Hilton complied. *Id.* ¶ 60. Meanwhile, another agent (Agent 8) approached Ms. Hilton, stopping within approximately six inches of her face, and proceeded to record her with his smartphone. *Id.* ¶ 62. As both Agents 3 and 8 continued to record Ms. Hilton, Agent 8 asked the other, "which car did she get out of? Was it this car?", to which Agent 3 replied, "I got 'em, I got 'em. Yeah, I got 'em." *Id.* ¶ 63. Agent 3 then said to Ms. Hilton, "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." *Id.* ¶ 64. Agent 3 then turned to Agent 8 and said, "she's just going on the domestic terrorist watchlist." *Id.* Agent 8 replied, "Oh, absolutely." *Id.* Around the same time, Agent 8 told Agent 5 "she's going on a domestic terrorist watchlist. I just want to put it in," to which Agent 5 replied, "absolutely, go for it." *Id.* ¶ 65.

Moments later, another observer arrived and began recording the agents, as well. *Id.* ¶ 66. Agent 8 told the new observer, "We're gonna do the same thing. Just for a warning, we're putting you into a watchlist." *Id.* ¶ 67. A moment later, Agent 6 pointed at the new observer and said, "Take a picture of this guy! We'll put him on the watchlist." *Id.* As more observers arrived, the Agents directed Ms. Hilton and the other observers to move farther away; they complied. *Id.* ¶ 69.

Ms. Fagan and Ms. Hilton do not believe the federal agents involved in their separate encounters are the same agents, and Defendants have not contested this assertion or provided evidence to the contrary. *Id.* ¶ 70.

### c. Other Unnamed Plaintiffs Encounters with Federal Immigration Enforcement Agents in January 2026

Plaintiffs report similar encounters between Mainers and federal agents. *Id.* ¶¶ 71-82. In some cases, Mainers, who exercised their First Amendment right observe federal agents, report that upon following federal agents' vehicles from a safe distance to document their conduct, were led by those agents to the observers' own homes. *Id.* ¶¶ 72-76, 81. Federal agents told one observer, "This is a warning. We know where you live," and told another observer "This is your one warning. You're impeding an operation." *Id.* ¶ 77.

### 3. Relevant DHS Technology

DHS, like many law enforcement agencies, uses advanced technologies to achieve its mission, including facial recognition software and license plate readers. *Id.* ¶ 93; *Def's Opp'n*, Attach. 2, *Decl. of Assistant Special Agent in Charge Jeffery P. Barbero* ¶ 8 (*Barbero Decl.*). In May 2025, Defendants ICE and CBP began using a new facial recognition app, Mobile Fortify, that enables agents to identify an individual using a smartphone camera. Once an agent takes a photo of an individual's face, the app searches through approximately 200 million images across several government databases to quickly identify subjects of interest during operations. *Id.* ¶¶ 94-95. DHS agents use Mobile Fortify in the field, and all photos taken using Mobile Fortify are retained in DHS's Automated Targeting System for

8

fifteen years, along with geolocation data tracking where an agent's encounter with the individual took place. *Id.* ¶ 95-97. In other operations outside Maine, ICE has used facial recognition tools provided by Clearview AI, which deploys a private database of billions of images scraped from online sources, including social media, YouTube, and millions of other websites. *Id.* ¶ 98.

DHS also uses license plate readers that allow agents to obtain information about a vehicle's owner and travel history. *Id.* ¶ 99. In November 2025, ICE began using a mobile app called Mobile Companion to scan a license plate using a smartphone. *Id.* ¶ 100. The agent is then able to access previous sightings of the vehicle, information about the vehicle's travel patterns, and data from private data brokers including phone numbers, addresses, associates, social media activity, driver license data, voter registration, and more. *Id.* The Mobile Companion app can also be used to set up watchlists of license plate numbers and obtain real-time notifications whenever a listed vehicle is captured on a national camera network. *Id.* USBP also uses a network of license plate readers and predictive intelligence to identify and detain individuals whose travel patterns it considers suspicious. *Id.* ¶ 101.

### 4. Relevant DHS Policy

DHS official policy regarding First Amendment protected activities prohibits DHS and its personnel from profiling, targeting, or discriminating against any individual for exercising his or her First Amendment rights. *Defs.' Opp'n*, Attach. 4, *DHS Policy Memo.* at 1. DHS also prohibits maintaining records that describe how a

U.S. citizen exercises his or her First Amendment rights, including information about an individual's lawful participation in protests or other non-violent demonstrations against government policy or actions, unless expressly authorized by statute, pertinent to or within the scope of authorized law enforcement activity, or by the consent of the individual about whom the record is maintained. *Id.* at 1-2.

Following the encounters described, federal agents in Maine were reminded of DHS standing policy and informed not to tell individuals they will be on a database or watchlist simply for exercising their First Amendment rights. *Barbero Decl.* ¶ 11; *Wells Decl.* ¶ 8-10. ICE and HSI searched their respective databases and report neither Ms. Hilton's nor Ms. Fagan's information was entered into a database and that neither Plaintiff is under investigation or monitoring related to the complaint's alleged encounters. *Barbero Decl.* ¶¶ 9-10; *Wells Decl.* ¶ 9. As to Ms. Fagan's second encounter with federal agents on January 23, 2026, ICE's Assistant Field Office Director Stephen Wells, the supervisor overseeing the Maine operation, states that he is "still reviewing the facts of this incident to determine whether any disciplinary action will be taken" and that he neither "approve[s] nor condone[s]" the alleged conduct. *Wells Decl.* ¶¶ 8, 10.

### 5. Plaintiffs' Complaint

Plaintiffs allege Defendants and other federal agents acting at their direction are unlawfully retaliating against Mainers for exercising their First Amendment right to observe and record immigration enforcement activity in public spaces. *See Compl.* They allege Defendants use government surveillance capabilities to collect

10

and track personal information about observers and other protestors, and in some cases, deploy those surveillance tools and the information collected to threaten and harass Mainers to deter them from exercising their constitutional rights. *Compl.* ¶ 3; 27-82. They allege Defendants in Maine have engaged in a policy and practice, at the direction of DHS leadership, to chill the exercise of protected activity by collecting Plaintiffs' biometric and personal information, often by scanning their faces or license plates, and then storing that information in a database or "terrorist watchlist." *Id.* ¶ 29; 83-102. They further allege that Defendants have used that identifying information to deter First Amendment-protected activity by either expressly threatening observers that they will be treated as "domestic terrorists" or by engaging in other tactics designed to intimidate or harass Mainers engaged in First Amendment activity. *Id.* ¶¶ 30; 31-82; 103-137.

Plaintiffs maintain that Defendants' alleged policy and practice of collecting and maintaining biometric and other personal data, as well as threatening and harassing Mainers for exercising their rights objectively chills that First Amendment-protected activity and causes substantial harm. *Id.* ¶¶ 138-160. They seek declaratory and injunctive relief on a class-wide basis for the Mainers that Defendants have allegedly targeted for intimidation and whose information Defendants allegedly have collected and tracked in response to observing and recording immigration enforcement operations. *Id.* ¶¶ 5-7, at 44.

a.    **Database Claims (Counts I and II)**

According to Plaintiffs, pursuant to an official policy or practice, Defendants are collecting and maintaining Mainers' biometric data and other personal information in one or more government databases or watchlists because of their exercise of their First Amendment rights. *Id.* ¶¶ 172-176; 181-184. In Count I, Plaintiffs allege Defendants' collection and maintenance of the alleged database or watchlist constitutes First Amendment retaliation. *Id.* ¶¶ 177-180. In Count II, Plaintiffs allege Defendants' collection and maintenance of the alleged database or watchlist unconstitutionally burdens free speech. *Id.* ¶¶ 185-190.

### b.    Harassment Claims (Counts III and IV)

Plaintiffs further allege a pattern and practice by Defendants of threatening and intimidating Mainers engaged in First Amendment activity by telling them they are being added to a "terrorist watchlist" or that agents would come to their homes, constitutes First Amendment retaliation (Count III) and unconstitutionally burdens free speech (Count IV). *Id.* ¶¶ 191-208.

## II.    THE PARTIES' POSITIONS

### A.    Plaintiffs' Motion for a TRO

Ms. Hilton and Ms. Fagan seek a TRO barring Defendants from collecting, maintaining, and disseminating their biometric data and other personal information based on their First Amendment-protected activity and from threatening them with placement in any database or watchlist, or otherwise retaliating against them for exercising those rights. *Mot. for TRO* at 20. They maintain all four factors for issuing a TRO weigh in their favor. First, Plaintiffs insist they are likely to succeed on the

merits of their claims, as Defendants targeted them for engaging in constitutionally protected activity (Counts I and III) and Defendants' targeting of Plaintiffs unconstitutionally discriminates based on content and viewpoint (Counts II and IV). *Id.* at 6-14. Second, Plaintiffs claim irreparable harm without a TRO because Defendants' threats and retention of Plaintiffs' information on a database chill their ability to exercise their constitutional rights and subject them to significant collateral consequences. *Id.* at 14-15. Lastly, Plaintiffs maintain the balance of equities and public interest support protecting their constitutional right to document immigration enforcement operations. *Id.* at 15-17.

### B.    Defendants' Opposition

Defendants oppose Plaintiffs' motion. First, Defendants dispute several of Plaintiffs' primary factual claims. Defendants assert there is no formal or informal policy or practice sanctioning the unnamed agents' conduct described in Plaintiffs complaint. *Defs.' Opp'n* at 6; *id.*, Attach. 3, *Boston ERO Email*; *DHS Policy Memo.* Rather, the alleged encounters with federal agents described in the complaint are "empty threats" contrary to standing DHS policy, which does not authorize agents to threaten members of the public for observing or recording law enforcement activity. *Id.* Furthermore, they represent that Defendants did not enter Ms. Hilton's and Ms. Fagan's data into any alleged database or "terrorist watchlist." *Defs.' Opp'n* at 5-6; *Wells Decl.* ¶ 9; *Barbero Decl.* ¶ 10. Accordingly, Defendants argue Plaintiffs are unlikely to succeed on the merits of their claims against the Defendant agencies and federal officials. *Defs.' Opp'n* at 7-8.

13

As for the unnamed federal agents, although Defendants do not contest that Plaintiffs sufficiently allege that the agents in the videos acted contrary to DHS policy during the Hilton and Fagan encounters, Defendants maintain Plaintiffs lack standing to pursue prospective relief because they fail to establish a real and immediate likelihood they will encounter agents who will make similar statements in the future or statements that would create an objectively reasonable chilling effect if Plaintiffs heard them again. *Id.* at 8-15. Defendants argue Plaintiffs do not face a risk of irreparable harm because Defendants did not enter their information into a database, federal agents in Maine have been reminded of DHS's policy on First Amendment activity, and they acknowledge that Plaintiffs are free to continue engaging in such activity. *Defs.' Opp'n* at 15-16; *Boston ERO Email*. Defendants argue the balance of equities and public interest weigh in favor of the Defendants and against Plaintiffs' requested TRO. *Id.* at 17. Finally, Defendants argue Plaintiffs' requested TRO is impermissibly overbroad and vague. *Id.* at 18-19.

### C.      Plaintiffs' Reply

In response, Plaintiffs point out that their First Amendment claims do not depend on Defendants placing their information into a database, but rather the collection of biometric and other data itself constitutes a First Amendment violation. *Pls.' Reply* at 2. Plaintiffs further highlight that Defendants do not deny that they maintain the data they collected in some form but merely say they searched a specific subset of databases and assert that Plaintiffs are not under "investigation or monitoring" by Defendants. *Id.* at 2-3. As for standing, Plaintiffs insist they have

provided evidence that their information is currently retained by the government, which Defendants have not meaningfully disputed, and demonstrated a substantial risk that Defendants will repeat their unlawful collection and retention of Plaintiffs' biometric and personal data. *Id.* at 3-5. Additionally, Plaintiffs maintain they have standing on their free speech claims and dispute Defendants' assertions that diminished immigration enforcement activity in Maine and the "recent reminder" to agents that the alleged "empty threats" are against government policy do not show that the alleged harm will not likely recur. *Id.* at 5-7. Plaintiffs further contend they have demonstrated irreparable harm and that their requested TRO is not too vague or broad and imposes no unnecessary burden on Defendants. *Id.* at 7.

## III.   LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The standard for issuing a temporary restraining order is the same as for a preliminary injunction. *See Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 564 F. Supp. 2d 63, 66 (D. Me. 2008). The movant must show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. P.R.*, 353 F.3d 108, 120 (1st Cir. 2003)). The third and fourth factors "merge when the Government is the opposing party." *Nken*

15

*v. Holder*, 556 U.S. 418, 435 (2009).  Trial courts enjoy wide discretion in making judgments regarding the appropriateness of preliminary injunctive relief. *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."  *Sindicato Puertorriqueño de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).  To demonstrate likelihood of success on the merits, Plaintiffs must establish a "strong likelihood," not just a "mere possibility," that they will ultimately prevail.  *Respect Maine PAC v, McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)).

### 1.    The Present Record and the Unresolved Facts

Before addressing Plaintiffs' likelihood of success on the merits, the Court briefly addresses what the limited record establishes at this early stage.  In doing so, the Court emphasizes that it is not commenting on the merits of several of Plaintiffs' claims.  Rather, given the dearth of evidence at this stage, the Court is pointing out that, at this time, it cannot evaluate either parties' likelihood of success on the merits of several of Plaintiffs' claims because there is information that the parties have yet to discover and present to the Court.  Accordingly, the Court makes clear that when it determines that Plaintiffs have not yet shown sufficient evidence to support certain claims, the Court cannot forecast what might be revealed during the course of

16

litigation but is instead holding Plaintiffs to their threshold burden of production, as the party seeking the injunction, to present the Court with the evidence demonstrating extraordinary relief they seek is warranted. *See García-Colón v. State Ins. Fund Corp.*, No. 21-1211 (RAM), 2024 U.S. Dist. LEXIS 126093, at *7 (D.P.R. Jul. 15, 2024) (citations omitted).

Here, several contested facts are critical to the merits of Plaintiffs' requested TRO. First, whether Defendants collect and maintain a database of individuals who exercise their First Amendment right to observe and record immigration enforcement activity. Second, whether Defendants maintain a policy and practice of collecting and retaining the data of First Amendment observers or otherwise retaliating against individuals for exercising those same rights. At this time, given the record before it, the Court cannot conclude that Plaintiffs have carried their burden to prove either of these significant facts. Plaintiffs have not established an alleged informal policy and practice nor that any alleged database or "terrorist watchlist" exists or that their information is retained on it. Rather, Plaintiffs, so far, have only shown that on January 21 and 23, federal agents acted contrary to formal DHS policy, and at least some images taken of Plaintiffs during those encounters are retained on the agents' phones, in part pursuant to a litigation hold. *Tr. of Proceedings* at 25:2-10, 25:16-21, 28:7-14, 28:20-29:22 (ECF No. 23) (*Tr.*).

First, as to Plaintiffs' database claims, there is no evidence before this Court to conclude the alleged database exists or that either of Plaintiffs' personal information was ever entered or is still retained in any such alleged database.

17

Granted, Defendants have been careful not to affirmatively assert that the Government does not have a database that covers protestors and observers as Plaintiffs have alleged and have limited their factual representation to say that, if a database exists, the Plaintiffs "were not placed on any database." *Id.* at 27:16-28:1. At this stage, it remains Plaintiffs' burden to produce evidence of any alleged "terrorist watchlists'" existence. Furthermore, even if they did sufficiently produce evidence of any alleged database, in the face of the Defendants' denial, Plaintiffs have also not met their burden as to whether either Plaintiffs' biometric or other personal information was ever entered or retained in such a database. At oral argument, Plaintiffs conceded that they do not yet know whether the Agents from the January 21 and 23 encounters used their personal phones or government phones to record their biometric data and license plate information, or what the Agents did with that information, including running Plaintiffs' information through DHS's technology, such as Mobile Fortify or Mobile Companion. *Id.* at 30:18-34:3.

Similarly, Plaintiffs have not produced evidence to sustain their allegation that Defendants' immigration enforcement operations in Maine have acted pursuant to an informal policy and practice, at the direction of DHS leadership, to chill the exercise of protected First Amendment activity by retaliating and collecting protestors' biometric and personal information or by threatening to do so. Notwithstanding formal DHS policy prohibiting its personnel from profiling, targeting, or discriminating against any individual for exercising his or her First Amendment rights, including information about an individual's lawful participation in protests,

18

*DHS Policy Memo*, Plaintiffs maintain they have presented sufficient evidence to show an informal policy at DHS, sanctioned by agency leadership. As evidence, they present to the Court the accounts of Ms. Hilton and Ms. Fagan, as well as three other Mainers' alleged encounters, news reports detailing ICE's alleged tactics across the country, and public statements from DHS officials. *Compl.* ¶¶ 31-82, 91-93; *Decl. of Melissa Hewey in Supp. of Pls.' Mot. for TRO* (ECF No. 4) (*Hewey Decl.*).

The evidence in this motion contrasts with *Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025), where the Los Angeles Press Club and other media sought to enjoin the DHS's allegedly excessive use of force, which the plaintiff maintained constituted retaliation for constitutionally protected activities in violation of their First Amendment rights. In *Los Angeles Press Club*, the district court granted a preliminary injunction, not a TRO. *Id.* at 1045 ("Order Granting Plaintiffs' Motion for Preliminary Injunction"). Moreover, the *Los Angeles Press Club* plaintiffs were able to adduce what the district court described as an "avalanche of evidence" that "federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." *Id.* at 1067. In *Los Angeles Press Club*, DHS had policies to limit the use of crowd control weapons, but the district court concluded that DHS could not resort to "a pristine set of policies" to justify its actions because the violations of the rights of journalists, legal observers, and protestors were so common and widespread. *Id.* (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). The district court also pointed

19

to statements of Secretary Noem, which it found, "ratified Defendants' practice of meeting First Amendment protected activities with force." *Id.*

Plaintiffs have shown neither at this stage. First, Plaintiffs have not presented the Court with a multitude of evidence indicating a general practice among agents conducting enforcement operations in Maine. Plaintiffs present this Court with two affidavits, involving two observers, and although they are detailed and credible, it is not the kind of multitudinous evidence sufficient to demonstrate a widespread pattern and practice of immigration authorities violating First Amendment rights in Maine. *Cf. id.* at 1045 (finding of an informal policy based on "detailed and credible declarations from nearly 50 journalists, legal observers, and protestors"). Nor is there evidence in the record of federal officials ratifying the agents' alleged conduct during the Maine operations. *Cf. id.* at 1067 n.8 (finding ratification from agency leadership based on their public statements explicitly referring to the Los Angeles enforcement operations at issue).[2] In fact, a supervisory official for ICE explicitly states he neither "approve[s] nor condone[s]" and is "still reviewing . . . whether any disciplinary action will be taken." *Wells Decl.* ¶¶ 8, 10; *cf. L.A. Press Club*, 799 F. Supp. 3d at 1067 (explaining that a policy or custom of retaliation may be inferred from widespread evidence of repeated constitutional violations and the absence of evidence that officers were discharged or reprimanded).

---

[2]    This is not to say that the record lacks any evidence of an official policy to track and document observers. Exhibit 21, for example, is a Reuters article dated February 10, 2026 that detailed this allegation. *See Hewey Decl.* Attach. 21, "*ICE is cracking down on people who follow them in their cars*". It may well be that the Plaintiffs in discovery are able to demonstrate that the complained of policy is more widespread and officially sanctioned and directed than the current record confirms.

In sum, Plaintiffs, so far, have only presented evidence to demonstrate that, on January 21 and 23, federal agents acted contrary to formal DHS policy in response to Plaintiffs' exercising their First Amendment right to observe and record law enforcement operations in public.  Again, this is not to suggest that facts supporting their database and informal policy allegations will not come to light through discovery, but for the purposes of Plaintiffs' requested TRO, the Court is left with the narrow task of determining whether prospective relief is appropriate to protect Plaintiffs from federal agents acting contrary to DHS policy because of Plaintiffs' First Amendment conduct in the future.  Accordingly, the Court moves to the merits of Plaintiffs' claims on what the limited evidence shows at this stage.

### 2.   Standing

To have standing to pursue their requested TRO against Defendants' acting contrary to DHS policy because of Plaintiffs' First Amendment conduct, Plaintiffs must "establish a real and immediate threat," *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983), showing "a sufficient likelihood that [they] would again be wronged in a similar way." *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992) (citations omitted).  Plaintiffs' January 21 and 23 encounters with federal agents alone do not establish a real and immediate threat.  *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) ("Past injury, in and of itself, 'is an insufficient predicate for equitable relief'") (quoting *Am. Postal Workers Union*, 968 F.2d at 1376).  Instead, Plaintiffs must point to evidence that the threatened harm is "certainly impending," not "speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).

21

Because Plaintiffs have produced insufficient evidence to demonstrate a real and immediate possibility that Plaintiffs will encounter threats or conduct from Defendants in the future, the Court cannot conclude that there is a real or immediate threat of harm such that a TRO should issue at this time. Although Plaintiffs at oral argument maintain that they have refrained from observing and recording law enforcement activity in public despite having the opportunity to do so, they have not placed that information into the record for the Court to evaluate. *Tr.* at 38:14-39:6 (**Mr. Atkinson**: "Yes, there were opportunities to do so. We haven't put those into the record . . ..").  In any event, for the purposes of standing to pursue their requested TRO, Plaintiffs cannot rely on their "subjective apprehensions," but instead must rely on evidence demonstrating the "reality of the threat of repeated injury." *Lyons*, 461 U.S. at 107; *accord Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (KAVANAUGH, J., concurring in grant of application for stay) (quoting *id.* at 107 n.8).

Again, the problem is that Plaintiffs present scant evidence to the Court beyond key contested facts. Plaintiffs have not shown why their fear of alleged harm is likely to recur despite Defendants' representations that agency leadership instructed the agents involved in the January 21 and 23 encounters not to make such statements that violate DHS policy. *Barbero Decl.* ¶¶ 11; *Wells Decl.* ¶¶ 8. Moreover, ICE disavowed the alleged conduct and reports they are investigating "whether any disciplinary action will be taken." *Wells Decl.* ¶¶8-10. Plaintiffs' disagreement with *how* Defendants have addressed the agents' conduct on January 21 and 23 is not evidence that Defendants are likely to exhibit the same conduct in the future.

Accordingly, given the evidence available at this stage, the Court cannot conclude that Plaintiffs have shown an immediate and real threat that the alleged misconduct will recur in the future, such that their requested TRO should issue.

### 3.   Scope of Relief

Finally, even if Plaintiffs could demonstrate an ongoing injury from their January 21 and 23 encounters with Defendants or, at minimum, a likelihood of recurring injury, the scope of Plaintiffs' requested relief is impermissibly broad and vague, and it raises fundamental issues of enforceability.  An injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required."  *See* FED. R. CIV. P. 65(d)(1)(B)-(C).  A general prohibition not to retaliate against peaceful observers because of their First Amendment activity is too broad and too vague to provide Defendants a clear idea of what conduct is prohibited.  In *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026), the Eighth Circuit recently stayed a preliminary injunction in which the district court enjoined the Government from retaliating against persons engaged in peaceful and unobstructive protest activity, because the injunction constituted a forbidden "universal injunction."  *Id.* at 1099 (citing *Trump v. CASA, Inc.*, 606 U.S. 91, 98 (2025)).

Moreover, considering the First Amendment right to observe and record an officer is limited "if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties," *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014), and that law enforcement collects and retains data for lawful purposes separate from those challenged by Plaintiffs today, *Defs. Opp'n* at 5, any directive

from the Court according to the broad terms of Plaintiffs' requested TRO would require agents to predict what this Court would consider peaceful and unobstructive protest activity or an impermissible collection and retention of Plaintiffs' data. *Cf. New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025) ("[T]he issuance of a nonspecific injunction or restraining order may be justified . . . . when the information needed to make the order specific in form is known only to the party to be enjoined" (quoting 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRACTICE AND PROCEDURE § 1955 (2d ed. 2024) (footnotes omitted)).

In addition, as Defendants pointed out at oral argument, Plaintiffs' proposed injunction would present confounding problems of compliance. Plaintiffs propose that the injunction apply only to the two named plaintiffs. How Defendants would recognize the two named Plaintiffs to assure compliance with the proposed TRO was unanswered by the Plaintiffs. Of course, it would be easy to say that Defendants should refrain from engaging in unconstitutional activity and that would solve the issue, but the myriad interactions among ICE agents, observers, protestors, and others are too complicated to be reduced to simplicity. The Court is concerned that the practical effect of the requested TRO would be a general injunction, which if it is to issue, should be based on a more complete evidentiary record and more thoughtful consideration of its implications.

To be clear, by rejecting the request for a TRO on this record, the Court is not condoning what the videotapes confirm occurred to both Ms. Hilton and Ms. Fagan in January 2026. The First Circuit has unequivocally reinforced the right of the

24

public "to film government officials, including law enforcement officers, in the discharge of their duties in a public space." *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011); *see Gericke*, 753 F.3d at 7. Indeed, the First Circuit has written that to do so is "a basic, vital, and well-established liberty safeguarded by the First Amendment." *Glik*, 655 F.3d at 85; *Gericke*, 753 F.3d at 7. But there is, in the Court's view, a significant difference between an agency-wide policy of First Amendment suppression and the actions of a few agents, who are acting contrary to agency policy. The latter may be remedied by training, discipline, and would be less likely to recur, while the former suggests a more endemic issue that would require more significant judicial intervention. On this record, the Court does not know which of these alternatives, or perhaps a combination of both, underlies the January 2026 conduct of these agents in this case.

Finally, not only would Plaintiffs' requested injunction place this Court in the untenable position of "exercis[ing] general oversight of the Executive Branch," *Casa*, 606 U.S. at 861, its breadth and vagueness would irreparably harm the Government and undermine the public interest by causing law enforcement to hesitate in performing their lawful duties. *See Tincher*, 164 F.4th at 1100.

## B.    Remaining Factors

Because the Court cannot conclude Plaintiffs have shown they are likely to succeed on the merits of their claims, the Court does not address the remaining TRO factors. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the

25

merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity") (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

### C.   Summary

The Court concludes that Plaintiffs have not met their burden to obtain their requested TRO, but in doing so the Court reiterates that it is not weighing whether Plaintiffs are likely to prevail on the merits of their claims, particularly their allegations that Defendants entered Plaintiffs' biometric data or other personal information into a database or that the federal agents Plaintiffs encountered on January 21 and 23 acted pursuant to an informal DHS policy to retaliate against Plaintiffs' First Amendment activity. *Esso Standard Oil, Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("[T]he party seeking the preliminary injunction bears the burden of demonstrating that these four factors weigh in its favor"); *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) ("A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right"). Instead, the posture of this case, along with the limited available evidence and several unresolved critical facts, compels the Court's conclusion that a TRO is not appropriate at this time. Accordingly, despite the "serious legal issues" Plaintiffs set forth in their complaint, "because the caselaw in this area is nuanced" and Plaintiffs do not "provide a sufficient uncontested factual record . . . they [have] failed to sustain their burden to demonstrate that they are likely to succeed on the merits of their claim," such that their requested TRO should issue at this time. *We the People PAC v. Bellows*, 512 F.

26

Supp. 3d 74, 77 (D. Me. 2021) (*Bellows I*) (denying TRO).  In other words, given "the scant factual record" beyond the contested, unresolved facts, "the Plaintiffs [have] not proven their entitlement to extraordinary injunctive relief."  *We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 37 (D. Me. 2021) (*Bellows II*).

## V.    CONCLUSION

The Court DENIES Plaintiffs' Motion for Temporary Restraining Order (ECF No. 3).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of March, 2026

27