UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS<br>  on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>        Defendants. | Case No. 26-cv-00092-JAW<br><br>**PLAINTIFFS' WRITTEN ARGUMENT IN SUPPORT OF APPLICATION OF FIRST AMENDMENT PRIVILEGE** |

In a case about the government's surveillance and intimidation of Mainers for exercising their First Amendment right to document the government's abuses of power and hold it to account, the government is demanding access to information that threatens community members' right to associate for the purpose of engaging in that very protected activity. The court should not allow this trespass onto fundamental freedoms. *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (recognizing the "vital relationship between freedom to associate and privacy in one's associations"); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("the videotaping of public officials is an exercise of First Amendment liberties").

## I.    The First Amendment Discovery Privilege

The Supreme Court has long "acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues," *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295 (1981), and the critical role privacy plays in safeguarding this fundamental right. *See*, *e.g.*, *NAACP*, 357 U.S. at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). The Court thus recognizes a privilege against compelled disclosure of associational information when disclosure may impede future collective expression. *Id.*; *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (collecting cases).

This court applies a two-part framework. *Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 240 (D. Me. 2010) (citing *Perry*). First, the party asserting the privilege "must demonstrate a *prima facie* showing of arguable First Amendment infringement," *Perry*, 591 F.3d at 1160, by showing that disclosure "will result in harassment of current members, a decline in new members, or other chilling of associational rights." *United States v. Comley*, 890 F.2d 539, 544 (1st Cir. 1989); *McKee*, 723 F. Supp. 2d at 240. Once a *prima facie* showing is made, "the

1

burden then shifts to the government to show both a compelling need for the material sought and that there is no significantly less restrictive alternative for obtaining the information." *Comley*, 890 F.2d at 544. Plaintiffs easily demonstrate First Amendment infringement that far outweighs any valid interest the government may have in documents and information it seeks.

## II.    Community Group Member Identities and Communications are Protected

In early 2026, residents of Maine began organizing in response to increased immigration enforcement activity in the communities where they live and work. Doe 1 Decl., ¶¶ 2-6, 8; Doe 2 Decl., ¶¶ 2-6, 8; Doe 3 Decl., ¶¶ 2-6, 8; Nadeau Decl., Exs. D-G. Having seen reporting about immigration operations in other states, including violent tactics and other abuses, these community members were concerned about their own neighborhoods and broader communities. *Id*. They organized to bear witness, support and protect their communities, and expose abuses of power. *Id*. The primary way in which they organized was through group "chats" using the messaging application Signal. *Id*. These community groups used Signal chats to facilitate and coordinate the observation of DHS operations and to make each other aware of when and where those operations were taking place. Doe 1 Decl., ¶ 8; Doe 2 Decl., ¶ 8; Doe 3 Decl., ¶ 8; Nadeau Decl., Exs. D-G. Defendants now seek to conduct discovery into those chats, including group membership, internal communications, and information about how the groups have been organized and operated—all of which is protected by the First Amendment.[1]

A.    <u>The Community Group Chats are Covered by the First Amendment Privilege</u>

The First Amendment privilege applies to all manner of formal and informal associations or groups—what matters is whether "individuals have associated to advance shared views, or engaged in collective effort on behalf of shared goals." *Sullivan v. Univ. of Wash*., 60 F.4th 574,

---

[1] As set forth in more detail in the Declaration of Genevieve Nadeau, Plaintiffs withheld responsive community group Signal chats in full, and redacted information about those community chats from smaller group and one-on-one chats involving the plaintiffs.

580 (9th Cir. 2023) (citation modified); *see also Donohue v. Milan*, 942 F.3d 609, 616–17 (2d Cir. 2019) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2018 WL 2441518, at *11 (N.D. Cal. May 31, 2018). Here, the community chats have all the indicia of a protected association. The members associate to further their shared goal of documenting immigration enforcement in order to expose the truth of what is happening and support those impacted by government abuses. Doe 1 Decl., ¶¶ 6, 8; Doe 2 Decl., ¶¶ 6, 8; Doe 3 Decl. ¶¶ 5-6; Nadeau Decl., Exs. D-G. As set out by the First Circuit:

> Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest… [and] freedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression. This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties. Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally.

*Glik*, 655 F.3d at 82–83 (1st Cir. 2011) (citation modified).

The fact that Plaintiffs are members of the community group chats and chose to bring this lawsuit does not change the analysis. *See, e.g., Fraternal Order of Police Pa. Lodge v. Springfield*, 668 F. Supp. 3d 375 (E.D. Pa. 2023) (plaintiffs protected from certain deposition topics); *Curling v. Raffensperger*, 2021 WL 5162576 (N.D. Ga. Nov. 5, 2021) (limiting deposition questions to plaintiffs); *Democratic Nat'l Comm. v. Ariz. Sec. of State's Off.*, 2017 WL 3149914 (D. Ariz. July 25, 2017) (plaintiff's documents protected); *Int'l Action Ctr. v. United States,* 207 F.R.D. 1 (D.D.C. 2002) (limiting discovery from plaintiffs).

   B.  <u>The Documents and Information at Issue are Covered by the First Amendment Privilege</u>

Although the Supreme Court was initially concerned with the compelled disclosure of membership lists, case law makes clear that the privilege applies more broadly to also include the

communications at issue here. *See*, *e.g.*, *Perry*, 591 F.3d at 1162 (internal communications and strategies)*; In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 475, 477 (10th Cir. 2011) (internal and inter-group communications including "research, strategy, and deliberative processes" such as "communications regarding strategy for lobbying"); *Greenville v. Syngenta Crop Prot., Inc.*, 2011 WL 5118601, at * 6 (C.D. Ill. Oct. 27, 2011) ("content of internal communications between members, employees, and agents of associations."); *Beinin v. Ctr. for Study of Popular Cultur*e, 2007 WL 1795693, at *2 (N.D. Cal. June 20, 2007) (communications "between and among people who share political views and goals"). Here, the information sought—identities of community group chat members and their communications revealing strategies or internal discussions related to clearly protected activity—falls squarely within the First Amendment privilege.

**III.   Disclosing Community Group Membership and Communications to the Government Would Have a Significant Chilling Effect**

In order to make a *prima facie* showing, Plaintiffs need only offer evidence sufficient "to initially demonstrate a reasonable probability that disclosure will chill its associational rights." *In re Motor Fuel*, 641 F.3d at 492; *see also Black Panther Party v. Smith*, 661 F.2d 1243, 1267–68 (D.C. Cir. 1981), ("[T]he litigant seeking protection need not prove to a certainty that its First Amendment rights will be chilled by disclosure. It need only show that there is some probability that disclosure will lead to reprisal or harassment."), *vacated as moot on other grounds sub nom, Moore v. Black Panther Party*, 458 U.S. 1118 (1982).

As set forth in the declarations of Does 1-3 and Plaintiff Hilton, members of the community group Signal chats fear retribution should information about those chats be disclosed to the government. They and others may not have joined or actively participated in the groups if they had understood the government would learn about their participation or had access to their

communications, and they are likely to cease participating in these or similar community groups in the future if this information is disclosed to the government. *See* Doe 1 Decl., ¶¶ 9-15; Doe 2 Decl., ¶¶ 9-12; Doe 3 Decl., ¶¶ 9-13; Hilton Decl., ¶¶ 7-8. Their fear is well-founded.

The public record is replete with information that would cause any reasonable person to fear retribution—*especially from the government itself.* The specific encounters with immigration agents alleged in the case make clear that they are hostile to legal observers and other protestors. The agents' behavior is reasonably understood as part of a concerted effort by the current administration to criminalize and otherwise chill organized dissent, as reflected in public statements by high-ranking DHS and DOJ officials that, among other things, further label protestors as "domestic terrorists" and falsely characterize filming law enforcement as illegal "obstruction" and "doxxing."[2] The White House Border Czar threatened to make protestors "famous," and recently said that "hostile rhetoric" and "miscommunicating what ICE does every day" "must stop" as he blamed protesters for "bloodshed" by DHS.[3] This is not just rhetoric. The Director of the FBI has openly bragged about criminally investigating similar Signal chats for activities that, as described, are lawful and protected.[4] And the government's abuse of its

---

[2] *See, e.g.,* C.J. Ciaramella*, DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, Reason (Dec. 22, 2025), https://tinyurl.com/54ceta5b; Matt Sledge, *How local cops are running with Trump's NSPM-7 attacks on Antifa*, The Intercept (July 7, 2026), https://tinyurl.com/yzpndvms (linking FBI PSAR suggesting that wearing dark clothing, tracking law enforcement, and using encrypted chats are strategies used by "anarchist violent extremists").

[3] Fox News, *Homan pushes to create 'database' to make those who impede ICE 'famous'* (Jan. 15, 2026), https://tinyurl.com/bpa6kz4j ("We're going to create a database. Those people that are arrested for interference . . . we're going to make them famous . . . We're going to let their employers and their neighborhoods and their schools know who these people are."); C-SPAN, *"Border Czar" Tom Homan Condemns "Hateful Rhetoric" Against ICE* (July 20, 2026), https://tinyurl.com/4e7urvns.

[4] David Ingram, *The FBI is investigating Minnesota Signal chats tracking ICE, Patel says*, NBC News (Jan. 26, 2026), https://tinyurl.com/4b577c6h.

investigative and prosecutorial authority to punish other observers and protestors—even online critics—is now well-documented.[5]

In addition, discovery in this case has revealed that Defendants have *already* ██████ many observers and protesters in Maine ████████████████████████ ████████████████████████ Nadeau Decl., Exs. K-M. Some people were ████ because they █████████████████████████ █████████████████████ *Id.* Ex. L. Defendants took these actions even though ████ █████████████████████████████████ ██████████████ *Id.* Ex. N. These documents confirm the real risk that Defendants will continue targeting observers and protestors in Maine—particularly those perceived to be coordinating to document ICE activity.

Finally, the government's litigation of this case only further demonstrates a disregard of Plaintiffs' and community members' First Amendment rights. In addition to seeking the information at issue here, the government has pressed Plaintiffs to disclose their attendance at *any* protests dating as early as 2020 (Nadeau Decl., ¶ 3, Exs. D-G); their "beliefs and opinions regarding law enforcement personnel, operations, tactics, and activity" (*Id.* at ¶ 3); their involvement in activism or advocacy unrelated to this case (*Id.* Ex. E); and their involvement with unrelated political groups or campaigns (*Id.* Exs. E-G). The chilling nature of these questions should be self-evident.

---

[5] *See, e.g.,* Mike McIntire et al., *They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling*, N.Y. Times (July 18, 2026), https://tinyurl.com/4rfyy59n; Brad Heath et al., *Trump's DOJ charged hundreds with assaulting officers. Many cases were dropped, but the damage was done*, Reuters (July 30, 2026), https://tinyurl.com/486jm74n; *see also* Hannah Critchfield & Shane Shifflett, *How ICE Is Weaponizing Social Media Against Its Critics*, Wall Street Journal (Aug. 3, 2026), https://tinyurl.com/epateyrj.

Against this backdrop, a confidentiality order is insufficient to mitigate the chilling effects of compelled disclosure to the government, even if the information is protected from public view. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1130–31 (2026) ("even if there is no disclosure to the general public, the pressure to avoid ties and speech which might displease officials demanding disclosure can be constant and heavy") (citation modified); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) ("While assurances of confidentiality may reduce the burden of disclosure to the State, they do not eliminate it."); *Int'l Action Ctr.*, 207 F.R.D at 3 ("It is the government itself that Plaintiffs fear, and therefore confining that information to government . . . counsel will hardly assuage those fears or avoid the intimidation that Plaintiffs fear might follow.").

## IV.   The Government Cannot Meet Its High Burden to Overcome the Privilege

The government cannot demonstrate that the information it seeks is both relevant and proportional to the needs of the case, Fed. R. Civ. P. 26(b)(1), never mind meet its high burden of showing both that it has a compelling need for the information *and* there is no significantly less restrictive alternative for obtaining it. *Comley*, 890 F.2d at 544; *see also Perry*, 591 F.3d at 1161 (information sought must be "highly relevant"); *Hale v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 6854416, at *2 (S.D. Ill. Dec. 5, 2014) (information must be "essential" to the case).

**"Opportunities to observe" ICE.**  Defendants initially argued the community chats are relevant to assessing whether Plaintiffs have forgone specific opportunities to observe ICE. Any such evidence would be minimally relevant at best at this stage. Plaintiffs need not establish any subjective chill at all, let alone this particular *kind* of chill, to prevail on the merits of their retaliation claims. *See, e.g., Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (the relevant inquiry is objective, *i.e.*, whether the defendants' actions would chill "a reasonably hardy individual").

Nor are forgone opportunities to observe necessary to establish standing. To start, in a First Amendment retaliation case, allegations that the plaintiffs are "targets" of government retaliation is "a claim regarding concrete harm"—"distinct from any resulting chilling effects" and independently sufficient to confer standing. *See, e.g.*, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025); *Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir. 1997); *Dickinson v. Trump*, 827 F. Supp. 3d 1375, 1393 (D. Or. 2026). Plaintiffs have also experienced other concrete injuries—including government retention of their personal information, *see Guan v. Mayorkas*, 530 F. Supp. 3d 237, 261–62 (E.D.N.Y. 2021), Plaintiffs Pantos and Williams's detention at the border, and their ongoing exposure to heightened scrutiny while traveling. In short, the chilling effect on Plaintiffs is just one of several bases for establishing standing.

To the extent Plaintiffs *do* intend to rely on ongoing chill for injunctive relief, much of their evidence has nothing to do with specific forgone opportunities to observe. *E.g.*, Nadeau Decl., Ex. H (¶¶ 31-32) (left Signal groups entirely and avoid international travel); ECF 3-1 (Hilton Decl., ¶¶ 40-41) (precautions taken while observing, traveling, and visiting family). And the documents at issue here—messages about ICE activity which Plaintiffs may not have seen or been otherwise able to pursue—are particularly tangential to establishing actual ongoing chill.

**Coordination among observers.**  Defendants have also suggested that the information they seek is relevant to show how the groups were coordinating their activities. But any suggestion that coordination may justify agents' violations of Plaintiffs' or other observers' First Amendment rights fails as a matter of law and logic. First, as both a necessary component of association and a frequent precursor to speech, coordination is at the heart of the First Amendment. *See, e.g., Citizens Against Rent Control*, 454 U.S. at 294 ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or

8

lost."); *Roberts*, 468 U.S. at 622 (right to speak and petition the government "could not be vigorously protected" without "a correlative freedom to engage in group effort toward those ends[.]"). It would be a hollow promise indeed if the First Amendment protected the right to associate but only if any expressive activity were unplanned or spontaneous. ████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████. Nadeau Decl., Ex. N.

Second, Defendants may not justify intrusive discovery based on pure speculation as to what they might find. *See, e.g., Calderon v. U.S. Dist. Ct.*, 98 F.3d 1102, 1106 (9th Cir. 1996) (courts should not permit discovery "for fishing expeditions to investigate mere speculation"); *Ocwen USVI Servs., LLC v. U.S. Virgin Islands*, 350 F.R.D. 503, 531 (D.V.I. 2025) ("Basing discovery on speculation alone amounts to a fishing expedition undertaken in hopes of stumbling upon a viable affirmative defense."). The use of discovery for fishing expeditions is particularly frowned upon when it implicates the privacy of third parties. *See Chestnut v. Kincaid*, 2022 WL 358170, at *2 (D. Md. Feb. 7, 2022).

Finally, information Defendants did not have at the time they violated Plaintiffs' rights cannot justify their actions. *See, e.g., Vera v. Williams Hosp. Grp., Inc.*, 73 F. Supp. 2d 161, 169–70 (D.P.R. 1999). Indeed, "after-the-fact justifications are especially problematic in the First Amendment context." *C.S. by Stroub v. McCrum*b, 149 F.4th 848, 857 (6th Cir. 2025). Put simply, the government may not rely on after-acquired information to justify constitutional violations. *See, e.g., Glenn v. Wash. Cnty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011) ("[court] cannot consider evidence of which the officers were unaware"); *United States v. Kelly*, 481 F. Supp. 3d 862, 869 n.5 (S.D. Iowa 2020) ("after-the-fact justification for pretextual police behavior [] contributes to the appearance of social injustice.").

**Class members**.   Finally, Defendants have also suggested the information they seek is relevant for class certification, claiming "plaintiffs have to demonstrate that every single person who could conceivably be part of the class was acting lawfully," July 21 Tr. 28:25-29:10, and speculating the chats might help them tell a story about what was happening before and after specific encounters. *Id.* 22:1-7. But that all is immaterial to the requirements of Rule 23. "Indeed, for an injunctive-relief class such as this, plaintiffs need not establish the precise number or identity of class members" to establish numerosity. *See Tassinari v. Salvation Army*, 349 F.R.D. 10, 25 (D. Mass. 2025); *Van Meter v. Harve*y, 272 F.R.D. 274, 281 (D. Me. 2011). Nor is the information sought relevant to commonality or typicality, *see Tassinari*, 349 F.R.D. at 27, given that the focus of these inquiries is "on whether the *defendant's conduct* was common as to all of the class members," *Barbara v. Trump*, 790 F. Supp. 3d 80, 92–93 (D.N.H. 2025) (emphasis added). And while Defendants may well argue that those not *lawfully* observing and recording cannot be covered by classwide injunctive relief, Plaintiffs have not included those individuals in the proposed class. In any event, the community group chats are of limited use in identifying class members, and *Defendants* themselves are in the best position to identify individuals whose personal information they have collected.

## V.    Conclusion

Plaintiffs did not sacrifice either their own First Amendment rights or the rights of others by filing this case. Yet the government seems intent on using the litigation to intrude into personal beliefs, expressive activity, and associations that have little or no bearing on the case. For all of the foregoing reasons, and because the Court's decision here may invite more intrusive inquiries into community groups in the future, the Court should find that the First Amendment protects the community group chat membership and communications from disclosure.

Dated: August 4, 2026

Respectfully submitted,

*/s/ Genevieve Nadeau*

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

JoAnna Suriani*
Janine M. Lopez*
F. Elias Boujaoude*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org
elias.boujaoude@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
510 Meadowmont VIII. Cir. No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*
Yotam Barkai*
John Paredes*

Benjamin J. Cabranes*
Tyler T. Mikulis*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com
tmikulis@dirllp.com

*Pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 4, 2026, I caused a copy of the foregoing to be served via e-mail on counsel of record for Defendants.

*/s/ Genevieve Nadeau*
Genevieve Nadeau
Protect Democracy Project
15 Main Street, Suite 312
Watertown, MA 02472
