# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS, <br><br> Defendants. | Case No. 26-cv-00092-JAW |

## DECLARATION OF CARLYN WILLIAMS

I, Carlyn Williams, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am 36 years old and a current resident of South Portland, Maine.  I was born and raised in Maine.

PLAINTIFFS-000001

2.    On the morning of January 20, 2026, my spouse, Xenia Pantos, took my car to drive to work.  My car is a Chevrolet Bolt that I have owned since 2024.

3.    Around 10 a.m., Xenia tried to call me multiple times.  I was on a work call and unable to answer at first, but I paused my work call and picked up after receiving multiple calls. Xenia was crying and extremely upset about what they had just seen.  They told me they had just stopped to observe an ICE operation, and agents in military garb had taken a man on the side of the road.

4.    It was the first day of ICE's escalation in Maine, and there were many reports of ICE operations around Portland that day, although Xenia's call was the first I had heard of any ICE activity that day.

5.    Later that afternoon, around 3 p.m., I learned of reports that ICE agents were active in a nearby neighborhood with a large immigrant community where children were expected to be dropped off from school.  A friend picked me up at my house and we drove to the location where agents had been reported.  It was around school pickup time, and we wanted to be present at the bus stop to show support for our community, make sure kids got off the bus and back home safely, and witness and record any arrests by ICE agents.

6.    We arrived at the location of the reported sighting and parked in a nearby parking lot.  At that point, there were no ICE agents in the area.

7.    At 3:17 p.m., while sitting in the parking lot, I received a phone call from a "No Caller ID" number.

8.    I answered the call, and the person on the line asked, "Is this Carlyn Williams?" I asked who was calling, and the person said, "This is the Department of Homeland Security." I confirmed I was Carlyn Williams. The person then asked, "Does anyone other than you ever

drive your vehicle?" I responded, "No, not really." The person repeated a version of the question and asked if I was sure. I said, "Well, sometimes my spouse drives it." He said something like, "Was she driving it this morning? Are you aware that she stopped at an incident?" I believe he may have also said Xenia had taken photos and videos. I was disoriented by the questions and gave a non-committal response along the lines of, "I'm not sure." The person then said something like, "You should encourage her not to do anything like that in the future because people who are doing things like that might get added to a domestic terrorism watchlist." The call then ended.

9.      In total, the call lasted approximately one minute. The person on the call never provided their name or any identifying information other than DHS.

10.      I felt scared and shaky after the call. My friend called another friend who is a lawyer. None of us had heard about any observers or protestors receiving calls from DHS agents.

11.      I still do not understand who called me or how they obtained my information. Xenia later told me that they had seen an ICE agent take a photo of someone else's car during the encounter that morning, so I assume an agent took a photo of the license plate on my car as well.

12.      I also later viewed a video on Instagram of an immigration operation in Portland, which Xenia told me was a video of the incident they had witnessed. Near the very end of the video, an agent wearing a camouflage vest and a baseball cap can be seen holding up his phone and apparently recording the person who was filming the video. Because Xenia was at the incident as well, I believe this agent may have recorded my license plate and used it to find my cell phone number. Still, I am surprised someone was able to obtain my cell phone number just

PLAINTIFFS-000003

from running my license plate number, especially since I do not recall providing my phone number when registering my vehicle.

13.    The caller's questions made me feel particularly uneasy and vulnerable. I found it strange that the caller immediately asked whether someone else drives my car, instead of asking whether I had been observing the arrest that morning. I assume the caller had accessed a photo of me and realized I was not the person they encountered earlier in the day. It also made me uneasy that the caller immediately referred to Xenia (who uses they/them pronouns) as "she" when asking whether my spouse had been at the incident that morning. I understood that to mean the caller knew I was gay.

14.    I felt scared to drive my car that week, knowing that someone had my information and could be tracking me. I was on high alert when driving around town, always aware of who was following me and worried it might be an ICE vehicle.

15.    I also worried for our safety at home, where we had our foster child living with us at the time. After the phone call, Xenia and I discussed the need to take additional safety measures, such as buying a gun for protection and having a plan for leaving our home if necessary. We also considered changing my license plate.

16.    The phone call also made me hesitant to continue observing and recording ICE agents. I decided to do so two more times, but I always made sure I was in someone else's car since Xenia and I agreed that it wasn't safe to use our own vehicles. After one sighting of an ICE vehicle, two other observers said they had seen agents take photos of their license plates.

17.    I had many other opportunities to respond to ICE sightings but chose not to do so because I was afraid of interacting with agents. Xenia and I live very close to Redbank and Cash

PLAINTIFFS-000004

Corner, two neighborhoods in South Portland where ICE sightings were very frequently reported.

18.	Starting on March 13, 2026, Xenia and I took a trip to Quebec City, Canada, for our anniversary. We crossed the border from Maine into Canada at the Jackman Border Crossing without issue, driving Xenia's Hyundai.

19.	On the afternoon of March 16, 2026, Xenia and I arrived at the Jackman Border Crossing to return to Maine. Xenia was driving their car and handed our passports to the CBP agent, who later told us his name was Brad Guay. Agent Guay scanned the passports and then told us to pull into the first lane and get out of the car. He then took our phones and car keys and instructed us to go into the building and have a seat.

20.	Approximately five minutes later, Agent Guay called us up and asked, "Carlyn, do you have your car registration?" Xenia responded that we were driving in their car. The officer said something like, "I understand that, but do you, Carlyn, have your car registration?" I told him no, because it was in my car at home. He then asked what car I drive, and I said a Chevy Bolt. As I responded, I observed Agent Guay referencing his computer screen as though he were viewing information about my vehicle. He asked for the license plate number, but I said we didn't have it.

21.	I felt very nervous throughout the encounter, and I remember shaking and feeling my heart racing. When we were first asked to pull over, I expected we would be able to leave after a couple of minutes and continue on our way. I grew more and more anxious the longer we were held there without explanation.

22.	I was especially nervous when we asked to use the bathroom and the woman behind the counter said something like, "I don't know what you're in for, so I need to check with

PLAINTIFFS-000005

him" (meaning Agent Guay).  It seemed as though we were under investigation and not free to leave.

23.     Agent Guay told us he was going to search our vehicle and asked if we had anything that he should be aware of.  We told him that we had wine and food in the car, and he said he didn't care about that.  We watched from the waiting area as Agent Guay searched the car and our bags.

24.     We continued waiting after he completed the vehicle search.  Agent Guay seemed to consult with multiple other agents, but we could not hear what they said.  After some time, I approached Agent Guay to ask what was going on and make clear that Xenia and I are U.S. citizens.  He tapped our passports and said, "I can see that," but he did not provide any additional information.  I asked if we could answer any questions for him, and he said, "Not yet."

25.     Finally, about an hour after we had arrived, Agent Guay called us up and told us something like, "You'll be free to go soon, but I need to collect some information first."  He asked what we do for work, where we had stayed in Canada, and what our home address is, and said he needed it to complete a report.  We provided the information he requested and asked for his name.

26.     Before we left, I asked Agent Guay if he could tell us why we had been stopped.  He said I had an agricultural violation relating to a dog when I entered the United States through Mexico a long time ago.  I responded that I had brought a dog into the country in 2015 when returning from Peru with a layover in Mexico, but I had done so legally and had never been told before that I had committed a violation.

PLAINTIFFS-000006

27. I have traveled internationally at least 10 times since 2015, including crossing the Mexico border at a land crossing in 2023. I have never had an issue entering the country and have never been told there is a violation on my record.

28. I believe the reason Xenia and I were stopped and detained at the border is directly related to the incident in January where a DHS agent must have taken down my license plate information because Xenia observed and recorded their activities. I believe that based on the timing, the fact that I have never had an issue crossing the border before, and the fact that Agent Guay's first substantive questions to us were about *my* car and license plate. That struck me as particularly strange since we were driving Xenia's car and neither of us had previously mentioned owning another vehicle.

29. My car registration is up to date and does not expire until May 31, 2026. I can't think of any other reason why CBP would have asked about the car registration if not for the incident in January. I have had the car since 2024 and have never driven it across the border.

30. I felt very shaken after our detention at the border and needed time to process the experience. I feel certain now that my name and personal information are on a government watchlist of some kind. It is especially concerning to be tracked by the government as a married gay couple, given the current political climate.

31. After the experience at the border, I decided to leave the rapid-response messaging groups where I had previously learned about ICE sightings. It now feels too risky to even consider observing and recording ICE agents.

32. I am particularly afraid of traveling either internationally or domestically. I am strongly considering avoiding any international travel for the foreseeable future, as I would worry the whole trip about the possibility of being detained upon arriving back in the country. I

PLAINTIFFS-000007

have also seen news reports about other observers of ICE operations losing their TSA PreCheck status. I am enrolled in TSA PreCheck and I am concerned that my status will be revoked or otherwise affected as well, leading to additional issues while traveling.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 29, 2026 .

Carlyn Williams

PLAINTIFFS-000008