# EXHIBIT I

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS, | Case No. 26-cv-00092-JAW |
| Defendants. | |

## <u>DECLARATION OF POLYXENIA PANTOS</u>

I, Polyxenia Pantos, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am 35 years old and a current resident of South Portland, Maine.

2. I am a pediatric occupational therapist specializing in early intervention. I work with children across the Greater Portland area, including at daycares and in their homes.

PLAINTIFFS-000009

3.      On Tuesday, January 20, 2026, I took my spouse Carly's car (a Chevrolet Bolt) to work.  I often drive Carly's car instead of my own Hyundai, because her car is electric and I spend more time driving around the city for my job.

4.      Shortly before 10 a.m., I was driving from one daycare to another along Washington Avenue.  On the side of the road, I saw a group of unmarked cars with tinted windows and several agents standing near them.  It was the first day of ICE's enforcement surge in Maine, so I immediately was aware that these could be ICE agents.

5.      I decided to stop and record the ICE agents' actions.  I consider it a responsibility as a citizen to witness the actions of law enforcement, both to make them aware that people are watching and to help hold them accountable for any wrongdoing.  I have felt this way ever since witnessing an incident in Boston where cops violently slammed a young Black man against a sign.

6.      I looped around the block and parked behind another woman who was filming the ICE agents.  I had been wearing a mask while working at the daycare that morning because I was sick, so I put the mask on again and exited my car.

7.      By the time I arrived, the ICE agents had completed their arrest, but they continued to stand around and speak to each other.  I held my phone up and took a few photos of the agents and their vehicles.

8.      I stayed at the scene for about five minutes.  I did not interact with or verbally engage the agents at all, and I remained at least 10 feet away from them at all times.

9.      At one point, I saw a female agent take a photo of the other observer's license plate.  The agent was wearing a vest marked "POLICE HSI."

PLAINTIFFS-000010

10.     I later viewed a video of the incident I had witnessed on Instagram.[1]  Near the very end of the video, an agent wearing a camouflage vest and a baseball cap can be seen holding up his phone and apparently recording the person who was filming the video.  I believe I arrived on the scene while this Instagram video was being filmed, and I am concerned this agent may have filmed me as well.

11.     I soon left for work and called Carly, devastated and crying about the fact that federal agents were in our community, treating our neighbors this way.

12.     After work that day, Carly told me about a strange and alarming phone call she had received from an unknown number that afternoon.  She said the person on the call had said he was from the Department of Homeland Security and asked if I had stopped at an incident that morning.  She said the person had warned her that I would be put on a domestic terrorist watchlist if I continued to go to things like that.

13.     Based on our recent experience at the border (described below), I now feel confident that the person who called Carly was actually a DHS agent.  I believe the agent had access to Carly's phone number because he or another agent had scanned or photographed the license plate on Carly's car during my encounter with them earlier that day.

14.     The fact that Carly had received a call from someone who clearly knew where I had been that morning made me feel very unsafe and exposed.  It was scary to know that someone had our personal information and could come to our home at any time.  We took extra security measures at home after the call and even discussed buying a gun for protection and putting together a safety plan.

---

[1] https://www.instagram.com/reels/DTvRBzwjsHN/

PLAINTIFFS-000011

15. I have not observed or recorded ICE agents since that day. After the phone call, Carly and I decided that it was too risky to try to observe and record ICE agents in either of our cars. I was concerned that my car could also end up on a government watchlist, and I worried about what that would mean for us, our foster child, and for my clients.

16. In March 2026, Carly and I took a trip to Quebec City, Canada, for our anniversary. We drove my Hyundai, and we crossed the border from Maine into Canada on March 13 without issue.

17. On the afternoon of March 16, 2026, we arrived at the Jackman Border Crossing to return to Maine. I drove into the only open lane and gave our passports to the CBP agent, who later told us his name was Brad Guay.

18. Agent Guay took the passports, looked at them in the booth, and then told us to pull into the first lane. I asked why, and he said something like, "It's just policy."

19. Agent Guay asked us to get out of the car, took our phones and car keys, and told us to wait inside the terminal. He went to a desk, typed on his computer, and called us up a few minutes later.

20. When we reached the desk, Agent Guay asked Carly whether she had her car registration with her. This immediately raised alarm bells for me, since we were driving my car and had not mentioned anything about Carly having her own car. I suspected that we were being questioned because of the DHS incident in January. I told Agent Guay that we were driving my car, but Agent Guay continued asking Carly about her car and license plate.

21. I felt very scared and unsafe throughout the encounter. My passport has an "X" gender marker and I was aware how vulnerable we were in the terminal, with no other citizens

PLAINTIFFS-000012

present except for the two of us and a truck driver.  Carly and I discussed what we were going to do if we got separated and questioned.

22.    At one point, I asked to use the bathroom and was told something like, "I don't know what you're in for, so I need to check with him" (meaning Agent Guay).  I have crossed the border many times, and no one has ever used language suggesting I was "in for" something.

23.    I had taken off my watch in the car, and Agent Guay had taken our phones, so I had no idea what time it was or how much time had passed.  At one point, we asked Agent Guay what was going on and reminded him we were citizens, but he just tapped our passports and said, "I can see that."

24.    Agent Guay told us he was going to search our vehicle and asked if we had anything that he should be aware of.  We told him that we had wine and food in the car, and he said he didn't care about that.

25.    Agent Guay then searched the car, opening all four doors, the trunk, and our bags. There was food and wine in the car, but Agent Guay didn't say anything about it.

26.    Before we left, we asked Agent Guay what the incident had been about.  He said something about an agricultural violation and asked Carly if she had ever brought a dog or dog food into the country.  Carly said yes, she had brought a dog legally into the country in 2015. Carly and I have traveled internationally together multiple times since 2015, and no one has ever mentioned an agricultural violation on her record.

27.    Agent Guay asked for our home address, our jobs, and where we had stayed in Quebec City.  We asked him why he needed this information and he responded that he needed it to close his "report." After that, we were allowed to leave.

PLAINTIFFS-000013

28. I was really shaken after this experience. Carly and I got in the car and immediately started driving before we could look up a map because we were afraid of remaining at the border for any time longer than necessary.

29. I have continued to feel scared ever since. I strongly considered getting a new phone because I was worried that the government might have been able to review the contents of my phone.

30. Our experience at the border seemed to confirm that Carly and I actually are on a watchlist of some kind.

31. I have worried about what this means for our ability to travel and whether Carly and I should expect to be stopped and questioned again. We recently flew to and from the Outer Banks for vacation, and I was extremely nervous both times that we would be detained. I am even more concerned about any international travel. We are considering taking a trip with friends, but I am afraid that traveling internationally with us would make them vulnerable to government scrutiny too.

32. I have also worried about our personal safety. As part of a married gay couple and as someone who is non-binary, it is particularly unsettling to know we are on the government's radar in this political environment.

33. As an occupational therapist, I work closely with many children whose families have limited resources and whose immigration status I do not know. I am very worried that I am putting these families at risk because of their association with me. I often see clients in their own homes, and I have been concerned about driving Carly's car to their homes in case the car's movements have been monitored. In fact, I now frequently drive the less energy and cost

PLAINTIFFS-000014

efficient vehicle (my Hyundai) to clients' houses to minimize the risk I might be bringing to them by driving Carly's car to their houses.

34.    It is deeply upsetting to me that I may have endangered my spouse, our foster child, and my clients just because I did my civic duty by observing immigration agents and trying to keep my community safe.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

5/3/2026.

Polyxenia Pantos

PLAINTIFFS-000015