**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 2:26-cv-00092-JAW |

**MOTION TO DISMISS**

**TABLE OF CONTENTS**


INTRODUCTION ........................................ 1

BACKGROUND ........................................ 2

LEGAL STANDARD ........................................ 4

ARGUMENT ........................................ 6

I. Plaintiffs Lack Article III Standing for Prospective Relief ........................................ 6

A. Discovery did not reveal an ongoing retaliatory policy or practice; it showed the opposite. ........................................ 7

1. There is no policy authorizing First Amendment retaliation. ........................................ 7

2. There is no widespread or officially sanctioned practice of First Amendment retaliation. ........................................ 8

B. Plaintiffs' intent to continue observing ICE does not establish a likely future constitutional injury. ........................................ 12

1. The Maine Surge ended. ........................................ 13

2. Any encounter requires a highly fact-specific assessment. ........................................ 15

C. Plaintiffs' asserted chill cannot transform a speculative future injury into a present Article III injury. ........................................ 17

II. The Court Should Dismiss Counts II and IV ........................................ 19

III. The Court Should Dismiss the Unnamed Agents as Defendants ........................................ 20

CONCLUSION ........................................ 20

# TABLE OF AUTHORITIES

Page(s)

Cases

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......... 15, 16

*Air Sunshine, Inc. v. Carl*,
663 F.3d 27 (1st Cir. 2011) .......... 5

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) .......... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5

*Castro v. Scanlan*,
86 F.4th 947 (1st Cir. 2023) .......... 11

*Chicago Headline Club v. Noem,*
168 F.4th 1033 (7th Cir. 2026) .......... 14, 15

*Chiles v. Salazar*,
607 U.S. 627 (2026) .......... 19

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... *passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 7, 15, 17

*Colten v. Kentucky*,
407 U.S. 104 (1972) .......... 16

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996) .......... 4

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 4

*Gagliardi v. Sullivan*,
513 F.3d 301 (1st Cir. 2008) .......... 5

*Gericke v. Begin*,
753 F.3d 1 (1st Cir. 2014) .......... 15, 16, 19

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) .......... 10, 15

*Golden v. Zwickler*,
394 U.S. 103 (1969) .......... 6

*Gonzalez v. United States*,
284 F.3d 281 (1st Cir. 2002) .......... 5

*Gray v. Cummings*,
917 F.3d 1 (1st Cir. 2019) .......... 4, 12

*Hussen v. Noem*,
822 F. Supp. 3d 944 (D. Minn. 2026) .......... 14

*Laird v. Tatum*,
408 U.S. 1 (1972) .......... 17, 18

*Maryland v. Wilson*,
519 U.S. 408 (1997) .......... 10

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 15

*N.H. Right to Life PAC v. Gardner*,
99 F.3d 8 (1st Cir. 1996) .......... 17

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) .......... 6, 7, 12

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 6

*Ozonoff v. Berzak*,
744 F.2d 224 (1st Cir. 1984) .......... 18

*Ramirez v. Sanchez Ramos*,
438 F.3d 92 (1st Cir. 2006) .......... 17

*Reichle v. Howards*,
566 U.S. 658 (2012) .......... 10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4

*Valentin v. Hosp. Bella Vista*,
254 F.3d 358 (1st Cir. 2001) .......... 4, 5

**Statutes**

5 U.S.C. § 552a .......... 8, 10

**Rules**

Federal Rule of Civil Procedure 12 .......... 4

## INTRODUCTION

Plaintiffs seek judicial regulation of all federal immigration operations in Maine based on the actions of a handful of agents who were deployed there for an enhanced operation lasting four days in January 2026. From their isolated, irregular past encounters with those agents, Plaintiffs wrongly seek to extrapolate a broader federal policy or practice of retaliating against individuals who film immigration enforcement activities in Maine and seek sweeping prospective relief against federal agencies and senior officials. But the Constitution does not authorize prospective judicial supervision of federal law enforcement based on allegations of past misconduct without evidence of a sufficient likelihood that the plaintiff will be injured again in a similar way. That evidence is absent here.

The First Amended Complaint should be dismissed for several reasons. First, Plaintiffs lack standing to seek prospective relief because they cannot demonstrate a real and immediate threat that they personally will experience unconstitutional retaliation for simply exercising their First Amendment rights to safely record Immigration and Customs Enforcement (ICE) activity in Maine. Second, Counts II and IV merely repackage Plaintiffs' retaliation theories as claims for direct infringement of the First Amendment without identifying any independent restriction on their rights aside from the alleged retaliatory acts, or any clear theory apart from retaliation. Third, claims against "Unidentified Federal Agents" should be dismissed because Plaintiffs have not pleaded a basis for relief against them and instead chose to plead only claims for prospective injunctive relief pertaining to alleged policies and practices of the agencies.

## BACKGROUND

For four days in January 2026, the Department of Homeland Security (DHS) deployed an additional 159 ICE agents to Maine to carry out an enhanced immigration enforcement operation entitled "Operation Catch of the Day" (the "Maine Surge" or the "Surge").[1] Plaintiffs are four individuals who observed and recorded ICE activity during the Surge. Each had one encounter during that week where an agent allegedly (i) collected and maintained their personal information, and/or (ii) made threatening statements. First Am. Compl. ("FAC") ¶¶ 43-47, 58-67, 77-78, 82, ECF No. 29. Plaintiffs allege that on specific occasions during the Maine Surge: agents recorded Plaintiffs while Plaintiffs were recording them (Plaintiffs Fagan, Hilton, and Pantos); agents made statements characterizing Plaintiffs as "domestic terrorists" and suggesting that they would be put on a "database" or "watchlist" (Plaintiffs Fagan, Hilton, and Williams); and an agent recorded information about a Plaintiff in a DHS system, resulting in an inspection at a border crossing in March 2026 (Plaintiff Williams). FAC ¶¶ 32-93.

Plaintiffs assert that the agents they encountered acted pursuant to an "official federal policy" of collecting and maintaining protestors' personal information in government databases or watchlists to retaliate against their First Amendment activity. FAC ¶¶ 211, 219. They also assert that the agents used verbal threats and acts of intimidation consistent with a "nationwide pattern and practice" of retaliation. FAC ¶¶ 229, 237. They purport to bring claims on behalf of a class of Maine residents "who have exercised or will exercise their constitutional right to peacefully observe or record immigration enforcement operations conducted by Defendants in the District of Maine and

[1] Ex. A, Pls PI Ex. 45 (DEFS000831).

whose biometric data or other personal information is or will be collected and maintained by Defendants because of that activity." FAC ¶ 197.

Plaintiffs Elinor Hilton and Colleen Fagan filed their initial complaint on February 23, 2026, asserting their constitutional claims against DHS and several of its component agencies, as well as several unidentified federal agencies, departments, or components of the U.S. government and several unidentified federal immigration enforcement agents and officers. ECF No. 1, Compl. ¶¶ 10-21.

After commencing this action, Plaintiffs Elinor Hilton and Colleen Fagan immediately sought a temporary restraining order (TRO) prohibiting Defendants from collecting or maintaining their personal information based on First Amendment activity, placing them in any government database or "terrorist watchlist," or threatening or otherwise retaliating against them for observing or recording immigration enforcement. ECF Nos. 1, 3. On March 23, 2026, the Court denied Plaintiffs' motion. ECF No. 24. In addressing Plaintiffs' contentions of a broader governmental policy or practice, the Court distinguished cases involving extensive evidence of widespread constitutional violations. It concluded that the record before it did not contain the "multitudinous evidence" necessary to demonstrate a widespread policy or practice among immigration authorities in Maine and contained no evidence that federal officials ratified the alleged conduct. *Id.* at 19-20. The Court said Plaintiffs should seek discovery before moving for a preliminary injunction (PI) to determine whether the alleged wrongdoing was "more widespread and officially sanctioned and directed than the current record confirms." *Id.* at 20 n.2.

The parties thereafter negotiated a limited period of expedited discovery for purposes of Plaintiffs' PI motion, spanning from April 1 to May 22, with PI briefing to

begin on May 29 and a hearing the week of June 29. ECF No. 25. However, after obtaining Defendants' consent to limited expedited discovery and finalizing the schedule, Plaintiffs expanded the scope of issues for discovery, both by filing a First Amended Complaint that added claims from two new plaintiffs, Carlyn Williams and Polyxenia Pantos, and by representing that they may seek class-wide relief at the PI stage.[2] The "expedited" discovery window was thus extended two more times, ECF Nos. 40, 66, and finally closed after five full months on August 28, 2026. Plaintiffs ultimately received over 20,000 pages of documents and spent over 34 hours deposing Defendants employees, including two 30(b)(6) witnesses from ICE and CBP, and four ICE agents involved in Plaintiffs' encounters. Defendants received 350 pages of documents from Plaintiffs and deposed each of them. Materials from the extensive factual record are therefore referenced in this motion to support a factual challenge to subject matter jurisdiction.

## LEGAL STANDARD

Subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1). *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001). A court lacks subject matter jurisdiction if there is no Article III standing, *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996), which must be demonstrated by the plaintiff "for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Prospective equitable relief requires a threatened injury that is "concrete" and "real and immediate' not 'conjectural' or hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021); *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019).

[2] *See, e.g.*, ECF No. 40 n.2; Ex. B, Discov. Hrg Tr. 05/12/2026 26:7-27:6, 29:16-22.

A jurisdictional attack may be facial or factual. In a facial challenge, "the court must credit the plaintiff's well-pleaded factual allegations," draw all reasonable inferences in the plaintiff's favor, and adjudicate the challenge accordingly. *Valentin*, 254 F.3d at 363. By contrast, in a factual challenge, the defendant disputes "the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff and proffer[s] materials of evidentiary quality in support of that position." *Id.* The facts pled in the complaint are entitled to "no presumptive weight," and the court may review evidence beyond the pleadings. *Id.* Attaching exhibits to a 12(b)(1) motion does not convert it to a motion for summary judgment. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must assert factual allegations that "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, they "raise a right to relief above the speculative level," *id.* at 555. While the plausibility standard is not a "'probability requirement,' . . . it does require 'more than a sheer possibility that a defendant has acted unlawfully.'" *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 33 (1st Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the complaint fails to include "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," it should be dismissed. *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (citation omitted).

## ARGUMENT

### I. Plaintiffs Lack Article III Standing for Prospective Relief

Despite extensive discovery, Plaintiffs cannot establish anything more than speculation that they will be subjected to the same activity because all the evidence reveals that Defendants' policy is to *not* record individuals based only on First Amendment activity, and the evidence *fails* to demonstrate a widespread practice of authorizing First Amendment retaliation. Furthermore, considering that the January encounters occurred during a large-scale operation that has since ended, whether a future encounter will occur, let alone produce the particular conduct challenged here—and do so under circumstances rendering that conduct unconstitutional—depends on a chain of speculative contingencies Article III does not permit the Court to assume.

Time and again, the Supreme Court has reiterated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). And it is equally insufficient for a plaintiff claiming standing to observe that the challenged conduct is repeatable in the future. *See Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (noting "that the former Congressman can be a candidate for Congress again is hardly a substitute for evidence that this is a prospect of immediacy and reality" (emphasis added)). Nor does a claim that an allegedly illegal practice is commonly used suffice to make the threat to the plaintiff sufficiently concrete. *Lyons*, 461 U.S. at 106 ("The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds . . . falls far short of the allegations that would be necessary to establish a case or controversy between these parties."). Standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025)

(Kavanaugh, J. concurring in grant of stay). Plaintiffs must establish that they themselves are likely to be subjected to the same allegedly unconstitutional conduct they seek to enjoin. *Lyons*, 461 U.S. at 105-06, 111; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Vasquez Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J. concurring in grant of stay) ("[P]laintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent. Therefore, they lack Article III standing[.]").

### A. Discovery did not reveal an ongoing retaliatory policy or practice; it showed the opposite.

Plaintiffs seek to enjoin a purported policy or practice of intimidating observers because they engage in protected activity. To support standing, Plaintiffs must show that the challenged conduct was authorized or that it reflected a pattern sufficiently attributable to official policy. *See Lyons*, 461 U.S. at 105-06, 110 n.9. The evidence shows neither.

#### 1. There is no policy authorizing First Amendment retaliation.

DHS policy instructs personnel not to "profile, target, or discriminate against any individual for exercising his or her First Amendment rights," and not to "collect, maintain in DHS systems, or use information protected by the First Amendment" unless an exception applies, such as when "that information is relevant to a criminal, civil or administrative activity relating to a law DHS enforces or administers."[3] All ICE officers must receive regular training on the First Amendment Policy at least once per year.[4] Consistent with the First Amendment policy, ICE does not authorize capturing information about individuals for merely exercising their First Amendment rights; instead, that happens

[3] TRO Opp'n Ex. B, DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019), ECF No. 18-4

[4] ICE 30(b)(6) Dep. 180:6-181:6.

if there a legitimate law enforcement purpose, such as conduct impeding operations or presenting a potential safety concern.[5] *See* 5 U.S.C. § 552a(e)(7) (providing that that an agency that maintains a system of records shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment . . . unless pertinent to and within the scope of an authorized law enforcement activity. . . .").

Plaintiffs identify no DHS or ICE policy instructing or authorizing officers to collect and maintain information about First Amendment activities without an appropriate law enforcement purpose, or to threaten observers with placement on a terrorism-related database simply because they are exercising their First Amendment rights. To the contrary, DHS's First Amendment Policy prohibits exactly that conduct. After the January incidents, ICE issued a reminder of the First Amendment Policy to all agents and officers in Maine.[6] And a supervisory official for ICE stated he neither "approve[s] nor condone[s]" the actions of the individual ICE agents involved in the complained-of encounters."[7]

**2. There is no widespread or officially sanctioned practice of First Amendment retaliation.**

The Court previously concluded that the record lacked evidence of an official policy of retaliating against protestors but left open the possibility that discovery might show the challenged conduct was "more widespread and officially sanctioned and directed than the current record confirms." TRO Order, ECF No. 24 at 20 n.2. After months of expedited discovery directed to that very question, the evidence does not show that the conduct in the FAC was widespread, officially sanctioned, or directed. Plaintiffs' mere

[5] ICE 30(b)(6) Dep. 244:15-245:5, 258:6-259:17, 281:14-282:2, 288:17-289:6, 290:9-21, 305:11-22, 319:13-24, 381:18-382:3.
[6] TRO Opp'n Ex. B, DHS Memo.
[7] Wells Decl. ¶ 8, ECF No. 18-2.

characterization of discrete incidents as a "practice" cannot substitute for the far more robust showing that is needed to support a sweeping injunction regulating DHS's activities.

The "domestic terrorist" and "watchlist" remarks alleged in the FAC arose twice during the Surge, in the two instances that began this case.[8] At other times during the Surge, Plaintiffs engaged in multiple opportunities to observe and record ICE activity, and none allege First Amendment injuries during any of those other opportunities.[9] Also, the challenged conduct in the FAC was limited to a small subset of the 159 agents who were temporarily deployed during the Maine Surge. Three of the four encounters—those involving Hilton, Pantos, and Williams—involved the same Boston HSI team, and their allegations substantially overlap in their reliance on the conduct of Agent J.C., who made allegedly threatening statements to both Hilton[10] and Williams,[11] and who documented Williams' name and vehicle information in HSI's Internal Case Management ("ICM") system,[12] which led to the March 2026 border stop referenced in the FAC.[13] Fagan's encounter involved a different ERO team temporarily deployed from Utah.[14] The ERO

[8] J.R. Dep. 326:8-20; J.C. Dep. 177:15-178:6, 319:2-9. *See infra* n.11.

[9] Ex. C (Plaintiffs' Responses and Objections to Defendants' Expedited First Set of Interrogatories to Elinor Hilton and Colleen Fagan, at 14-15); Fagan Decl. ¶¶ 3-8, ECF No. 3-5; Ex. D (Plaintiffs' Responses and Objections to Defendants' Expedited First Set of Interrogatories to Polyxenia Pantos and Carlyn Williams at 19-22).

[10] J.C. believed Hilton violated traffic laws and chased his team while they had a prisoner in their custody, interrupting their ability to safely meet with a transport vehicle. J.C. Dep. 165:14-22, 167:13-22, 171:16-21, 180:8-16. He testified that he intended to give "a verbal warning in hopes that they just don't do that again," *id.* 180:14-16, and acknowledged that he could have "chosen better words," *id.* 317:17-18.

[11] The fact that J.C. called Williams on her cell phone not in dispute, though J.C. and Williams have different recollections about what was said on the call. According to Williams, J.C. referenced a "domestic terrorism watchlist," which J.C. has denied. Williams Suppl. Decl. ¶ 14; J.C. Dep. 177:15-178:6, 319:2-9.

[12] ICM is the case management system used to document HSI investigations. J.C. documented contemporaneous subject records on 8 individuals he encountered in Maine that he believed posed "potential threats to law enforcement" in case "future law enforcement comes into contact with them." J.C. Dep. 111:13-17; 144:9-146:7, 155:8-21, 220:2-221:5, 226:6-15, 228:9-13, 326:4-15. J.C. did not attempt to nominate any individuals to the terrorist watchlist. *Id.* 324:22-325:2.

[13] J.C. explained that he believed, and believes, that Williams was interfering with an arrest, was one of two people who were aggressive toward ICE officers and would not follow orders, and that he "wanted to come back and investigate her later." J.C. Dep. 125:18-19, 126:10-12, 146:18-24.

[14] J.R. Dep. 304:17-19.

officer who made the "domestic terrorist" remark to Fagan relayed to his supervisor that he was "trying to be funny," and was given verbal counseling to be more mindful of what he says.[15] Both the Boston and Utah teams left Maine when the Surge ended.[16]

At most, Plaintiffs can show sporadic instances in which officers used their government phone cameras to document the appearances of individuals and vehicles that inserted themselves into active law enforcement operations, and used basic license plate searches to make on-the-spot determinations about potential risks to their safety and the integrity of their operations. For example, in their recent PI motion, Plaintiffs referenced communications showing that ICE officers would run routine name and record checks on the vehicles that followed them. But officers have legitimate reasons to identify individuals or vehicles encountered during enforcement activity, assess whether they present safety or operational concerns, and to obtain address information in connection with those functions. *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 412 (1997) (describing the government's interest in officer safety as "legitimate and weighty") (citation omitted); *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (recognizing a traffic stop as an "inherently dangerous situation"). To establish a widespread pattern or practice of sanctioned unlawful conduct, Plaintiffs must establish at a minimum that these actions were actually unlawful, *i.e.*, not within the scope of the Privacy Act's allowance for collecting and maintaining First Amendment-related information[17] "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7); *see also Reichle v. Howards*, 566 U.S. 658, 668 (2012) (noting that it is "wholly legitimate" to take law enforcement action because of

[15] J.R. Dep. 144:5-15, 145:11-15.
[16] J.R. Dep. 304:17-19; J.C. Dep. 23:11-17.
[17] For purposes of this motion, Defendants reserve their challenge to the proposition that stalking, tailing, or chasing law enforcement vehicles is itself First Amendment protected activity.

speech if the "speech provides evidence of a crime or suggests a potential threat"). Plaintiffs have not done so but instead rely on assumptions that *all* such activity was unlawful. That is not sufficient to create a chilling effect or show a likely future injury.

Plaintiffs attached exhibits to their PI briefing indicating that personnel occasionally discussed cars that were tailing them and driving to the owner's registered address. And they attached declarations from Plaintiff Hilton and a husband-and-wife pair who claimed that this happened to them in June 2026. But no Plaintiff claimed that this happened to them in the SAC, and standing is assessed by "the facts as they existed at the time the [operative] complaint was filed." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023) (brackets in original) (citations omitted). In any event, the evidence does not establish that that this was regular, officially sanctioned, or retaliation against speech.

Ultimately, Plaintiffs' policy theory does not eliminate the contingencies that their claim for injunctive relief rely on. Even if Plaintiffs again encounter immigration officers, Article III still requires a nonspeculative basis to conclude that those officers are likely to employ the same practices challenged here. The record identifies no policy directing them to do so, no evidence that the officers responsible for the January incidents remain in Maine, and no subsequent incident establishing that current Maine personnel have threatened anyone with placement on a terrorism-related database or harassed individuals who were simply filming them from a safe distance. Their theory requires the Court to infer from disputed past incidents during an extraordinary operation that different officers, operating under materially different circumstances, will engage in similar unconstitutional conduct in the future. Those inferences should not be made.

*Lyons* reinforces that conclusion. There, despite an alleged policy of routinely using chokeholds in circumstances when officers were not threatened by deadly force, the plaintiff lacked standing because he had not shown an "immediate threat" that he would be subjected to another chokehold "without any provocation or resistance on his part." *Id.* at 105. Here, Plaintiffs have not established a policy of retaliation, thus their claims are even weaker than those the Court rejected in *Lyons*.

Finally, even if Plaintiffs were able to marshal sufficient evidence of a directed policy or practice of violating First Amendment rights, it would still not be enough to overcome the other contingencies in this case. An alleged policy or practice may bear on whether conduct could recur somewhere; it does not establish the distinct proposition that a particular plaintiff "will again be wronged in a similar way." *Gray*, 917 F.3d at 19 (citation omitted). That other individuals might suffer harm does nothing for a plaintiff's own standing; Plaintiffs must establish both a sufficient likelihood the predicated wrongful conduct will recur *and* that plaintiff herself will suffer it. *See, e.g.*, *Vasquez Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J. concurring in grant of stay) ("[P]laintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent. Therefore, they lack Article III standing[.]").

**B. Plaintiffs' intent to continue observing ICE does not establish a likely future constitutional injury.**

Plaintiffs have stated that they intend to continue observing and recording immigration enforcement, but even in the remote chance that Plaintiffs locate an ICE arrest happening in Maine's public spaces again, the likelihood of future contact with law enforcement is not the likelihood of future constitutional injury. *See Lyons*, 461 U.S. at

105-06, 108-09. Plaintiffs must establish that each of them faces a sufficiently likely prospect of again being subjected to the challenged conduct. And that conclusion does not follow merely because Plaintiffs intend to continue engaging in the same protected activity that preceded their earlier encounters.

**1. The Maine Surge ended.**

The Maine Surge was different from ordinary ICE activity in Maine, and the Surge has indisputably ended. ICE deployed 159 additional personnel from around the country for the enhanced operation that lasted four days and resulted in a sharp increase in arrests.[18] ICE made 204 arrests in January; 187 of them during the four-day Surge, compared with 32 arrests in December.[19] The Surge then ended and enforcement returned to approximately its pre-Surge level. By January 29, Senator Collins reported that ICE ended its enhanced activities and had no ongoing or planned large-scale operation in Maine.[20] And in February, ICE made 27 arrests—an 87% reduction from January and 15% fewer than in December.[21] Plaintiffs' past exposure to allegedly unlawful conduct during exceptional circumstances does not establish likely future exposure under materially changed present conditions.

Just today, the district court in *Tincher v. Mullin* granted the government's motion to dismiss and denied the plaintiffs' motion for jurisdictional discovery on standing grounds based on the end of Operation Metro Surge ("OMS"). *See* Ex. E, Order, No. 25-cv-4669, (D. Minn. Sep. 18, 2026), ECF No. 352. Despite having previously found standing at the preliminary injunction stage, the district court recognized that the end of OMS and consequent drawdown of officers now made the plaintiffs' possibility of future

[18] *See* Pls. PI Exhibit 45; Ex. F (MIRC OCTD Dashboard).
[19] Ex. G (MIRC Apprehension Dashboard); Ex. F (MIRC OCTD Dashboard).
[20] Ex. H (Sen. Collins' X Post).
[21] Ex. G (MIRC Apprehension Dashboard).

injury too remote. *Id.* at 20-22. The court noted that what shaped its earlier analysis "was the sheer number of agents deployed to the Twin Cities at that time" and the way that "officers frequently conducted at-large arrests of noncitizens, which lead Plaintiffs to their distinctive follow-and-observe protest strategy." *Id.* at 20. After OMS, however, "the past injuries Plaintiffs experienced are less indicative of a threat of imminent future harm given that they are less likely to be out protesting at-large immigration enforcement activities when fewer of those actions are taking place." *Id.* at 20-21. That decision is consistent with other courts' reasoning, including the Seventh Circuit's, recognizing how the end of an "enhanced immigration enforcement initiative . . . could affect both the justiciability of this case and the propriety of injunctive relief." *Chicago Headline Club v. Noem* 168 F.4th 1033, 1037 (7th Cir. 2026); *see also* Stay Order, *Chicago Headline Club*, No. 25-3023, Dkt. 28 at 2 (Stay Order) (7th Cir. Nov. 19, 2025) (noting that standing was in "substantial tension with *Lyons*"); *Hussen v. Noem*, 822 F. Supp. 3d 944, 984, 1003 (D. Minn. 2026) ("The drawdown of Operation Metro Surge makes it less likely that irreparable harm will occur," as "scaling down law enforcement by 60-70% dramatically reduces the number of stops and arrests."). For the same reasons, Plaintiffs fail to establish standing here.

Plaintiffs offer no objective evidence establishing that opportunities for encounters like those underlying their claims have persisted. Instead, Plaintiffs rely on generalized assertions about continued ICE activity from near the time of the Surge: Hilton estimates that she learned of approximately fifty opportunities to observe enforcement activity during the week following her January 21 encounter.[22] Fagan asserts that "there have been many reported ICE sightings in my community in Greater Portland since January 2026."[23]

---

[22] Hilton Suppl. Decl. ¶¶ 2, 35, 37, 40.
[23] Fagan Suppl. Decl. ¶ 24.

Williams states that ICE sightings were reported "very frequently" through March 16.[24] Pantos asserts that operations increased significantly in May and that "many" opportunities would have existed had she continued looking for them.[25] These claims do not credibly rebut that ICE's operational presence and resources in Maine declined substantially after the Surge ended.[26] More fundamentally, that ICE continues to conduct regular enforcement activity does not establish that any particular Plaintiff is likely to encounter ICE again, much less have an encounter sufficiently similar to reproduce the asserted injury. *See Chicago Headline Club*, 168 F.4th at 1041; *Murthy v. Missouri*, 603 U.S. 43, 73 (2024).

**2. Any encounter requires a highly fact-specific assessment.**

Even if a Plaintiff encounters another ICE operation, whether that encounter will produce an alleged First Amendment violation necessarily depends "a highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. The First Circuit recognizes a right to record law enforcement officials performing their duties in public. *Glik*, 655 F.3d at 82-84. But "[t]he right to film . . . may be subject to reasonable time, place, and manner restrictions." *Id.* at 84. Officers may issue "reasonable orders to maintain safety and control" that incidentally affect the right to film. *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012)). As such, "a

---

[24] Williams Suppl. Decl. ¶ 29.

[25] Pantos Suppl. Decl. ¶ 36.

[26] Plaintiffs possessed contemporaneous records uniquely capable of substantiating those assertions. Their community Signal groups existed specifically to share information about enforcement activity so that members could locate and observe ICE operations. *See, e.g.*, Hilton Supp. Decl. ¶ 2. Defendants therefore requested Plaintiffs' communications and records reflecting reported ICE sightings from January 20 onward, which would permit comparison of the frequency of reported enforcement activity during and after the Surge. *See* Ex. I, Plaintiffs' Responses and Objections to Defendants' Expedited First Set of Requests for Production of Documents to Elinor Hilton and Colleen Fagan at 7-8 (RFP No. 3), 10-11 (RFP No. 7); Ex. J, Plaintiffs' Responses and Objections to Defendants' Expedited First Set of Requests for Production of Documents to Polyxenia Pantos and Carlyn Williams at 8-9 (RFP No. 3), 12-13 (RFP No. 8). Plaintiffs produced none.

command that bystanders disperse . . . even when directed at a person who is filming, may be appropriate for legitimate safety reasons." *Id.* Orders "specifically directed at the First Amendment right to film" may only be imposed, however, "if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties." *Id.*

Any likelihood of unconstitutional interference with the right to film will turn on the circumstances of the particular encounter—including the operational circumstances confronting the officers, whether any restriction is directed at the act of recording itself or instead reflects a legitimate safety or operational concern, and the Plaintiff's own conduct. *See Gericke*, 753 F.3d at 8. A bystander who does not comply with "reasonable orders to maintain safety and control" is no longer engaged in First Amendment activity. *Id.* Therefore, if a Plaintiff decided not to comply with an officer's orders, and an officer responded to the Plaintiff's conduct in a way that the Plaintiff claims is retaliation against her First Amendment rights, a fact-specific assessment would be needed to determine whether it was retaliation for protected activity or a response to activity that was no longer within the realm of the First Amendment. *See Colten v. Kentucky*, 407 U.S. 104, 109 (1972) ("We have little doubt that Colten's conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment.").

The Court cannot know in advance whether those circumstances will arise, much less whether they will give rise to a constitutional violation. Plaintiffs' theory of future injury thus depends on a chain of contingencies far too attenuated to establish standing. A particular Plaintiff must encounter a future immigration operation; circumstances must produce an interaction with federal officers; those officers must respond in one of the particular ways challenged here; and the circumstances must make that response

unconstitutional. Article III does not permit prospective relief to rest on such a "speculative chain of possibilities." *Clapper*, 568 U.S. at 410. Moreover, one should not lose sight of the fact that DHS's First Amendment Policy prohibits the violations Plaintiffs claim to fear.

### C. Plaintiffs' asserted chill cannot transform a speculative future injury into a present Article III injury.

Plaintiffs cannot avoid the requirement of establishing a concrete risk of imminent injury by claiming to have a present or ongoing "chilling effect" from the conduct challenged here. Hilton has admitted that she recently moved out of state, and the record does not credibly demonstrate that Hilton or Fagan have experienced an ongoing chilling effect.[27] In any event, self-censorship can constitute an injury only when it results from a *credible* threat, not subjective apprehension alone. *See Ramirez v. Sanchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006); *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996). That rule accords with *Clapper*; Plaintiffs cannot manufacture standing by undertaking burdens in response to a future injury that is itself not sufficiently imminent. 568 U.S. at 416. And it accords with *Lyons*; the fact that a plaintiff allegedly alters her present conduct because of a past constitutional injury does not establish that she is sufficiently likely to suffer that injury again. Plaintiffs' alleged decision to restrict their activities because they fear that possibility does not make it less speculative. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

In *Laird*, the plaintiffs' claims that their exercise of First Amendment rights was chilled by "the mere existence, without more, of a governmental investigative and data-

[27] Hilton Suppl. Decl. ¶¶ 1, 12; Order After In Camera Review at 2, ECF No. 99 ("The documents also lack any information to suggest that members of the group have refrained from their monitoring activities due to the prior actions of ICE agents."); Fagan Dep. 24:9-23, 26:1-3, 85:5-19, 86:15-88:3, 91:1-92:12.

gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose" was held to be insufficient to establish the "real or immediate" harm required by Article III. *Laird*, 408 U.S. at 10. Plaintiffs have attempted to distinguish *Laird* by pointing to *Ozonoff v. Berzak*, 744 F.2d 224, 228-29 (1st Cir. 1984). *Ozonoff* is inapposite. In that case, the plaintiff was challenging an executive order that would have allowed the government to investigate his political activity before hiring him. *Id.* at 225-27. The First Circuit found those circumstances—which would have required the plaintiff to choose between "either (1) bringing his speech or associational activity into conformity with a (typically vague) standard or (2) risking loss of an employment opportunity"—resembled "the cases that *Laird* distinguished, where standing was found." *Id.* at 229. The Supreme Court distinguished other cases in *Laird* by noting that, in those cases, "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird*, 408 U.S. at 11. Plaintiffs in this case do not challenge a government order and cannot simply claim a "chilling effect" without establishing an imminent injury.

At bottom, for purposes of standing to pursue the injunctive relief they seek in this case, Plaintiffs cannot rely on their "subjective apprehensions," but must instead rely on evidence demonstrating "the reality of the threat of repeated injury." *Lyons*, 461 U.S. at 107 n.8. Even assuming Plaintiffs will continue seeking out opportunities to record immigration operations in Maine, the record supplies no basis to conclude that any Plaintiff is sufficiently likely again to encounter an officer who will engage in the particular conduct challenged in the FAC. Because Article III requires a "sufficient likelihood" that each

Plaintiff will "again be wronged in a similar way," *id.* at 111, Plaintiffs lack standing to obtain the prospective relief they seek.

## II. The Court Should Dismiss Counts II and IV

Plaintiffs' four First Amendment claims concern two sets of alleged conduct: collecting and maintaining personal information (Counts I and II) and making allegedly threatening statements (Counts III and IV). FAC ¶¶ 207-43. Counts I and III expressly plead First Amendment retaliation. FAC ¶¶ 207-14, 228-31. Counts II and IV purport to plead separate claims for direct infringement of Plaintiffs' First Amendment rights. FAC ¶¶ 216-24, 233-42. But the latter claims identify no independent restriction on Plaintiffs' protected activity. Instead, they challenge the same conduct alleged in Counts I and III, on the same ground that Defendants undertook that conduct because Plaintiffs exercised their First Amendment rights and thereby chilled their speech. Counts II and IV thus plead retaliation again, not a distinct theory of direct First Amendment infringement.

The FAC does not identify what First Amendment theory Plaintiffs are pleading in Counts II and IV. Plaintiffs' PI briefing appears to characterize these counts as claims of viewpoint discrimination. Pls.' Mot. for Prelim. Inj. & Incorporated Mem. of Law, ("PI Mot") at 28-32, ECF No. 101-2. But viewpoint discrimination ordinarily concerns governmental regulation or restriction of expression because of the viewpoint expressed. *See Chiles v. Salazar*, 607 U.S. 627, 641 (2026). Plaintiffs identify no regulation, prohibition, or order restricting what they may say or record. Nor do they allege that officers ordered them to stop filming; to the contrary, Plaintiffs acknowledge that they were never ordered to stop. FAC ¶¶ 49, 59; *cf. Gericke*, 753 F.3d at 8 (addressing restrictions on the right to film). Government conduct does not become a direct infringement on the First Amendment merely because it has some downstream effect on protected activity. *See*

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 708 (1986) (O'Connor, J., concurring) (noting that it would be "absurd" to "require analysis under the First Amendment" of "any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation[.]"). Here, the collection of information and allegedly threatening statements are not alleged to regulate Plaintiffs' speech on their face. What allegedly connects those actions to the First Amendment is why Defendants took them. Plaintiffs allege that Defendants acted because Plaintiffs observed and recorded them, with the purpose and effect of deterring that protected activity. FAC ¶¶ 218, 235. That is the gravamen of a retaliation claim.

## III. The Court Should Dismiss the Unnamed Agents as Defendants

Finally, to the extent Plaintiffs purport to assert claims against specific law enforcement officers, those claims should be dismissed. The FAC names "Unidentified Federal Defendants" as Defendants, but merely including unidentified persons in the caption does not state a claim against them. The FAC does not clearly identify which claims are asserted against the unidentified officers, what relief Plaintiffs seek against them, or the factual basis on which any particular officer is allegedly liable. Plaintiffs' claims are for prospective relief pertaining to an alleged policy or practice. They cannot seek injunctive relief against officers from Boston and Utah who have no likelihood of returning to Maine.

## CONCLUSION

For these reasons, the Court should dismiss this case.

Dated: September 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER HAAS

Branch Director

/s/ *Natalie M. Villalon*
NATALIE M. VILLALON
J. STEPHEN TAGERT
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 860-9963
Natalie.M.Villalon@usdoj.gov
Stephen.Tagert@usdoj.gov

ANDREW B. BENSON
United States Attorney

JOHN G. OSBORN
Assistant United States Attorney
United States Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
John.Osborn2@usdoj.gov

*Counsel for Defendants*