**In the Matter Of:**

*HILTON v*

*MULLIN*

*Highly Confidential - Attorneys' Eyes Only*

[redacted]

*August 13, 2026*

LEXITAS™

Q. Okay. Got it.
And when you say that he asked you because they were a man short, what did you mean by that?
A. Their team was short. I don't know why.
Q. Okay. Got it.
How long were you on the TDY to Maine?
A. Not very long. It was short.
Q. Help me try to approximate what "very short" means.
A. I don't believe it was longer than a week. I think weather called it off. It was supposed to be longer, and I believe weather called it off.
Q. Okay. And when it got called off, did you go back home to Boston?
A. Yes.
Q. Okay. Got it.
And after Maine, have you TDYed elsewhere?
A. No.
Q. Okay. Got it.
And what is your current assignment?
A. Counterterrorism leads.
Q. Okay. And when did you get that

Q. When you say "if I had anything," what does that mean?
A. If I generated a new criminal case, it would require her approval.
Q. I see. Okay. Now, the incident that we were just going through and the videos, where you described -- well, and we saw female one and you described female two, did you generate a new criminal case in connection with either of them?
You can answer.
A. No.
Q. Okay. Why not?
A. It was just a subject record generated because it's -- they are a threat -- potential threats to law enforcement. If future law enforcement comes into contact with them, I wanted that to be known.
I didn't go into a criminal case because, honestly, the ladies that I encountered were the least of my worries. I got in a fight, a foot chase, and other things later that I was more focused on than what you're asking me about.
Q. Okay. So I now want to just turn to what we're going to mark as Coleman Exhibit 7,

A. Yes.

Q. Okay. And, again, based on the other searches and pulls you had already done?

A. Yes.

Q. Okay. We've already gone through the subject record information, although this one is a little bit different, so let me dwell on subject record category. Here, you have [redacted]

Do you see that?

A. Yes.

Q. What does that mean?

A. The drop-down that populated that, it's an immigration case-related, to my -- to the best of my knowledge.

Q. Okay. And why would you select that it's immigration-related?

A. Because I believed her to be interfering with an arrest and the transportation of a person who had immigration crimes.

Q. Okay. The next one, different primary action code. Here, I take it this is a selection out of a drop-down menu, but the primary action code is [redacted]

What does that mean?
A. To my knowledge, it's to -- that
[redacted]
Q. And --
A. I don't know more than that.
Q. Okay. But this is your -- your selection to recommend [redacted] is that right?
A. She didn't meet the [redacted] because I wanted to come back and investigate her later. I just wasn't afforded the opportunity to.
Q. Okay. So this is you saying that you wanted someone to look into her?
A. Just --
MR. TAGERT: Objection. Speculation.
Q. Is that right?
A. She's just being referred to Customs.
Q. Well, when you say [redacted] what does that mean?
A. The status itself is just -- it's option number [redacted]. It's a drop-down menu.
[redacted] -- I can't recall how many, but [redacted] is on

identifying HSI agents to potentially dox them."
Do you see that?
A. Yes.
Q. Now, I mean, this is the woman in the video. So help me understand, on what basis did you have reason to believe that what she was filming was for the purpose of potentially doxing HSI agents?
A. I can go off of my notes and what I vaguely remember. And the notes are accurate for the time that I created the record, that statements made, the aggressiveness of the person present. The video is a fraction what they did there. That's -- we were there longer than a few minutes.
Q. Okay. So what is not captured on the video that led you to believe that she was there with the purpose of identifying the HSI agents to potentially dox them?
A. So --
MR. TAGERT: Go ahead.
A. While I was in Maine, from multiple different locations, I heard multiple times that people were going to find me and my family, and

we're going to pay for it. I heard many threats, and I heard tons of profanity towards us.

In regards to proximity of the events, the notes were right after the event. You're asking me now. I don't recall 100 percent of the specifics. The notes would be more accurate than my memory currently.

Q. Okay. So you're saying what was not caught on video footage is something other than her just saying, "I'm entitled to film"?

A. Yes.

Q. Okay. And is it your representation that this individual said that -- something along the lines of she was going to find you and your family?

MR. TAGERT: Objection. Misstates testimony. You can answer.

A. I am saying that the notes reflect what I was thinking and what I observed at the time of the incident. And I can tell you today, from my recollection of what happened, I left there in amazement of how people treated us. It was aggressive. Borderline violent. They were combative, not listening. They wouldn't get away

from us so we could just leave.
The goal of the whole time that we were there with the team was to just make the arrest and leave. We didn't want to deal with the public. And that's what we tried to do. We made ten arrests. And of the ten arrests, there wasn't a problem at every single one.
Q. And you successfully made all ten arrests?
A. Yes. I didn't do all ten. I did -- I put handcuffs on eight of ten. That's what I recall.
Q. Fair to say that Agent [redacted] was much closer to Ms. Neff for the entirety of that operation?
MR. TAGERT: Objection. Speculation. But go ahead.
A. Agent [redacted] was walking around. So were the people present that were aggressive. I can't honestly say one way or the other if he directly dealt her the whole time. I specifically remember two people who were extremely nasty, combative, and did not follow any order whatsoever.

A. Good afternoon.
Q. I hope you had an okay lunch. Just okay?
A. Just okay.
Q. Okay. Before we show you the next document, I just wanted to ask a follow-up from where we left off at lunch.
And you remember we were talking about the ICM records associated with [redacted] and the Toyota [redacted] that were there at the operation encounter on the morning of January 20th.
Do you remember that?
A. Yes.
Q. Okay. And you were telling us that what we didn't see in the videos that were played this morning was the entirety of the encounter, and you have some recollection, as reflected in those ICM records, about a potential threat to dox.
Do you remember that?
A. Yes.
Q. Okay. What is doxing?
A. It's when people try to discover the identity of someone else with the intention of

Q. Okay. Got it. That's what you mean by "unmarked"?

A. Yes.

Q. Okay. When various agents who you were not able to identify tell Hilton -- Ms. Hilton more than once that they can record, you heard the comments, "Absolutely, you can. I didn't say you couldn't. Yeah, you can film. Just let them do their thing," you understood that that was an accurate statement of protesters' First Amendment rights to record? Yes or no?

MR. TAGERT: Objection. Calls for a legal conclusion and speculation.

Q. You can answer.

A. So you saw me walk up to Ms. Hilton. It wasn't just a female recording. Prior to that, she got out of the vehicle that chased me across two towns while I had a prisoner in the back of my car. And so she was trying -- she was part of a group of people who were trying to interfere with the transportation of a prisoner who was wanted for immigration crimes.

Q. And so how do you know that it was Ms. Hilton?

A. Am I allowed to state why, or you don't care?

Q. Yes, of course. No, of course.

A. Prior to that, there was a group of organized people who were responding to law enforcement surveillance that intentionally interrupted the surveillance for people who law enforcement officers, me, had an arrest warrant for, to alert the person that we're looking for that we're present by honking the horns, blowing the whistles and then; in other words, ruining our surveillance.

In addition to that, they would chase us across towns. Blowing traffic lights, violating traffic laws in a dangerous manner to chase a law enforcement vehicle is not normal because I know they knew that we were law enforcement because we used our emergency equipment lights on our vehicles to bypass intersections to ditch them so we could continue surveillance somewhere else and/or arrest or transportation of prisoners.

They were well organized, working together to interrupt investigative efforts, arrests, and transportation of prisoners.

A. Yes.

Q. Okay. Was one of them -- was one of those cars the Nissan?

A. I don't recall the exact cars. There's a video of the footage of me arriving after the fact, at the end. You could relay to the video footage -- rely on the video footage.

Q. And was Ms. Hilton --

A. Ms. Hilton wasn't connected to that. That was an experience that lead to prior knowing that these people -- that people are being dispatched to law enforcement surveillance with the intention to interrupt it.

Q. Okay. But you don't know if Ms. Hilton is part of that group of people?

A. She chased me in a car with others, with what intentions, I don't know, bypassing intersections, blowing traffic lights, creating almost traffic accidents to keep up with the law enforcement vehicle that uses its police equipment.

The reason we used our police equipment to try to ditch the people who were chasing us is Enforcement Removal Operations will not meet us

with a congo line of angry people. It's a security risk.

Q. When you say that Ms. Hilton chased you in a car with others, what car was she chasing you in?

A. There was a Nissan sedan specifically behind my car. I watched it in the mirror along with having a prisoner in my back seat.

Q. Okay.

A. My divided attention is more on my immediate security of the prisoner sitting behind me than all the movements and who is driving the car. I remember the Nissan sedan.

Q. Okay. So you remember the sedan. And is it your testimony that Ms. Hilton, you remember -- you distinctly remember Ms. Hilton as being in that sedan that chased you?

MR. TAGERT: Objection.

Go ahead.

A. That was the first vehicle that showed up. And she was the first person that showed up. It's not rocket science that it's the only car sitting nearby that she didn't get out of it.

She didn't get out of my car. She didn't

pop out of the woods. We were behind Home Depot. Behind Home Depot. Not in the front. In a place where the public doesn't go. You don't go behind Home Depot to enter the front of Home Depot. It led me to -- the circumstances led me to believe that she got out of that car.

Q. Okay. So I want to just make sure I'm following.

Your testimony is that you had a prisoner in your car; is that right?

A. Yes.

Q. Okay. And you were transporting -- let me not use the word "transporting."

You were conveying that prisoner in your car to the Home Depot parking lot?

A. The word "conveying," I'm not sure that I would use that word. My word would be "transporting."

I am responsible for the security of that prisoner. I'm not going to stop my car and get in a confrontation with someone who is chasing me, not knowing their intentions, especially when my safety is involved and the prisoner that's sitting behind me.

Q. Okay. I just want to make sure that I'm understanding. Okay. You've got a prisoner in your car, and you are transporting them to the Home Depot parking lot to hand over to ERO; is that right?

A. Yes.

Q. Okay. Now, when you say that you are being chased, was the Nissan behind you at the scene of the arrest?

A. I don't recall.

Q. Okay. Is it your testimony, just as you were getting close to the Home Depot or entering the Home Depot parking lot, you were being followed behind by the Nissan?

A. No.

Q. Okay. So when --

A. The Nissan --

Q. -- did the Nissan come into --

A. -- followed me specifically more than 5 miles through several traffic lights, through an illegal U-turn, through a gas station, around Home Depot once, to around Home Depot twice. I didn't want to go back to Home Depot, but that was where ERO met me. And they showed up.

Q. I see. Okay. So now your testimony is you did not see Ms. Hilton specifically in the Nissan at the time that it was behind you for that 5 miles or so, but when you got to the Home Depot parking lot, you were the first to arrive to that parking lot. As you were pulling in, the Nissan was behind you. And as you got out of the car, the first person you saw was Ms. Hilton?

A. No.

Q. Okay. What did I get wrong?

A. I was up front. The Nissan parked short of my perimeter at that time. Multiple people got out. And I don't recall who they all were or her seating position in the car. And of the multiple people that were there, they were part of the group that chased us. And currently there was one car. I mean, she didn't just walk up.

Q. So you're surmising that she had to be somebody who got out of the Nissan; is that right?

MR. TAGERT: Objection. That's not his testimony.

You can answer the question.

A. Did I believe that she got out of the Nissan? I believe that, yes.

Q. Okay. You did not actually see her get out of the Nissan?

A. No.

Q. Okay. Just thank you for helping me understand what you are testifying to. Okay.

MS. RHEE: Let's watch another video of what we saw, which is -- let's look at Plaintiffs' Exhibit 000026.

(Video labeled "PLAINTIFFS-000026 marked Exhibit 14.)

THE WITNESS: Number 14?

(Video played.)

SPEAKER: The same thing.

MR. TAGERT: Can you see this? Sorry, it's sideways.

THE WITNESS: It's sideways. I can see it and I can hear my voice.

MS. RHEE: We can flip the screen.

MR. TAGERT: Okay. As long as the witness can see it. Sorry.

(Video played.)

SPEAKER: Same thing. Just so you

know, for a warning, we're putting you into a watchlist. The more you show up to these --

SPEAKER: Take a picture of this guy. We'll put him in the watchlist.

SPEAKER: He's got a video.

SPEAKER: How you doing today? Don't be scared now.

BY MS. RHEE:

Q. Do you see yourself in this video, Mr. Coleman?

A. No. I don't know who that is.

Q. Do you -- were you able to hear the audio of this?

A. Yes.

Q. Okay. And so did you hear, "Just so you know, for a warning, we're putting you into a watchlist"?

A. Yes.

Q. Okay. "The more you show up at these, you will be -- well, you'll see us at your house later to arrest you"?

A. Yes. I heard that.

Q. Okay. And do you know who that was who said that?

A. That was me.

Q. That was you? Okay. Is what you said along the lines of what you said to Ms. Hilton -- I'm sorry, Ms. Williams when you called the residence?

A. No.

Q. Okay. So when you said it here in the parking lot, who was it directed at?

A. Unknown to me at the time, a female in an orange scarf, I believe she was wearing, or something orange.

Q. And was that statement directed at the female in the orange scarf?

A. Yes.

Q. Okay. And then there was another agent who said, "Take a picture of this guy." And then was it you who said, "It doesn't matter. I can get your eyes. Terrorist watchlist for you as well, just FYI"?

A. I'm unsure.

Q. Do you want to watch it again?

A. I'm hearing a voice. I'm unsure if that's me. If they did an analysis, it could be. I don't recall that.

It was, regretfully so, not the best statement to have made.

Q. Why do you say that?

A. We do have a watchlist. You saw it on my paper. I didn't know who she was. She didn't get put in any system. And the "regretfully so" is my after the fact sitting here.

I look at the totality of what happened. You had a person that was part of a group that chased me to interrupt my transport and handoff of a prisoner, who was willing to violate traffic law, potentially a security risk to law enforcement. I would have loved to find out their identity, but I was unable to. And so giving them a verbal warning in hopes that they just don't do that again.

Nobody on my team wanted to arrest anybody. We just wanted to leave. We just wanted to get the arrest warrant that we had and leave. We weren't interested in any citizens.

Q. Okay. So when you talk about the watchlist and you say, "You saw it on my paper," is that the ICM record? I'm just trying to understand what you mean when you said, "We do

motherfucker.

SPEAKER: Hey, why don't you let my balls obstruct your fucking throats, you cocksuckers."

(End of video.)

Q. Okay. You were present at that interaction?

A. Yes.

Q. Okay. And what were -- why were you stopped at that particular moment?

A. I was not in the camera view. I was one of the last to arrive.

Q. Okay.

A. When I arrived, I saw the male in the video footage acting the way he had -- I had seen as well. And I had my pepper spray out, concerned from what the previous information that I had received that the female agent that was present needed help. She asked for help. She was boxed in by that male and a female.

Q. Okay. So when you talked about earlier testimony today about your fellow officer being boxed in, is this the footage of what we're seeing?

marked Exhibit 24.)

MS. RHEE: Okay. Thank you.

BY MS. RHEE:

Q. Okay. Now, why did you run this [redacted] report of [redacted]?

A. Because in addition to what I believed was interfering with our investigation -- or surveillance and investigation for apprehension of a subject that we had an arrest warrant for, that the boxing in of [redacted] and going to assist her is why I ran it.

Q. Okay. And what were you hoping to get from running it?

A. Any kind of information that could be potentially criminal in nature.

Q. What do you mean by "potentially criminal in nature"?

A. You have biographical info here that I could plug into an additional source to try to run it.

Q. Okay. So it's not that [redacted] itself will give you information about a possible crime. It's that it gives you further biographical information that you can query in other

[redacted] comprehensive search and report that you ran; is that right?

A. Yes.

Q. In addition to searching ACCURINT, you queried ICM; is that right?

A. To my recollection, sure. I don't know. I don't remember all the databases I touched.

Q. Okay. You recall searching ICM and creating a record in ICM for both [redacted], as an individual, and for his car, the [redacted]?

A. That sounds accurate.

Q. Now, in addition to that, while you were querying all of these various databases, did it come to your attention that [redacted] was [redacted]?

A. The exact roles that he had, I don't recall. If you just conduct a Google search, I believe I did that as well.

Q. Okay. And was it through Google or was it through one of these --

A. I did do --

whatever, I left. They stayed, but some chased us.

They chased us across multiple towns, blowing traffic lights, following me with a prisoner in my car. That's not normal human behavior. People don't act that way. The only reason they would do something is usually it ends in about three-tenths.

So after following me, blowing traffic intersections, without being an emergency vehicle, doing an illegal U-turn, almost causing a wreck, following me through Home Depot, not once but twice, and then I recognize the car that is behind me as the first car there, and several individuals get out, and I believed one of them to be Ms. Hilton, I was very frustrated.

Could I have chosen better words? Absolutely. It's not my first go-to, but to be human, I was pissed off. I mean, people don't act or behave that way. I'm expecting I'm going to get a vehicle assault. In my prior life, I was a deputy marshal and state police officer. The weakest link of the custody chain is during transport, and I'm having people aggressively

question.

A. I specifically recall she said she wasn't present, her car wasn't present, and she didn't know what I was talking about. I didn't have much to go off of, and continuing a confrontational phone call where someone is not admitting anything didn't seem fortuitous to me. So I gave her a warning; if you continue to do this, you'll be arrested. And I hung up.

Q. But did she tell you that her car was there ever?

MS. RHEE: Objection to the form of the question.

A. No. She did not.

Q. Okay. And did you think you were being followed while you were in Maine?

MS. RHEE: Objection to the form of the question.

A. I was followed, to certainty.

Q. Why did you think that?

A. The lady was at my hotel in the lobby. I went to the gym. I'm at Planet Fitness, and there she is taking pictures of me at Planet Fitness. I'm like, "Are you kidding me?"

MS. RHEE: Objection to the form of the question.

A. No.

Q. Can you describe why he was put on the ICM?

A. I would not have encountered [redacted] unless he hadn't done what he did, had he not been part of the group that chased us, bypassed our security and parked next to me, and I'm wondering who this is. Talking to my coworkers they're, like, no, he just drove right by us after being warned not to.

Bypassing law enforcement, security, in the midst of a prisoner transport is not a good thing. It's a security risk.

Q. And if you could pull out Exhibit 18, which I actually think is right in front of you.

A. Yes.

Q. So the second picture, the man there, my recollection is you testified about him reaching into the back of a trunk; is that correct?

A. Yes.

Q. What was your concern?

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. McHugh, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT [redacted], the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability; that before completion of the deposition review of the transcript was requested.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2026.

Janet McHugh

JANET M. MCHUGH
Notary Public

My Commission Expires:
July 16, 2028