**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS,<br>on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 2:26-cv-00092-JAW |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO THE MAGISTRATE JUDGE'S ORDER REGARDING PLAINTIFFS' INVOCATION OF THE FIRST AMENDMENT DISCOVERY PRIVILEGE**

In a case about the government's surveillance and intimidation of Mainers for exercising their First Amendment right to document the government's abuses of power and hold it to account, the government is threatening community members' right to associate for the purpose of engaging in that very protected activity. It means to use this litigation to scrutinize Plaintiffs and their neighbors—their beliefs, associations, and expressive activities—and to demonize their coordinated advocacy and protest. Because the Plaintiffs did not sacrifice their First Amendment rights or the rights of others by filing this case, the Court should not allow this further trespass onto their fundamental freedoms.

**BACKGROUND**

In early 2026, residents of Maine began organizing in response to increased immigration enforcement activity in their communities. Doe 1 Decl., ¶¶ 2–6, 8; Doe 2 Decl., ¶¶ 2–6, 8; Doe 3 Decl., ¶¶ 2–6, 8. Having seen reporting about operations in other states, including violent tactics and other abuses, these community members were concerned about their own neighborhoods. *Id*. They organized to bear witness, protect their communities, and expose abuses of power. *Id*. The primary way in which they organized was through group "chats" using the messaging application Signal. *Id*. These community groups used Signal chats to facilitate and coordinate the observation of DHS operations and to make each other aware of when and where those operations were taking place. Doe 1 Decl., ¶ 8; Doe 2 Decl., ¶ 8; Doe 3 Decl., ¶ 8; Pantos Dep. 30:14–17; Williams Dep. 40:3–7; Hilton Dep. 40:7–23; Fagan Dep. 84:16–25. Defendants now seek to conduct discovery into those groups, including internal communications and operations.[1]

As set forth in more detail in the Declaration of Genevieve Nadeau, in response to discovery requests regarding their "opportunities to observe and/or record ICE activity," Plaintiffs withheld potentially responsive community group Signal chats in full, and redacted

[1] The government has not ruled out seeking group membership in future discovery requests.

information about those groups from smaller group and one-on-one chats in which the Plaintiffs actively participated.[2] Importantly, Plaintiffs are not withholding any documents related to the encounters alleged in the First Amended Complaint (or any other similar encounters).

After Defendants objected, the parties briefed the matter and participated in three hearings before Judge Nivison, who ultimately reviewed the withheld documents *in camera*. He then held that, except for a portion of two pages, both the membership in the community groups and their discussions are protected by the First Amendment.[3]

## ARGUMENT

The Supreme Court has long "acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues," *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295 (1981), and the critical role privacy plays in safeguarding this fundamental right. *See*, *e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). The Court thus recognizes a privilege against compelled disclosure of associational information when disclosure may impede future collective expression. *Id.*; *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (collecting cases). Even if the precise circumstances presented here are new, the principles at stake are not. The community group chats were organized to

---

[2] The documents now at issue include portions of group chats regarding likely ICE sightings. But the full set of chats in Plaintiffs' possession are necessarily broader in scope, such that a decision here could have much broader consequences for the groups. Indeed, although not properly before the Court, the government is also seeking all communications and other documents that "*identified any federal employees or vehicles in any manner*" and the names of all people with whom Plaintiffs have had such communications. ECF No. 109-6; Nadeau Decl. ¶ 10.

[3] Judge Nivison concluded that only those pages potentially "(a) supported or undermined Plaintiffs' contention that the ICE agents' alleged conduct … was pursuant to an agency policy and/or (b) demonstrated that Plaintiffs did not exercise their First Amendment rights after the alleged January 2026 incidents because of the agents' conduct." ECF No. 99.

further members' shared goal of documenting immigration enforcement in order to expose the truth of what is happening and support those impacted by government abuses. Importantly, the First Circuit has long recognized not only community members' right to associate, but also the protected nature of their underlying purpose. *Glik v. Cunniffe*, 655 F.3d 78, 82–83 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest… [and] freedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition . . .") (citation modified). The government's attempted fishing expedition into the community group chats threatens both of these fundamental rights.

## I. The First Amendment Privilege is Applicable to the Community Group Chats and the Substance of the Groups' Discussions

Although the Supreme Court was initially concerned with the compelled disclosure of membership lists, the privilege also applies to internal communications—otherwise, the privilege would fail to serve its important purpose of protecting association against unnecessary intrusion.[4]

In fact, the weight of authority clearly favors protecting the substance of internal group communications. First, the Supreme Court *has* applied a version of the First Amendment privilege outside of membership lists. *See DeGregory v. Attorney General of State of New Hampshire*, 383 U.S. 825, 828–29 (1966) (protecting "the views expressed and ideas advocated" at political party meetings). Moreover, the courts of appeals to have considered the question have agreed, as have numerous district courts. *See In re Motor Fuel Temperature Sales Practices Litigation*, 641 F.3d 470, 480–81 (10th Cir. 2011); *Perry* 591 F.3d at 1162–63: *Frat. Order of Police Penn. Lodge v. Springfield*, 668 F.Supp.3d 375, 387–89 (E.D. Pa. 2023) (refusing to limit the privilege to membership lists as "inconsistent with nearly every opinion to interpret *NAACP*"

[4] Defendants appear to have abandoned the misplaced argument that the community group chats are not entitled to protection because they are not formal associations. ECF No. 81, p. 2.

and collecting cases); *see also In re Recalled Abbott Infant Formula Prod. Liability Lit.* 2024 WL 36982, at *1 (N.D. Ill. 2024); *Ass'n of Equip. Manuf. v. Burgum,* 427 F.Supp.3d 1082, 1101 (D.N.D. 2019); *Sexual Minorities of Uganda v. Lively*, 2015 WL 4750931 (D. Mass. 2015); *Sierra Club v. Union Elec. Co.*, 2015 WL 9583394, at *3 (E.D. Mo. Dec. 31, 2015); *Natural Res. Def. Council, Inc. v. Ill. Power Res., LLC*, 2015 WL 13940045, at *4–5 (C.D. Ill. 2015); *PA Advisors, LLC v. Google, Inc.*, 2009 WL 10741631, at *3–4 (E.D. Tex. Oct. 8, 2009). *Cf. Whole Women's Health v. Smith*, 896 F.3d 362, 372-73 (5th Cir. 2018); *Am. Fed.of Labor and Congress of Indus. Orgs. v. Fed. Election Com'n*, 333 F.3d 168, 176-77 (D.C. Cir. 2003).

The government misreads *United States v. Comley*, 890 F.2d 539 (1st Cir. 1989), as establishing otherwise. The law on the First Amendment privilege has developed quite a bit since *Comley*, but even then, the First Circuit did *not* reject the possibility that the privilege should cover the substance of associational materials in appropriate cases. The Court expressed "reservations about the strength of the First Amendment concerns *implicated by the challenged subpoena*," 890 F.2d at 544 (emphasis added), noting that it did not seek to identify *any* individuals, only the substance of information passed between two specified people (including a government employee under investigation) during a limited number of recorded phone calls that were themselves the focus of the investigation. It went on to assume that Comley *had* made a *prima facie* showing, but found the government had a compelling need for the recordings, contrasting *United States v. Garde*, 673 F. Supp. 604 (D.D.C. 1987)—in which the court protected the substance of subpoenaed information from disclosure. *Comley*, 890 F.2d at 545.

Finally, that the chats may include some discussion of unprotected activity (which the government speculates and Plaintiffs dispute[5]) does not defeat the privilege. "The right to

[5] Defendants cite no authority for the proposition that activities like safely following government vehicles in public and noting government license plates are not protected, especially when these activities are in furtherance of lawful observation and recording.

associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982); *see also In Re Grand Jury Proceeding*, 842 F.2d 1229, 1234–45 (11th Cir. 1988) (a mix of expressive and commercial activities does not change the analysis).[6]

## II. Plaintiffs Have Made a Prima Facie Showing of First Amendment Infringement

In order to make a *prima facie* showing, Plaintiffs need only offer evidence sufficient "to initially demonstrate a reasonable probability that disclosure will chill its associational rights." *In re Motor Fuel*, 641 F.3d at 492; *Pulte Home Corp. v. Montgomery Cnty.,* 2017 WL 1104670, at *4 (D. Md. Mar. 24, 2017) (*citing Black Panther Party v. Smith*, 661 F.2d 1243, 1267–68 (D.C. Cir. 1981) ("litigant seeking protection need not prove [chill] to a certainty")).

Defendants do not meaningfully dispute the substantial evidence Plaintiffs have set forth as to the likely chilling effect disclosing community group chat membership and communications to the government will have on those groups. In fact, they wave away the Doe declarations and ignore entirely the public record demonstrating why the group members have good reason to be fearful of both DHS and DOJ. *Compare Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 240–42 (D. Me. 2010) (highlighting that the plaintiff did not adduce direct evidence from anyone who would themselves be chilled and distinguishing the case from *Perry* and *Dole v. Serv. Emps. Union*, 950 F.2d 1456 (9th Cir. 1991)).

But as set forth in the Doe and Hilton declarations, members of the community group Signal chats fear retribution should information about those chats—including both the

[6] The government also argues that if the privilege applies to group communications, it only applies to deliberations as to "how an association wishes to speak as a group." Def. Br. 6. But Defendants again read the caselaw—and the First Amendment—much too narrowly as protecting only certain formulations of protected activities. *Perry*, 591 F.3d at 1162 (the existence of a *prima facie* case does not depend on the type of information sought).

membership *and their communications*—be disclosed to the government. They and others may not have joined or actively participated in the groups if they had understood the government would learn about their participation or had access to their communications, and they are likely to cease participating in these or similar community groups in the future if this information is disclosed to the government. *See* Doe 1 Decl., ¶¶ 9–15; Doe 2 Decl., ¶¶ 9–12; Doe 3 Decl., ¶¶ 9–13; Hilton Decl., ¶¶ 7–8. Their fear is well-founded.

The public record is replete with information that would cause any reasonable person to fear retribution—*especially from the government itself.* The encounters with federal agents alleged in this case make clear that they are hostile to legal observers and other protestors. The agents' behavior is reasonably understood as part of a concerted effort by the current administration to criminalize and otherwise chill organized dissent, as reflected not only in the record of this case, *see* ECF No. 101, but in public statements by high-ranking DHS and DOJ officials that, among other things, label protestors as "domestic terrorists" and falsely characterize filming law enforcement as illegal "obstruction" and "doxxing."[7] The White House Border Czar even threatened to make protestors "famous."[8] This is not just rhetoric. The FBI Director has openly bragged about criminally investigating similar Signal chats for activities

---

[7] *See, e.g.,* C.J. Ciaramella*, DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, Reason (Dec. 22, 2025), https://tinyurl.com/54ceta5b; Matt Sledge, *How local cops are running with Trump's NSPM-7 attacks on Antifa*, The Intercept (July 7, 2026), https://tinyurl.com/yzpndvms (linking FBI PSAR suggesting that wearing dark clothing, tracking law enforcement, and using encrypted chats are strategies used by "violent extremists").

[8] Fox News, *Homan pushes to create 'database' to make those who impede ICE 'famous'* (Jan. 15, 2026), https://tinyurl.com/bpa6kz4j ("We're going to create a database. Those people that are arrested for interference . . . we're going to make them famous . . . We're going to let their employers and their neighborhoods and their schools know who these people are."); C-SPAN, *"Border Czar" Tom Homan Condemns "Hateful Rhetoric" Against ICE* (July 20, 2026), https://tinyurl.com/4e7urvns.

that, as described, are lawful and protected.[9] And the government's abuse of its investigative and prosecutorial authority to punish other observers and protestors is now well-documented.[10]

In addition, discovery in this case has revealed that Defendants have *already* treated Plaintiffs and other Maine observers as criminals, used law enforcement systems to investigate them, and entered at least eight observers into DHS databases. *See* ECF Nos. 101, 117 (and supporting evidence). Documents produced in discovery also show at least one HSI agent assigned to Maine planned to infiltrate a community Signal chat. Nadeau Ex. H.

Finally, the government's litigation of this case only further demonstrates a disregard of Plaintiffs' and community members' First Amendment rights. In addition to seeking the community chats, the government has pressed Plaintiffs to disclose their attendance at *any* protests dating as early as 2020 (Nadeau Decl., ¶ 3, Exs. D–G); their "beliefs and opinions regarding law enforcement" (*Id.* at ¶ 3); their involvement in activism or advocacy unrelated to this case (Williams Dep. 22:22–23; Fagan Dep. 93:19–95:25); and their involvement with unrelated political groups or campaigns (Williams Dep. 86:1–87:22; Hilton Dep. 64:5–64:15, 197:6–205:24). The chilling nature of these questions should be self-evident.

The government insists the Confidentiality Order in this case is sufficient to mitigate the community groups' fears, especially if their names are not disclosed. However, a number of courts applying the First Amendment privilege or similar analyses have acknowledged that confidentiality/protective orders limiting disclosure to the government are not always sufficient

[9] David Ingram, *The FBI is investigating Minnesota Signal chats tracking ICE, Patel says*, NBC News (Jan. 26, 2026), https://tinyurl.com/4b577c6h.

[10] *See, e.g.,* Mike McIntire et al., *They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling*, N.Y. Times (July 18, 2026), https://tinyurl.com/4rfyy59n; Brad Heath et al., *Trump's DOJ charged hundreds with assaulting officers. Many cases were dropped, but the damage was done*, Reuters (July 30, 2026), https://tinyurl.com/486jm74n; *see also* Hannah Critchfield & Shane Shifflett, *How ICE Is Weaponizing Social Media Against Its Critics*, Wall Street Journal (Aug. 3, 2026), https://tinyurl.com/epateyrj.

to mitigate likely chilling effects when disclosure to the government itself is what people fear. *See, e.g., First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1130–31 (2026); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021); *Perry*, 591 F.3d at 1165; *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002). There is a considerable record here substantiating the reasons group members fear both DHS and DOJ, and why disclosing internal communications as "attorney eyes only" or anonymizing them would still be chilling.

For example, the documents may be used to identify group members through other means, or to otherwise build a record of their activities, or to try to infiltrate the groups.[11] ***Indeed, recent reporting and court filings show the government doing exactly what community members fear—infiltrating and surveilling social media and private chats.***[12] DHS in particular has taken steps to identify critics even when they have attempted to speak anonymously.[13] When the government has been so brazen in demonizing—if not criminalizing—the specific kinds of protected associations at issue here, no form of disclosure can mitigate the chilling effect.[14]

*McKee* does not require the Court to conclude otherwise. Judge Rich did not suggest that a confidentiality order will be dispositive in all circumstances—if that were the case then the privilege would hardly exist at all. As the Supreme Court recently said: "Just ask yourself, would

[11] *See, e.g.,* Hannah Critchfield & Shane Shifflett, *How ICE Is Weaponizing Social Media Against Its Critics*, Wall Street Journal (Aug. 3, 2026), https://tinyurl.com/epateyrj; David Ingram, *The FBI is investigating Minnesota Signal chats tracking ICE, Patel says*, NBC News (Jan. 26, 2026), https://tinyurl.com/4b577c6h.

[12] Alan Feuer & Ernesto Londono, *U.S. Investigated Left-Leaning Groups During Minnesota Immigration Crackdown,* N.Y. Times (Aug. 13, 2026), https://tinyurl.com/nhktt5cz; *see also United States v. Sant*, No. 26-cr-00115 (D. Minn. Aug. 13, 2026), ECF No. 212.

[13] *See, e.g.*, Shawn Musgrave, *The Feds Want to Unmask Instagram Accounts That Identified Immigration Agents*, The Intercept (Sep. 18, 2025) https://tinyurl.com/5bx9df5x; Mario Trujillo, *A List of ICE Subpoenas to Tech Companies*, Electronic Frontier Foundation (Aug. 26, 2026), https://tinyurl.com/4ejjbp7e.

[14] In *Comley*, the First Circuit recognized that incidental disclosure of associate identities may be of concern in some cases. 890 F.2d at 544. The government already sought and maintains it has a right to discover the participants in the community groups—making that fear reasonable here.

it have been an answer in *NAACP v. Alabama* if the State's Attorney General promised to keep the NAACP's membership rolls to himself?" *First Choice Women's Res. Ctrs*, 146 S. Ct. at 1131.

**III. Defendants Do Not Have a Compelling Need for the Community Group Chats**

Once a *prima facie* showing is made, "the burden then shifts to the government to show both a compelling need for the material sought and that there is no significantly less restrictive alternative for obtaining the information." *Comley*, 890 F.2d at 544. The government here cannot demonstrate that the information it seeks is both relevant and proportional to the needs of the case, Fed. R. Civ. P. 26(b)(1), never mind meet its high burden to outweigh the community groups' First Amendment rights. *Perry*, 591 F.3d at 1161 (information must be "highly relevant"); *Hale v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 6854416, at *2 (S.D. Ill. Dec. 5, 2014) (information must be "essential" to the case). The government's reasons for seeking the group chats have evolved during this dispute, but it now points to three.[15]

Evidence of a Policy or Practice. Defendants note that a key question in this case is whether they have "policy" of collecting personal information and otherwise threatening observers based on their First Amendment rights, but make no effort to explain how the community group chats might bear on the issue, never mind offer compelling evidence that the government itself does not already have in its possession as to its own activities and practices.[16] And after reviewing the documents, Judge Nivison has already concluded that the chats do not contain evidence either establishing or refuting Plaintiffs' claims.

[15] Plaintiffs respectfully disagree with Judge Nivison that any of these is sufficiently compelling to outweigh the First Amendment harm that may be done by disclosure, particularly in light of the fact that Defendants themselves have superior access to most relevant information.

[16] The assertion that "Defendants are entitled to know whether Plaintiffs have any evidence to support their claims because Defendants have not seen anything," Def. Br. 9, is striking given the substantial evidence adduced already through expedited discovery and summarized in Plaintiffs' preliminary injunction motion—establishing widespread, officially-sanctioned practices meant to intimidate and deter community observers from exercising their rights. ECF No. 101.

Justifying Agents' Actions. Defendants suggest that the group chats are relevant to whether agents "acted reasonably" during particular encounters, but again fail to explain how—in particular how messages agents had not seen (and what they speculate was discussed) could possibly justify their actions in the field after the fact.[17] *See, e.g., Vera v. Williams Hosp. Grp., Inc.*, 73 F. Supp. 2d 161, 169–70 (D.P.R. 1999). Indeed, "after-the-fact justifications are especially problematic in the First Amendment context." *C.S. by Stroub v. McCrum*b, 149 F.4th 848, 857 (6th Cir. 2025). Put simply, the government may not rely on after-acquired information to justify constitutional violations. *See*, *e.g*., *Glenn v. Wash. Cnty*., 673 F.3d 864, 873 n.8 (9th Cir. 2011) ("[court] cannot consider evidence of which the officers were unaware").

Ongoing Injury. Somewhat puzzlingly, Defendants continue to argue that the group chats are "essential" to testing whether Plaintiffs were chilled by their encounters with agents. But these documents have only limited relevance to either the merits of Plaintiffs' claims or their standing to seek prospective relief. In short, ongoing chill is only one basis for establishing standing (ECF No. 101, p. 30-34); forgone opportunities to observe are only one way to show chill (*id*.); and the documents at issue do not necessarily establish forgone opportunities.[18] In any event, after reviewing the documents, Judge Nivison concluded that they *do not* show whether or not Plaintiffs were chilled.

**CONCLUSION**

For the foregoing reasons, the Court should uphold Judge Nivison's September discovery orders applying the First Amendment privilege.

---

[17] The suggestion that this case is about "whether [agents] acted reasonably by checking licence plates or investigating *individuals who followed them*," Def. Br. 9–10, is misleading at best.

[18] Large group discussions of ICE sightings do not necessarily reflect opportunities that the Plaintiffs themselves either knew about or were otherwise able to pursue.

Dated: October 1, 2026

Respectfully submitted,

<u>*/s/ Genevieve Nadeau*</u>

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

JoAnna Suriani*
Janine M. Lopez*
Ori Lev*
F. Elias Boujaoude*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org
ori.lev@protectdemocracy.org
elias.boujaoude@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
101 Glen Lennox, Suite 300
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*

Yotam Barkai*
John Paredes*
Benjamin J. Cabranes*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com

**Pro hac vice*