# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

------------------------------

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSLEVES AND ALL OTHERS SIMILARLY SITUATED,

Case No.: 26-CV-00092-JAW

Plaintiff,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL.,

Defendant.

------------------------------

CONFIDENTIAL DEPOSITION OF POLYXENIA JEANNE PANTOS

Portland, Maine

Thursday, July 23, 2026

10:11 a.m.

CONTAINS CONFIDENTIAL INFORMATION

Job No.: 642254

Pages: 1 - 105

Recorded by: Raechel Meyerowich

Deposition of Polyxenia Jeanne Pantos, held at the offices of:

UNITED STATES ATTORNEY'S OFFICE - DISTRICT OF MAINE
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101

Pursuant to Notice, before Raechel Meyerowich, Reporter, and Sandra Dow, Notary Public in and for the State of Maine.

A I don't know.
Q You don't know?
A I mean, I just don't remember.
Q Okay. Did you send messages to any group chats about what had happened?
A I don't remember.
Q Okay. Did you -- were you part of any Signal chats where you were sharing messages at that time?
A Yes.
Q Okay. What were those?
A I was in a mutual aid group for South Portland, where I live.
Q Okay.
A I was in a rapid response chat. And then I think I was in a few smaller conversations based on, like, breakouts from those chats.
Q Okay. So what -- what is the mutual aid group?
A The mutual aid group is people in my community getting what people need, like, getting resources to people in need.
Q Okay. What kind of resources?
A Food and diapers, mostly.
Q Okay. And what is the rapid response?

MS. NADEAU: I'm going to stop the witness here. So I think here we're talking about the community group chats that we've asserted a First Amendment privilege with respect to.

So the witness can answer at a high level what the chat was, but I'm going to object and instruct them not to answer any further questions.

MR. TAGERT: Okay. Well, I might be asking some questions, and you can instruct not to answer. So --

MS. NADEAU: Yep.

BY MR. TAGERT:

Q Okay. So what is the -- what is the rapid response chat? What's its purpose?

A To alert people as to where ICE either is or is suspected to be in the community.

Q Okay. Do you know how people got their information about what was --

MS. NADEAU: Objection. I'm going to instruct the witness not to answer.

MR. TAGERT: Can I finish my question?

MS. NADEAU: Yes.

MR. TAGERT: Okay.

MS. NADEAU: Sorry.

Q Do you know where individuals got information that they were sharing on the rapid response chat?

MS. NADEAU: Objection. I'm going to instruct the witness not to answer on First Amendment grounds.

Q Do you know how many people were in the rapid response chat?

MS. NADEAU: Same objection and instruction.

MR. TAGERT: The number of people is?

MS. NADEAU: Yes.

Q Okay. Do you know whether all the people in the rapid response chat were located in Maine?

MS. NADEAU: Objection and same instruction.

Q Do you know whether there were any individuals who lived outside of Maine in those chats?

MS. NADEAU: Objection. Same instruction.

MR. TAGERT: Are you making the same -- sorry. We can also take it out the record. But are you making the same objections for the mutual

aid group chat?
MS. NADEAU: Are we talking about the mutual aid now?
MR. TAGERT: We're not. But will -- are you making the same instructions?
MS. NADEAU: Not at this time.
MR. TAGERT: Okay. So the rapid response chat is the one?
MS. NADEAU: Correct.
MR. TAGERT: Okay.
MS. NADEAU: And any sort of breakout from that.
MR. TAGERT: Okay.
MS. NADEAU: Yes.
BY MR. TAGERT:
Q Are any of the people that you listed as friends in your -- in your interrogatory responses, did you meet any of those on either the mutual aid group chat or the rapid response chat?
MS. NADEAU: Objection with respect to the rapid response chat, and same instruction.
MR. TAGERT: She can't answer if she met people that way? I haven't even asked if those people are -- who those people were.
MS. NADEAU: Yes. I think to the

extent that it goes to any sort of operation of those chats, I'm going to object and instruct them not to answer.

BY MR. TAGERT:

Q Okay. So will you answer the question of the mutual aid group chat, whether you met any of those friends through that?

A Any of the people that I listed, did I meet them through the chats?

Q Yeah. I can also provide you the list of names if that would be helpful.

A No, I don't. The answer is no, I did not meet any of them through the chats.

Q Okay. Okay. Do you know who organized the rapid response chat?

MS. NADEAU: Objection. I instruct you not to answer.

I assume you don't need me to say the full basis every time, but tell me if you want me to. These are objections --

MR. TAGERT: No, I -- I understand.

MS. NADEAU: Okay.

Q How did you learn about the rapid response chat?

A I don't remember.

Q Okay. And everything here is true and correct, to your recollection?
A Yes.
Q Okay. So going to paragraph 5, where it says:
I consider it a responsibility as a citizen to witness the actions of law enforcement, both to make them aware that people are watching and to help hold them accountable for any wrongdoing.
What do you mean that you want to make them aware that people are watching?
A Yeah. I think as an occupational therapist, what was really drilled into me is, like, if you didn't document it, then it didn't happen. And I think the same goes for law enforcement, is the more documentation we have and the more eyes we have on people, the more knowledge there is around what's happening.
Q Okay. And the next sentence, where it says, I have felt this way ever since witnessing an incident in Boston where cops violently slammed a young Black man against a sign.
When did that incident occur?
A I don't know. Pre-2020.

Q -- broadly speaking?
A No.
Q Okay. So have -- are you on any Signal groups right now?
A I am. Yeah.
Q Okay. Just mutual aid groups?
A I don't think I joined that mutual aid group.
Q Okay. Are you on any rapid response groups?
A No.
Q Are you on any Signal groups related to ICE activity?
A No.
Q Okay. Have you participated in any other protests in 2026?
A No.
Q Okay. In 2025, did you?
MS. NADEAU: Actually, I'm going to object to this line of questioning. Sorry not to jump in sooner. We've objected to this previously on a number of grounds, including First Amendment privilege.
MR. TAGERT: Why is it privileged if she attended a protest?

MS. NADEAU: It's First Amendment activity and associational in nature.

MR. TAGERT: But it's about whether she attended one and --

MS. NADEAU: I understand that. I assume you're going to ask follow-up questions about what those protests were?

MR. TAGERT: Sure. But, I mean --

MS. NADEAU: Okay.

MR. TAGERT: -- that's publicly going to events. That's not -- there's nothing in the First Amendment privilege case law that says that you can hide facts.

MS. NADEAU: We can continue to argue about it on the record. We've taken this position for months now.

MR. TAGERT: Okay. Well, then I'm going to ask the questions, and if you're going to object to all of them --

MS. NADEAU: Okay. Just to be clear, I am instructing the witness not to answer about it.

MR. TAGERT: Okay.

BY MR. TAGERT:

Q So to make the record clear, did you participate in any protests in 2025?

MS. NADEAU: Objection. Don't answer.
Q Okay. Did you participate in any protests in 2024?
MS. NADEAU: Objection. Don't answer.
Q In 2023?
MS. NADEAU: Objection. Same instruction.
MR. TAGERT: Okay.
Q In 2022?
MS. NADEAU: Objection. Same instruction.
Q In 2021?
MS. NADEAU: Objection. Same instruction.
Q Okay. All right. Exhibit 17.
(Exhibit 17 was marked for identification and is attached to the transcript.)
Q Do you recognize this document, Dr. Pantos?
A Yes.
Q Okay. What is it?
A This is Plaintiffs' Response and Objections to Defendants' Expedited First Set of Interrogatories to Polyxenia Pantos and Carlyn Williams.