# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

------------------------------

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSLEVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL.,

Defendant.

------------------------------

Case No.: 26-CV-00092-JAW

CONFIDENTIAL DEPOSITION OF CARLYN WILLIAMS

Portland, Maine

Thursday, July 23, 2026

2:02 p.m.

CONTAINS CONFIDENTIAL INFORMATION

Job No.: 642254

Pages: 1 - 113

Recorded by: Raechel Meyerowich

Deposition of Carlyn Williams, held at the offices of:

UNITED STATES ATTORNEY'S OFFICE - DISTRICT OF MAINE
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101

Pursuant to Notice, before Raechel Meyerowich, Reporter, and Sandra Dow, Notary Public in and for the State of Maine.

Cumberland counties.
Q Okay. Is any of it related to immigration?
A No.
Q Okay. When did you start [redacted]
A Oh, I should know that, but I don't. I started doing, like, contract-based consulting work in early 2003, but I don't remember exactly when I incorporated as [redacted].
Q Okay. And are you part of any, like, professional memberships?
A No.
Q Okay. Do you own any businesses other than [redacted]?
A No.
Q Okay. Do you own [redacted]?
A Yes.
Q Okay. I figured so. Okay. So have you attended any protests in 2026?
MS. NADEAU: Objection. I'm going to instruct the witness not to answer. I think that's protected by the First Amendment associational privilege.
MR. TAGERT: Okay. As we did earlier,

I'm going to ask questions, and you can go ahead.
BY MR. TAGERT:
Q So have you attended any protests in 2025?
MS. NADEAU: Objection. Same instruction.
Q Did you attend any in 2024?
MS. NADEAU: Objection. Same instruction.
Q 2023, did you attend any?
MS. NADEAU: Objection. Same instruction.
Q Did you attend any in 2022?
MS. NADEAU: Objection. Same instruction.
Q Did you attend any in 2021?
MS. NADEAU: Objection. Same instruction.
Q Did you attend any in 2020?
MS. NADEAU: Objection. Same instruction.
Q Are you involved in any activism or advocacy outside of protesting?
MS. NADEAU: Objection. And, actually, I'm going to give the same instruction.

MR. TAGERT: Okay.
BY MR. TAGERT:
Q So what was the purpose of the group?
A To help our community. Like, to help community members who wanted to be aware of what was happening in our community, be more aware of that.
Q Okay. Was it a rapid response group?
A I don't believe so.
Q Okay. So what kind of group was it?
MS. NADEAU: I'm actually going to object to any more questions about the group itself on First Amendment associational privilege grounds and instruct the witness not to answer.
MR. TAGERT: Okay. About everything related to the group?
MS. NADEAU: Like, I don't know what you're going to ask. But about any of the sort of operations or internal communications of the group, yes.
MR. TAGERT: I asked what the -- what the group was.
MS. NADEAU: She answered what the purpose of the group was.
MR. TAGERT: Okay.

MS. NADEAU: It's up to you.
MR. TAGERT: Okay. So you say the question that you're withdrawing it for, and then I will restate the question.
MS. NADEAU: Okay. You're testing my memory here, but I think you asked whether one of the group chats she was in related to activities was specific to immigration or those kinds of activities. And I objected.
MR. TAGERT: Okay.
MS. NADEAU: Feel free to restate that.
BY MR. TAGERT:
Q So you were -- were you in some groups related to immigration activities?
A Yes.
Q Okay. Do you know approximately how many people were in those groups?
MS. NADEAU: I am going to object to that on the same grounds that it's covered by the First Amendment --
MR. TAGERT: Okay.
MS. NADEAU: -- associational privilege and instruct you not to answer. Sorry. There's a lot of words to get out there on the objection.
Q Do you know whether those groups contain

only people from Maine?
MS. NADEAU: I'm going to object to that and instruct her not to answer.
Q Do you know whether there were people from other states in those groups?
MS. NADEAU: Same objection and same instruction.
Q Do you know whether there were any nationwide Signal chats?
MS. NADEAU: Same objection, same instruction.
Q Do you know the administrators of any of these groups?
A I'm not sure who the administrators are.
Q Okay. Do you know if they were organized by a politician or any political group?
MS. NADEAU: Same objection and same instruction.
MR. TAGERT: The answer to whether she knows if it was organized by a politician? Like, that's -- I mean, we're talking about political figures here. So --
MS. NADEAU: We're still asking about associational activity.
MR. TAGERT: Yeah. But it's a

politician, so --
MS. NADEAU: So? They have associational rights as well.
MR. TAGERT: Okay. So people running for political offices can have secret groups? Is that your position?
MS. NADEAU: That is not what I said.
MR. TAGERT: Okay. I mean, so -- all right. That's what happened in other places. So --
MS. NADEAU: I don't know if that's true or not, but I'm going to stand on the objection.
MR. TAGERT: Okay.
BY MR. TAGERT:
Q So do you know if there were any political action groups organizing Signal chats?
A I don't know.
Q Okay. Do you know if there were any politicians in these groups?
A I don't know.
Q Okay.
Q Okay. So it's on number 6 of your declarations, it says, We arrived at the location of the reported sighting.

A A litigation hold notice. What is a litigation hold notice?
Q Were you told to not delete documents relating to this lawsuit at any point by anybody?
A Yes.
Q Okay. Do you know approximately when that occurred?
A Sometime between -- sometime in late March or probably early to mid-April.
Q Okay. This will be Exhibit Number 30.
A Thank you.
(Exhibit 30 was marked for identification and is attached to the transcript.)
Q Okay. Do you recognize this message?
A Yes.
Q Do you recall who sent this to you?
A I believe it was [redacted].
Q Okay. Who is [redacted]?
A A friend of mine.
Q Okay. How long have you known [redacted]?
A Maybe, like, a year and a half-ish.
Q Okay. So how did you meet?
A We met through South Portland DSA Working Group.

Q What is the DSA Working Group?
A The Democratic Socialists of America Working Group.
Q Okay. Is that a political group?
A Yes.
Q Okay. Is it a group that you join, or is it -- strike that question.
Are you a member of the DSA Working Group?
A Yes.
Q Okay. How long have you been a member of that?
A About a year and a half.
Q Okay. Do you discuss immigration activity in the DSA Working Group?
MS. NADEAU: Objection. I'm actually going to instruct her not to answer it because that sounds like it's getting into a First Amendment privilege territory.
Q Okay. What is the purpose of the DSA Working Group?
A To think about local issues that we can impact and make better for us and our neighbors.
Q Okay. So is it focused on local politics?

A In South Portland.
Q Okay.
A Yes.
Q It's not focused on national politics?
A No.
Q Okay. About how many members are in the DSA Working Group?
MS. NADEAU: Objection. I'm going to instruct her not to answer on First Amendment grounds.
MR. TAGERT: Okay.
Q Did the DSA Working Group have a Signal chat?
A Yes.
Q Okay. Was it related to -- was that a way to communicate where immigration law enforcement was in January?
MS. NADEAU: Objection. I'm going to instruct her not to answer on First Amendment associational privilege grounds.
Q How long have you been part of the DSA Working Group Signal chat?
MS. NADEAU: Objection. Asked and answered, I believe.
MR. TAGERT: But didn't ask about the

Q Okay. Why else did you think that?
A Oh, I think that they had put their car, like, model and color in the chat.
Q Okay. Was that pretty common in those -- in the chat?
MS. NADEAU: Objection. I'm going to instruct her not to answer that on First Amendment privilege grounds.
Q Okay. So did people try to identify themselves in different ways in the Signal chats?
MS. NADEAU: I don't know what that means, but I'm going to object to it on First Amendment privilege grounds.
Q Did -- did participants in the Signal chats include their clothing or vehicle information when they were observing ICE activity?
MS. NADEAU: Same objection and instruction not to answer.
Q Would participants of the Signal chats often ask for other people to come join them?
MS. NADEAU: Same objection and instruction.
Q Did participants of the Signal chats ever discuss criminal activity?
MS. NADEAU: Objection and same

instruction.
Q Did these Signal chats encourage overthrowing any governmental entity?
MS. NADEAU: Oh, come on. Objection and same instruction.
Q Okay. So back to both [redacted]'s vehicle and the other vehicle drove the speed limit and at a reasonable distance from the ICE vehicle at all times. What is your definition of driving the speed limit -- or driving a reasonable distance?
A Multiple car lengths behind.
Q Okay. And exactly what speed were you traveling?
A It varied by the road we were on --
Q Okay.
A -- and what the speed limit was on the various roads.
Q And how long were you following?
A I think between five and ten minutes.
Q Okay.
A But I'm not sure.
Q And did the immigration law enforcement vehicle, was it also going to speed limit?
A It was when we were following it. When it did the U-turn, it then sped off at a speed