# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---------------------------x
ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, et al.,

Defendants.
---------------------------x

Civil Action No. 26-CV-00092-JAW

CONFIDENTIAL
The entire transcript has been designated CONFIDENTIAL pursuant to the confidentiality designation made on the record.

VIDEOTAPED DEPOSITION OF ELINOR HILTON
Portland, Maine
FRIDAY, JULY 24, 2026
8:20 a.m.

Job No.: 642256

Pages: 1 - 211

Transcribed by: Wanda Greenlee, CCR No. 1188

VIDEOTAPED DEPOSITION OF ELINOR HILTON,

conducted at the offices of:

United States Attorney's Office - District of Maine
100 Middle Street
Portland, Maine 04101

Pursuant to agreement, before Raechel Meyerowich, Notary Public in and for the State of Maine.

Q. -- certain information? Okay. And so going to the morning of January 21st, you said that you received a message. How did you receive a message about where ICE activity was occurring?

A. I received a message in a Signal chat that I was in.

Q. Okay. How many Signal chats are you in related to immigration, law enforcement, ICE activity?

A. Five or six.

Q. Okay. And what is the nature of those chats?

MS. NADEAU: Let me just interrupt. The witness can answer at a high level what the nature or purpose of the chats was, but I'm going to assert a privilege with respect to anything else.

MR. TAGERT: I assume we'll do the same thing we've done before?

MS. NADEAU: Sure will.

THE WITNESS: I believe that the chats were created to support people who wanted to observe and document ICE activity in and around the Portland area.

BY MR. TAGERT:

Q. Okay. So was it Maine specific?

MS. NADEAU: Objection on First Amendment associational privilege grounds.
MR. TAGERT: Okay.
MS. NADEAU: I instruct the witness not to answer.
BY MR. TAGERT:
Q. Okay. Did it contain people from other states?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Okay. Is that nationwide chat?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. How did people communicate about where they were?
MS. NADEAU: I'm not sure I understand that question, but same objection, same instruction.
BY MR. TAGERT:
Q. How did people communicate their locations --
MS. NADEAU: Same objection. Same instruction.

BY MR. TAGERT:
Q. -- when they were -- how did people communicate their locations when they were observing ICE activity?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Would people provide their own identifying information to ask people to come with them to wherever ICE was -- wherever they had observed ICE activity?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Were -- were all -- so there were five or six groups. Were those all rapid response groups?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Were any mutual aid groups?
MS. NADEAU: Are you asking if any -- sorry, I'm not sure --
BY MR. TAGERT:
Q. Were any of the five or six Signal

chats that you're part of mutual aid groups?
MS. NADEAU: You can answer that.
THE WITNESS: Not to my knowledge.
BY MR. TAGERT:
Q. Okay. Are there any categories of Signal chat groups that you are aware of that is not either a rapid response group or a mutual aid group?
MS. NADEAU: Objection. Go ahead.
THE WITNESS: Can you define mutual aid?
BY MR. TAGERT:
Q. Do you know if any group is meant -- any of the five or six groups that you're a part of is meant to just provide food and/or diapers and other sorts of materials to individuals, or are they all about responding to ICE activity?
MS. NADEAU: Objection. Go ahead.
THE WITNESS: I don't believe that I was in any chats that were for the purpose of what you've described to be mutual aid.
BY MR. TAGERT:
Q. Okay. Approximately how many people were in each of these chats?
MS. NADEAU: Same objection as before, and the same instruction.

BY MR. TAGERT:
Q. And you're still a part of all of these Signal chats?
A. I have not left any Signal chats since the beginning of the case.
Q. Okay. And have you continually provided the information on those Signal chats to your counsel?
MS. NADEAU: Objection. You can answer.
THE WITNESS: Can you be more specific? Like, what -- what information?
BY MR. TAGERT:
Q. Is there activity still happening on those Signal chats?
A. Not in most of them.
Q. Okay. So out of the five or six, how many still have active -- let's say, since -- since the beginning of June, how many of those five or six have had messages in them?
A. A couple of them, I think.
Q. A couple meaning two or three?
A. I can't say for sure. I have not monitored them as closely. Yeah, I also have been removed from some chats.

Q. Do you know who the admins of the chat are?
A. No.
Q. Do you know whether there are people located in Portland?
MS. NADEAU: Objection. I'm going to raise the First Amendment privilege again and instruct her not to answer.
MR. TAGERT: She can answer if she knows yes or no.
MS. NADEAU: You've asked other questions about the chat. I've already let you go a little further than maybe I should have. So I think that's enough on the operations of the chat.
BY MR. TAGERT:
Q. Okay. So returning to the morning of the January 21st encounter. I believe you said that you saw an ICE vehicle that you suspected to be an ICE vehicle. Why did you suspect it to be an ICE vehicle?
A. I believe what I said is that I saw a vehicle that I suspected to be an ICE vehicle. I suspected it to be an ICE vehicle because it was reported in one of the chats as suspicious, also because it was idling suspiciously in a neighborhood

BY MR. TAGERT:
Q. Yes.
A. Because of the messages in the Signal chat.
Q. Okay. And is that how you learned where ICE was on other days as well?
A. I have learned about suspected ICE sightings in those chats at other times.
Q. Okay. And apologies if I've asked this already, but are you an administrator of any of the Signal chats we discussed?
A. No.
Q. Okay. And do you know if anyone in those group chats are politicians?
MS. NADEAU: Objection. I'm going to assert the same First Amendment privilege and instruct the witness not to answer.
BY MR. TAGERT:
Q. Okay. Do you know if those group chats were organized by politicians?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Do you know if the group chats are organized by any sort of political or advocacy

group?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Are you part of any group chats with the -- with anyone related to democratic socialists?
MS. NADEAU: Objection. You can answer yes or no.
THE WITNESS: Sorry. Can you restate the question?
MR. TAGERT: Sure. Or will you read back?
(Question read by the court reporter.)
THE WITNESS: Yes.
BY MR. TAGERT:
Q. Are those the same group chats that you've already referenced, or are those separate group chats?
A. I know that I am in separate chats with folks associated with the Democratic Socialists of America. I do not know if those same people are in the chats that I have referenced previously.
Q. Okay. But they're not the same chats; is that correct?
MS. NADEAU: Objection.

BY MR. TAGERT:
Q. The Democratic -- so -- so you're part of the Democratic Socialists of America chats, right?
A. That is not what I said. I am in chats with people associated --
Q. Okay.
A. -- with Democratic Socialists of America.
Q. Okay.
A. I am not in official chats that are made by that organization.
Q. Okay.
A. And, no, those are not the same chats as the ones I had referenced previously.
Q. Okay. Okay. So going to Paragraph 4 of your declaration. Do you see where it says: I drove to the Home Depot and pulled into the southwest end of the parking lot, where I saw two groups of people with cars tucked into a corner near the garden center.
A. Yes.
Q. Okay. What do you mean by the term tucked into?
A. I think what I was getting at there

MS. NADEAU: Objection.
THE WITNESS: Right.
BY MR. TAGERT:
Q. So you can't testify as to the contents of it?
A. Right.
Q. Okay. So in the next page, it says: Can you please check and see [redacted] 68 are outside my house. Is that to check the spreadsheet that you discussed earlier?
A. Yeah.
Q. Okay. And then the message: Not in DB, means it's not on that database; is that right?
A. Yes.
Q. And was [redacted] organizing protests in any way?
MS. NADEAU: Objection. I'm going to instruct her not to answer on First Amendment grounds.
BY MR. TAGERT:
Q. Do you know whether [redacted] was the administrator of any Signal chats?
MS. NADEAU: Same objection and instruction.

chats --
MS. NADEAU: Objection.
BY MR. TAGERT:
Q. -- that you're a part of?
MR. TAGERT: Can I finish my question?
MS. NADEAU: Sorry.
MR. TAGERT: Thank you. I'll let you get to your objection.
BY MR. TAGERT:
Q. Is [redacted] in any of the Signal chats that we've discussed earlier, the five or six related to observing ICE activity?
MS. NADEAU: I'm going to object on First Amendment grounds and instruct her not to answer.
BY MR. TAGERT:
Q. How many individuals do you know in those Signal chats?
MS. NADEAU: Objection on First Amendment grounds, and I'll instruct her not to answer.
BY MR. TAGERT:
Q. Do you know how the protesters learned what hotel ICE was staying in?

A. I don't.
Q. Do you know who would?
MS. NADEAU: Objection.
THE WITNESS: No.
BY MR. TAGERT:
Q. You don't know anybody who knew where they were staying -- where ICE was staying?
MS. NADEAU: Objection.
THE WITNESS: Sorry. I don't think that was the question you asked me.
BY MR. TAGERT:
Q. Okay.
MR. TAGERT: Will you repeat the question.
THE WITNESS: The last two?
MS. NADEAU: Well, let's do one question at a time. You should only answer one question at a time.
(Question read by the court reporter.)
THE WITNESS: You -- you asked do you know who would -- like, who would know?
BY MR. TAGERT:
Q. Okay. So you don't know who would know?
A. No, but that's a different question.

Q. Okay.
A. Yeah.
Q. So how many people do you know who knew where ICE was staying?
MS. NADEAU: Objection. That misstates her testimony.
BY MR. TAGERT:
Q. Or do you know anyone who knows where ICE was staying?
MS. NADEAU: Actually, I'm going to stop -- like, this seems like a pretty inappropriate use of a deposition. Are you trying to fish the witness for activities of other people?
MR. TAGERT: I --
MS. NADEAU: You're, like, several steps removed from anything in her personal knowledge. This seems pretty inappropriate to me.
MR. TAGERT: Oh, well. Okay. I mean, she can answer the questions and say she doesn't know, if she doesn't know.
MS. NADEAU: You can answer the questions as phrased, but I'm not going to say she can answer all the questions.
MR. TAGERT: Okay.
THE WITNESS: Which question?

MR. TAGERT: Read it back.
(Question read by the court reporter.)
THE WITNESS: I don't know.
(Exhibit No. 67 was marked for the record.)
BY MR. TAGERT:
Q. Okay. I'm going to hand to you what should be the final exhibit, 67. Do you recognize this document?
A. Yes.
Q. Okay. What is it?
A. It is a press release, I believe.
Q. By whom?
A. No ICE for Maine.
Q. Okay. And what is no ICE for Maine?
A. It was an organization -- no, that's a strong word. It was a group of people who were running a popular campaign to end the Cumberland County contract -- Cumberland County contract -- Cumberland County Jails contract with ICE.
Q. Where is Cumberland County?
A. Here.
Q. Portland?
A. Portland is part of Cumberland.
Q. So do you see the name Tophe Thorne --

A. Yes.
Q. -- and Jack O'Brien? Do you know either of those individuals?
A. Yes.
Q. Which one? Or both?
A. I've met both of them.
Q. Okay. Who's Tophe Thorne?
A. Tophe.
Q. Tophe. Thank you.
A. I don't know Tophe well. I -- I only know him from the No ICE for Maine meetings.
Q. Okay. And who is he?
A. That's all I know about him.
Q. So you don't know anything about him other than from these meetings?
A. Right.
Q. Okay. So did you attend meetings run by No ICE for Maine?
A. Yes.
Q. What -- what -- when were those?
A. There were many of them from Spring of 2025 to Spring of 2026.
Q. Okay. So are there -- no more meetings have happened recently?
A. This organization has been dissolved.

Q. Okay. Why was it dissolved?
A. The contract with ICE was ended.
Q. Okay.
A. So...
Q. And are either of these individuals on any of the Signal chats that you're on?
MS. NADEAU: Objection, and instruction not to answer on the same First Amendment grounds.
BY MR. TAGERT:
Q. Okay. Do you know who April Fournier is?
A. Yes.
Q. Who is that?
A. She's a Portland city councilor.
Q. Okay. Is she on any of the Signal chats that we discussed earlier?
MS. NADEAU: Objection, and instruction not to answer on the same First Amendment grounds.
BY MR. TAGERT:
Q. Do you know who Mark Dion is?
A. Yes. He's the mayor of Portland.
Q. Okay. Do you know him?
A. Do you mean --

Q. Personally?
A. -- personally?
Q. Yes.
A. No.
Q. Okay. Do you know if he's on any of the Signal chats that you're on?
MS. NADEAU: Same objection and instruction.
BY MR. TAGERT:
Q. Okay. Do you know --
MS. NADEAU: Counsel, I'm just going to assume I don't need to restate the whole thing, but if you want me to restate the whole objection --
MR. TAGERT: You can -- you can just say, Objection, First Amendment. That's fine.
BY MR. TAGERT:
Q. Grace Valenzuela, do you know who that is?
A. No.
Q. Okay. Do you know whether Valenzuela is on any of the Signal chats that you're part of?
MS. NADEAU: Objection on First Amendment grounds and instruct her not to answer.
BY MR. TAGERT:
Q. Okay. Do you know who Representative

Rafael Macias is?
A. No.
Q. Where is Toshima Place (phonetic spelling)?
A. Topsham, yes.
Q. Topsham. Okay. You don't know Macias?
A. No.
Q. Do you know whether Macias is on any of the Signal chats that you're part of?
MS. NADEAU: Same objection and instruction not to answer on First Amendment grounds.
BY MR. TAGERT:
Q. Okay. Do you know Cynthia Finney?
A. Not personally.
Q. Okay. But do you know who she is?
A. Yes.
Q. Okay. How do you know who she is?
A. She's a public figure.
Q. Okay. Just through the Maine AFL-CIO, or has she been part of anything else?
A. No, that's not -- that's how I know of her.
Q. Okay. Do you know whether she is on

any of the Signal chats that we've discussed?
MS. NADEAU: Objection on First Amendment grounds and instruction not to answer.
BY MR. TAGERT:
Q. Okay. Alec Maybarduk, do you know who that is?
A. No.
Q. Okay. Do you know whether Maybarduk is on any of the Signal chats that we've discussed in this case?
MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.
BY MR. TAGERT:
Q. Okay. Safijya Khalid, do you know who that is?
A. Very vaguely.
Q. Okay. How do you vaguely know who she is?
A. She's also a public figure.
Q. Okay. Just through the Community Organizing Alliance or through anything else?
A. I think I know of her because she spoke at this event.
Q. Okay. And by this event, the one in this email?

A. Yeah.
Q. Okay. And do you know whether she is on any of the Signal chats that we've discussed relating to immigration law enforcement?
MS. NADEAU: Same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Okay. Jodi Hayashida, do you know who that is?
A. No.
Q. Okay. Do you know whether Hayashida is on any of the Signal chats that you -- that we've discussed in this case?
MS. NADEAU: Same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Okay. And Ilma Lopez, do you know who that is?
A. No.
Q. Do you know what Chaval or the Ugly Duckling are?
A. Yes. They are restaurants.
Q. Okay. Do you know whether Lopez is on any of the chats that we've discussed on -- or any of the Signal chats we've discussed?

MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.

BY MR. TAGERT:

Q. Okay. Amanda Gavin, do you know who that is?

A. No.

Q. Okay. Do you know what the Graduate Union is at University of Maine?

A. I believe it is the union of graduate students.

Q. Okay. Do you know whether she is on any of the Signal chats we've discussed in this case?

MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.

BY MR. TAGERT:

Q. Do you know who Keeley Parker is?

A. No.

Q. Okay. Do you know whether she's on any of the Signal chats that we've discussed in this deposition today?

MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.

BY MR. TAGERT:

Q. Okay. Crystol Cron, do you know who

that is?
A. We've met before.
Q. Okay. Who is she?
A. She's the director of Presente!.
Q. What's Presente!?
A. It's a nonprofit organization.
Q. Okay. Do you know what it does?
A. Yes.
Q. What does it do?
A. It serves immigrant communities. They do a lot of food distribution.
Q. Okay. Do you know if she's on any of the Signal chats that we've discussed relating to immigration law enforcement in this case?
MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.
BY MR. TAGERT:
Q. Do you know whether any of these people are administrators of those Signal chats?
MS. NADEAU: Same objection on First Amendment grounds and instruction not to answer.
BY MR. TAGERT:
Q. Do you know whether any of these people are organizers of any of those Signal chats?
MS. NADEAU: Same objection and

instruction.

BY MR. TAGERT:

Q. Okay. And have you attended any protests in 2026?

MS. NADEAU: I would object again on First Amendment grounds, associational privilege grounds, and instruct the witness not to answer for the same reason I've objected in the past.

BY MR. TAGERT:

Q. Have you attended any protests in 2025?

MS. NADEAU: Same objection and instruction.

BY MR. TAGERT:

Q. Other than the protest [redacted], did you attend any protests in 2024?

MS. NADEAU: Same objection and instruction not to answer.

BY MR. TAGERT:

Q. Did you attend any protests in 2023?

MS. NADEAU: Same First Amendment objection and instruction not to answer.

BY MR. TAGERT:

Q. Did you attend any protests in 2022?

MS. NADEAU: Same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Did you attend any protests in 2021?
MS. NADEAU: Same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Did you attend a protest in 2020 -- in 2020?
MS. NADEAU: Same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Did you attend a protest about immigration?
MS. NADEAU: That's a repeat question, I think. But same First Amendment objection and instruction not to answer.
BY MR. TAGERT:
Q. Did you attend any protests about any other activities?
MS. NADEAU: Same -- I'm going to object on First Amendment associational grounds and instruct her not to answer.
BY MR. TAGERT:
Q. Have you ever protested any -- strike