# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

```
---------------------------x
ELINOR HILTON, COLLEEN     )
FAGAN, POLYXENIA PANTOS,   )
AND CARLYN WILLIAMS, ON    )
BEHALF OF THEMSELVES AND   )
ALL OTHERS SIMILARLY       )
SITUATED,                  )
                           )
         Plaintiffs,       )
                           ) Civil Action No.
                           ) 26-CV-00092-JAW
    v.                     )
                           )
MARKWAYNE MULLIN,          )
SECRETARY OF HOMELAND      )
SECURITY, et al.,          )
                           )
         Defendants.       )
 --------------------------x
```

CONFIDENTIAL

The entire transcript has been designated CONFIDENTIAL pursuant to the confidentiality designation made on the record.

VIDEOTAPED DEPOSITION OF COLLEEN FAGAN
Portland, Maine
FRIDAY, JULY 24, 2026
1:41 p.m.

Job No.: 642256

Pages: 1 - 123

Transcribed by: Wanda Greenlee, CCR No. 1188

VIDEOTAPED DEPOSITION OF COLLEEN FAGAN,

conducted at the offices of:

United States Attorney's Office - District of Maine
100 Middle Street
Portland, Maine 04101

Pursuant to agreement, before Raechel Meyerowich, Notary Public in and for the State of Maine.

physically, so I'm wondering if there's a distinction there between trying to stop an operation physically versus nonphysically?

A. I don't know what nonphysically would look like.

Q. Are there -- so the message also said: Make sure you are following guidelines for being an observer and taking document. What does taking document mean?

MS. NADEAU: Objection.

THE WITNESS: From what I understand, that means recording, editing what's going on in the communities.

BY MS. VILLALON:

Q. And are there guidelines for taking document?

MS. NADEAU: Objection.

THE WITNESS: I don't know.

BY MS. VILLALON:

Q. Okay. On the second page, Bates No. at the bottom, Plaintiffs-000140. It states at the top that an attachment was shared. And then it says, also this: Quote, [redacted] is actually Platner. And then it's the same screenshot that we saw with the photo of the cat in our last exhibit.

And if we look at the previous page, it appears that [redacted] sent this message. So is this screenshot between [redacted] and Graham Platner?

MS. NADEAU: Objection.

THE WITNESS: I don't know exactly.

BY MS. VILLALON:

Q. So to your knowledge, is [redacted] actually Graham Platner?

A. I don't have Graham Platner's contact information, so I don't actually know.

Q. Does your sister have Graham Platner's contact information?

MS. NADEAU: Objection.

BY MS. VILLALON:

Q. Your sister, [redacted]?

MS. NADEAU: Objection.

THE WITNESS: I don't know who's in her phone contacts.

BY MS. VILLALON:

Q. Do you have any reason to believe that she has Graham Platner's contact information?

A. I don't know. I know she's -- like, she used to work in, like, the more political side, like [redacted] and things like that, so -- but I

don't know, like, besides that what she does with contacts or whatever.

Q. So have you been in contact with Graham Platner about the January 23rd incident at any point?

A. No.

Q. On the fourth page of this document, Bates No. Plaintiffs-000142, [redacted] wrote: I -- [redacted] wrote: I love -- I love how the douchebag tried telling you there's a database, crying with laughter emoji.

A. Uh-huh.

Q. And there is for sure for actual terrorists and people red-flagged, bit not for that. I -- I think he meant to say, but, but what are your thoughts about [redacted]'s statement? Do you agree with it or not?

MS. NADEAU: Objection.

THE WITNESS: I mean, I agree that there's actual terrorists, and terrorists -- and actual terrorists that are red-flagged. But yeah, that's it, I would say. I don't have any other opinions on what he said.

BY MS. VILLALON:

Q. Below that message, [redacted]

THE WITNESS: I don't know when the exact day was where I did join these group chats. It could have been after. It could have been on. I don't know what the exact date was.

BY MS. VILLALON:

Q. Did you join any of the five to ten chats, any at all, before January 23rd?

A. I don't think so.

Q. So earlier we talked about a message between you and your sister at around 5:00 a.m., where your sister asked if you were sending something to Signal. So did you join Signal that morning?

A. I don't remember where when I joined Signal.

Q. Okay. And why did you decide to become a member of the five to ten group chats on Signal, where individuals shared information about ICE activity in Maine?

A. To continue to observe ICE activity in Maine.

Q. So you joined the Signal chats in order to continue to observe ICE activity?

A. To observe ICE activity in Maine, yes.

Q. And this was after your encounter with officers, when they characterized you as a domestic terrorist?
A. Can you repeat that?
Q. So you joined these group chats to observe ICE activity in Maine after your encounter with the officers, where they called you a domestic terrorist?
A. I don't remember. I think -- I do believe that I probably was a member, I don't know how many, before January 23rd. But I don't know, like, how many I was part of or which ones.
Q. Okay. But did you join or continue to participate in Signal group chats after your encounter with police -- or with ICE officers?
A. Yes.
Q. And was that for the purpose of continuing to observe ICE activity in Maine?
A. Yes.
Q. Did you ever use the disappearing message function in Signal?
A. I don't know.
Q. Did anyone in your group chats use the disappearing message function in Signal?
A. I don't know. I'm not -- I wasn't an

A. Yes. Wait. No, because am I -- well, yeah. Yeah, the date in February -- I think around that time since it was shipped. So I don't know if it was, like, before or...
Q. Okay. So I'm looking at the date of the email at the top. It says, Friday, 23 Jan, 2026?
A. Uh-huh.
Q. 07:58:29+000. So remember we talked about UTC, and so that, at the time, was five hours before East Coast Time. So it may have been 2:58 in the morning. I'm not sure. Do you recall at all that is the time that you ordered this?
A. Around January 23rd.
Q. Okay.
A. Then it says it's shipped. So you know what I mean? Yeah.
Q. Okay.
A. All right. That is the T-shirt I ordered, yes.
Q. Got it.
A. I don't know what time.
Q. Maybe to place it better, did you order this before you went out to observe officers on January 23rd or after?

A. I don't know when it shipped or -- I don't know what -- I don't know, but it was around that time. It just says shipped. I don't know the exact date and time it was ordered. You know what I mean?

Q. And what does Abolish ICE mean to you?

A. Let me see. I would say what it means is to -- I think it's like a -- or like a, maybe, political statement and/or ICE needs to be reformed, things like that, I would say.

Q. So the word abolish --

A. Means get rid of.

Q. Yeah. Do you agree to get rid of ICE?

MS. NADEAU: Objection.

THE WITNESS: I think that there needs to be an overhaul and reform of it, I would say.

BY MS. VILLALON:

Q. Okay. But do you believe it needs to be abolished?

MS. NADEAU: Objection.

THE WITNESS: I don't know.

BY MS. VILLALON:
Q. Have you worn this T-shirt before?
A. Yes.
Q. How many times?
A. Maybe, like, twice.
Q. And when did you wear it?
MS. NADEAU: Objection.
THE WITNESS: I don't remember exactly when.
BY MS. VILLALON:
Q. Where did you wear it?
MS. NADEAU: Objection. Actually, I'm not sure that this is an appropriate line of questioning. She has a First Amendment right to wear the T-shirt.
MS. VILLALON: I'm just asking her questions about when she wore it and where.
MS. NADEAU: I know. It's expressive activity, though.
MS. VILLALON: That's what this is all about.
MS. NADEAU: It's expressive activity, not at issue in this case.
MS. VILLALON: About abolishing ICE?
MS. NADEAU: Yes.

(Exhibit No. 28 was marked for the record.)
BY MS. VILLALON:
Q. Do you recognize this image?
A. No.
Q. Do you believe you've ever seen it before?
A. I don't know. I probably have seen it before, but I haven't, like, paid much attention to what it was. I don't know where it's from or anything like that.
Q. Do you recall receiving, quote, training containing this information?
MS. NADEAU: Objection.
THE WITNESS: I don't remember.
BY MS. VILLALON:
Q. Okay. That's all for this. In 2025, did you attend any protests?
MS. NADEAU: Objection. Don't answer that. So we've taken the position for months that protests unrelated to the observation in this case are protected by the First Amendment, among other things. And so I'm going to instruct her not to answer on those grounds.
BY MS. VILLALON:
Q. Did you attend any protest related to

immigration enforcement?

MS. NADEAU: Yeah. Same objection and instruction not to answer.

BY MS. VILLALON:

Q. Following the incident on January 23rd, 2026, did you attend any protests related to immigration enforcement?

MS. NADEAU: Same First Amendment objection and instruction not to answer.

BY MS. VILLALON:

Q. Do you consider observing ICE activity to be a form of protest?

MS. NADEAU: Objection. You can answer.

THE WITNESS: Yes.

BY MS. VILLALON:

Q. Okay. So did you attend any protests in 2025 related to observing ICE activity?

MS. NADEAU: Objection, same First Amendment grounds and instruction not to answer.

BY MS. VILLALON:

Q. Did you observe ICE activity in 2025?

MS. NADEAU: Objection, but you can answer.

THE WITNESS: Not that I recall.