**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,

Defendants.

Case No. 26-cv-00092-JAW

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Earlier this year, Defendants told the Court that this case warranted no relief because it was only about two observers, two encounters, and "a few officers" whose "empty threats" were "contrary to DHS policy." TRO Opp. (ECF No. 18) at 1, 8, 11, 17. When asked whether "the agents here were acting on their own," the government asserted, "That is correct, that is not DHS's policy." TRO Tr. (ECF No. 23) 28:7–14. The Court relied on those representations, holding that it could not determine on that record whether the January conduct reflected "an agency-wide policy of First Amendment suppression" or "the actions of a few agents." TRO Order (ECF No. 24) at 25; *see id.* at 22. The Court denied emergency relief and instead the parties conducted limited expedited discovery. ECF No. 85 at 4 & n.2. Because Defendants cast the case so narrowly, discovery proceeded in the same way: tethered to the named Plaintiffs and, through them, the agents on only two of the 24 ICE teams deployed to Maine during Operation Catch of the Day.

Even through that narrow window, however, discovery has proven that none of the government's representations hold up. The agents' threats were not empty. Agent J.C., who called Plaintiff Williams to warn that she could be placed on a domestic terrorism watchlist, classified Williams as a [redacted] in an investigative database—a record that has already caused Williams and her spouse, Plaintiff Pantos, to be detained at the border. Agent J.C. intended (but failed) to create the same kind of record for Plaintiff Hilton, but he successfully branded other observers present at her encounter as [redacted] for being "professional protestors."

Discovery revealed a concerted and officially sanctioned practice to intimidate and deter observers by not only threatening them, but also leading them to their homes. These were not rogue agents. When a team reported it was taking observers "[redacted]," the operation's command center answered: "Take em home." And the Department's Rule 30(b)(6) witness

testified that agents who lead observers home "are [acting] within their scope and they can do it" and that threatening domestic terrorist designation could be an appropriate technique. Defendants' agents have received no relevant training, and, even when caught engaging in constitutional violations, received no discipline.

While the case is still in its preliminary stage, with only limited discovery, the record demonstrates that agents routinely collect images of observers' faces and license plates, and have created retaliatory investigative records about their protected activity. Agents also threatened multiple observers with being placed on watchlists, and have continued their practice of intimidating drive-bys: in June of this year, an agent led Plaintiff Hilton to the address on her driver's license and conspicuously stopped in front of the house. Other Mainers have experienced the same. All Plaintiffs have experienced concrete harm and have been chilled in the exercise of their First Amendment rights: Williams and Pantos have stopped all observation activity entirely, and Hilton and Fagan have reduced their protected activity or taken other precautions while doing so.

Therefore, even at this preliminary stage, Plaintiffs are entitled to appropriate relief: (1) an order archiving Plaintiff Williams's ICM and TECS records that eliminates her [redacted] and bars reimposition absent an independent, lawful basis; (2) an injunction barring adverse action against all Plaintiffs based on personal information collected because of protected activity; (3) an injunction against two practices used in Maine to intimidate Plaintiffs—threatening placement on a "domestic terrorist" watchlist or database, and leading them to their homes—because they observed or recorded immigration operations; and (4) dissemination of the Court's decision to agents and officers conducting immigration operations in Maine—together with corresponding declaratory relief.

## FACTUAL BACKGROUND

### I. Operation Catch of the Day

During the second Trump administration, Defendants have deployed thousands of federal agents across the country in coordinated immigration enforcement operations, including in "surges" to various locations that have resulted in widespread abuses. In the fall of 2025, ICE directed certain field offices to create "strike teams"—a group of approximately [redacted] agents that can be deployed as a group as needed during a one-year term.[1] On January 20, 2026, Defendants deployed [redacted] joint strike teams (JSTs) and [redacted] special response teams (SRTs) to Maine for "Operation Catch of the Day," all led by the ICE Office of the Director.[2] ICE established a Joint Operations Center (JOC) to serve as the primary means of [redacted] with [redacted] during the operation.[3] Members of the JOC included [redacted] officials from the [redacted], ERO, and HSI.[4] The JOC also established an "Intel Desk" for the operation, including HSI criminal analysts.[5]

### II. Defendants Warn Agents to Be Prepared for "Agitators"

At a virtual briefing for all personnel, Deputy Field Office Director P.H. and others gave an overview of Operation Catch of the Day. The briefing occurred against the backdrop of widespread protests in Minneapolis and elsewhere. The president and high-ranking officials had

---

[1] S.C. Dep. 14:2–14, 28:16–23, 32:2–23; ICE 30(b)(6) Dep. 70:6–71:9; J.R. Dep. 35:5–11, 71:17–73:3. Excerpts from Defendants' depositions cited to herein are attached.

[2] Ex. 45. The operation was led by the Office of Firearms and Tactical Programs (OFTP) within ICE's Office of the Director. Ex. 30 at DEFS000483; ICE 30(b)(6) Dep. 58:16–59:17, 94:11–19, 95:10–13. Each strike team consisted of personnel from Enforcement and Removal Operations (ERO) or Homeland Security Investigations (HSI). Ex. 45. Each had a team leader responsible for overseeing the conduct of agents on the team. J.R. Dep. 68:2–3, 69:2–8.

[3] Ex. 30 at DEFS000486; ICE 30(b)(6) Dep. 81:17–82:5, 100:3–12; D.L. Dep. 158:4–7; J.R. Dep. 38:6–12, 68:2–6.

[4] Ex. 45; ICE 30(b)(6) Dep. 96:12–97:9, 100:3–101:17.

[5] Ex. 29 at DEFS000479; *see also* Ex. 30 at DEFS000498; ICE 30(b)(6) Dep. 131:19–134:19, 136:3–140:21; S.C. Dep. 166:16–167:13, 171:9–172:4.

responded by labeling protestors as "agitators"[6] and characterizing First Amendment-protected conduct as criminal.[7] Not two weeks before the briefing, an agent in Minneapolis shot and killed Renee Good—a protestor called a "domestic terrorist" by federal officials[8] and described as "some agitator" by agents deployed to Maine.[9]

Director P.H. generally told agents to allow members of the public to exercise their First Amendment rights,[10] but also warned them to expect people "impeding" their efforts.[11] Agents recalled receiving instructions that "if people were impeding our operations, *confronting us when conducting arrests*, that . . . the expectation would be to conduct arrests."[12] One agent recalled an instruction to "give warnings" to people impeding their operations, but confirmed that agents

---

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 18, 2026 at 7:15am ET), https://tinyurl.com/ymddkcnw (people "protesting include many highly paid professional agitators"); Harmeet Kaur, *Word of the Week: Who gets called an 'agitator'?*, CNN (Jan. 14, 2026), https://tinyurl.com/bd7vrhnf (President describing protestor as "probably a paid agitator"); U.S. Immigration and Customs Enforcement (@ICEgov), X (Jan. 20, 2026 at 11:45am ET), https://tinyurl.com/5faxk7wu (criticizing "agitators" for "protesting ICE"); The Source with Kaitlan Collins, *DOJ: No Basis For Civil Rights Investigation Into ICE Shooting*, CNN Transcripts (Jan. 13, 2026), https://tinyurl.com/2h7rz2xm (Defendant Mullin calling for "investigati[on] [into] the paid protesters, and who's paying them to obstruct federal officers").

[7] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, at 00:24 (YouTube, July 14, 2025), https://tinyurl.com/2x54ku93 (then-Secretary Noem: "videotaping" federal agents "when they're out on operations" is "violence" and "threatening their safety"); Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is 'Violence'*, The American Prospect (Sept. 9, 2025), https://tinyurl.com/489m2jwk (DHS Asst. Sec.: "videotaping ICE law enforcement and posting photos and videos of them online is doxxing" and "illegal[] harassment").

[8] Homeland Security (@DHSgov), X (Jan. 7, 2026 at 7:23 PM ET), https://tinyurl.com/yfc83h6y (then-Secretary Noem accusing Renee Good of "domestic terrorism" and describing her as part of a "mob of agitators" impeding an operation); Stephen Miller (@StephenM), X (Jan. 7, 2026 at 1:35 PM ET), https://tinyurl.com/mtfssza3 (accusing Good of domestic terrorism).

[9] Ex. 49 at DEFS001460–66 (members of Boston strike team describing Good as "some agitator" and describing the shot that killed her as a "good" one).

[10] ICE 30(b)(6) Dep. 154:20–157:9, 317:6–318:4.

[11] S.C. Dep. 62:15–63:5 ("were just told . . . to expect agitators and people impeding our operations, which has become very common in Title 8 enforcement").

[12] S.C. Dep. 55:7–17; *see also* J.C. Dep. 34:1–11 (instructions were to arrest "people who interfere with immigration arrests or investigations"); Ex. 31 (email directing agents that anyone interfering with an ICE operation should be given one warning and then arrested).

received no instruction about what that warning should look like.[13] According to DHS's 30(b)(6) witness, Director P.H.'s instruction to agents who encountered people impeding operations was to "[t]ake appropriate action as the officer or agent deems appropriate."[14]

Despite the emphasis on "agitators" and people interfering with their operations, agents deployed to Maine received no guidance on distinguishing between First Amendment-protected activity and unlawful impeding.[15] Indeed, multiple agents who participated in the operation could not recall *ever* receiving training on First Amendment protections while employed by ICE.[16] Asked whether Director P.H. advised agents on the line between protected activity and "impeding," DHS's 30(b)(6) witness said she did not "*because there isn't a need because there is no specific line.*"[17]

## III. Plaintiffs and Other Mainers Exercise Their First Amendment Rights to Observe, Record, and Protest ICE Activity

In Maine, as elsewhere, concerned residents responded to aggressive immigration enforcement by exercising their constitutional right to observe and document ICE operations. Many Mainers, including Plaintiffs, joined together to share information about ICE activity in their neighborhoods and coordinate strategies for bearing witness and holding federal agents accountable for abuses.[18] Their concerns were grounded in recent experience: Operation Catch of

---

[13] J.C. Dep. 35:23–36:22.
[14] ICE 30(b)(6) Dep. 159:2–160:21.
[15] J.C. Dep. 34:20–35:7; S.C. Dep. 55:7–22, 65:14–66:2, 133:6–12; D.L. Dep. 156:1–12, 157:4–16.
[16] J.R. Dep. 108:7–109:3 ("I don't think I've received any training on what constitutes First Amendment protections"); J.C. Dep. 35:12–15 ("Q. Other than the prebrief, do you recall ever receiving guidance or instruction about First Amendment rights? A. Not at HSI.").
[17] ICE 30(b)(6) Dep. 157:13–23. Prior to some other surge operations, ICE *did* provide agents with training about responding to potential interference with their operations—showing the agency understood such training was needed. Ex. 46; Ex. 64 ([redacted]).
[18] Hilton Dep. 40:20–24; Fagan Dep. 84:16–21; Williams Dep. 40:3–7; Pantos Dep. 44:14–20. Excerpts from Plaintiffs' depositions cited to herein are attached. PII and similarly sensitive but irrelevant material have been redacted from the excerpts.

the Day began while Operation Metro Surge in Minneapolis remained underway, and videos recorded by members of the public had helped expose often-violent tactics employed by agents.[19]

Despite knowing that there is nothing unlawful about coordinating to engage in protected observation or protest activity,[20] Defendants perceive such coordination as inherently suspect. On January 22, 2026, DHS's Office of Intelligence and Analysis advised Maine personnel about "[redacted]."[21] The email advisory acknowledged "[redacted]" but described the intel as [redacted]."[22] Agents echoed these concerns, suggesting that the level of "coordination" among people observing operations in Maine raised suspicion.[23] Even before arriving in Maine, Acting Supervisory Special Agent S.C.—the team leader of the Boston JST—told his team, without explanation, that "the stated mission" of groups protesting ICE activity "is to impede."[24]

## IV. Defendants Threaten and Intimidate Plaintiffs in Response to Protected Activity

Plaintiffs are among many Mainers exercising their First Amendment rights. In separate incidents involving multiple strike teams, federal agents responded in remarkably similar ways: by recording Plaintiffs' faces, collecting their license plate numbers, and threatening them with placement on a "domestic terrorist" watchlist or database. Since these initial encounters, ICE

[19] Hilton Dep. 73:8–74:21 (concerns about "ICE officers being incredibly violent to community members" and "retaliat[ing] against observers," including "the murders of Alex Pretti and Renee Good"); Pantos Dep. 24:9–25:10 ("ample evidence of recent history that ICE coming to town is pretty negative for people, for entire communities"); Neff Decl. ¶¶ 3–4, 12.

[20] D.L. Dep. 130:23–131:4.

[21] Ex. 33 at DEFS000621.

[22] *Id.* at DEFS000624.

[23] D.L. Dep. 127:24–129:10 (evidence of "professional protesters" in Maine included "the same people or the same cars" "showing up at multiple times at different days," who were "organizing" with "an app or radios or whatever"); J.R. Dep. 261:22–263:15 ("agitators" were "coordinated," evidenced by observing them "speaking on radios" and "reporting ICE officers sightings"); J.C. Dep. 167:4–168:9 (describing "a group of organized people").

[24] Ex. 49 at DEFS001541–44.

agents have also driven Plaintiff Hilton to her home—another practice, still ongoing, by agents in Maine and elsewhere meant to intimidate observers who follow agents' vehicles in order to document public detentions of immigration targets. The common thread among these practices was a message intended to resonate throughout the community: We know who you are and we have the power to make your life difficult. These tactics have had the intended effect.[25]

### *1. Polyxenia Pantos and Carlyn Williams*

Around 10 a.m. on January 20, the first day of Operation Catch of the Day, Plaintiff Pantos drove by an arrest.[26] Pantos parked several car lengths away and stood outside their car, silently observing the end of the arrest and taking photos to document the scene. Pantos then left after five to ten minutes.[27] During those few minutes, Agent J.C. collected information about Pantos and another observer on the scene, including by recording Pantos's car—a Chevy Bolt owned by their spouse, Plaintiff Williams.[28] S.C. circulated photos to the Intel Desk with the message, "Two agitators," even though he admittedly did not observe Pantos himself[29] and video evidence and testimony make clear that neither observer impeded the operation.[30]

Nonetheless, later that day, another member of the Boston JST, Agent J.C., gathered intelligence on the observers.[31] J.C. identified Williams as the registered owner of the Chevy Bolt using its license plate number and then searched a database, Accurint for Law Enforcement, for

---

[25] Pantos Dep. 27:9–11 (very upset), 57:14–58:4 (scared and overwhelmed); Williams Dep. 52:13–19 (freaked out, shaking out after call), 66:24–67:13 (considered getting a gun); Hilton Dep. 29:24–30:22 (shaken, crying, scared, didn't sleep at home); Fagan Dep. 25:19–25 (not comfortable observing and recording ICE officers), 107:13–108:3 (felt "scared and threatened").
[26] Pantos Decl. ¶ 3; Pantos Dep. 21:19–24:14 (narrative).
[27] Pantos Decl. ¶ 8; Pantos Dep. 22:23–25.
[28] Ex. 26 (video of Chevy Bolt); Ex. 24, Ex. 23, Ex. 27, Ex. 28 (videos and photos of other observer and her vehicle).
[29] Ex. 48 at DEFS001272; S.C. Dep. 147:1–6 ("I did not see the person [Plaintiff Pantos]").
[30] Ex. 8; D.L. Dep. 53:8–54:2, 55:22–56:5, 60:22–25; 100:2–20; 101:1–4.
[31] Ex. 62 at 29 (Resp. to No. 9).

additional information about her. That search identified Pantos as living at Williams's address,[32] leading J.C. to search for information about Pantos as well.[33] J.C. sent Williams's photo to the Boston JST along with the message: "Was this the protestor." Retired agent D.L., the agent who had secured the perimeter that morning, responded that Williams's photo did not match the "lady [he] had asked to back up," explaining "It doesn't look like her (I was pretty close to her)" and "I don't think those are the same women." J.C. then separately identified the other observer, stated "[t]hey were both there," and reported "adding them in ICM now."[34]

Having also obtained Williams's cell phone number, Agent J.C. called Williams at 3:17 p.m., identifying himself as "the Department of Homeland Security."[35] J.C. asked Williams whether anyone else drove her vehicle, and Williams said her spouse sometimes drives it. J.C. commented on Pantos's presence at an ICE incident that morning and ended the call with a warning: "You should encourage her not to do anything like that in the future because people who are doing things like that might get added to a domestic terrorism watchlist."[36]

Despite learning that Williams had not been on the scene, J.C. still created records in HSI's Investigative Case Management (ICM) database about both Williams and her vehicle, describing her as an "aggressive woman [who] interject[ed] herself into an arrest."[37] Both records designate Williams a [redacted] and [redacted][38] Among other potential consequences, this means any time

[32] Ex. 67.
[33] Ex. 22. J.C. circulated this information to the Boston JST, writing "Not that I'm petty but here's the people who live at the address of . . . the female protestor[.]" Ex. 49 at DEFS001619.
[34] Ex. 49 at DEFS001619–23.
[35] Williams Decl. ¶ 14; Williams Dep. 35:3–37:16 (narrative), 50:10–52:12 (additional detail); Ex. 7; Ex. 5.
[36] Williams Decl. ¶ 14; Ex. 6; Williams Dep. 35:3–37:16; *see* J.C. Dep. 318:15–319:9 (he warned Williams that "if you continue to do this, you'll be arrested").
[37] Ex. 35 at DEFS000651.
[38] Ex. 34; Ex. 35; Ex. 18; Ex. 21.

Williams travels internationally she will be [redacted] through at least January 2027.[39] This has already occurred once: on March 16, 2026, returning from an anniversary trip to Quebec, Williams and Pantos were held for about an hour at the Jackman Border Crossing.[40] CBP officers took their phones, searched their vehicle and luggage, and made them feel like criminal suspects while refusing to explain the reason for their detention.[41]

***2. Elinor Hilton***

Plaintiff Hilton spent the morning of January 21 observing ICE operations in her community. Around 11:30 a.m., she learned about ICE activity at a nearby Home Depot. Hilton drove to the store parking lot, parked her car about 20 feet from one group of agents and 75 feet from a second group detaining someone, and then began filming.[42] Hilton was the only observer standing in the parking lot at that point.[43] Although Agent D.L. testified that Hilton complied with orders and did not interfere, he immediately held up his phone, ostensibly to record her.[44] Agent J.C. then approached and filmed Hilton's face as well. He asked which car she had gotten out of, and D.L. responded, "I got 'em, I got 'em."[45] An agent believed to be J.C. then told Hilton that if she kept "showing up to things like this," she would be put on a domestic terrorist watchlist and agents would go to her house that night.[46] J.C. then reiterated, "[S]he's just going on a domestic terrorist watchlist. I just want to put it in."[47]

---

[39] CBP 30(b)(6) Dep. 102:11–14, 145:14–147:10, 156:8–19 (if individual is subject to a TECS lookout, "per CBP policy, that officer . . . has to refer that individual into secondary").

[40] Williams Decl. ¶¶ 30–37; Williams Dep. 72:21–76:24 (narrative); Pantos Dep. 66:3–70:5 (narrative); Ex. 19; Ex. 20.

[41] Williams Decl. ¶¶ 34–36; Pantos Decl. ¶ 27; Pantos Dep. 69:7–18; Williams Dep. 74:14–25.

[42] Hilton Decl. ¶ 7; Hilton Dep. 25:9–30:11 (full narrative), 53:9–55:23 (additional details), 65:16–66:16, 69:10–70:11 (parked at a distance), 62:8–63:8, 66:17–67:8 (intention to observe).

[43] Hilton Decl. ¶¶ 9, 22.

[44] D.L. Dep. 100:2–20 (Hilton "didn't get close enough" to interfere), 101:1–4, 116:1–4.

[45] Ex. 1.

[46] Hilton Dep. 27:22–28:6.

[47] Hilton Decl. ¶ 21; Ex. 66.

Several additional observers appeared in the parking lot. J.C. approached them, filmed each person's face at close range, and said, "I'm going to do the same thing. Just so you know for a warning, we're putting you into a watchlist. The more you show up at these, well, you'll see us at your house later to arrest you."[48] To an observer covering his face, J.C. said, "It doesn't matter, I can get your eyes. Terror watchlist for you as well." He asked other agents what cars the observers had arrived in.[49] As extensive video evidence demonstrates and one agent conceded, none of these observers interfered with the enforcement operation.[50]

Soon after this incident, J.C. sought help identifying the Home Depot observers from CBP Officer K.M. He sent photos of Hilton and others, along with the statements "Officer safety" and "Let me know what you find."[51] K.M. then ran a facial recognition search using the Mobile Query application on his phone.[52] He identified Hilton and others and conducted [redacted] searches to obtain more information about them.[53] K.M. relayed some of the resulting information to J.C.,[54] but does not appear to have shared any information about Hilton. J.C. later created ICM records for two of the other observers and a vehicle he associated with observers, describing each as a "Threat to Law Enforcement, Professional Protestor."[55] He admitted that he "[a]bsolutely" would have created an ICM record for Hilton as well but believed he had not been able to identify her.[56]

---

[48] Ex. 17; *see also* Ex. 2; Hilton Dep. 28:8–12.
[49] Ex. 17.
[50] Ex. 1; Ex. 2; Ex. 3; D.L. Dep. 116:1–4 (confirming no observers interfered in the Home Depot parking lot).
[51] Ex. 10 at DEFS000002–03.
[52] Ex. 61 at 28–31.
[53] *Id.*; Ex. 9.
[54] Ex. 10.
[55] Ex. 42 at DEFS000676; Ex. 43 at DEFS000681. Agent J.C. created ICM records for six observers, including Plaintiff Williams. Exs. 34–44
[56] J.C. Dep. 166:7–18.

Plaintiff Hilton limited her observation activity for several months after her experience at the Home Depot, but gradually resumed in May.[57] On June 16, 2026, long after Operation Catch of the Day had ended, Hilton noticed an ICE vehicle and drove behind it at a safe distance for quite a while, intending to document any detention agents stopped to conduct.[58] The vehicle drove through several neighborhoods and finally led Hilton directly to the address where Hilton used to live and the one still listed on her driver's license and registration. The ICE agent stopped in front of the house and waved at Hilton. The agent then drove away and onto the highway, at which point Hilton chose not to follow.[59]

### 3. *Colleen Fagan*

On January 23, Plaintiff Fagan drove around neighborhoods with significant immigrant populations to observe and record any ICE arrests.[60] Around 6:40 a.m., Fagan observed two ICE vehicles outside an apartment complex. Fagan exited her car and began recording the agents with her cell phone, staying at least 15 feet away from them.[61] Deportation Officers J.Y. and [redacted], both on the Salt Lake City JST, immediately began walking toward Fagan and held up their phones to record her and another observer on the scene.[62] When Fagan asked J.Y. why he was recording her, he replied, "Cause we have a nice little database and now you're considered a domestic terrorist, so have fun with that."[63]

[redacted] and J.Y. both recorded Fagan and her vehicle.[64] [redacted] has since explained that he recorded the observers' faces and license plates because "they parked their cars close to our

[57] Hilton Decl. ¶ 37; Hilton Dep. 167:8–13.
[58] Hilton Decl. ¶ 50; Hilton Dep. 182:8–24.
[59] Hilton Decl. ¶ 51; Hilton Dep. 185:7–186:1.
[60] Fagan Decl. ¶ 3; Fagan Dep. 17:6–14.
[61] Fagan Decl. ¶¶ 10–12; Fagan Dep. 18:2–19:21.
[62] Fagan Decl. ¶ 12; Ex. 61 (Resp. to No. 1).
[63] Fagan Decl. ¶ 13; Fagan Dep. 16:23–20:13 (full narrative); Ex. 15 (text exchange with J.Y. [redacted]).
[64] Ex. 13; Ex. 14; Ex. 12 ¶ 6 ([redacted] photo and video were later deleted).

operations, walked toward us, and were both making heated verbal statements"[65]—though video evidence makes clear that Fagan did not say anything at all until the agents began recording her.[66] [redacted] admits his purpose was to collect information "*in case* either of [the observers] committed an act of violence or illegally interfered with our lawful investigation of the alien."[67] He concedes that neither Fagan nor the other observer ultimately did so.[68]

## V. Defendants' Actions Reflect Widespread, Officially Sanctioned Practices

Plaintiffs' experiences are neither unique nor the result of one or two agents gone astray. Even limited discovery thus far evidences common practices targeting observers whose conduct the First Amendment squarely protects. Two particular practices have come into focus so far: (1) agents collect images, license plate numbers, and other identifying information about observers, and (2) agents intimidate protestors and observers using specific tactics like "domestic terrorist" warnings and drive-bys of their homes to deter them from further protected activity.

Underlying these practices is a broad—and subjective—view of what conduct amounts to "impeding" or "threatening" law enforcement that is shared by officials up and down the chain of command. DHS's 30(b)(6) witness testified that the determination of what activity crosses the line into impeding "depends on [each] officer and agent."[69] And agents cast nearly all protestors and observers as "agitators" interfering with their operations. Supervisory Detention and Deportation Officer J.R. testified that anyone whose actions require agents to "heighten their

---

[65] Ex. 12 ¶ 8.
[66] Ex. 4.
[67] Ex. 12 ¶ 8 (emphasis added).
[68] Ex. 12 ¶ 8. No agent instructed Fagan to step back, despite the team leader acknowledging that an officer would have done so if a bystander got too close. J.R. Dep. 135:22–136:13.
[69] ICE 30(b)(6) Dep. 156:16–157:9. The Department's representative also testified that an officer's subjective sense of virtually *any fact or circumstance* could turn protected activity into impeding, including their "type of shoes," whether "their hands [are] clenched," whether "they are looking," and whether the ground was "icy." *Id.* at 215:2–217:16; *see also id.* at 157:13–158:24, 207:12–210:9, 210:11–212:2; 225:17–227:21, 231:23–233:8, 233:10–234:7.

awareness of their surroundings" is interfering with an arrest—including a person filming and honking a horn from a parked car across the street.[70] His expansive view of "impeding" was commonly held by other agents on the operation.[71] It is also shared by high-level officials, including the current and former Homeland Security Secretaries. *See supra* nn.7–8.

### *1. Targeted Collection of Information About Observers and Protestors*

Agents in Maine routinely capture photos, video recordings, and other information about protestors and observers—often labeled "agitators"[72]—on their government-issued phones.[73] Operation Signal chats from four days in January reveal that agents collected and shared photos or license plate numbers of dozens of individuals whose actions, as described, constitute protected activity—including people "recording," "taking photos," "honking," and "following" agents.[74]

---

[70] J.R. Dep. 116:6–117:16; *see also id.* at 132:1–12 (interference because "the officer's attention had to be taken away from the arrest to basically create a perimeter").

[71] J.C. Dep. 211:15–214:2 (people who "show up blowing whistles, honking their horns, screaming" are "interfering"); S.C. Dep. 303:20–304:6 ("agitators are [people] blowing whistles and other stuff").

[72] Ex. 47 at DEFS001210 ("agitator spotted"); Ex. 48 at DEFS001257–59 ("Are we compiling a list of agitators?" / "agitator, getting plates"), DEFS001360 ("Agitator vehicle"); DEFS001377–79 ("Agitator"); Ex. 49 at DEFS001953 ("Could be an agitator"), DEFS001962 ("maybe agitator"); *see also infra* n.74.

[73] D.L. Dep. 23:19–24:1 (all recordings made on government-issued phone).

[74] Ex. 48 at DEFS001280 ("took quick pics of us"), DEFS001282 ("taking pictures and making improper hand gestures"), DEFS001288 ("tail[ing]"), DEFS001289 ("following"), DEFS001294 ("agitator vehicle that is live streaming and blowing her whistle"), DEFS001295–96 ("agitator vehicle following us," "We are taking her for a cruise around Portland"), DEFS001308 ("following"), DEFS001309 ("Agitator honking during knock and talk"), DEFS001310 ("We believe we have another tail."), DEFS001311 ("vehicle appears to be running surveillance"), DEFS001315–1317 ("following"), DEFS001323 ("following"), DEFS001324–25 ("PLEASE RUN . . . Following the vehicle"), DEFS001330 ("These guys were following us. Had female on foot recording."), DEFS001352–53 ("Females recording and following us"), DEFS001373–74 ("Driver conducting surveillance"), DEFS001377–78 ("Taking photos of vehicles"), DEFS001389 ("two vehicles following us"), DEFS001393–94 ("[f]ollowing"), DEFS001397 ("following"), DEFS001399 ("Aggressively followed"), DEFS001414 ("Taking photos of vehicles"); Ex. 47 at DEFS000978, DEFS000980 ("Following us honking"), DEFS001031 ("Agitator with whistle"), DEFS001056 ("followed"), DEFS001154–55 ("Had a number of admirers"), DEFS001198–1201 ("being followed"), DEFS001218–19 ("following").

Agent D.L. openly admits to recording "protesters"[75] and admits he did *not* collect information about "individuals who may have been in the vicinity but not protesting or recording."[76] He estimates he filmed protestors "dozens of times" during Operation Catch of the Day,[77] despite acknowledging that he did not witness any criminal activity by protestors.[78] Similarly, [redacted] concedes that he recorded observers "in case" they engaged in unlawful activity—not because they actually did so.[79] J.R., his supervisor, agreed that officers "record[ed] *in the event that* interference took place."[80] He nonetheless considered those actions consistent with "standard" practice: if agents "felt" that an encounter "could lead to [a] possible [18 U.S.C.] 111 charge," then it was standard to record the individual and their license plate.[81]

No agents were reprimanded for recording Plaintiffs; nor were they instructed not to record protestors or observers in similar circumstances.[82] On the contrary, agents understood that recording individuals in these circumstances was consistent with DHS policy.[83] And they had good reason to. Defendants' operations in Minneapolis at the same time as Operation Catch of the Day may have been more organized than in Maine, but they reflect the same DHS practice allowing—even encouraging—the collection of information about protestors.[84] At least one

---

[75] D.L. Dep. 41:24–42:3, 44:10–16.
[76] *Id.* at 70:15–71:2; *see also* J.R. Dep. 152:5–153:2.
[77] D.L. Dep. 171:5–21.
[78] *Id.* at 132:2–5.
[79] Ex. 12 ¶ 8.
[80] J.R. Dep. 132:1–12 (emphasis added).
[81] J.R. Dep. 131:9–22; *see also id.* at 111:19–112:1 ("Officers can record whoever they'd like, same as the public."); *id.* at 141:5–142:20 ("[T]heir conduct, again, was not any violation of policy that I saw . . . [W]e were told to get video evidence of potential 111 violations for prosecutions, and that instruction came from the Department of Justice."). This testimony aligns with an April 2026 letter from then-Acting ICE Director Todd Lyons, who confirmed that ICE agents have "collected information to identify individuals reasonably believed to be involved in, or directly supporting, *potential* violations of federal law." Ex. 65.
[82] J.R. Dep. 143:12–15; S.C. Dep. 131:21–132:19.
[83] D.L. Dep. 175:10–16; J.R. Dep. 142:6–20; S.C. Dep. 310:19–311:02.
[84] On January 12, 2026, HSI directed agents in Minnesota to use an online form "to capture all images, license plates, identifications, and general information on hotels, agitators, *protestors*

purpose of accumulating information about protestors and observers in Signal chats and other government records[85] is to potentially inform later criminal investigations.[86]

### *2. Intimidation of Protestors and Observers*

Agents in Maine, as elsewhere, routinely intimidate protestors and observers to deter their protected activity. Their main tactics include (1) threatening observers, particularly with a domestic terrorist designation or watchlist, and (2) leading observers to their homes.

***"Domestic terrorist" threats.*** In three separate incidents, federal agents warned Plaintiffs and several other observers that they would be considered "domestic terrorists" because of their protected activity. *See supra* pp. 9–11. Agents testified to hearing this language from senior officials.[87] One agent admitted he intended his statement as a "warning" to discourage observers from showing up at future operations.[88] Another agreed the only conceivable reason to threaten an individual with a domestic terrorist designation would be to make the person go away.[89] And

---

etc." Ex. 54 (emphasis added); *see also* Ex. 55; Ex. 56. The goal was to collect this information "in one consolidated form and not just blindly dump into signal chats." Ex. 54; *see also* Ex. 58; Ex. 50. Dozens of people were caught up in this tracking of "agitators," often for purely protected activity. *See, e.g.*, Ex. 56. Defendants ultimately created multiple spreadsheets documenting form submissions and a "Master List of Agitators" with names and license plate numbers. *See, e.g.*, Ex. 56; Hewey Decl. ¶ 9 (explaining HILTON-MAINE2026-DEFS006788).

[85] "[A]ny information collected" during encounters between ICE and protestors and observers "is treated as an official government record," even if the individuals were not arrested or detained. Ex. 65; *see also* Ex. 30 at DEFS000499 ([redacted]).

[86] Ex. 12 ¶ 8; S.C. Dep. 154:6–155:4 (collecting vehicle information in case "it became an issue later than this or later on as part of the operations"); D.L. Dep. 65:20–66:1 (appropriate to record protestors and observers "because you don't know what's going to be important later on"); J.C. Dep. 127:2–18 (similar).

[87] *See* J.C. Dep. 266:24–268:15 (using "domestic terrorist" language after hearing "senior White House leadership was making similar statements"); 338:22–339:22 (similar); S.C. Dep. 243:11–16 ("The border czar mentioned putting people on a domestic terrorist watch list if they were convicted of crimes of impeding ICE officers or agents").

[88] J.C. Dep. 179:21–180:2, 180:8–16; *id.* at 182:20–183:5 (designed so "she felt that she should just leave so I don't have to deal with her").

[89] D.L. Dep. 112:24–113:11 ("Cops tell people things all the time to get rid of them"), 114:17–24.

the Department's 30(b)(6) witness maintained that warning a person they will be placed on a domestic terrorist watchlist can be an appropriate deescalation technique.[90]

Defendants have not reprimanded any agents for threatening to add Plaintiffs and others to a "domestic terrorist" list. Agent J.C. was never instructed not to repeat his threat, nevermind reprimanded[91]—despite Defendants' sworn declaration at the TRO stage that agents had been "informed not to tell individuals that they will be on a database or watchlist simply for exercising their First Amendment rights," ECF No. 18-1 ¶ 11. Agent S.C., J.C.'s supervisor, admitted he did not impose any discipline and does not recall anyone in his chain of command saying it violated DHS policy.[92] Officer J.R. minimized his officer's threat as "probably over the top,"[93] and recalls only a single conversation advising J.Y. to be "more mindful of what he says" because his "joke didn't land."[94]

***Drive-bys***. Driving by an observer's home address is another common intimidation tactic deployed in Maine that neither began nor ended during the January operation. Before Operation Catch of the Day began, Special Agent C.H.—the Boston JST's assistant team leader—explained the practice to her team: "Sounds like in MN some of the [redacted] have been playing games with the agitators following them. They run the agitators [sic] plates and take the agitator on a nice [redacted]

[90] ICE 30(b)(6) Dep. 361:17–365:10 ("It's based on what that agent, officer, their trainings, observations, and experience, that they experience, based on the situation, what they feel could deescalate the situation.").
[91] J.C. Dep. 214:14–19.
[92] S.C. Dep. 244:23–245:6, 253:6–12.
[93] J.R. Dep. 133:12–22.
[94] J.R. Dep. 143:16–145:15 (did not "know if it would be considered discipline"); *contra* Dkt. 18-2 (sworn TRO declaration from J.R.'s supervisor Wells stating J.R. "informed me that he had spoken to the officers involved and told them not to tell individuals that they will be in a database or on a watchlist for exercising their First Amendment rights"). J.R. also initially claimed to have sent his team a message in response to J.Y. Ex. 16; J.R. Dep. 153:7–157:1. But the message was sent on or before January 22—the day *before* the Fagan incident—leading J.R. to admit that it "could have" related to "something entirely different." J.R. Dep. 156:7–18. In any event, the message falls far short of reprimanding J.Y. for any "domestic terrorist" comment or instructing him not to make such statements. Ex. 16.

[redacted]. *Sounds like it scares some off*."[95] J.R. admitted his team led an individual to their house for exactly this purpose: to "show them that we knew who they were" and "have them stop following us."[96]

During Operation Catch of the Day, agents in Maine adopted the drive-by practice with the express approval of the JOC and team leadership, and sometimes their active participation. Several agents disclosed leading protestors home on operation-wide Signal chats. Assistant team leader C.H., for example, stated: "Dealt with her yesterday. Brought her back to her house. She went to the news about it."[97] An ERO agent wrote, "[redacted] has a tail. [redacted]."[98] On January 23, a team supervisor notified the Signal chat that a "convoy of cars" was following his team in Portland; he stated the team did not need any assistance and was taking the protestors [redacted][99] A member of the JOC responded, "Take em home."[100] An HSI team leader asked the Intel Desk to run the plate of an individual "following" them and then wrote, "[redacted] Provide us his home address"; an intelligence analyst soon responded with a name and home address, facilitating the drive-by.[101]

Defendants have never instructed agents to stop engaging in this practice or reprimanded any of the agents involved.[102] This practice has continued: Plaintiff Hilton and two other Mainers

---

[95] Ex. 49 at DEFS001544 (emphasis added). S.C., the team leader, responded, "I like rides." *Id.* at DEFS001545. Agents often conducted these drive-bys in Minneapolis, as more than a dozen sworn declarations confirm. *See Tincher v. Noem*, No. 25-cv-04669 (D. Minn.), ECF Nos. 1-11, 67, 136-4, 136-8, 136-17, 136-24, 136-27, 136-31, 136-33, 136-41, 136-42, 136-44, 136-51, 136-57, 136-63, 136-78, 136-82; *see also Tincher*, ECF No. 160 (agents parked outside of observer's home and later told him he "would be added to a list of domestic terrorists").
[96] J.R. Dep. 220:1–222:6, 322:7–11.
[97] Ex. 48 at DEFS001353.
[98] Ex. 48 at DEFS001288.
[99] Ex. 47 at DEFS001196.
[100] *Id.*
[101] Ex. 48 at DEFS001393–94.
[102] D.L. Dep. 123:12–125:10 (does not recall agents being advised not to drive past protesters' houses); J.R. Dep. 223:5–13; S.C. Dep. 299:15–300:11 (no discussion with C.H. regarding drive-bys).

were driven to their homes in June.[103] When deposed in August, Officer J.R. maintained that no policy prohibited agents from conducting drive-bys.[104] And when asked about agents deliberately leading protestors to their homes, DHS's 30(b)(6) witness agreed it was permissible: "If it's within their scope of employment and they are—they are doing the functions of their job as an officer or agent, then they are within their scope and they can do it."[105]

## LEGAL STANDARD

A district court may grant a preliminary injunction when movants show (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17–18 (1st Cir. 2006). When the government is the opposing party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A movant's likelihood of success is the most significant factor. *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

## ARGUMENT

Plaintiffs allege retaliation and viewpoint discrimination in violation of the First Amendment for three related acts or practices, all based on their protected activity: the creation, maintenance, and dissemination of adverse law enforcement records about Plaintiff Williams; the collection of personal information about all Plaintiffs; and the intimidation of all Plaintiffs using specific tactics. All four preliminary injunction factors weigh in Plaintiffs' favor.

### I. Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims

Three settled legal principles control Plaintiffs' claims. First, the right to observe and record law enforcement officers performing their duties in public is "a basic, vital, and

[103] Hilton Decl. ¶ 51; C. Jagger Decl. ¶¶ 3–15; R. Jagger Decl. ¶¶ 9–18.
[104] J.R. Dep. 222:22–223:3.
[105] ICE 30(b)(6) Dep. 368:13–369:12.

well-established liberty safeguarded by the First Amendment," *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011), which an officer may curtail "only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties," *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014). Second, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To demonstrate retaliation, plaintiffs must show (1) they engaged in constitutionally protected conduct; (2) they were subjected to an adverse action by the defendant; and (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). Third, government action that burdens speech because of its content or viewpoint is "presumptively unconstitutional" and survives only if narrowly tailored to a compelling interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The record developed in expedited discovery reflects that Defendants violated those principles.

### A. Plaintiffs All Engaged in Constitutionally Protected Activity

The record is clear that Plaintiffs' activity was squarely protected by the First Amendment. In all three January encounters, Plaintiffs observed and recorded immigration enforcement actions from a distance, did not interfere with any arrest, and complied with instructions given.[106] *Supra* pp. 6–12. Two of the agents who recorded Pantos, Hilton, and Fagan admitted that they did not interfere,[107] and Defendants themselves acknowledged this at the TRO stage. *See* TRO Opp. 13 ("Defendants do not dispute on the current record that Plaintiffs' alleged conduct in these instances did not interfere with officers' duties . . . .").

[106] Hilton Decl. ¶ 21; Fagan Decl. ¶¶ 10, 12; S.C. Dep. 273:22–274:1; D.L. Dep. 100:2–20 (Hilton "didn't get close enough" to interfere), 101:1–4, 116:1–4; Ex. 12 ¶¶ 8, 10.

[107] D.L. Dep. 90:9–14 (regarding Pantos, no recollection of a vehicle used to interrupt an arrest), 82:3–11 (regarding Pantos, no protestor on January 20 for whom he had reasonable suspicion of criminal activity), 100:2–20, 101:1–3, 115:24–116:4 (regarding Hilton); Ex. 12 ¶¶ 8, 10 (regarding Fagan).

During expedited discovery, the government's defense has changed: in discovery responses and deposition testimony, they have attempted to inject uncertainty into the record as to whether Plaintiffs interfered (or were about to interfere) with arrests at the time they were recorded and threatened.[108] This *post hoc* attempt to find shelter in *Gericke*'s limitation on the right to observe and record has no credible support in the record.

***Pantos and Williams.*** Consistent with Pantos's testimony about their minimal presence on the scene, two of the three agents deposed who were at Pantos's encounter could not even recall Pantos's presence.[109] The other observer on the scene likewise did not see Pantos interact with agents, speak to agents, or interfere with ICE activity in any way.[110] The only contrary evidence in the record is Agent J.C.'s testimony. He claimed that two individuals aggressively interfered with the arrest, one by shouting profanities, making threats, and being "nasty," and the other who was "far more aggressive than the first one."[111] But that claim did not stand up to minimal scrutiny during his deposition,[112] and video evidence taken by the other observer at Pantos's encounter contradicts J.C.'s testimony: only one observer (the person filming) can be heard throughout the encounter, no one can be heard making threats, and the one profanity comes after the agents are in their vehicles.[113] D.L., the agent responsible for establishing a perimeter,

---

[108] For example, asked in discovery whether they contend that any Plaintiff "impeded or interfered with law enforcement, threatened Officer Safety, or otherwise engaged in any criminal conduct," Defendants answered that the question "is premature" and that they "are not in a position at this time" to make any such contention. Ex. 63 at 13–14 (Resps. to Nos. 13–14).

[109] D.L. Dep. 53:24–54:2 (could not recall any observer or protestor other than the person filming video), S.C. Dep. 147:1–6, 149:21–150:4, 156:14–23 (no recollection of seeing Chevy owner, despite the fact that he photographed observers "because it happened in front of me and everybody else was involved with the arrest").

[110] Neff Decl. ¶ 15.

[111] *See* J.C. Dep. 66:22–67:16, 70:14–19, 71:2–23, 72:8–11, 73:11–16.

[112] J.C. Dep. 66:22–67:16 (his "attention [was] divided" and he was "not on the perimeter"); 67:11–13 ("I don't recall the threats. My memory is I heard threats. I don't recall specific threats."); 70:14–19 (could not recall how many occupants were in Pantos's vehicle).

[113] Ex. 8. All the vehicles visible appear to have closed windows, making it unlikely Agent J.C. heard this single profanity.

expressly disagreed with Agent J.C.'s characterization of both observers' conduct.[114] J.C.'s testimony is simply not credible.

***Fagan.*** Officer J.R. described Fagan as only filming, verbally criticizing his agents, and at one point "walk[ing] up on" officers—even though she remained a reasonable distance away and was never told to stay back.[115] Nonetheless, J.R. maintained that Fagan interfered because the "officer's attention had to be taken away from the arrest."[116] If adopted, this definition of "interference" would swallow the First Amendment protection. Officers do not have unlimited discretion to decide to equate clearly protected activity with impeding an operation, lest ordinary Americans have no way to safely exercise First Amendment rights.

***Hilton.*** The record similarly demonstrates that Hilton engaged in nothing other than protected activity. Agent D.L. acknowledged this in his deposition testimony, yet captured Hilton's face and license plate anyway.[117] J.C. testified that he considered Hilton a threat to officer safety, but as with his recollection of Pantos's encounter, his testimony lacks credibility. He originally claimed that Hilton had exited a white Nissan that had allegedly "chased" the strike team.[118] But Hilton arrived on the scene alone in her car—a green Toyota with red racing stripes and bumper stickers[119]—several minutes before anyone else arrived.[120] J.C. later admitted that he never saw Hilton get out of the Nissan,[121] an admission corroborated by video evidence from early in the incident—when Hilton was the only observer present—showing Agent J.C.

---

[114] D.L. Dep. 90:9–14 (no recollection of a vehicle used to interrupt an arrest), 82:3–11 (no protestor on January 20 for whom he had reasonable suspicion of criminal activity).
[115] J.R. Dep. 134:18–136:8.
[116] J.R. Dep. 132:1–12.
[117] D.L. Dep. 100:2–20.
[118] J.C. Dep. 165:15–166:6.
[119] Hilton Decl. ¶ 4; Ex. 53.
[120] Hilton Decl. ¶ 9.
[121] J.C. Dep. 176:3–5 (Q. "You did not actually see her get out of the Nissan?" A. "No.").

specifically asking D.L. which car Hilton exited.[122] J.C.'s testimony, months after the encounter, lacks credibility or reflects his reckless assumption that *any* person who showed up to observe and record must have been trying to impede the operation.

Hilton likewise engaged in protected activity when she followed an ICE vehicle at a safe distance to observe it in June. *See Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (clearly established "right to watch police-citizen interactions at a distance and without interfering" included following an officer from stop to stop); *Glik*, 655 F.3d at 82 (recognizing "an undoubted right to gather news 'from any source by means within the law'"). *Chestnut* squarely rejects Defendants' testimony that there is no valid reason for following an ICE agent.[123] Because law enforcement conducts some activities on the move, the right to observe and record those activities must encompass the right to move along with them from a reasonable distance. It is well-settled that the First Amendment protects conduct that is integral to speech, *see, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 680–81 (4th Cir. 2023) (livestreaming police incidental to speech), and the right to observe and record would be illusory if limited to wholly static contexts.

### B. Defendants Retaliated Against Plaintiff Williams by Creating, Maintaining, and Disseminating Adverse Law Enforcement Records About Her

Plaintiff Williams's ICM/TECS person record states that she is the registered owner of a vehicle "used to interrupt ICE arrests, and her License Photo matches the video recordings of an aggressive woman interjecting herself into an arrest."[124] The vehicle record similarly states that Williams's car "was used to interrupt an ICE arrest where the driver aggressively photographed and accosted Agents present."[125] The evidence establishes that Defendants created and

[122] Ex. 1.
[123] J.R. Dep. 224:4–12, 224:18–225:3 (following an ICE agent "can be" per se interference).
[124] Ex. 35 at DEFS000651; Ex. 18 at DEFS000311.
[125] Ex. 34 at DEFS000646; Ex. 21 at DEFS000320.

disseminated these false records in retaliation for protected activity—namely, Williams's spouse's decision to observe an immigration enforcement action.[126] Williams is entitled to an order archiving her records while this litigation is pending (and eventually expunging them entirely).

***Adverse Action.*** An adverse action need only be "more than de minimis": that is, it need only be enough to chill "a reasonably hardy individual" from exercising her rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Williams's ICM/TECS subject records indisputably meet this standard. The ICM records brand Williams a [redacted] in HSI's investigative database, reflecting "an ongoing criminal investigation."[127] Subject records are "[redacted]" to CBP's TECS portal,[128] which is [redacted].[129] In Williams's case, the records specifically require that she be "[redacted]" for secondary inspection any time she travels internationally, at least through the end date of January 20, 2027 (which J.C. has discretion to extend).[130] This has *already* resulted in a lengthy border detention. *Supra* pp. 7–9.

A reasonably hardy individual surely would be deterred from continuing to engage in protected activity by the consequences of the ICM/TECS records. *See, e.g.*, *Adlerstein v. CBP*, 2020 WL 5846600, at *9–12 (D. Ariz. 2020) (CBP maintaining records of plaintiffs' activities would chill a person of ordinary firmness); *Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007);

[126] Because J.C. created the records on the apparent (and reckless) assumption that Williams engaged in protected activity, Williams can state a retaliation claim. *See Heffernan v. City of Paterson*, 578 U.S. 266, 274 (2016) (cognizable claim where adverse action was motivated by a mistaken belief that the plaintiff engaged in protected activity).
[127] ICE 30(b)(6) Dep. 409:24–410:11.
[128] Ex. 32 at DEFS000587.
[129] CBP 30(b)(6) Dep. 102:11–14; *see also id.* at 163:16–166:12 (explaining TECS record's potential impact on Global Entry status or eligibility).
[130] CBP 30(b)(6) Dep. 121:3–18, 147:11–18, 156:8–19 ("per CBP policy, that officer working the primary inspection booth has to refer that individual into secondary"); Ex. 35 at DEFS000651.

("the prospect of being singled out" for secondary inspection "could reasonably deter" protected activity); *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 266 (E.D.N.Y. 2021). And although a plaintiff need not have been actually deterred to establish an adverse action, Williams *has* been chilled in the exercise of her rights. *See infra* pp. 31.

***Causation.*** The evidence also establishes "a causal connection" between Pantos's protected activity and the adverse action. *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). Here, there is direct evidence of retaliatory animus—including Agent J.C.'s own words. J.C. repeatedly referred to Williams as "the protestor" while discussing his investigation and creation of the ICM records.[131] J.C. maintained the information about Williams in a folder titled "Maine Surge Protesters."[132] The ICM/TECS records themselves call out the "photograph[ing]" of ICE agents. And in his phone call to Williams, J.C. commented on Pantos's presence at the arrest that morning, without stating that Pantos interfered.[133] Williams's perceived protected activity—observing, recording, and protesting—thus plainly motivated the record creation.

Even if J.C. genuinely believed that Pantos's protected activity—observing and documenting an ICE arrest from a distance—constituted interference with a federal operation, the analysis is the same and only underscores the need for relief here. Defendants have failed to provide guidance or training on how to recognize First Amendment-protected activity or how to distinguish it from unlawful impeding. *Supra* p. 5. As a result, agents on the ground take an extraordinarily broad view of "impeding" and a correspondingly narrow view of First Amendment rights. J.C. is no exception; he testified, for example, that people who "show up blowing whistles, honking their horns, screaming at us" were "interfering."[134] The fact that

---

[131] Ex. 49 at DEFS001619–20.
[132] J.C. Dep. 268:22–269:13.
[133] Williams Decl. ¶ 14; Williams Dep. 50:16–51:20; J.C. Dep. 147:22–149:22.
[134] J.C. Dep. 211:15–214:2.

agents misunderstand the First Amendment does not excuse their conduct. *See AAUP v. Rubio*, 802 F. Supp. 3d 120, 188 (D. Mass. 2025) (government officials' "apparent indifference" to the distinction between protected and unprotected speech "is no defense" to "intentionally target[ing] political speech in order to stop . . . protest").

Nor can Defendants rely on the conduct of the second observer, Hillary Neff, to justify creating a record about Williams. J.C. knew there were two separate individuals at the encounter and was told that Williams was not one of them. *Supra* pp. 7–8. In any event, Neff did not impede the operation either. Neff recorded most of the arrest from a distance of 20-35 feet from the arrest; she briefly moved closer to record the license plates of the detained individual and ICE vehicles, but she was already stepping back onto the sidewalk when J.C. instructed her to "get out of here."[135] Although she verbally objected, Neff was back on the sidewalk within a second. She continued filming on the sidewalk at a reasonable distance from the arrest, even after Agent D.L. approached her.[136] This is all protected activity. *See Glik*, 655 F.3d at 84 ("The same restraint demanded of law enforcement officers in the face of 'provocative and challenging' speech must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." (cleaned up)). For that reason, D.L., who directly interacted with her for the majority of the encounter, agreed that Neff did not engage in any unlawful conduct.[137] And neither J.C. nor any other agent arrested Neff (or anyone else), despite having been instructed to do so if people were impeding.[138] *See supra* pp. 4–5. Plaintiffs

[135] Ex. 8; Neff Decl. ¶¶ 5–11.
[136] Ex. 8; Neff Decl. ¶¶ 5–11; S.C. Dep. 145:4–146:24 (Neff complied with order to stop moving); D.L. Dep. 56:18–57:1 (Neff complied).
[137] D.L. Dep. 67:21–23, 88:10–16 (Neff did not accost D.L.).
[138] J.C. nonetheless created ICM records for Neff and her vehicle, in which Neff is described as "aggressively accost[ing] HSI agents during an immigration arrest, with the purpose of identifying HSI Agents to potentially dox them." Ex. 36; Ex. 37; Neff Decl. ¶¶ 9–12.

are thus likely to establish that the creation and maintenance of Williams's ICM/TECS records amounts to First Amendment retaliation.

### C. Defendants Retaliated Against Plaintiffs by Collecting Their Biometric Data and Other Personal Information in Response to Protected Activity

There is no dispute that agents collected images of Plaintiffs' faces and/or vehicles at each of the incidents alleged in the complaint. Plaintiffs are likely to succeed in showing that the agents who gathered this information retaliated against them for First Amendment-protected activity. *See supra* pp. 19–22 (describing protected activity).

Photographing or recording an observer in response to protected activity qualifies as an adverse action. "[E]ven relatively minor events" qualify as adverse so long as they would deter "a reasonably hardy individual" from engaging in protected activity, *Barton*, 632 F.3d at 29–30. This Court has held that officers photographing a person while he filmed them, "presumably in an attempt to intimidate him into stopping," can be an adverse action. *Cantrell v. Brunswick Police*, 2024 WL 1859800, at 6 (D. Me. Apr. 29, 2024); *see also Anderson v. Davila*, 125 F.3d 148, 159–60 (3d Cir. 1997) (surveillance undertaken in retaliation for protected activity).

This conclusion is especially warranted here, since Defendants conceded that one reason for recording observers was to deter further protected activity. D.L. testified that he recorded (or pretended to record) observers "almost like a deterrent. If you are going to film us, we are going to film you."[139] A reasonably hardy individual would also be chilled given agents' other explanation for recording observers—*i.e.*, in case the information might support potential criminal investigations or prosecutions in the future.[140] Plaintiffs and other observers have

---

[139] D.L. Dep. 98:15–24.

[140] J.R. Dep. 131:9–22, 139:1–5 (recorded "possible 111 charge[s]"); J.C. Dep. 69:10–20 (capturing license plates is "beneficial intelligence" to "pass along to future law enforcement"); Ex. 12 ¶¶ 1–8. And there is ample public evidence that Defendants have in fact investigated and prosecuted individuals engaged in similar protected activity over the past year. *See, e.g.*, Mike McIntire et al., *They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling*, N.Y.

confirmed that Defendants' targeted recordings have the intended effect—fearful that the government will use their information against them later, they have either ceased engaging in protected activity or been substantially more cautious when doing so.[141]

The agents who recorded Plaintiffs largely admit that Plaintiffs' protected activity motivated the decision to record them. D.L. openly admitted to recording "protestors" dozens of times.[142] [redacted] explained that he singled out Fagan and another observer because they "parked their cars close to our operations, walked toward us, and were both making heated verbal statements"—every aspect of which is protected. *See City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). J.C. and J.Y. calling Plaintiffs "domestic terrorists" further underscores their retaliatory motive, given its recent association with protestors. *Supra* pp. 6–7.[143] And J.C.'s warnings to Hilton and Williams about the consequences that would follow if they continued "showing up" or "doing things like this" are compelling evidence that they were recorded because they showed up at ICE operations to document agents' actions.

### D. Defendants' Practice of Intimidating Protestors and Observers Is Unconstitutional Retaliation

Finally, Plaintiffs are likely to establish that Defendants violated the First Amendment rights by engaging in two particularly egregious intimidation tactics to deter further protected activity: threatening a "domestic terrorist" designation on a government "watchlist" or "database," and looking up Hilton's home address and driving her to her former home.

---

Times (July 18, 2026), https://tinyurl.com/4rfyy59n; Brad Heath et al., *Trump's DOJ charged hundreds with assaulting officers. Many cases were dropped, but the damage was done*, Reuters (July 30, 2026), https://tinyurl.com/486jm74n.

[141] *See infra* pp. 31–33; Neff Decl. ¶¶ 17–18. Defendants have already used the collected information to create records about Plaintiff Williams and five other observers. *See supra* n.55.

[142] D.L. Dep. 171:5–21.

[143] J.C. Dep. 268:3–21, 338:22–339:22.

Even a groundless threat is an adverse action when it would deter a person of ordinary firmness from engaging in protected activity. *See Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 44 (1st Cir. 2024). And courts have recognized that a "gratuitous show of uninvited law enforcement interest"—such as "park[ing] near [a plaintiff's] house to observe and intimidate him"—"would certainly be enough to chill" protected activity. *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 515 (D. Md. 2015); *see also Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) ("since there is no justification for harassing people for exercising their constitutional rights," the chill "need not be great in order to be actionable").

Here, agents openly admitted that the purpose of their intimidation tactics was to deter protected activity. As to drive-bys, J.R. explained that driving to a protestor's home had "worked," as "[t]he person stopped following them,"[144] and C.H. similarly described the tactics as a way to "scare [observers] off."[145] As to the "domestic terrorist" warnings, J.C. explained that his purpose was to make Hilton "fe[el] that she should just leave."[146] And D.L. could think of no reason to threaten a person with a domestic terrorist watchlist other than "to drive somebody away."[147] A reasonably hardy person would react to federal agents appearing at their homes or calling them terrorists exactly as Defendants intended—namely, by ceasing or reducing their protected activity. And again, all Plaintiffs did in fact change their behavior in meaningful ways in response to these threats. *See infra* pp. 33–34.

### E. Defendants' Collection of Plaintiffs' Information and Intimidation of Them Is Also Unconstitutional Viewpoint Discrimination

Plaintiffs are also likely to establish that Defendants' targeted recordings and intimidation tactics unconstitutionally burdened their right to free speech. Government action that burdens

---

[144] J.R. Dep. 221:18–222:6.
[145] Ex. 49 at DEFS001544.
[146] J.C. Dep. 182:20–183:3.
[147] D.L. Dep. 114:17–24; *see also* Neff Decl. ¶ 19.

speech because of its content is "presumptively unconstitutional." *See Reed*, 576 U.S. at 163. Where the government engages in viewpoint discrimination by "target[ing] not subject matter, but particular *views* taken by speakers on a subject," it has engaged in an "egregious form" of content discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Any such content-based discrimination must survive strict scrutiny, requiring the government to demonstrate its actions are narrowly tailored to serve a compelling government interest. *Reed*, 576 U.S. at 163; *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021).

The targeted collection of information about Plaintiffs and threats against them was plainly content- and viewpoint-based. Defendants "singl[ed] out specific subject matter for differential treatment," *Reed*, 576 U.S. at 156, by recording only the individuals who showed up to observe, record, and protest their immigration operations, *supra* p. 14.[148] No one can seriously contend that Defendants would have recorded Plaintiffs, driven them by their houses, or threatened them with domestic terrorist watchlists had they been cheering on the federal agents.

Defendants cannot satisfy strict scrutiny here, because their actions are in no way narrowly tailored to serving the government's interest in officer safety and enforcing federal law. Defendants' position is essentially that agents can and should collect information about protestors and observers "just in case" it later becomes relevant.[149] But the First Amendment has never tolerated that kind of sweeping surveillance of individuals engaged in protected activity. Defendants "may well prefer to have every [observer's] information close at hand, just in case,"

---

[148] *See* Ex. 49 at DEFS001761 ("Cool one more protestor to add"), DEFS001760 ("Still working on protestors"); Ex. 37 (record for vehicle "involved in protesting"); Ex. 38 ("professional protestor"); Ex. 39 (same); Ex. 40 (same); Ex. 41 (same); Ex. 42 (same); Ex. 43 (same); Ex. 44 (same); *cf.* Ex. 49 at DEFS001699 (agent indicating she plans to report "fake" ICE sightings to hotline and give addresses of "agitators").

[149] *See* D.L. Dep. 43:1–3, 65:11–66:1, 68:3–7 (agents never know what will become important later on); J.R. Dep. 131:9–22, 138:14–139:5 (appropriate to film in case of "potential" criminal violations); Ex. 12 ¶¶ 1–8.

but "the prime objective of the First Amendment is not efficiency." *Bonta*, 594 U.S. at 614–15. The Privacy Act and formal DHS policies *already* prohibit DHS personnel from collecting and maintaining information about how individuals exercise their First Amendment rights,[150] confirming that Defendants' practices are not tailored to any asserted interest here.

Defendants' practice of intimidating individuals who observe and record ICE activity are no better. By agents' own admission, these tactics were designed to make lawful observers go away, *see supra* pp. 15–16, 28, which is not a legitimate, let alone compelling, governmental interest. To the extent the government claims these tactics serve its interest in protecting officer safety or enforcing federal law, that, too, is questionable. But at minimum, the practices adopted and sanctioned by Defendants here are not narrowly tailored to serve those ends. Agents have many ways to ensure their operations are conducted safely that do not require falsely threatening observers with a domestic terrorist label or intimidating them at their homes.

## II. Plaintiffs Have Standing and Seek Appropriate Relief

To seek prospective relief, a plaintiff must show an injury that is: concrete and either ongoing or a "real and immediate threat," traceable to the defendant, and redressable by the order sought. *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 111 (1983)).

### A. Plaintiff Williams Has Standing to Seek an Order Archiving or Modifying Her ICM and TECS Records

In light of this case's preliminary posture, Plaintiffs seek an order directing Defendants to "archive" Williams's ICM and TECS records or, at minimum, modify them to remove the

[150] 5 U.S.C. § 552a(e)(7); Ex. 11. Notably, Defendants only reminded ERO Boston officers about this memorandum on the *same day* they opposed Plaintiffs' TRO motion. ECF No. 18-3. Agents could not recall receiving training on this policy, J.R. Dep. 237:12–238:20; D.L. Dep. 168:6–21, and neither of the privacy trainings produced in discovery mention the prohibition on collecting and maintaining records of First Amendment activities. Ex. 59 (CBP training); Ex. 60 (DHS training).

requirement that she be referred to secondary inspection. Williams has standing to seek this relief, as she is experiencing three distinct concrete injuries traceable to the records.

*First*, the ICM/TECS records directly impair Williams's ability to travel internationally [redacted] *See supra* p. 23. Although the report from Williams's detention in March confirms that officers found no evidence of unlawful conduct,[151] the [redacted] has not been canceled or modified. Accordingly, Williams will face a similar experience each time she enters the country, through at least January 20, 2027. Enhanced screening at the border is a concrete harm sufficient to confer standing. *See Tabbaa*, 509 F.3d at 102; *Guan,* 530 F. Supp. 3d at 266–70. Williams's ICM/TECS records cause precisely this harm.

*Second*, the ICM/TECS records have reasonably caused Williams to self-censor, which independently confers standing. *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 56–58 (1st Cir. 2003); *Ozonoff v. Berzak*, 744 F.2d 224, 228–29 (1st Cir. 1984). After the border stop made clear to Williams that she is flagged in a government database, she stopped observing ICE activity entirely and even left the Signal groups through which she had learned of ICE activity in her community.[152] She is also forgoing international travel altogether.[153] Given the implications of a [redacted] record in ICM/TECS, this response is more than reasonable. *See supra* p. 23.

*Third*, even if Williams had not been chilled, the retaliatory creation and maintenance of the ICM/TECS records is a sufficient injury on its own. *See Guan*, 530 F. Supp. at 256–63 ("retention of the information itself constitutes an injury regardless of its effect on Plaintiffs"); *Alasaad v. Nielsen*, 2018 WL 2170323, at 11–13 (D. Mass. May 9, 2018) (retention of unlawfully obtained data is "continued harm"). This flows from the broader principle that a

[151] Ex. 20 ([redacted]); CBP 30(b)(6) Dep. 159:12–21.
[152] Williams Decl. ¶¶ 43–44; Williams Dep. 43:22–44:6.
[153] Williams Decl. ¶ 49.

retaliatory adverse action is itself a sufficient injury. *E.g.*, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580–81 (D.C. Cir. 2025); *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).

Finally, Williams's injuries are at least preliminarily redressable by the order Plaintiffs seek at this time—namely, an order that archives or modifies the ICM/TECS records to limit their real-world adverse consequences. A federal court may order expungement or modification of government records "where necessary to vindicate rights secured by the Constitution," *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 536 (D.C. Cir. 2015) (quoting *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975)). Although Plaintiffs do not seek expungement given the preliminary posture of the case, an "archived" record will significantly redress the harm to Williams in the interim. An archived record remains in the database but no longer "alerts" every time the person crosses the border, meaning [redacted].[154] So long as Defendants cannot reimpose a similar requirement absent an independent, lawful basis to do so, this order provides meaningful redress.

### B. All Plaintiffs Have Standing to Seek an Order Prohibiting Defendants from Using Their Unlawfully Collected Information to Their Detriment

Plaintiffs likewise have standing to seek injunctive relief on their claim that Defendants unlawfully collected their personal information. At this stage, Plaintiffs seek a limited injunction—one that bars Defendants from taking any adverse action against them based on the information collected during the encounters described in the complaint.

Plaintiffs have standing to seek this relief. A person whose information the government collects because of her speech suffers a concrete, particularized injury the moment the collection occurs. A plaintiff "need only establish that its information was obtained by the government." *Guan*, 530 F. Supp. 3d at 262; *see Ozonoff*, 744 F.2d at 228–29; *Hassan v. City of New York*, 804

[154] CBP 30(b)(6) Dep. 118:7–119:9, 121:19–122:11.

F.3d 277, 291 (3d Cir. 2015) (plaintiffs, "the very targets of the allegedly unconstitutional surveillance," are "unquestionably affected in a personal and individual way" (cleaned up)); *Anderson*, 125 F.3d at 160 (retaliatory surveillance a "specific present harm"); *see also supra* pp. 31–32 (retaliatory adverse action itself establishes an Article III injury).

Plaintiffs are also experiencing ongoing harm attributable to the collection of their information—namely, the chilling of their First Amendment activity. Pantos ceased *all* observation of ICE after learning about Agent J.C.'s phone call.[155] While Williams briefly continued observing ICE, she would only do so in friends' cars (and later ceased entirely).[156] Hilton reduced her observation activity and no longer uses her own car, limits her online presence, and began taking additional precautions, including not taking her phone with her while traveling and not traveling internationally at all.[157] And Fagan likewise is not as active as she otherwise would have been.[158] These types of changes are more than enough to establish ongoing chill. *See AAUP v. Rubio*, 802 F. Supp. 3d at 176–78; *L.A. Press Club v. Noem*, 171 F.4th 1179, 1188 (9th Cir. 2026).[159] The order Plaintiffs seek would redress these injuries by prohibiting Defendants from relying on the collected information to Plaintiffs' detriment, thus substantially ameliorating their fear as to how the government might use the information against them.

---

[155] Pantos Decl. ¶ 18.
[156] Williams Decl. ¶ 23.
[157] Hilton Dep. 116:17–117:10; Hilton Decl. ¶¶ 59–61.
[158] Fagan Decl. ¶ 23; Fagan Dep. 25:19–25 (not comfortable observing ICE today).
[159] *Laird v. Tatum*, 408 U.S. 1 (1972), does not preclude standing. *Laird* holds only that plaintiffs cannot establish standing based on a subjective chill from "the *mere existence, without more*, of a governmental investigative and data-gathering activity." *Id.* at 10 (emphasis added). Here, that agents targeted Plaintiffs specifically could not be clearer. *Ozonoff*, 744 F.2d at 229 (emphasizing "the key words 'without more'").

### C. All Plaintiffs Have Standing to Seek a Tailored Injunction Prohibiting the Specific Intimidation Practices Deployed Against Them

On their final claim, Plaintiffs seek a tailored injunction that prohibits, within Maine, the practice of intimidating protestors and observers by: (1) threatening to place an individual on a "domestic terrorist" watchlist or database; or (2) looking up an individual's home address and driving them to that home, in each case because the person engaged in protected activity by observing or recording immigration operations. In the context of injunctive relief, standing is satisfied when the plaintiff "faces a realistic risk of future exposure to the challenged policy." *Berner v. Delahanty*, 129 F.3d 20, 24–25 (1st Cir. 1997) (explaining that when "the First Amendment is in play . . . the Court has relaxed the prudential limitations on standing to ameliorate the risk of washing away free speech protections"). That is the case here.

#### 1. Defendants' Officially Sanctioned Practice of Intimidation Makes Plaintiffs' Continuing Injuries Likely to Recur

Plaintiffs have experienced concrete injuries traceable to Defendants' intimidation tactics. As explained, a retaliatory adverse government action itself establishes an Article III injury. *Supra* pp. 31–32. And all Plaintiffs have been threatened with placement on a "domestic terrorist" "database" or "watchlist." *See supra* pp. 8–11. Hilton experienced additional retaliation when she was led to her former residence in an unmistakable message of intimidation. Defendants previously argued that these "isolated" instances of past misconduct could not be the basis for Plaintiffs seeking prospective relief. TRO Opp. 9–15 (citing *Lyons*, 461 U.S. 95). But that argument misses the mark in two ways.

In *Lyons*, the Supreme Court held only that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . *if unaccompanied by any continuing, present adverse effects*." 461 U.S. at 102 (emphasis added) (cleaned up). Plaintiffs *are* experiencing ongoing adverse effects—namely, their self-censorship in response to

Defendants' intimidation. *Supra* pp. 31–33. Courts have recognized that chilled speech because of past misconduct can be a sufficient basis for obtaining injunctive relief. *See, e.g.*, *L.A. Press Club*, 171 F.4th at 1187–88 (chilled speech in response to "fear of government punishment" "establishes continuing, present adverse effects sufficient to confer standing"); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 784 (5th Cir. 2024) (*Lyons* argument "falls short in this First Amendment case because Plaintiffs have provided evidence of ongoing chill").

*Lyons* also poses no barrier where plaintiffs can establish "a real and immediate threat" of being "wronged in a similar way" again. *Gray*, 917 F.3d at 19 (quoting *Lyons*, 461 U.S. at 109, 111). The threat of repetition is established where the record shows "a pattern of police behavior" reflecting official policy, *Lyons*, 461 U.S. at 110 n.9, particularly where, as here, Defendants expressly defend their authority to continue the challenged conduct. *See Melendres v. Arpaio*, 695 F.3d 990, 995, 998 (9th Cir. 2012) (standing based on three incidents coupled with "Defendants' express claim of authority" to engage in the challenged conduct); *Kariye v. Mayorkas*, 2024 WL 4403870, at *2 (9th Cir. Oct. 4, 2024) (unpublished) (ten incidents "plausibly allege an unwritten, officially sanctioned pattern"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 360–61 (D.D.C. 2020) (injunction granted based on "pattern of conduct, bolstered by" public statements). The likelihood of recurring injury also "ceases to be speculative when actual repeated incidents are documented." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020); *see also Barrios v. City of Chicago*, 2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016) (standing where plaintiff himself was "recently subjected" again to the police misconduct at issue). Hilton's intimidation in June is exactly this type of repeat incident, and the record confirms that Defendants have indeed sanctioned the practice of deterring protected activity using the intimidation tactics she and other Plaintiffs experienced.

*First*, the record demonstrates the widespread and coordinated nature of these particular intimidation tactics. Plaintiffs and several other observers were threatened with the "domestic terrorist" label, despite interacting with different strike teams. *See supra* p. 8–11. And on Defendants' own Signal chats, agents repeatedly discussed driving by observers' homes.[160] The extent of the misconduct is likely far greater than the evidence thus far reflects. The chats do not appear to mention several of the examples discussed in declarations and news reports,[161] and Plaintiffs have not yet discovered *any* chats from 23 of the 24 teams operating during Catch of the Day nor the [redacted] specific Signal chat.[162] And this pattern of behavior continues.[163]

Critically, operation leadership repeatedly sanctioned the use of the drive-by intimidation tactic. Members of the JOC and Intel Desk provided home addresses and, in one case, expressly encouraged agents to "take" protestors "home" in the operation-wide Signal chat—even after agents confirmed that they did not need any assistance. *See supra* pp. 17. Both supervisors deposed thus far have acknowledged that their teams engaged in drive-bys.[164] And although Defendants submitted sworn declarations at the TRO stage indicating that agents had been "informed" not to threaten to add people to watchlists or databases, ECF No. 18, no supervisor corrected or condemned any of the agents' intimidation tactics. *Supra* pp. 16–18. The only response in the record is J.R.'s claim that after Fagan's video went viral, he had a single conversation telling J.Y. "to be more mindful of what he says" because his "joke didn't land."

---

[160] Ex. 47 at DEFS001196 ("Take em home"); Ex 48 at DEFS001288 ("[redacted] has a tai[redacted]"), DEFS001293 ("[redacted]"), DEFS001353 ("Brought her back to her house"), DEFS001393–94 ([redacted] Provide us his home address."). In two other examples, a member of the JOC ([redacted]) responded to messages about an "agitator" and about individuals "[t]aking photos" by providing screenshots with their home addresses. Ex. 48 at DEFS001377–79; Ex. 51; Ex. 52.

[161] *See* ECF Nos. 4-11, 4-12, 4-14.

[162] *Cf.* Ex. 49 at DEFS001544 ("[redacted]" began the practice of drive-bys in Minnesota to "scare[] some off"); J.R. Dep. 50:6–51:6 (describing SRTs' role in engaging with protestors).

[163] Hilton Decl. ¶ 51; C. Jagger Decl. ¶¶ 3–15; R. Jagger Decl. ¶¶ 9–18.

[164] *See* S.C. Dep. 281:17–282:3; J.R. Dep. 220:1–221:1.

*Supra* p. 16. J.R. himself acknowledged he "didn't know if it would be considered discipline."[165] The complete failure to hold agents accountable for their misconduct further supports the inference that this practice is officially sanctioned. *See* TRO Order 17, 20 n.2.

Finally, the Department approved of both challenged practices under oath. Its Rule 30(b)(6) witness would not say that deliberately leading a protestor home violates DHS policy: if agents were "doing the functions of their job," then "they are within their scope and they can do it." *Supra* p. 18. He similarly testified that threatening a person with a domestic terrorist designation can be an appropriate deescalation technique. *Supra* p. 15–16. Nothing has changed since January in terms of training or policies governing interactions with the public (in Maine or elsewhere).[166] And both ERO Boston and HSI New England, two offices represented on the JOC that sanctioned these tactics, remain responsible for immigration enforcement in Maine.[167]

Plaintiffs therefore have standing to seek relief on their intimidation claim. Plaintiffs are experiencing ongoing consequences that render *Lyons* inapplicable. And unlike in *Lyons*, Plaintiffs cannot avoid repeated injury by simply obeying the law—they intend to continue or would like to resume engaging in First Amendment-protected activity, which exposes them to retaliation under officially sanctioned practices. *See Honig v. Doe*, 484 U.S. 305, 320 (1988).

**2. An Injunction Is Necessary to Provide Plaintiffs with Complete Relief**

Plaintiffs' proposed injunction is consistent with equitable principles. *First*, the injunction "[d]escribe[s] in reasonable detail . . . the act or acts restrained," Fed. R. Civ. P. 65(d)(1)(C), ensuring that agents can know "what conduct the court has prohibited." *Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 12 (1st Cir. 2018). A narrower injunction that prohibited

[165] J.R. Dep. 144:5–9.
[166] *Id.* at 315:4–21, 318:21–319:4.
[167] ICE, *ICE Field Offices*, https://tinyurl.com/yc8y626e; ICE 30(b)(6) Dep. 167:8–168:15.

these tactics *only* against the named Plaintiffs may not meet that standard. As the Court acknowledged at the TRO stage, agents in the field cannot be expected to recognize the four named plaintiffs among the many observers they encounter. TRO Order 24. Accordingly, to ensure workability, the requested relief instructs agents *what* acts are prohibited when they encounter an observer, rather than requiring them to recognize four specific observers and refrain from activity only as to them. *See Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) ("[I]n constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." (cleaned up)).

*Second*, the injunction imposes no serious burden on Defendants, since the tactics Plaintiffs ask the Court to prohibit have no lawful application to *anyone*. Even assuming a person has crossed the line from protected activity into impeding an operation, it is still not appropriate to falsely threaten them with a domestic terrorist designation or drive past their home in a show of intimidation. An injunction against this practice would not hinder agents from taking any appropriate, lawful actions they believe are necessary to protect themselves and their operations.

**D. The Court May Also Grant Declaratory Relief**

At minimum, the Court has the authority to order interim declaratory relief confirming that it violates the First Amendment to: (1) collect images, license plate numbers, and other personal information about people solely for observing or recording agents in public; and (2) intimidate protestors and observers by telling them they are or will be placed on "domestic terrorist" or other "watchlists" or "databases," or by driving by or otherwise leading them to their homes to deter further protected activity. *See Scaer v. City of Nashua*, 162 F.4th 256, 267 (1st Cir. 2025) (remanding with instructions to enter an interim declaratory judgment). Plaintiffs have established standing to seek declaratory relief, either instead of or in addition to injunctive relief. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (declaratory relief available where plaintiff

had been warned to cease activities or face prosecution). Interim declaratory relief is warranted here, where the agents' conduct demonstrates a pervasive lack of understanding about the First Amendment's protections. *See Richmond Steel, Inc. v. Legal & Gen. Assurance Soc'y, Ltd.*, 799 F. Supp. 234, 237 (D.P.R. 1992) ("In determining whether to grant declaratory relief, a court should consider the interests of the parties and of the public.").

**E. An Order Granting Injunctive and/or Declaratory Relief Should Be Disseminated to All Agents Working in Maine**

The Court has the authority to ensure dissemination of its decision to federal agents engaged in immigration enforcement in Maine. In fact, courts routinely order dissemination as a component of equitable relief. *E.g.*, *Doe v. Snyder*, 612 F. Supp. 3d 710, 713 (E.D. Mich. 2020). And the record demonstrates why such an order is needed. Agents in Maine have received virtually no training on recognizing First Amendment activity. *Supra* pp. 5. To the extent the Court's decision clarifies that Plaintiffs' conduct falls within the sphere of First Amendment activity, agents should be required to review the decision and understand what the law requires.

## III. Plaintiffs Will Experience Irreparable Harm Absent Injunctive Relief

A First Amendment violation itself is irreparable harm. *See Smith v. Trump*, 791 F. Supp. 3d 90, 99 (D. Me. 2025) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (cleaned up)). Courts have repeatedly applied this principle to retaliatory government conduct like that challenged here. *E.g.*, *Index Newspapers*, 977 F.3d at 837–38. All Plaintiffs wish to observe and record ongoing ICE activity in their communities, and all have been chilled to some extent in their willingness to do so. *Supra* pp. 31–33. Williams faces additional irreparable harm from her [redacted], *supra* p. 31. All Plaintiffs further face a real risk that they will again be intimidated for exercising their rights. *Supra* p. 36–37.

## IV. The Public Interest and Balance of the Equities Favor Granting Relief

Where the government opposes injunctive relief, the third and fourth factors—balance of the equities and the public interest—merge. *Doe v. Trump*, 157 F.4th 36, 52 (1st Cir. 2025). Where a plaintiff demonstrates a likelihood of success on a First Amendment claim, these two factors are generally satisfied. *Id.*; *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022). Here, these two factors decisively favor Plaintiffs. Observing and recording ICE activity is at the very core of the First Amendment's protections, *Glik*, 655 F.3d at 82, and the ability to exercise that right freely is critical for individuals, like Plaintiffs, seeking to hold Defendants accountable for abuses committed in their communities. An ICE officer's recent fatal shooting of a Biddeford man underscores the vital public interest in protecting Plaintiffs' rights.

On the other hand, the tailored relief Plaintiffs seek will not impair Defendants' interest in conducting lawful immigration enforcement. Defendants have no interest in sending Williams to secondary inspection based on indisputably inaccurate ICM/TECS records. Nor do Defendants have any legitimate interest in taking adverse action against Plaintiffs based on unlawfully collected information or in intimidating observers to deter their protected activity. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Am. Acad. of Pediatrics v. Kennedy*, 823 F. Supp. 3d 141, 174–75 (D. Mass. 2026) (cleaned up).

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and issue preliminary injunctive and declaratory relief as described herein.

Dated: September 11, 2026

Respectfully submitted,

*/s/ Melissa A. Hewey*

JoAnna Suriani*
Janine M. Lopez*
Ori Lev*
F. Elias Boujaoude*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org
ori.lev@protectdemocracy.org
elias.boujaoude@protectdemocracy.org

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
101 Glen Lennox, Suite 300
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*

Yotam Barkai*
John Paredes*
Benjamin J. Cabranes*
Tyler T. Mikulis*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com
tmikulis@dirllp.com

**Pro hac vice*