UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---------------------------x
ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, et al.,

Defendants.
---------------------------x

Civil Action No. 26-CV-00092-JAW

CONFIDENTIAL

The entire transcript has been designated CONFIDENTIAL pursuant to the confidentiality designation made on the record.

VIDEOTAPED DEPOSITION OF COLLEEN FAGAN
Portland, Maine
FRIDAY, JULY 24, 2026
1:41 p.m.

Job No.: 642256

Pages: 1 - 123

Transcribed by: Wanda Greenlee, CCR No. 1188

BY MS. VILLALON:

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. Okay. All right. I'm going to ask you some questions about the January 23rd, 2026, encounter with law enforcement. Can you, in your

own words, tell me step by step what happened on January 23rd, starting when you woke up?

A. Yeah.

MS. NADEAU: Objection. You can go ahead.

THE WITNESS: Okay. Yes. I woke up around probably 5:00. I left my house to go and observe. I had my first encounter around 5:30. When I was driving down Westbrook Street in South Portland, I noticed that there was a car parked with agents outside of it. And then I -- oh, how do I describe it? It's like down -- down the street, and there's, like, three parking spots in one side, and three parking spots on the other side.

And I pulled over to the other side of the road, and I started recording what looked like three agents that were about to detain somebody. And so I continued to record them. They detained that person and left.

And then I -- I did contact my sister about the incident, and I sent the information to Project Relief Maine about the abduction. And from that incident to the second video, I don't know for sure what I did. But when the second occurrence -- occurrence happened, it happened at Cortland Court

Apartments.

So during that encounter, I drove -- I drove in there, drove around. It's like a cul de sac. And once I was driving around, I was driving out of the cul de sac and I noticed there was a black -- I don't know what kind of car it was -- parked on the side of the road.

And then I was slowing down, and I looked to my left to see what looked like those big SUV-type cars to the left -- left side of where, like, I stopped. And so then I pulled into that driveway, and I parked my car on the side of the road, and I noticed that there were law enforcement there. And so I got out of my car, and I started to record what was happening.

BY MS. VILLALON:

Q. Okay. And then what happened?

A. And then what happened was, when I was starting to record them, the two ICE agents, they pulled out their phone and they started to come up to me and record me. And then one of them went past me and got -- went to go get my license plate. And so I told him, like, it wasn't -- it's not illegal to record. And then he said, Yes, I know.

And then I asked him why he was

taking my information down, and that's when he said that there was a nice little database, and that I was basically being labeled as a domestic terrorist.

Q. And then what happened?

A. And then what happened after that? I was shocked that he said that to me, so I reacted. And I did laugh, and I was pretty shocked about him calling me a domestic terrorist for filming. So I had my reaction, which included that, then asking him a series of questions like, Are you crazy, things like that, because I'm not a domestic terrorist. So, yeah.

Q. And then what happened after that?

A. And then from what I recall, I -- I don't know. I know that I -- at some point, I asked him, like, if he needed therapy because it was a, you know, it was pretty intense being called a domestic terrorist. I'm just saying. And then he got into his car, and there was -- he got into his car, and then I told him to leave. And then I turned and went back, I believe, towards my car.

Q. And what did you do after you got in your car?

A. I left. I -- I did contact my sister, and I don't know what else besides that.

Q. Did you call your sister -- oh, sorry -- sorry to interrupt. Did you call your sister or text your sister? Or both?
A. Probably both. Probably called, most likely.
Q. And what did you do after that for the rest of the day?
A. The rest of the day, I left and I drove around. I left that part of -- I left that apartment complex, and I drove -- I think I did one more round through another complex -- another complex, and then I just -- I might have gotten coffee and then went to work.
Q. Did you share the videos that you took that day with any group chats, starting with the first video, the first encounter that you witnessed prior to the encounter with ICE officials, where they made a statement about you being a domestic terrorist?
A. Can you repeat that? Sorry.
Q. Yeah. So starting with the first video that you took, you said around 5:30 a.m.?
A. Uh-huh.
Q. Did you share that video with any group chats?

you state: Since my interactions with federal agents on January 23rd, 2026, I have not observed or recorded any further ICE activity. If I hear reports of ICE in my community in the future, I would like to be able to observe and record them again, and I am anxious about how I might be treated by agents now that they have recorded me.

At this point, do you feel comfortable going out and observing ICE agents if you encounter them in the community?

MS. NADEAU: Objection.

THE WITNESS: At this point, meaning?

BY MS. VILLALON:

Q. Today.

A. Today. Can you repeat that? I'm sorry.

Q. Today. So at this moment --

A. Maybe not today.

Q. No, not during the deposition today. But, you know, in the present, would you feel comfortable going out and observing and recording ICE officers if you encounter them in your community?

A. I would not say I would feel comfortable about it.

THE WITNESS: I don't know when the exact day was where I did join these group chats. It could have been after. It could have been on. I don't know what the exact date was.

BY MS. VILLALON:

Q. Did you join any of the five to ten chats, any at all, before January 23rd?

A. I don't think so.

Q. So earlier we talked about a message between you and your sister at around 5:00 a.m., where your sister asked if you were sending something to Signal. So did you join Signal that morning?

A. I don't remember where when I joined Signal.

Q. Okay. And why did you decide to become a member of the five to ten group chats on Signal, where individuals shared information about ICE activity in Maine?

A. To continue to observe ICE activity in Maine.

Q. So you joined the Signal chats in order to continue to observe ICE activity?

A. To observe ICE activity in Maine, yes.

THE WITNESS: Or keep exercising your constitutional rights.

BY MS. VILLALON:

Q. So at this point, you -- you planned to continue exercising your rights to go out and observe ICE?

MS. NADEAU: Objection.

THE WITNESS: I don't know. I don't think so. These are, like, reporter -- like questions for, like, some sort of reporter that we were discussing. So I don't know about that.

BY MS. VILLALON:

Q. You wrote: I will not let myself be threatened or silenced for filming ICE.

Does that mean that you were, yourself, planning on continuing to document and observe ICE activity?

MS. NADEAU: Objection.

THE WITNESS: Like, eventually, I would still go out and observe ICE. I just don't know if it's the exact day or time. So it's...

BY MS. VILLALON:

Q. So by then, you didn't feel threatened; is that correct?

MS. NADEAU: Objection.

THE WITNESS: No. I can still feel scared and be threatened, but still want to exercise my constitutional rights.

BY MS. VILLALON:

Q. Okay. So is it true, your statement in this document, I will not let myself be threatened?

MS. NADEAU: Objection.

THE WITNESS: This -- I don't know if this is like the final draft for these questions, because we were, like, putting it together. So, like -- where does it say that?

BY MS. VILLALON:

Q. It's underneath.

A. What was your question? I will not let myself be...

Q. Is that an accurate statement, I will not let myself be threatened?

MS. NADEAU: Objection. You can answer.

THE WITNESS: Yes, that's accurate.

MS. VILLALON: Okay. We're done with this exhibit. Thank you. I'll show you Exhibit 23.

(Exhibit No. 23 was marked for the record.)