UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

------------------------------

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSLEVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL.,

Defendant.

Case No.: 26-CV-00092-JAW

------------------------------

CONFIDENTIAL DEPOSITION OF CARLYN WILLIAMS

Portland, Maine

Thursday, July 23, 2026

2:02 p.m.

CONTAINS CONFIDENTIAL INFORMATION

Job No.: 642254

Pages: 1 - 113

Recorded by: Raechel Meyerowich

all aspects of this declaration?
A Yes.
Q Okay. Okay. So -- so we're going to turn to more of the facts in this case now.
Do you recall what day you received a phone call from someone in this -- related to the filing of this case?
MS. NADEAU: Objection.
Q Do you recall -- do you recall what day you received a call from someone that you thought was from the government?
A Yes. January 20th.
Q Okay. Can you tell me about that day just generally and -- and explain to me, you know, the different steps throughout?
A Yes. I was working. I was on a call with my accountant. And, I mean, I woke up. It was, like, a normal day. I, like, went to work. I was working at my house, and I was on a call with my accountant.
And Xenia then called me. That was, like, sort of the first thing of note. They called me once, normal. But then they called me again, and they don't usually call me, like, in, you know, quick succession like that. And so I

said, I need to pick up this call.

And Xenia let me know that they had just observed ICE amidst an operation, or who they thought were ICE agents doing an operation, and they were very upset. Xenia was, like, was crying on the phone. And they said it was --

MS. NADEAU: Can I actually pause? Not to reveal any marital communications, the actual things said between the two of you?

THE WITNESS: Oh, sure.

MS. NADEAU: You can describe generally the conversation. That's fine.

THE WITNESS: Okay. Yeah.

A They called. They told me about it. They were sad.

And then the day kind of continued on. I did some work. And then I learned that there were some reports of ICE agents in a nearby neighborhood, in the Redbank neighborhood, and it was coming up on, like, the school bus drop-off time.

And so I thought it would be good to go over there to see -- to, like, sort of support kids getting off the school bus and make sure everyone was safe.

And so my friend [redacted] -- I called my friend and asked if she wanted to pick me up and go together. She picked me up. We went over together. We didn't see any ICE agents in the area. We'd also missed the bus stop or, like, some of the buses getting dropped off. So there was really nothing happening at that stage.

Then we sort of parked in a parking lot to try to gather ourselves and decide what we wanted to do. And that was when I got a phone call from a no caller ID number, and I believe that was a DHS agent. I can walk through that phone call if you want me to. But that was a phone call that we -- that I had.

And then I don't really remember the rest of the day, to be honest.

Q It's okay. Okay. So turning to your declaration -- well, actually, before that, so [redacted]. Who -- who is [redacted]?

A A friend of mine.

Q Okay. And somebody that you knew before 2025?

A Yes. I believe we met on a boat in 2024.

Q Okay. And what's [redacted]'s last name?

MR. TAGERT: Okay.
BY MR. TAGERT:
Q So what was the purpose of the group?
A To help our community. Like, to help community members who wanted to be aware of what was happening in our community, be more aware of that.
Q Okay. Was it a rapid response group?
A I don't believe so.
Q Okay. So what kind of group was it?
MS. NADEAU: I'm actually going to object to any more questions about the group itself on First Amendment associational privilege grounds and instruct the witness not to answer.
MR. TAGERT: Okay. About everything related to the group?
MS. NADEAU: Like, I don't know what you're going to ask. But about any of the sort of operations or internal communications of the group, yes.
MR. TAGERT: I asked what the -- what the group was.
MS. NADEAU: She answered what the purpose of the group was.
MR. TAGERT: Okay.

A Because of the impact that immigration law enforcement was having on community members.
Q Okay. How many Signal chats were you part of?
A I'm not sure.
Q Are you in any Signal chats -- chat groups anymore?
A Yes.
Q What are those?
A All sorts.
Q Okay. Are any related to immigration law enforcement?
A I mean, I'm in a chat where we're talking about what ordinances the City of South Portland could put into place to protect community members.
Q Did you leave any of the chat groups that you were involved in after the incident in January 2020 -- or, excuse me, January 2026?
A Did I leave any of the chat groups I was in after January 2026?
Q Have you left any Signal chat groups?
A Yes.
Q When did you do that?
A Well, I don't think I can remember all

of the Signal chat groups that I've left since January 2026.

Q Okay.

A I did leave anything that was more related to Immigration and Customs Enforcement in -- after our March encounter at the border.

Q Okay. And are you aware of any databases collecting immigration law enforcement, license plates, names, anything like that?

A I'm not aware of them.

Q Okay.

MS. NADEAU: Counsel, can I just interrupt for one second? I will withdraw my objection to one of your questions, which I think related to whether one of the chats she's in is about immigration or law enforcement.

MR. TAGERT: Okay.

MS. NADEAU: It was a single question. It was a yes or no question, but I will withdraw that one objection.

MR. TAGERT: Okay. So --

MS. NADEAU: Yes. Apologies for any confusion.

MR. TAGERT: Do we need to go off the record to figure out what that exact question was?

can take a break if you want one whenever.
A Okay, thanks. I'm good.
Q You're good?
A I was just curious.
Q Great. Yeah. Understood.
A It's like a nervous tic, I think.
Q Yeah. Okay.
(Exhibit 21 was marked for identification and is attached to the transcript.)
Q So this, do you recognize this document, what this is?
A Yes.
Q What is it?
A This is a screenshot of a phone call that I received on January 20th.
Q Okay. And what was said on the phone call?
A I picked up the phone. A voice on the other side said, is this Carlyn Williams? I said, may I ask who's calling? He said, this is the Department of Homeland Security. I said something along the lines of, yes, this is she.
And then he asked me, does anyone other than you ever drive your vehicle? And I said -- I think I said at first, no, not really. And then

he asked some version of that same question again and reiterated the question. And I said, sometimes my spouse drives my vehicle.

And then he asked if I was aware that -- he said she -- if she had driven my vehicle that morning and had observed an ICE operation that morning. And I said, a noncommittal sort of, I'm not sure.

And then he said something along the lines of, well, you should let her know to not do that sort of thing in the future, because people who are doing that sort of thing are getting added to a terrorist watch list.

Q Did he -- go ahead.

A And then I said -- I don't know what I said. And then I think he said something along the lines of, I just wanted to give you a heads-up. And I said, thanks. And then he -- and then that was the end of the call. I don't exactly remember the end.

Q Okay. Was anyone else with you?

A Yes. I was on the phone with -- sorry. I was in the car with my friend, [redacted].

Q Did you have a speaker phone? Or did you --

A Not at the very beginning. But I think once he said it was the Department of Homeland Security, I put it on speaker.
Q Okay. So [redacted] heard it too, then?
A Yes.
Q Okay. What did you do after that call?
A We called one of [redacted]'s friends, who's a lawyer, to just ask if he'd ever heard of anything like that happening. And he said no, basically.
Q Okay. Who was this, that friend?
A I don't know.
Q Okay. Were you thinking about filing a lawsuit at that moment?
MS. NADEAU: Objection.
A No. I was pretty freaked out. I wasn't, like, thinking about that.
Q Okay. So you -- got it.
A I was too busy shaking.
Q Okay. What else did you do after that call?
A Then we got out of the car, and the final bus of the day arrived. We saw the cute kids get off the bus. And then I think [redacted] probably dropped me back off at home.

A I don't remember.
Q And what did you discuss?
A The experience of Xenia's observing and then the phone call that I received from DHS.
Q Okay. And what happened after that?
A Like, after this phone call happened?
Q Yes.
A With [redacted]?
Q Yes.
A She sent me this message.
Q Okay. So did -- did she ever write an article about --
A Not that I'm aware of.
Q Okay. Was [redacted]'s message at the bottom the first time you learned about this lawsuit?
A I don't know.
Q Did you speak with Hilton before she filed the lawsuit?
A I don't believe so. No.
Q Okay. Did you consider joining this lawsuit at this point?
A No.
Q Okay. Okay. So returning to your declaration, we're going to go to paragraph 15.

A Okay.
Q Okay. So it says:
After the phone call, Xenia and I discussed the need to take additional safety measures such as buying a gun for protection and having a plan for leaving our home if necessary.
Why did you discuss buying a gun?
A I think we were just looking for ways to feel safer.
Q Okay. And you thought having a gun would make you feel safer -- safer?
A I think it could have given us some peace of mind, but we didn't end up getting one.
Q Okay. Okay. And so turning to paragraph 16:
I decide to do so -- do so meaning continue observing and recording ICE agents two more times -- but I always made sure I was in someone else's car since Xenia and I agreed that it wasn't safe to use our own vehicles.
What were those two times?
A One of the times was -- they were -- they were the two times we discussed earlier about July 22nd.
Q You mean January 22nd?

So it's just shifts like that.
Q Okay. How many times have you traveled internationally in the last two years?
A The last two years? This Christmas, last Christmas. I believe -- I believe three times.
Q Okay. And when were those?
A In December of 20 -- sorry. This is a very hard thing for me to cross -- like, think about. Okay. I think in December of 2024, Xenia and I went to Mexico for Christmas. Oh, maybe we went to Guatemala first. I don't really remember. But we -- I believe in the last two years, we've gone to Mexico, Guatemala, and Canada.
Q Okay.
A I just don't remember the exact times.
Q Okay. So we're going to jump ahead to the -- to your crossing back into the U.S. Do you recall what date that occurred?
A March 16th.
Q Okay. So after leaving Quebec, can you, can you walk me through that step by step?
MS. NADEAU: Objection. You can answer.
A We drove from Quebec, got a really good

ice cream cone, went to the border, crossing to cross back into the U.S. I was in the passenger seat. Xenia was driving. Xenia handed over our two U.S. passports.

Then the agent asked that we pull into, like, bay 1 or a bay. So we pulled into that. He walked over to the vehicle. He said something like, I'm going to need you to get out of the vehicle and give me your phones and keys. And he still had our passports. And then, so we did that.

And then we went into the building. He instructed us to go into the building. We went in. He said, have a seat. We had a seat.

And then, do you want me to just walk you through the whole thing?

Q Go on.

A Okay. And then after about five minutes, he gestured for us to come to the counter. And then he said to me, Carolyn -- again, my name is Carlyn. But he said, Carolyn, do you have your car registration with you? And Xenia said, you know, we're in my car.

And he said that he understands that, but then asked me again if I had my car

registration with me. I said no, because I don't carry it around with me.

And then he asked if I -- what kind of car I drive, and I said a Chevy Bolt. And he looked at his computer screen and sort of gave a nod. And then he asked if I knew my license plate number. And I said no, because I don't.

And then that was sort of it. He said, okay, please sit back down. We just sort of waited for a while. The whole time we were there, he was sort of, like, walking around in the offices and, like, seemingly talking to other people.

And at one point, Xenia and I asked to go to the bathroom. And the other agent -- because the guy we'd been talking to was not there at that point. He's, like, somewhere else. The agent said, I don't know what you're in for, so I'm going to have to ask him.

And so then she asked him. They let us go to the bathroom.

And then he searched our vehicle and told us not to, like, come near him while he was searching the vehicle. And then he came back inside.

Oh. He asked us if we had anything of note in our vehicle before he did the search. I think he said, like, is there anything I should know about? And we said, there's, like, a bottle of wine and maybe some cheese, some food. And he said not to worry about that. It's no problem.

And he searched our vehicle. He came back inside. We kept waiting.

And then after a while of just sort of nothing happening, I went up to the counter and offered to answer any questions that he might have. And I said, you know, can I answer any questions that you might have? And he said, not yet.

And then I said, okay. I'm just curious about what might be going on because we're both U.S. citizens. And he said, I can see that, and tapped on our passports.

We sat back down. And then a while later, he called us back up and said, you'll be free to go in a moment or, like, in a couple of minutes or something like that. But first, I need to ask you a few questions. He asked what profession, like, what we both do for work and, like, the address of where we stayed in -- which

we didn't know, but we knew the name of where we stayed in Quebec City.

And he wrote those things down. And then I asked him what he was writing those down for. And he said for, like, his incident report or something along those lines.

And then I asked him, can you tell us what this was all about? And he said it had something to do with an agricultural violation in 2015 or -- like, I don't know exactly what he said, but something like a long time ago, an agricultural violation having to do with a dog or dog food or something like that.

And I was, like, yeah, I brought a dog back from Peru in, like, in 2015. And he said, yeah, it was, like, through Mexico. And I confirmed, like, yep, we came through Mexico. And I was, like, but I was never aware at that time or any of the time since coming back into the U.S. that there was any sort of agricultural violation on my passport. So he told me that.

And then I asked what his name was. And he said, Brad. And then I said, what is your last name? And he said, Guay. And then that was it.

Q Okay. So how many agents did you speak