UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---------------------------x

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, et al.,

Defendants.

Civil Action No. 26-CV-00092-JAW

---------------------------x

CONFIDENTIAL

The entire transcript has been designated CONFIDENTIAL pursuant to the confidentiality designation made on the record.

VIDEOTAPED DEPOSITION OF ELINOR HILTON
Portland, Maine
FRIDAY, JULY 24, 2026
8:20 a.m.

Job No.: 642256

Pages: 1 - 211

Transcribed by: Wanda Greenlee, CCR No. 1188

date when you interacted with law enforcement at a Home Depot in January? Do you recall what date that was?

A. I believe that was January 21st.

Q. Okay. Can you tell me about January 21st, and just go step by step? What happened that day?

MS. NADEAU: Objection.

THE WITNESS: Sure. Yes. So January 21st, I did not go into work. Instead, I stayed home because I knew that there was increased ICE activity in Portland, and I was concerned about that. And I wanted to be available to document interactions with ICE officers happening in the Portland area.

So that morning, the first thing that I did was drive to a different part of South Portland, because I received a message that there was a suspected ICE vehicle in a neighborhood of South Portland. So I drove there to see if I could document what was happening with those ICE officers.

When I arrived there, there was one car that I suspected to be an ICE vehicle. I parked probably more than 20 feet behind the car. And I got out of my vehicle to try to talk to the people

who were sitting in the car. It was idling. And I motioned to them to roll down their window so that I could ask them if they were federal agents or who they were. They ignored me and didn't roll down their windows, but I could see through the windows, the vests that they were wearing that said Police ICE on them.

And so I took at least one picture of the car, at the back of the car, and I believe one very brief video of the front of the car. And that car started driving away, and I got back into my car and drove behind it for a little while.

And there was a point where that car turned around in a parking lot, and I did as well, and I could see one of the officers reach out his hand to take a picture, I assume, with his phone of me and my vehicle. And I lost sight of the car in traffic and drove home.

And then later that day, I got a message that there were ICE vehicles in the Home Depot parking lot in South Portland. And so I drove there and -- I drove all the way to the edge of the parking lot before I was able to see the vehicles that had been described. I parked my car and immediately started taking a video on my phone. And

there were two cars parked, blocking the back part of the parking lot. And I walked towards those cars, and the ICE officers also started filming or taking pictures, I assume, with their phones of me and my car.

And I walked back past -- I walked past those cars and those two vehicles, slowly, there behind them, maybe -- like, many yards, maybe 75 feet or something, a long distance. All the way diagonal across the parking lot, there were several other vehicles and what I assumed to be other ICE officers who looked to be involved in some sort of detention process.

So I calmly walked in that direction, filming on my phone. And as I walked in that direction, several of the officers approached me really quickly and, what felt like aggressively shouted at me and told me to stay where I was, which I did, and said some mean things to me and threatened to spray me with pepper spray if I got closer.

And one of the initial two cars that I saw, the officer drove over to where I was and swerved his car in front of me, I assume to stop me from walking any closer. And one of the other

officers filmed me or took a photo of me with his phone, like about 6 inches from my face. And one of the officers told me that if I kept coming -- if I kept showing up to things like this, that they would come to my house later and that I would be put on a watch list.

BY MR. TAGERT:

Q. Okay. What happened after that?

A. I continued filming. A few other observers arrived. I know that the officers made a similar threat to at least one of the other observers that I heard. The officers continued doing -- I couldn't see what they were doing in the back of the parking lot because I wasn't allowed close enough to see the interaction that they were having with the person that I -- the person or people I assume they were detaining, but they continued doing whatever they were doing back there while several of the officers stayed sort of facing the observers, creating a -- essentially a barrier between the observers and whatever business they were doing in the back corner of the parking lot.

And I continued filming. The -- several of the officers attempted to make conversation with me, taunted me, taunted the other

observers. And then several large SUVs arrived with more law enforcement. I don't know what kind exactly, but they were wearing, like, military-style outfits with helmets and holding weapons that looked like -- like, I assume that they were pepper-ball guns. They looked kind of like paintball guns, but large weapons.

And they exited those vehicles and instructed me and the other observers to move even further away, which we did. And they pushed us back towards the edges of that section of the parking lot and created essentially a second barrier between us and any of the other officers that had been there before.

And I waited there, filming until it seemed like they -- I saw, really briefly, some of the ICE officers load at least one person in handcuffs into a large white van. And like shortly thereafter, many of the cars started driving away, and the cars that I assumed to be ICE vehicles sort of slowly started departing. And I waited until most of them had gone, and then I also got into my car and drove away.

Q. Okay. Where did you drive after that?

A. I drove to a different neighborhood of South Portland for a few minutes, where I -- I knew that there had also been increased ICE activity. So I drove a couple of loops in that neighborhood. And then I think some of the shock wore off, and I realized how scared I was.

And I spoke on the phone with my boyfriend, and when I was explaining what had happened, I realized how scary it was and how shaken I was. And so I decided that I shouldn't be out anymore, and so I drove to my brother's house.

Q. Okay. And then did you stay at your brother's house that night or...

A. No. I stayed there for several hours, and my brother and his partner were really kind to me while I was really scared. I was in tears. I was shaking and crying. And they expressed concern about me sleeping at my house that night, given the threats that the officers had made to come to my house later. So I made a plan to stay at a friend's house, and I went back home briefly to pack some clothes.

Q. Okay. So the beginning of your statement, you said that there were -- you knew there was increased ICE activity in the area, and

Q. -- certain information? Okay. And so going to the morning of January 21st, you said that you received a message. How did you receive a message about where ICE activity was occurring?

A. I received a message in a Signal chat that I was in.

Q. Okay. How many Signal chats are you in related to immigration, law enforcement, ICE activity?

A. Five or six.

Q. Okay. And what is the nature of those chats?

MS. NADEAU: Let me just interrupt. The witness can answer at a high level what the nature or purpose of the chats was, but I'm going to assert a privilege with respect to anything else.

MR. TAGERT: I assume we'll do the same thing we've done before?

MS. NADEAU: Sure will.

THE WITNESS: I believe that the chats were created to support people who wanted to observe and document ICE activity in and around the Portland area.

BY MR. TAGERT:

Q. Okay. So was it Maine specific?

then you followed the -- a vehicle, right, to the Home Depot?
A. No, that is not what happened.
Q. Okay. That's not what happened. But did you see another vehicle earlier in the day?
A. Before the interaction at Home Depot?
Q. Yes.
A. Yes.
Q. Okay. And you drove behind it for a little while?
A. Correct.
Q. How long was a little while?
A. I would say less than 15 minutes.
Q. Okay. So 15 minutes is a little while to you?
MS. NADEAU: Objection.
THE WITNESS: Time is a hard thing to quantify. Sometimes it's a little while.
BY MR. TAGERT:
Q. Okay. Why did you decide to follow it?
A. I was hoping to be present if that vehicle were -- if the officers in that vehicle were to detain somebody.
Q. Why did you hope to be present?

A. So that I would have the opportunity to document their interaction with the person that they were detaining.
Q. Okay. And you used the phrase earlier, Detention Process. The documents sometimes describe abductions. Are those the same thing to you?
A. Yes.
Q. Okay. And at the Home Depot, did you talk with the officers at all?
MS. NADEAU: Objection.
THE WITNESS: Yes.
BY MR. TAGERT:
Q. Okay. What did you say?
A. It'll be easier if you watch the video, but I believe I said a few times that I was just filming. And I said, This is my right. I know my rights. And I said -- I believe I said, I don't talk to cops. And then I didn't say anything else.
Q. Okay. Did you initiate any conversation with them?
A. I don't believe so.
Q. Okay. You said that -- that you heard one of the offers -- excuse me, one of the officers say something similar about databases to

another observer; is that right?
A. Yes.
MS. NADEAU: Objection.
BY MR. TAGERT:
Q. Do you know who that observer was?
A. I do.
Q. Who was it?
A. That was my friend, [redacted].
Q. [redacted]. Okay. And did you and [redacted] both learn about the officers being at Home Depot in the same way?
MS. NADEAU: Objection.
THE WITNESS: I don't know.
BY MR. TAGERT:
Q. How long have you known [redacted]?
A. I think since I was two.
Q. Okay. So did you and [redacted] travel together that day?
A. No.
Q. How did [redacted] get there? Do you know?
MS. NADEAU: Objection.
THE WITNESS: I don't know.
BY MR. TAGERT:
Q. Who else was there other than you and

[redacted]?

A. There were maybe four other observers, I assume.

Q. Okay. Did you know any of them?

A. I knew one of them -- one of the other ones, yeah.

Q. Who was that?

A. That's someone I've met named [redacted].

Q. Okay. How did you meet [redacted]?

A. I met [redacted] through friends of friends.

Q. Did you meet [redacted] before 2025?

A. I think I met [redacted] in 2024.

Q. Okay. How did you meet?

A. I was introduced by my brother's partner.

Q. Okay.

A. Yeah.

Q. And so the other three observers, did you know any of them?

A. No.

Q. Do you know if any of those people were told something similar about being put on a database?

A. I don't know.

Q. Okay. Is that the only platform you're on?
A. I have a Facebook account that I almost never use.
Q. Okay. Is it just those two?
A. Sometimes I look at Reddit, but I don't post things there.
Q. Okay. What do you mean by the term observe ICE operations?
A. Are you referencing a specific part of the --
Q. Yes.
A. -- declaration?
Q. The first line: I took a day off of work to observe ICE operations.
A. I think I mean it in, like, standard understanding of the word to, like, watch.
Q. Okay. And also to document, as you've described?
A. Yes. That was my intention.
Q. Okay. And how did you know where ICE was that -- on that day?
MS. NADEAU: Objection.
THE WITNESS: On January 21st?

BY MR. TAGERT:
Q. Yes.
A. Because of the messages in the Signal chat.
Q. Okay. And is that how you learned where ICE was on other days as well?
A. I have learned about suspected ICE sightings in those chats at other times.
Q. Okay. And apologies if I've asked this already, but are you an administrator of any of the Signal chats we discussed?
A. No.
Q. Okay. And do you know if anyone in those group chats are politicians?
MS. NADEAU: Objection. I'm going to assert the same First Amendment privilege and instruct the witness not to answer.
BY MR. TAGERT:
Q. Okay. Do you know if those group chats were organized by politicians?
MS. NADEAU: Same objection. Same instruction.
BY MR. TAGERT:
Q. Do you know if the group chats are organized by any sort of political or advocacy

BY MR. TAGERT:

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. Okay. Okay. So going to Paragraph 4 of your declaration. Do you see where it says: I drove to the Home Depot and pulled into the southwest end of the parking lot, where I saw two groups of people with cars tucked into a corner near the garden center.

A. Yes.

Q. Okay. What do you mean by the term tucked into?

A. I think what I was getting at there

is that they were -- to explain the layout of the parking lot, there's, like, the main parking lot for the Home Depot. And then it's not even visible from most parts of the main parking lot, is like a separate parking lot on the side of the building. That is, I think, for the garden center.

And so the vehicles were in the part of the parking lot that is not visible from most other parts of the property, and so that's what I was getting at.

Q. Okay. And so was that part not visible from the road?

A. I think it's visible from parts of the road.

Q. Okay. Do you know which road?

A. I do not know the name of the road.

Q. Okay. Do you know how the observer who sent the chat saying that there were officers at Home Depot, do you know how that observer saw those vehicles?

A. No.

Q. Okay. Do you know who saw the vehicles first?

A. No.

Q. Was it somebody who was at the scene?

A. I don't know.
Q. Okay. So did somebody tell you that the officers were located in the back of the parking lot?
A. No.
Q. So what -- what did the message say?
A. I don't remember what the message said.
Q. Okay. Do you have that message still?
A. I don't think so.
MR. TAGERT: Okay. So, Mr. Videographer, we are ready for the first video, which I think is -- should be labeled 3.
THE REPORTER: It's Exhibit 35.
MR. TAGERT: Yes, it should be Exhibit 35. It's labeled 3 on the video, though.
(Exhibit No. 35 was marked for the record.)
THE VIDEOGRAPHER: It's ready to go. Hit space?
MS. NADEAU: Are you going to space when he tells you to?
MR. TAGERT: You can go ahead and hit space. That's fine.
(Video played.)

MR. TAGERT: Yes.
THE REPORTER: Thank you.
THE VIDEOGRAPHER: Okay. The time is 9:51 a.m. We're off the record.
(A recess was taken.)
THE VIDEOGRAPHER: The time is 9:52 a.m., and we're on the record.
MR. TAGERT: Okay. Thank you.
BY MR. TAGERT:
Q. Ms. Hilton, we took a short break because of a technical issue. So returning to the video that we just watched, which is Exhibit 36 [sic]. Did you notice that two officers had blocked off the driveway when you first walked up to this scene?
A. I noticed that there were two vehicles parked there.
Q. Okay. Why did you think those were parked there?
A. I assumed they were parked there to keep others from driving into that part of the parking lot.
Q. Okay. And did you keep walking towards the other officers anyway?
MS. NADEAU: Objection.

THE WITNESS: I kept walking towards the other officers.

BY MR. TAGERT:

Q. Well, did you try to drive back there first?

A. I did not.

Q. Okay. So where did you park?

A. I parked in the main parking lot.

Q. Okay. And then you walked around to the back?

A. I walked to the side, yeah.

Q. Okay. How did you know to walk to the side?

A. All right. So the layout of the parking lot is like -- here's the Home Depot.

Q. Okay.

A. Here's the parking lot. It extends this far past the Home Depot. I parked here. The lot where the ICE officers were is here.

Q. Okay.

A. So I could see them from where I parked.

Q. Okay.

A. Which isn't like the farthest part of the main parking lot.

Q. But why do you use whistles?
A. I use a whistle to alert neighbors that there is ICE activity in their area.
Q. Why are you trying to alert neighbors if there's ICE activity in their area?
A. So that they're aware that ICE is active in their communities?
Q. Why do you want them to be aware?
A. Mostly because I have seen documentation of ICE officers being incredibly violent to community members, and so I worry for the safety of the people who live in those neighborhoods.
Q. So you think that having ICE officers conduct law enforcement leads to violence?
A. I have seen --
MS. NADEAU: Objection.
THE WITNESS: -- documentation where that is the case.
BY MR. TAGERT:
Q. Does that happen for all arrests that happen by law enforcement -- immigration law enforcement?
MS. NADEAU: Objection.
THE WITNESS: I can't know that.

BY MR. TAGERT:
Q. Do you think that having ICE officers make arrests makes the community less safe?
MS. NADEAU: Objection.
THE WITNESS: Yes.
BY MR. TAGERT:
Q. Why is that?
A. Because of the numerous instances where they have used excessive force and have retaliated against observers.
Q. What instances are you discussing?
A. The first two that come to mind are the murders of Alex Pretti and Renee Good, who were two observers that were murdered while they were doing that.
Q. Okay. Anything else that you were thinking of?
A. Other instances where ICE has used excessive force in their detention. There was a murder in Maine last week, where somebody who was not the target was murdered.
Q. Okay. What -- what would -- what happened there?
MS. NADEAU: Objection.
THE WITNESS: My understanding of

choose this lawsuit specifically as the -- the way to check whether you're on a watch list?
MS. NADEAU: Objection.
THE WITNESS: I was invited to join the lawsuit.
BY MR. TAGERT:
Q. You were invited to join? Who invited you?
A. The lawyers from Protect Democracy.
Q. Okay. When did that invitation occur?
MS. NADEAU: Objection, I think on attorney-client privilege grounds. I don't want her to get into any more details of our communications.
MR. TAGERT: Okay.
BY MR. TAGERT:
Q. Okay. Turning to Paragraph 41: On a recent personal trip, I did not take my personal phone with me.
Why did you not -- well, starting out, what was that personal trip?
A. I went to Florida.
Q. Okay. Why did you choose not to bring a phone?
A. I was concerned, given the threats

that the ICE officers made, that I was being surveilled by the government or -- and that that surveillance would be used to retaliate against me.

Q. And you thought there might be some surveillance through your phone?

A. I was concerned that that could be true.

Q. Okay. Do you think that that still could be the case?

A. I don't know.

Q. Have you ever left your phone at home at any other time other than this personal trip?

MS. NADEAU: Objection.

THE WITNESS: Yes.

BY MR. TAGERT:

Q. Okay. When were the -- when did you do that?

A. I often leave my phone at home.

Q. Okay. So do you leave your phone at home when you're going out to observe ICE activity?

A. No.

Q. Okay. Is your -- did you fly to Florida?

A. Yes.

Q. Have you flown any other times since

A. Correct.
Q. Now we're going to turn to Page 16. So between January and May, did you -- say January 31st and May, did you ever go observe immigration law enforcement?
A. I don't think that I observed any immigration law enforcement in that time period.
Q. Okay. Why did you start going out to observe immigration law enforcement again starting in May?
MS. NADEAU: Objection.
THE WITNESS: I had seen an increase in reports of ICE activity.
BY MR. TAGERT:
Q. How did you see that?
A. Both in the Signal chats and in the news.
Q. Okay.
A. And through the MIRC statistics.
Q. Okay. And how did you get the MIRC statistics?
A. I believe they post them publicly on their social media.
Q. Okay. Okay. And so you say: I was able to observe and record ICE activities four

Q. Okay. And so you said that your brother's partner is named [redacted]?

A. Yes.

Q. Has [redacted] ever been told -- are you aware of whether [redacted] has ever been told whether [redacted] will be on a database? Whether --

A. No, I am not aware.

Q. Okay. So going to the next paragraph, the third time was on June 16th, 2026. Going to the next page: I noticed a vehicle I believed to be an ICE vehicle. I drove behind the vehicle at a safe distance for approximately 45 minutes.

How would you define a safe distance?

A. Multiple car lengths.

Q. Okay. And it was for approximately 45 minutes?

A. Yes.

Q. Where did you follow this person?

A. I believe it says that in the answer to the question. South Portland and into Portland, and then to Belfield Street, a street that I used to live on, and then I think into South Portland and Scarborough, and all over the place.

Q. Okay. About how many miles was that?

A. I don't know.
Q. Was it 30 miles?
A. I don't know.
Q. Okay. So about how far from -- did you say Belfield Street?
A. Yes.
Q. About how far is South Portland from Belfield Street?
MS. NADEAU: Objection.
THE WITNESS: The part of South Portland that I was in is maybe a 15-minute drive.
BY MR. TAGERT:
Q. Okay. Is that about 10 miles?
A. I don't know the distance.
Q. Okay. But it was more than 10 miles that you followed them. Is that a fair estimate?
MS. NADEAU: Objection.
THE WITNESS: I don't know.
BY MR. TAGERT:
Q. Okay. Where exactly in South Portland were you?
A. In the Redbank community?
Q. Okay. So you drove from the Redbank community up through Portland and then to Belfield Street -- or is Belfield Street in Portland?

A. It is in Portland.
Q. Okay. Do you know whether other people followed ICE officers for 30 to 45 minutes, if that was -- did anybody ever relay to you that they were following ICE officers for 30 to 45 minutes?
MS. NADEAU: Objection.
THE WITNESS: Can you repeat the question?
BY MR. TAGERT:
Q. Do you know whether other people were following ICE officers for at least 30 minutes in their vehicles?
A. I don't know.
Q. Okay. Have you ever been followed in your vehicle for 45 minutes by another vehicle?
A. Not to my knowledge.
Q. Would you find that suspicious if somebody did?
MS. NADEAU: Objection.
THE WITNESS: I don't know.
BY MR. TAGERT:
Q. Would you feel comfortable if somebody was following you in a vehicle for 45 minutes?

MS. NADEAU: Objection.
THE WITNESS: Depends who they were.
BY MR. TAGERT:
Q. If it was someone you didn't know, would you feel comfortable?
A. I don't know how I would feel.
Q. And Belfield Street was the -- the address listed on your license; is that right?
A. That's right.
Q. Do you know whether that information is publicly available?
A. I don't.
Q. Do you know whether that information is connected to your license plate?
MS. NADEAU: Objection.
THE WITNESS: I would assume that it is.
BY MR. TAGERT:
Q. Okay. But you continued to follow the vehicle even after it had pulled over on Belfield Street?
A. Yes.
Q. How much longer did you follow it?
A. I don't remember.
Q. Why did you stop following it?

A. I lost sight of the vehicle.

Q. Okay. So going to the next paragraph, on June 17th, 2026, at around 8:00 a.m., just going to ask you one question about: I also took a photo of the ICE vehicle I was observing.

Do you know, is that a picture that we've looked at today?

A. Yes.

Q. Which one was that?

A. I don't know how to describe it. Sorry.

Q. No, no problem. Let's give you your pictures back. I think those may be the pictures.

A. It's this one.

Q. By this one, are you saying Defense Exhibit 45, Plaintiffs-000337?

A. Yes.

Q. Okay. Okay. We're going to go to Page 21. Okay. So the paragraph starting, At around 8:15 -- I'm going to ask you about in the middle -- after I stood there next to the vehicle for about a minute -- but feel free to read to refresh your recollection of the context.

A. Okay.

Q. So it says: I walked a few steps