UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

------------------------------

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, AND CARLYN WILLIAMS, ON BEHALF OF THEMSLEVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL.,

Defendant.

Case No.: 26-CV-00092-JAW

------------------------------

CONFIDENTIAL DEPOSITION OF POLYXENIA JEANNE PANTOS

Portland, Maine

Thursday, July 23, 2026

10:11 a.m.

CONTAINS CONFIDENTIAL INFORMATION

Job No.: 642254

Pages: 1 - 105

Recorded by: Raechel Meyerowich

Q [redacted]
A [redacted]
Q [redacted]
A [redacted]
Q [redacted]
A [redacted]
Q [redacted]
A [redacted]
Q [redacted]
A [redacted]
Q Okay. Okay. So we're now going to start talking about some of the facts in the case. So remind me, when did -- so can you tell me when you encountered immigration law enforcement during January 2026? What date, if you recall?
A No. But don't you -- can't you just tell me?

Q Does -- does January 20th sound like --
A Yes.
Q -- the right date? Okay. So can -- can you tell me step by step what happened that day, just starting when you left your house?
A Sure.
MS. NADEAU: Objection.
A Okay. So I am a pediatric occupational therapist. I go around to daycares and homes. And so I was going between one daycare to another, and I was driving and I saw a bunch of cars in the road.
And so I drove past. I turned right, and then I came back around. Because at that point, I didn't know what was going on, but I was worried it might be ICE. So I came back and turned around.
And then I got out of my car. I was sick and I had been wearing a mask at the daycare, so I put a mask back on.
And I was -- and then I was at the incident that we were discussing. And then I took some pictures. It was, like, towards the end, and so I was there for maybe 10 minutes, definitely less than 15 minutes. Everyone was wrapping up.

I took some pictures, and then all the agents left.
Q Okay. So you took some pictures. Did you have conversations with anyone?
A No one.
Q So no -- no other protesters?
A I talked -- once everyone was gone, I talked to one other person who was observing.
Q Who was that?
A I don't know.
Q You don't know a name?
A No.
Q Okay. And -- but you didn't speak with law enforcement at all?
A No.
Q Okay. So why -- you said you were worried it might be ICE. Why were you worried it might be ICE?
A I had seen on social media and heard from friends that ICE presence might be increasing in Maine that week.
Q Okay. So what social media was that?
A I don't know.
Q Okay. What social media do you have?
A I mean, it was on Instagram.

Q On Instagram?
A Yeah.
Q Okay. But you don't recall which account?
A No.
Q Okay. And what -- who -- which friends had you spoken with about it?
A I don't remember.
Q Okay. Why did you decide to stop?
A I decided to stop because it looked like -- it looked like something was happening. And I wanted to stop just so that I could be present if necessary to figure out what was going on.
Q Okay. What do you mean, present if necessary?
A I didn't know what was going on, and so I stopped to get more information.
Q Okay. But why did you want to get more information?
A Because I think it's helpful for people. The more information we have, the better.
Q Okay. Why is it helpful?
A I think there was a lot of fear around ICE coming to Portland. And so knowing if I was

seeing ICE or not felt like a really helpful piece of information.

Q And by a lot of fear in Portland, what do you mean exactly? Who was fearful?

A I was fearful.

Q Why were you fearful?

A Because I think we have ample evidence over the past -- we have ample evidence of recent history that ICE coming to town is pretty negative for people, for entire communities.

Q What evidence are you thinking of as examples of that?

A I mean, Minneapolis had been in the news, and so thinking about the impact that ICE had had in other cities.

Q And why did you think that this group of cars had immigration law enforcement officers?

A There were a lot of cars with out-of-state plates and no marked vehicles. Nothing said police or fire or emergency.

Q Okay. Had anybody told you to look out for unmarked cars?

MS. NADEAU: Objection.

A I think I know -- I think we -- I knew that that was a tactic that ICE was using, was

using unmarked vehicles.
Q How did you know?
A I think from social media.
Q From Instagram?
A Probably, yeah.
Q Do you recall where you learned that information on Instagram?
A No.
Q Okay. Where did you go next?
A I went to my next daycare.
Q Okay. And then no other encounters with law enforcement that day?
A No.
Q Okay. And did you speak with anybody about what happened?
A I did.
Q Who did you speak with?
A I called my spouse.
Q Okay. So anybody other than your spouse?
A That day? Is that your question?
Q Yes.
A I did. I talked to a nanny of a kid that I was working with, and I talked to a friend.
Q Okay. And what did you say to the nanny

and to your friend?
MS. NADEAU: Objection.
A I can't tell you --
THE REPORTER: Was that an objection?
MS. NADEAU: Yes.
THE REPORTER: Thank you.
A I can't tell you what I said to the nanny because it's covered under FERPA.
Q Okay.
A But my friend, I told her what had happened and that it was really upsetting.
Q Okay. And did you send any text messages relating to what you had seen?
A Yes.
Q On that day?
A Yes.
Q Okay. Who did you send messages?
A I texted my friend [redacted] asking -- yeah. I texted my friend [redacted]
Q Okay. And what did you ask her?
A I asked them --
Q I'm sorry.
A -- what I should do with the pictures.
Q Okay. And what did [redacted] say to do with them?

A Observer.
Q Observer?
A Yes.
Q So you -- and that was in a laundromat across the street from the law enforcement vehicles?
A Yes.
Q And do you know approximately how far away that was?
A I think my vehicle was probably closer to 20 to, like, 30 feet from all of the vehicles, 20 to 40 feet from all the law enforcement vehicles.
Q Okay. Why did you decide to take pictures?
A I mean, for the same reason that I just shared: That I think the more documentation that we can provide for everything, the more we're able to hold -- to help everyone hold themselves accountable.
Q Okay. So keep the declaration with you because we're going to be returning to it. But those are the various exhibits here. So we'll do these one at a time.
A Thank you.

Q Okay. Going to paragraph 13, it says:
I believe the agent had access to Carly's phone number because he or another agent had scanned or photographed the license plate on Carly's car during my encounter with them earlier that day.
Why do you think he got the information that way?
A I just don't know how else he could have gotten it.
Q But you think it was because of looking at the license plate?
A Yes.
Q Okay. So in paragraph 14, you mentioned discussing buying a gun for protection. Why did you think about buying a gun?
A I think we were just so scared and so overwhelmed. And the language around guns is that guns are for protection, and so we were just sort of grasping at anything that we were curious if it would help us to feel safer.
Q Okay. So you thought having a gun would make you feel safer?
A It was --
MS. NADEAU: Objection.

A I don't think I thought having a gun would make us feel safer. I was curious if thinking about -- thinking about having a gun would help us to feel safer.

Q Okay. And so paragraph 15: I have not observed or recorded ICE agents since that day. Is that still true as of today?

A Yes.

Q Okay. So regarding the -- so are you still part of the mutual aid group chat that you mentioned?

A No.

Q Okay. So did you -- when did you decide to not be part of that chat and the rapid response chat?

A I think it was, like, a slow -- a slow leaving of chat by chat.

Q Okay. Do you know approximately when that was?

A I think I left some chats in January, some in February, some in March.

Q Okay. And if you left a chat, what would happen to the messages that were on your phone? Do you know?

A I think they disappear.

record?

A No.

Q Okay. Great. So now we're going to turn to March. So do you recall when you came back into the country, what date that was? Do you know what I'm referring to?

A I do. Thank you. March 16th.

Q Okay. And can you -- similar to what we did earlier, can you go step by step what happened that day? You left Quebec in the morning, and then what happened afterward?

MS. NADEAU: Objection. Go ahead.

A We left Quebec City. We drove down to the Jackman border. I was driving my car. We pulled -- we, like, pulled into a gate, a booth that was closed because there was only one man in a booth. I backed up. I went into another booth behind a trucker.

And then I was driving, so I passed me and Carly's passports over. And the agent in the booth took both of our passports. He looked at them. He looked at his computer. And at this point, I was really not paying very much attention.

And then he said, can you two come with

me? Can you pull into the first lane or the first booth? And I said, oh, like, can you tell me what's going on? He said, oh, it's just policy.

We pulled in, and he said, can you give me your phones, your car keys? And he already had our passports. And we got out of the car and followed him inside.

Q Okay. So what happened after you followed him inside?

A We followed him inside, and he said, you can wait here on this bench. And he went to his computer.

And then after, like, maybe five minutes, he called Carly and I up to the counter and said -- he said, Carly, do you have your vehicle registration with you? And I said, oh, no, we're in my car. And he said, yeah, but I'm asking -- he was, like, yeah, but I'm asking Carly. I'm sure that was -- this is just my memory of what he said.

And Carly was, like, well, no, I don't have my vehicle registration with me. We're in Xenia's car. And then he asked if she could confirm what kind of vehicle it was and if she knew her plate, and she didn't. And he had our

phones already.

And then he said, okay, you two can wait over there. And then we waited, like, by the benches. We were there for about an hour.

And at one point pretty early on, I -- there was another woman at the counter. And I said to her, I said, oh. Like, can we use the bathroom? Or where's the bathroom? And she said, I don't know what you're in for, so I have to check with him first. And it was that language that I've never heard before that really alerted me to, like, this is not normal because that's not normal language that I've ever heard before in my entire life.

So then she had to ask him, the man who we now know is named Brad Guay, if we could go to the bathroom. We went to the bathroom. We came back. And mostly, we just waited.

And then at one point, Carly went up and said, is there anything that I can help you with? Do you have any questions that you need to answer? Because we are U.S. citizens. And he tapped on our passports and said, I can see that.

And then after more waiting, he called us up. And he kept going off and disappearing and

then coming back and going and coming back and talking to different people. And then he called us up to the counter so that he could close out his report, and he asked the address we had been staying at, our home address, and what we both did for work.

Q Okay. And what happened after that?

A We got in the car and left.

Q Okay. So --

A Oh, and he also searched our vehicle. I left out that detail.

Q So when did he search the vehicle?

A Midway through. It was after he asked about Carly's car, and we had been waiting some. He said -- he had disappeared and come back and disappeared and came back. And then he said, I'm going to search your vehicles. Is there anything I should know about?

Q Okay. And who was the woman that was there? Do you know who she was?

A No.

Q Okay. So you don't know if she was law enforcement or not?

A She was wearing the same outfit as him.

Q Okay.

A And she was behind the counter.
Q Okay.
A And she was dealing with the trucker. So it did seem like her and Brad Guay had the same job.
Q Okay. Okay. So now we're -- you already have your declaration in front of you. So if you could turn to -- or I think it's the bottom of the page of paragraph 21. You said, I was aware how vulnerable we were in the terminal.
Why did you think you were vulnerable?
A Sorry?
Q It's the very bottom --
A Oh.
Q -- line.
A Great. Thank you. Why did I feel like we were vulnerable? It was -- we didn't have our phones or our passports. I mean, for a lot of reasons. We didn't have our phones or our passports. Those are things I really rely on to feel safe, as everyone relies on their phone all the time.
There were -- there was only one other person in the terminal who was a citizen, and he was a trucker, the one that I mentioned.

And something was happening that had never happened to me before.
Q Okay. Have you traveled internationally since March?
A No.
Q Okay. Have you traveled since you signed this declaration in May?
A No.
Q Okay. May 3rd?
A No.
Q So you traveled to the Outer Banks at one point, right?
A Uh-huh.
Q Is that the only time you've traveled?
A Like, on -- yeah.
Q On a plane?
A Yeah. I've, like, driven.
Q Okay. But no other plane travel except for that?
A Right.
Q Okay.
MS. NADEAU: Thank you.
Q So, Dr. Pantos, I've handed you what is, I believe, Exhibit 13, Plaintiffs-000325.
(Exhibit 13 was marked for