**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,

Defendants.

Case No. 26-cv-00092-JAW

**SUPPLEMENTAL DECLARATION OF COLLEEN FAGAN**

I, Colleen Fagan, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years old and a current resident of Portland, Maine. I was born and raised in Maine and have lived here my entire life.

2. This declaration describes my encounters with federal immigration agents on January 23, 2026, and the effects of those encounters on my life since.

**The Morning of January 23, 2026**

3. Early on January 23, 2026, I decided to drive around my neighborhood and watch for ICE activity. I had heard that ICE was patrolling early in the day to detain people as they left their homes for work, so I left my home around 5:30 a.m. I intended to observe and record the activity of ICE agents in my community. The vehicle I drove that day was a black Toyota RAV-4.

4. I observed federal agents twice that morning. The first occurred at about 5:45 a.m. While driving on Westbrook Street in South Portland, I saw three people gathered by two cars stopped on the road near an apartment building I knew to have many immigrant residents. I drove to the opposite side of the street and parked in a public parking spot.

5. The first car was bluish-gray, with a woman sitting in it who did not look like law enforcement. A black SUV was parked behind her. Several people were gathered outside her car. I believed these were ICE or other DHS agents based on their uniforms, the vehicle, and the fact that it looked like they had pulled the woman over. Two wore what looked like bulletproof vests over their coats, and all of them wore masks.

6. I remained in my car while the agents questioned the woman, and after about 20 seconds I began recording with my cell phone. While I recorded, the agents began physically removing the woman from her car. She repeatedly screamed and cried for help and looked terrified. The agents restrained her and placed her in their SUV. I was shocked by the way they arrested her and shouted at the agents from my car. Once she was in the SUV, they drove away.

7. Witnessing this made me feel shocked and disturbed. Hearing the woman scream for help in particular made me feel angry.

8. After a few minutes, I continued driving through South Portland and through the Cortland Courts apartment complex on Westbrook Street. Shortly after 6:40 a.m. I pulled toward the Cortland Courts entrance, where I saw at least two large black SUVs that I believed, based on vehicles I had observed federal agents driving earlier, could be ICE or other DHS vehicles.

9. I parked about 20 feet from the agents' vehicles. Two agents (Agents 1 and 2 in the Complaint) stood outside one of the SUVs, wearing vests with patches identifying them as "POLICE." An additional agent stood on the far side of the SUVs.

10. I exited my car and began recording video with my cell phone, in order to help document and spread awareness about what was happening in my town, and to help protect people who were being questioned and detained. I walked toward the agents but stayed about 15 feet away. I also recorded two additional agents sitting inside an SUV; when I began recording, they closed their door and drove back from the other vehicles.

11. Another observer, who had been in a black car near the leasing office, also got out of his vehicle and began recording the agents.

12. After I began recording, Agents 1 and 2 walked toward me and took out their phones, appearing to record me. Agent 1 came within a couple of feet in front of me and held his phone up to my face, then returned to his vehicle. Agent 2 walked behind me toward my car, stopped in front of it, and appeared to record or scan my license plate. He then walked back toward me and the other agents, passing within a couple of feet in front of me, and also appeared to record the other observer.

13. As he walked past, I told Agent 2 it was not illegal for me to record him. He replied, "Exactly, that's what we're doing." I asked why he was recording my face and license

plate. He replied, "Cause we have a nice little database and now you're considered a domestic terrorist, so have fun with that."

14. This made me nervous, and caused me to laugh and ask, "For videotaping you? Are you crazy? I'm a domestic terrorist?" I also sarcastically asked if the agent needed therapy and told him to go away.

15. Agents 1 and 2 returned to their vehicles along with the third agent.

**Immediately Afterward**

16. I returned to my car and tried to collect myself. After a few minutes I called my sister to tell her what had happened, because I was in shock. This interaction left me feeling overwhelmed and concerned about what would happen next. The agent telling me I would be placed in a domestic terrorist database made me afraid that I might be retaliated against for observing and recording ICE activity in my community.

17. After a few minutes I left the parking lot and continued driving through nearby neighborhoods for a period of time, attempting to observe any additional agents. Not long after, I stopped and drove to work.

18. Later that day, I shared the video I had recorded with my sister, who posted it to social media. The video quickly went viral.

19. Because of the encounter and how public it became once the video was posted, I took the rest of that day off work due to the stress, fear, and anxiety I was feeling, and I obtained permission from my supervisor to work from home the following Monday. I discussed with him both my need to take the time off and my fears about the potential future impact of this incident on my work.

20. I was afraid that agents would come to my house. I stayed at a friend's home for several days after January 23, 2026 because I did not feel safe in my own home. When I returned home, I was afraid that someone would identify me from the video and come to my house to target me. I spoke with my sister by phone on my first night back about how frightened I was. In the days that followed, I also saw a suspicious car with out-of-state license plates parked near my home, and I spoke with my sister about it. I did not know then, and do not know now, whether it was connected to the encounter, but seeing it frightened me. To this day, when I see SUVs with dark windows that resemble ICE vehicles, I become nervous.

**The Months That Followed**

21. Before January 23, 2026, I intended to continue observing and recording immigration enforcement activity in my community on an ongoing basis. After the encounter, I largely changed my mind.

22. There were ICE arrests in Greater Portland in the days immediately following January 23, 2026, during the final days of the enforcement surge I did not look for opportunities to observe or record any of them, because of how overwhelmed I was.

23. For a period of several months, I chose not to look for enforcement operations to observe and record. One of the primary reasons was the January 23 encounter and my fear that the government would retaliate against me because of it—in particular because an agent had told me that ICE had a database and that I was considered a domestic terrorist. If not for that encounter, and especially if not for being called a domestic terrorist, I would have continued to look for opportunities to observe and record earlier in the year.

24. To the best of my knowledge, there have been many reported ICE sightings in my community in Greater Portland since January 2026. I believe I could have observed and recorded

at least some of them. Because I was dissuaded from observing, I did not keep track of each and every opportunity I decided to forgo.

**Recent Activity**

25. More recently, between May and August 2026, I have gone out on a few occasions to look for enforcement activity to observe and record. I have not had a confirmed sighting on any of those occasions and have not recorded anything.

26. I have resumed doing this to a limited degree because I believe it is important to do something in response to ICE operations in my community. Although I continue to have the fear described above, I have looked for ICE activity more recently for that reason. I also have a demanding work schedule and in some instances have not been able to respond to a reported sighting in time to observe and record it.

27. I am aware from public reporting and social media that ICE operations in Greater Portland peaked during Operation Catch of the Day in January 2026, but that ICE arrests are still occurring in Maine today. I think that I would be more active in trying to document this ICE activity if not for my experience in January.

28. I want to continue seeking out opportunities to observe and record immigration enforcement activity in the Greater Portland area going forward. If not for the January 23 encounter and my fear of retaliation, I likely would do so substantially more than I do now. After what happened to me in January, knowing that I might interact with ICE causes me increased anxiety.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026.

*/s/ Colleen Fagan*
Colleen Fagan