**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 26-cv-00092-JAW |

**SUPPLEMENTAL DECLARATION OF CARLYN WILLIAMS**

I, Carlyn Williams, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years old and a current resident of South Portland, Maine. I was born and raised in Maine. My spouse is Polyxenia Pantos, who is also a plaintiff in this action.

[redacted]

2. [redacted]

3. [redacted]

4. [redacted]

5. [redacted]

6. [redacted] Because of this, I have not traveled internationally since March 2026 and do not plan on doing so.

**The January 20, 2026 Enforcement Action and Phone Call**

7. On the morning of January 20, 2026, my spouse, Xenia, took my car to drive to work. My car is a blue Chevrolet Bolt that I have owned since 2024. Xenia often drives my car instead of their own because mine is electric and their job requires substantial driving around the city.

8. I was not present at the detention Xenia observed that morning. I did not observe it, did not record it, did not speak to any agent, and was not even near the location.

9. Around 10 a.m. on January 20, Xenia tried to call me multiple times. I was on a call with my accountant and unable to answer at first, but then I decided to pick up after seeing that Xenia had tried to reach me several times. Xenia was crying and extremely upset about what they had just seen. They told me they had just stopped to observe an ICE operation, and agents in military garb had taken a man on the side of the road.

10. It was the first day of ICE's escalation in Maine, and there were many reports of ICE operations around Portland that day, although Xenia's call was the first I had personally heard of any ICE activity that day.

11. Later that afternoon, around 3 p.m., I learned of reports that ICE agents were active in a nearby neighborhood with a large immigrant community where children were expected to be dropped off from school. A friend picked me up at my house and we drove to the location where agents had been reported. It was around school pickup time, and we wanted to be present at the bus stop to show support for our community, make sure kids got off the bus and back home safely, and witness and record any arrests by ICE agents.

12. We arrived at the location of the reported sighting and parked in a nearby parking lot. At that point, there were no ICE agents in the area.

13. At 3:17 p.m., while sitting in the parking lot, I received a phone call from a "No Caller ID" number.

14. I answered the call, and the person on the line asked, "Is this Carlyn Williams?" I asked who was calling, and the person said, "This is the Department of Homeland Security." I confirmed I was Carlyn Williams. The person then asked, "Does anyone other than you ever

drive your vehicle?" I responded, "No, not really." The person repeated a version of the question and asked if I was sure. I said, "Well, sometimes my spouse drives it." He said something like, "Was she driving it this morning? Are you aware that she stopped at an incident?" I believe he may have also said Xenia had taken photos and videos. I was disoriented by the questions and gave a non-committal response along the lines of, "I'm not sure." The person then said something like, "You should encourage her not to do anything like that in the future because people who are doing things like that might get added to a domestic terrorism watchlist." The call then ended. At no point during the call did the caller indicate that Xenia had interfered with an arrest.

15. In total, the call lasted approximately one minute. The person on the call never provided his name or any identifying information other than DHS.

16. I felt scared and shaky after the call. The friend I was with called another friend who is a lawyer. None of us had heard about any observers or protestors receiving calls from DHS agents.

17. At the time, I did not understand who had called me or how he had obtained my information. Xenia later told me they had seen an ICE agent take a photo of someone else's car during the encounter that morning, so I assumed an agent had photographed the license plate on my car as well.

18. I also later viewed a video on Instagram of an immigration operation in Portland, which Xenia told me was a video of the incident they had witnessed. Near the very end of the video, an agent wearing a camouflage vest and a baseball cap can be seen holding up his phone and apparently recording the person who was filming the video. Because Xenia was at the

incident as well, I believe this agent may have recorded my license plate and used it to find my cell phone number. I do not recall providing my cell phone number when registering my vehicle.

19. The caller's questions made me feel particularly uneasy and vulnerable. I found it strange that the caller immediately asked whether someone else drives my car, instead of asking whether I had been observing the arrest that morning. I assume the caller had accessed a photo of me and realized I was not the person they encountered earlier in the day. It also made me uneasy that the caller immediately referred to Xenia, who uses they/them pronouns, as "she" when asking whether my spouse had been at the incident that morning. I understood that to mean the caller knew I am gay.

20. I felt scared to drive my car that week, knowing that someone had my information and could be tracking me. I was on high alert when driving around town, always aware of who was following me and worried it might be an ICE vehicle. Xenia held the same fears and did not drive my car to their job for several weeks until it became unavoidable for economic reasons.

21. I also worried for our safety at home, where we had a foster child living with us at the time. After the phone call, Xenia and I discussed the need to take additional safety measures such as buying a gun for protection and having a plan for leaving our home if necessary. We also considered changing my license plate.

**My Observation Activity After the Phone Call**

22. During the January ICE escalation in Maine and the weeks following it, I was a member of between seven and ten group chats on the messaging app Signal in which people shared information about ICE activity in Maine. I was never an administrator of any of those chats. I joined them because I wanted to know what was happening in my community and to be able to respond when enforcement operations occurred near me.

23. The phone call made me hesitant to observe and record ICE operations. I did not avoid doing so entirely, but I changed how I did it. I observed on two occasions after the call, both on January 22, 2026, and on both I made sure I was in someone else's car, because Xenia and I had agreed it was not safe to use our own vehicles. I would not have gone out at all that day in my own vehicle.

24. On the morning of January 22, 2026, I learned that my friend was going to drive through South Portland to attempt to observe and record ICE activity. Although I was more hesitant after the January 20 phone call, I felt it was still an important exercise of my First Amendment rights, and I decided to go in large part because I would be with a friend and in their vehicle rather than my own. At approximately 9:17 a.m., I called my friend and asked if they would pick me up. After driving for a few minutes, we saw what appeared to be an ICE vehicle in a parking lot in South Portland. We also noticed several other observers in their vehicles who appeared to be observing the same ICE vehicle. Nothing happened for several minutes, and then the ICE vehicle suddenly left the parking lot. My friend and I attempted to continue observing at a reasonable speed and distance, but immediately lost sight of it. I asked my friend to drop me off around 10 a.m. so I could go to work.

25. Later that afternoon, I learned my friend planned to drive through Redbank in case there were opportunities to observe and record. Earlier that day I had seen several reports of ICE activity in Redbank, a diverse community with a large immigrant population. As with the morning, I was hesitant, but I decided to go because the opportunity was with a trusted friend and in her vehicle rather than mine. At approximately 4:07 p.m., I called my friend and asked if she would pick me up. After driving to Redbank, we spotted what we believed to be an ICE vehicle parked at a corner. We continued observing as it drove toward Westbrook. I noticed one

other vehicle that also appeared to be driving behind the ICE vehicle and observing. Both my friend's vehicle and the other vehicle drove the speed limit and at a reasonable distance from the ICE vehicle at all times.

26. I recall seeing a message from the other observer in a Signal chat stating that they had seen ICE take a picture of their license plate.

27. After a few minutes, the ICE vehicle made a sudden U-turn, and we did not attempt to continue observing it. My friend and I drove back to Redbank, where we noticed a woman parked in a vehicle who we believed to be another observer. We pulled up next to her and noticed she appeared very shaken. We asked if she was an observer and if she was alright, and she said she had been observing an ICE vehicle and had clearly seen an agent take a photo of her license plate. Approximately an hour after my friend picked me up, she dropped me off at home.

28. After the March 16, 2026 encounter described below, my friend told me that she also recalled seeing ICE take a picture of her license plate during the encounter on the afternoon of January 22, 2026.

29. Other than those two occasions on January 22, 2026, I did not seek out opportunities to observe or record ICE activity between January 20 and March 16, 2026, even though I was aware of many. Xenia and I live close to Redbank and Cash Corner, two neighborhoods in South Portland where ICE sightings were reported very frequently during this period. I chose not to respond because I was afraid of interacting with agents.

**The March 16, 2026 Border Detention**

30. Starting on March 13, 2026, Xenia and I took a trip to Quebec City, Canada, for our anniversary. We crossed the border from Maine into Canada at the Jackman Border Crossing without issue, driving Xenia's Hyundai.

31. On the afternoon of March 16, 2026, Xenia and I arrived at the Jackman Border Crossing to return to Maine. Xenia was driving their car and handed our passports to the CBP agent, who later told us his name was Brad Guay. Agent Guay scanned the passports and then told us to pull into the first lane and get out of the car. He then took our phones and car keys and instructed us to go into the building and have a seat.

32. Approximately five minutes later, Agent Guay called us up and asked, "Carlyn, do you have your car registration?" Xenia responded that we were driving in their car. The officer said something like, "I understand that, but do you, Carlyn, have your car registration?" I told him no, because it was in my car at home. He then asked what car I drive, and I said a Chevy Bolt. As I responded, I observed Agent Guay referencing his computer screen as though he was viewing information about my vehicle. He asked for my license plate number, but I said we didn't have it.

33. I felt very nervous throughout the encounter, and I remember shaking and feeling my heart racing. When we were first asked to pull over, I expected we would be able to leave after a couple of minutes and continue on our way. I grew more and more anxious the longer we were held there without explanation.

34. I was especially nervous when we asked to use the bathroom and the woman behind the counter said something like, "I don't know what you're in for, so I need to check with him," meaning Agent Guay. It seemed as though we were under investigation and not free to leave.

35. Agent Guay told us he was going to search our vehicle and asked if we had anything he should be aware of. We told him that we had wine and food in the car, and he said he

didn't care about that. We watched from the waiting area as Agent Guay searched the car and our bags.

36. We continued waiting after he completed the vehicle search. Agent Guay seemed to consult with multiple other agents, but we could not hear what they said. After some time, I approached Agent Guay to ask what was going on and to make clear that Xenia and I are United States citizens. He tapped our passports and said, "I can see that," but he did not provide any additional information. I asked if we could answer any questions for him, and he said, "Not yet."

37. Finally, about an hour after we arrived, Agent Guay called us up and told us something like, "You'll be free to go soon, but I need to collect some information first." He asked what we do for work, where we had stayed in Canada, and our home address, and said he needed it to complete a report. We provided the information he requested and asked for his name.

38. Before we left, I asked Agent Guay if he could tell us why we had been stopped. He said I had an agricultural violation relating to a dog when I entered the United States through Mexico a long time ago. I responded that I had brought a dog into the country in 2015 when returning from Peru with a layover in Mexico, but I had done so legally and had never been told before that I had committed a violation.

39. I have traveled internationally at least ten times since 2015, including crossing the Mexico border at a land crossing in 2023. I have never had an issue entering the country and have never been told there is a violation on my record.

40. I believe the reason Xenia and I were stopped and detained at the border is directly related to the January 20 encounter, when a DHS agent must have taken down my license plate information because Xenia observed and recorded their activities. I believe that based on the timing, the fact that I have never had an issue crossing the border before, and the

fact that Agent Guay's first substantive questions to us were about my car and license plate. That struck me as particularly strange since we were driving Xenia's car and neither of us had previously mentioned owning another vehicle.

41. My car registration was up to date at all relevant times and did not expire until May 31, 2026. I cannot think of any other reason why CBP would have asked about the car registration if not for the January 20 encounter. I have had the car since 2024 and have never driven it across the border.

42. I felt very shaken after our detention at the border and needed time to process the experience. It is especially concerning to be tracked by the government as a married gay couple, given the current political climate.

**The Effect on My Activity**

43. After the experience at the border in March, I left the Signal group chats where I had previously learned about ICE sightings. The border detention confirmed my fear that I had been placed on a government list, and it now felt too risky to be connected to that activity at all.

44. I have not observed or recorded any immigration enforcement activity since January 22, 2026.

45. I am aware from public reporting and from living in my community that ICE has continued conducting immigration enforcement operations in Maine, including a significant increase in activity in the Greater Portland area beginning in May 2026, and that such operations continue today.

46. During the increase in enforcement activity in May 2026, I wanted to return to observing and recording. I discussed this with two of my friends, and told them how much I

wanted to go out again and why I did not feel it was safe for me to do so. I ultimately decided against it.

47. I want to observe and record immigration enforcement activity in my community, and I intend to do so if I am able. If not for the January 20 phone call, the March 16 border detention, and my knowledge that [redacted] I would rejoin community Signal groups to the extent possible and I would respond to enforcement activity in my neighborhood as I did on January 22, 2026. I am not doing so because I believe it would expose me and my family to further government retaliation.

**Ongoing Harm**

48. Xenia and I have significantly changed our travel plans. In April 2026, we considered cancelling a domestic trip to the Outer Banks, North Carolina, out of fear that I would be detained at the airport. We ultimately chose not to cancel, but I experienced intense anxiety during our travel days.

49. We have also decided not to travel internationally. In fact, my spouse and I intended to go on a bike-packing trip in Nova Scotia with friends this September, but decided against it because of our experience in March. Knowing that I would likely be flagged at the border would have caused me an immense amount of stress during the trip. I also was concerned that if our friends traveled with us, [redacted].

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026.

*/s/ Carlyn Williams*
Carlyn Williams