**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 26-cv-00092-JAW |

**SUPPLEMENTAL DECLARATION OF ELINOR HILTON**

I, Elinor Hilton, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years old and was a resident of Portland, Maine at the time of the events described below. As of September 2026, I moved to Boston, Massachusetts, temporarily, but plan on returning to Maine next year for school.

**Observation Activity Before January 21, 2026**

2. I have been a member of community group Signal chats formed in January 2026 in response to the surge of Department of Homeland Security agents conducting immigration enforcement operations in Maine. Members share information about enforcement activity in their neighborhoods so that people can observe operations in public, document what is happening, and bear witness. I have never been an administrator of any of those chats.

3. Before January 21, 2026, I observed and recorded ICE agents on two occasions. I also attempted to observe on a few other occasions, but agents were no longer at the reported location by the time I arrived.

**The Morning of January 21, 2026**

4. On January 21, 2026, I took the day off work to observe ICE operations in Portland. I did so using my Toyota, which is green and has a lot of bumper stickers and distinctive red racing stripes on the front and sides.

5. Earlier that morning, before the encounter described below, I learned of a possible ICE sighting and drove to the location. I saw the reported vehicle parked on the side of a street and parked about 20 feet behind it. I got out and took photographs of the vehicle before the agents drove away

6. I then got into my car and drove behind them, staying several car lengths back, for a few minutes. At one point they drove into a parking lot and I followed. While we were both in the lot, I saw one of the agents reach his hand out the window and photograph my car. I was concerned and anxious about my car being photographed, particularly because I intended to continue observing enforcement activity. I continued driving behind them briefly before losing them, and went home around 10 a.m.

**The January 21, 2026 Encounter at Home Depot**

7. At approximately 11:30 a.m., I went out again to drive around South Portland. I saw a message in a community Signal group that there were ICE agents at a nearby Home Depot. I drove there and pulled into the southwest end of the parking lot, where I saw two groups of people with vehicles tucked into a corner near the garden center. I believed these were ICE or other DHS agents based on their uniforms and vehicles and the fact that they appeared to be detaining someone.

8. The groups were staggered. The first group consisted of two vehicles and at least two agents (Agents 3 and 4 in the First Amended Complaint), who were using their vehicles to block the second group of agents and their approximately five to six vehicles, which were farther back in a corner of the lot and appeared to be detaining one or more individuals.

9. I parked in a public parking spot about 20 feet from the first group. I did not notice any other observers there when I arrived. I got out, began filming with my phone, and cautiously walked toward them. I began filming because I wanted to document what the agents were doing, in case they violated the law or used excessive force during the detention.

10. I slowly approached Agents 3 and 4, holding my phone out in front of me. When they saw I was recording, Agent 3 pulled out his phone and held it up to record my face and my car.

11. Agents 3 and 4 and their vehicles were positioned so as to block my view of the detention, which was taking place about 75 feet behind them. I walked around them to get a better view, keeping my distance as I passed.

12. As I approached the second group, another agent (Agent 5) walked toward me and said, “You stay back.” I replied, “I can record.” Agent 5 responded, “Absolutely you can. I just

want you to stay right there for me, that's all I care about." I repeated, "I can record." He again responded, "Absolutely. 100% you can. I just ask you to stay right there."

13. As Agent 5 instructed me to stay where I was, approximately 35 feet from the second group, Agent 3 got into his car, drove around me, and swerved in front of me, again blocking my view. He then got out and started filming my face again.

14. I again walked around Agent 3 and his car to get a better view of the second group and the person or people being detained.

15. Two other agents from the group involved in the detention (Agents 6 and 7) walked toward me. Agent 6, who was carrying pepper spray, said, "You have like 5 friends on Facebook nobody wants to see you. Just go back over there alright." I replied, "I'm just recording," to which he responded, "We're still gonna do what we do, alright." I said again, "I'm just recording." Agent 6 replied, "Your whistles—you're not gonna stop nothing."

16. At this point I stopped walking toward the detention area. I repeated, "I'm just recording." Agent 6 gestured toward me and said, "Get back." I continued to film and told him, "This is my right, I know my rights."

17. As Agents 6 and 7 turned to walk away, Agent 3 stepped in front of me holding his phone as if to film me. Blocking my view of the back corner, he said, "Yeah you can film, just let them…" I responded, "I know I can film." Agent 3 replied, "Yeah, okay."

18. I stepped to the side of Agent 3 so I could see the back corner more clearly, but I did not move closer to the other group of agents. I said, "And I'm gonna film what they're actually doing, cause I'm allowed to do that." Agent 3 replied, "Oh good for you. Alright. It's a good project."

19. Another agent from the group involved in the detention (Agent 8) then approached me holding up his phone as if recording. He came within approximately six inches of my face and thrust the phone directly in front of me, holding it there to film me.

20. After a brief moment, Agent 8 stepped back slightly and asked Agent 3, who was still filming me, "Which car did she get out of? Was it this car?" Agent 3 responded, "I got em, I got em. Yeah I got em." Around that time, I briefly stopped filming because I was startled at how close Agents 3 and 8 were to me.

21. I remained where I was, continuing to comply with the instruction not to move closer. As I filmed, Agent 8 put his phone away and walked toward the back corner where Agent 5 was standing. Agent 5 asked, "What's up?" Agent 8 replied, "It's alright, she's just going on a domestic terrorist watchlist. I just want to put it in." Agent 5 responded, "Absolutely, go for it."

22. Up to that point I was the only person in the parking area who appeared to be observing. At about this time, another person arrived and began watching and filming as well.

23. The other observer stood near me, in the same place where Agent 6 had told me to stop a few minutes earlier. We filmed the agents and the detention behind them, though it was difficult to see because agents positioned themselves to block our view. While we stood there, one of the agents said, "If you get any closer, you will be sprayed!" Agent 5 said, "Did you hear what my partner just said?" An agent near the detention area then said to Agent 5, "Let her get closer," and Agent 5 stepped several feet back.

24. While I continued to film, Agent 8 said to the other observer and me, "We're gonna do the same thing. Just for a warning, we're putting you into a watchlist." Moments later, Agent 6, who was standing directly in front of me and brandishing pepper spray, pointed to the observer to my left and said, "Take a picture of this guy. We'll put him on the watchlist," while

performing a dance known as “flossing.” He then yelled toward the other observer, “Alright, don’t be scared now.”

25. During this time, Agent 6 asked the other observers and me, “Are you all getting paid for this?” Over the course of about 15 minutes, approximately four to six additional observers arrived and also began watching and filming.

26. A large number of additional agents then arrived—approximately ten to fifteen, in four to five large SUVs. Many wore helmets and vests and carried what appeared to be paintball or pepperball guns.

27. The agents told me and the other observers to move farther away from the back corner. We all complied and moved back as instructed. We stood where we were directed and continued to watch and film from that location for approximately ten more minutes.

28. While I filmed, the agents stood in front of us, and I was unable to see or record what was happening to the detainee or detainees.

29. From where I stood, it appeared that agents loaded one or more people into a van. Most of the agents then returned to their vehicles and left the lot. I stayed a few more minutes with a small number of other observers before getting into my car and leaving.

**The Immediate Aftermath**

30. Immediately after leaving the parking lot, my boyfriend called me. I told him what had happened and was really shaken.

31. I continued driving around South Portland for approximately 30 minutes. During that time I drove to the parking lot of a different housing complex in the area, in case there were agents there. I did not see any, and I was only there a few minutes before the shock of the day set in. I became very anxious and stressed and decided to leave.

32. I went to my brother's home to tell him and his partner what had happened. When I arrived, I immediately broke down and began crying. I was overwhelmed, to the point that they needed to help me calm down. I continued to cry as I told them what had happened. I felt shaken and was worried, based on what the agents said, that ICE might come to my home or otherwise retaliate against me. I also talked to several friends and family members about what had happened and how upset I was.

33. My brother and his partner expressed concern for my safety and suggested it might be safer for me not to sleep at my home that night. A few hours later I briefly returned home to pack an overnight bag, then went to a friend's house, where I spent the night.

34. I also spent a large portion of the following day at my father's house rather than at my own home. I did not want to be home that day, out of fear that agents would follow through on the threats they made on January 21st.

**The Week Following the Encounter**

35. In the week following the January 21 encounter, I became aware through the community Signal groups of a large number of opportunities to observe enforcement activity. I estimate there were approximately fifty such opportunities that week.

36. I hardly pursued any of them. I went out twice. On one occasion I rode as a passenger in a friend's car rather than driving my own vehicle, because I was concerned about being recognized and retaliated against if my car were seen. On another occasion I went out on foot. I did not see any confirmed enforcement activity either time.

**Observation Activity After That Week**

37. After that first week, and before May 2026, I attempted to observe on approximately five to ten occasions. I learned of several other opportunities through the same Signal groups and did not pursue them, in large part because I was worried and scared about being recognized or retaliated against, though in some instances I was also unable to participate because of work or other obligations.

38. On two of those occasions I went to locations where enforcement activity had been reported in order to verify whether it was occurring and to document it, but I did not encounter any agents. On both occasions I felt much more anxious and scared than I had before January 21.

39. On one of those occasions I returned to the same Home Depot where the January 21 encounter occurred. While I was there, I experienced what felt like a panic attack. My heart rate increased, my breathing became faster, I began sweating, and I felt anxious and unsettled. I left shortly afterward.

40. Since January 20, 2026, I have become aware through the community Signal groups of a large number of potential opportunities to observe enforcement activity in Maine. I cannot give an exact figure, but I estimate there have been at least a hundred.

41. From May through August 2026, I have attempted to observe enforcement operations approximately twenty times. Most of those attempts were unsuccessful because agents were no longer at the reported location by the time I arrived. On a handful of occasions I was able to observe and record.

**May 19, 2026**

42. On the morning of May 19, 2026, I learned of a potential sighting of agents and drove at around 9 a.m. to the area near Deering Avenue and Sherman Street in Portland, where I saw what I believed to be one or more ICE vehicles. Along with other observers, I drove behind those vehicles from a safe distance, on and off, until they arrived at a parking lot at Elm Street and Oxford Street, across from a nonprofit organization that serves immigrant communities. Agents there were detaining a man.

43. I parked on a nearby street at approximately 10:20 a.m., entered the parking lot, and began filming with my phone.

44. As I approached the agents, one of them told me to move back while he moved very physically close to me. I thought he was trying to prevent me from filming. I did not step back immediately but ultimately did end up taking steps backward. I said to the agent that I was filming and that it was my right to film what they were doing.

45. During this exchange, the agent knocked my arm. I did not initiate any physical contact with him, but another agent shouted words to the effect that I would go to jail if I touched an officer. I was upset and responded that the agent was touching me.

46. I asked the man who was being detained if I could call someone for him and told the agents that he needed his medicine.

47. The first agent told me to step back again as he was getting into his car, and I did.

48. I was not detained or arrested, and I have not been charged with any offense arising from that day. Along with other observers who were also present, I continued filming until the detention was complete and the agents began leaving the area.

**June 2026**

49. During the week of June 8, 2026, while in the Redbank Village neighborhood, I saw what I believed to be an ICE vehicle. I drove behind it at a safe distance for a short period, and when it drove off I did not attempt to follow.

50. On June 16, 2026, at around 8 a.m., I was parked near the intersection of Westbrook Street and Macarthur Circle, near the entrance of the Redbank Village neighborhood, when I saw a vehicle I believed to be an ICE vehicle. I drove behind it at a safe distance for approximately 45 minutes, following all traffic laws. I wanted to be present to observe and document any detention that the agents in the vehicle might conduct out in public.

51. After a while I noticed the vehicle was driving away from South Portland, where most arrests have occurred, which struck me as strange. It drove through several neighborhoods and then turned onto a street in a neighborhood where I used to live—and then onto the street I used to live on. It stopped outside the address listed on my driver's license for at least 20 seconds. I pulled over and parked several car lengths behind it. Several other cars drove past during this time.

52. At that point I had a feeling of impending doom and was very scared and anxious. After at least 20 seconds the vehicle drove away at a normal speed, and I followed at the same safe distance for a few more minutes. At several points during this encounter I saw the driver of the vehicle wave at me jokingly and appear relaxed in demeanor. The vehicle eventually drove onto a highway, at which point I lost sight of it and did not attempt to follow.

53. The address the vehicle stopped in front of is the address listed on my driver's license, and my father still lived there at the time. Seeing an agent drive to an address associated

with me and my family, stop there, and then wave at me confirmed my fear that agents had my information and could locate me.

54. On June 17, 2026, at around 8 a.m., I was parked near the entrance to Redbank Village in South Portland when I saw two vehicles I believed to be ICE vehicles turn onto Westbrook Avenue and drive toward Brickhill Avenue. I drove through Redbank into Brickhill, where I saw one of the vehicles idling on Townhouse Drive. I parked in the space behind it and remained in my vehicle, observing. I also took a photograph of the vehicle. After idling for about 20 minutes it drove away, and I drove behind it at a safe distance for about three minutes before losing sight of it in traffic.

**Ongoing Effects**

55. I have avoided participating in mutual aid efforts that would require using my car. I did not participate in a food delivery effort for people who did not feel safe leaving their homes, because I feared the government would use the information it collected about me and my vehicle to retaliate against me. I also stopped participating in a school watch program I had volunteered with for several months, in which neighbors stationed outside an elementary school during pickup and drop-off alerted people if ICE vehicles were seen nearby. I stopped for the same reason.

56. Because agents recorded my face and my car, I am afraid that an agent might recognize my car, follow through on what they threatened, and come to arrest me. I stopped using my car for anything related to observation or protest. More recently throughout the summer of 2026, I have only attempted to observe at locations where I can walk from home or work. I also began parking farther away from whenever I do drive somewhere, including my

own house and my brother's home, because I am afraid someone might identify my car and figure out where I live.

57. I have changed the way I travel. On a recent personal trip, I did not take my personal phone with me. I am worried that if I have been put on a list or in a database, it could give agents a reason to pull me aside and question me, look at what is on my phone, or arrest me. I intend to take these precautions any time I travel in the future.

58. On that same trip I was much more nervous and anxious than usual about flying, and I was worried that my movements or communications could be monitored.

59. I have restricted where I plan to travel. Having been recorded and photographed and told I was in a government database, I remain worried about being detained when traveling internationally, and I do not intend to travel internationally at this time. For example, my brother and his partner were vacationing in Canada all summer and invited me to join them several times. I declined because of my interactions with ICE and what I've learned about Carlyn Williams' experience from this case. I am also concerned that I could be placed on a "no-fly list" or a similar watchlist that could affect my ability to travel in the future.

60. I have become much more cautious about my online presence. I made my Instagram account private.

61. I am an artist, and I no longer attach my name or social media handle to artwork I create. I have also asked community organizations and others I create art for not to credit me publicly for my work. I have done this because I am concerned that law enforcement might use publicly available information to identify or target me.

**Ongoing Interest in Observing**

62. I am aware from public reporting, social media, and from my daily experience in my community that enforcement operations have continued in Maine and are continuing today.

63. Even though I have moved to Boston temporarily, I will be visiting Maine often and I want to be able to observe and record immigration activity in both Boston and Maine when there are opportunities. If not for the January 21 encounter, the threats agents made to me that day, the events of June 16, 2026, and the July 13 shooting of a community member in Maine by ICE agents, I would do so substantially more often, and without the precautions I now take.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026.

*/s/ Elinor Hilton*
Elinor Hilton