**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,

Defendants.

Case No. 26-cv-00092-JAW

**DECLARATION OF HILLARY NEFF**

I, Hillary Neff, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years of age and a current resident of Portland, Maine.

2. On January 20, 2026, I was driving to work and came upon what I thought was a traffic accident near the corner of Washington and Allen Avenues in Portland. As I approached the intersection in my car, I realized it was ICE agents detaining someone.

3. I care about advocating on behalf of immigrants in my community and had recently finished an online training about how to film ICE as a form of solidarity, advocacy, and protest. I participated in this training and was prepared to record ICE activity because I care about my community and neighbors, including immigrants and their families. I learned that I had a First Amendment right to record law enforcement activity in public so long as I did not interfere with their law enforcement activities.

4. I think it is important to record ICE activity because of the way in which they have been engaging in ambush detentions, leaving families without information and basically just disappearing people. I was prepared to record and document this law enforcement activity in order to alert and protect my community from the chaos and cruelty of ICE, to hold them accountable for abuses, and to help if the people they detain disappear.

5. I parked my car in a laundromat parking lot, got out of my car, walked about 30 yards and started filming with my phone from approximately 45 feet away from where a man in handcuffs was standing outside of his vehicle with an ICE agent. As I walked forward, I filmed the ICE vehicles and agents who had surrounded a victim of ICE who was in handcuffs outside his vehicle. I first recorded information about the ICE vehicle stopped in front of the victim's vehicle. At that point, I was approximately 30-35 feet from the victim who was located near the front of the rear door on the driver's side of his vehicle in handcuffs.

6. Approximately 15 seconds after I started filming, I approached the next set of vehicles to record the agents' activities and to gather information about the vehicles driven by

the victim, a silver Chevrolet Equinox SUV, and the ICE vehicle that had pulled up next to his car, a large grey Nissan SUV with flashing red and blue interior lights indicating it was law enforcement.

7. In order to help identify the person detained and those responsible for the detention and any abuse I witnessed or that followed, I walked a few feet in front of the victim's vehicle and held my phone out to record his license plate and the plate of the ICE vehicle next to him. I was about 10-12 feet away from the closest ICE agent (Agent 1), who was detaining the man, and only for about 2 seconds. I was already stepping back onto the sidewalk when that same agent said to me "you need to get out of here." Because I had just taken the training on how to safely and lawfully record ICE and knew that I had the right to observe and record ICE activity so long as I did not interfere with law enforcement activity, I replied simply and calmly that "I don't need to get out of here." I said this because I had not interfered, and did not, interfere with their enforcement activities. The detained man was calm, and there were about 6 ICE agents casually milling around.

8. The agent who told me to "get out of here" then said "step over that way or you're in cuffs next." At this point, I had stepped back to approximately 20 feet from the agent threatening me and the man in handcuffs. I was standing on the sidewalk. The road and sidewalk had been shoveled or plowed and there were snow banks on both sides of the sidewalk. An agent with glasses and wearing an HSI vest (Agent 2) casually walked toward me. The agent with glasses walked to within a foot in front of me and blocked my view of the activity that I was filming. I held my camera up higher to capture the detention. I did not engage with this agent even though he was attempting to block my camera view, and to physically threaten me by

approaching me and standing within inches of me. He was taller and much bigger than I, wearing full tactical gear and wearing a mask pulled up to just below his glasses.

9. I took a step back and to the left to record the detention as Agent 1 was walking the victim toward the back of his vehicle – still about 20 feet away. I continued narrating and documenting what I was seeing for the recording, counting the number of ICE agents. Agent 2 was not even looking at me as I was doing this. As they were moving the detained man backward, I walked a few steps forward on the sidewalk to continue filming. I kept the same radius away from the detention.

10. Agent 2 then said to "just stand back over there." He did not say or gesture where "over there" was. I quietly continued filming from a safe distance, 20-25 feet from the enforcement activities. He said that I could film but to back up. I said politely that I was "fine where I am." The agent with glasses said "but we're not" and inexplicably said that I was starting to interfere – even though I was not interfering and nothing had happened to indicate any interference. He then walked himself into me. This was scary and I immediately said "you're touching me" after which he falsely said "no, you're touching me." He then told me that I "had been warned." He was clearly trying to intimidate me and deter me from recording and exercising my rights, or to record from a distance that would not allow a clear view of the detention. At this point, the man being detained was near the rear of his car, still on the driver side, and I was approximately 25-28 feet from the enforcement activity.

11. Although I stood my ground and continued to record, I was not aggressive or rude to the agents during this interaction. The agents did not appear to be concerned about my presence based on their actions, and their threats appeared aimed at deterring me from effectively recording the detention. No one had their hands on their weapons and most of the time no agent

appeared to have any safety concerns. Although I continued to record when the agent falsely said I was “starting to interfere,” he gave me no more directions and no interference took place. No agent explained how I was allegedly interfering. This is likely because I was simply filming ICE activity.

12. After about 1 minute and 40 seconds from the time I parked and began recording, agents loaded the detained man into the grey Nissan SUV with the interior flashing lights. The ICE agents got into their vehicles after that and drove away. I recorded as much information about what I had witnessed as I could. I feel it is the least that I can do to try to help my community, to help families locate their loved ones, to help the victim’s family find their family vehicle, and to know what happened to him. I believe filming ICE helps to hold agents accountable, sheds light on their actions, and maybe even deters their aggression.

13. At one point during the interaction I recorded another ICE agent use a cell phone to record me. I also observed another ICE agent film or photograph my license plate.

14. This interaction was very upsetting for a number of reasons. First, witnessing a man I recognized from my community being abducted was upsetting. Second, the agents who spoke to me threatened to “put me in cuffs” and told me “you’ve been warned” even though I did not break any laws and did not interfere with their activities. Third, the agent in glasses was clearly trying to intimidate me with his size, first walking up to within a foot of me while I was standing on the sidewalk and then physically bumping into me, falsely claiming I had touched him. Given the numerous documented instances of ICE agents creating false narratives to justify violence and arrests, these threats and the false statements by a federal agent created fear, anxiety and uncertainty. I could not believe this was happening to me based only on having the courage

to record what was happening in public and standing my ground when I knew that I had the right to record from a reasonable distance without interfering.

15. At some point another bystander arrived on the scene and I noticed they were wearing a white N95 mask and also observing the ICE activity. This observer was about 30 feet behind me. I did not witness that observer, or any other observer, interact with the agents, speak to any agent, or interfere with ICE activity in any way.

16. The next day, when leaving work at night, there was a black sedan without any license plate that I suspect to have been driven by an ICE agent idling behind me when I left work. It pulled out behind me when I drove away, which was really scary. Because I have a baby at home, I did not want any interaction with ICE at my home so I drove to the Parkside Policing Center where I knew there would be a police car parked out front. I took several turns on my way to this police center and the suspected ICE vehicle followed behind. When I pulled in front of the police car the sedan kept driving.

17. As a result of the intimidation I experienced, I have been reluctant to continue to observe and record ICE activity. I have not observed or filmed ICE agents since this interaction. The fact that ICE had taken images of me, and could easily put pictures they had taken of me on the internet and make false claims, and seemed to have then followed me in a car without plates, made me very unsettled and afraid.

18. I added a deadbolt to my house, which I did not have prior to this interaction, to feel slightly safer from ICE. I started locking my doors, not something I had done before and that I did only because my ICE interaction was so intimidating. I didn't park my car at my house for a week afterward. I was unwilling to drive our daughter to daycare and this forced my husband to have to walk her there and back. The ICE intimidation made me feel unsafe and was very

disruptive. I was anxious because I felt that ICE agents, who are untrained and unprofessional, had my information, know who I was and where I lived, and have the authority to detain and disappear people, might retaliate against me for filming them.

19. I also saw and received the message they sent to other observers who were filming them that they "had a nice little watchlist" and that people were being listed as "domestic terrorists" for observing and filming ICE. This, of course, is frightening and impacts my willingness to stand up to federal agents even though it is more important than ever to do so because the people in power are undermining democracy and victimizing people.

20. My fear of being on some kind of watchlist was proven to be well-founded. This summer, I traveled out of the country to attend a wedding. Upon return to the U.S., I provided my passport to the custom's agent in the airport. After looking at his computer screen, he asked if I had been arrested this year. I told him that I had not. He then asked if I had "harassed a police officer." I told him that I had not.

21. I remembered the interaction I had with federal agents in Maine and told the customs agent that I had filmed an ICE detention. He replied, "OK, that's what it is" and told me that I was going to have to "come downstairs" with him. He then asked how I was getting home and told me I should be prepared to re-arrange my plans for traveling home. I was concerned and obviously nervous about whether I was going to be detained.

22. The agent escorted me downstairs to an area where there were 5-6 other federal agents. He handed my passport to one of those agents and they interacted for a bit. I was then subjected to secondary screening. My belongings were extensively searched and I was interrogated about my trip. The second agent left with my passport for a few minutes to "take a look at something." I was eventually told that I was free to go.

23. Getting pulled aside and detained at the airport returning to the U.S., taken someplace where there were no witnesses, and being subjected to an invasive search and interrogation was jarring. It is especially alarming because it was based on having engaged in what I thought was a fundamental right – to record law enforcement activities occurring in public.

24. [redacted]

25. It's clear that the intent of these agents was to deter me from exercising my right to film federal law enforcement. Sadly, it worked. Based on these two interactions, I am less likely to do so.

26. Although I may nonetheless film federal agents in the future because I feel that it is important for good people to exercise their rights despite the fear of consequences, it will be a scary experience, instead of an empowering one.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026.

/s Hillary Neff