**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,

Defendants.

Case No. 26-cv-00092-JAW

**SUPPLEMENTAL DECLARATION OF POLYXENIA PANTOS**

I, Polyxenia Pantos, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years old and a current resident of South Portland, Maine. My spouse is Carlyn Williams, who is also a plaintiff in this action.

**The January 20, 2026 Encounter**

2. On Tuesday, January 20, 2026, I took my spouse Carly's car—a blue Chevrolet Bolt registered in her name—to work. I often drive Carly's car instead of my own Hyundai, because her car is electric and I spend a great deal of time driving around the city for my job.

3. Shortly before 10 a.m., I was driving from one daycare to another along Washington Avenue. On the side of the road, I saw a group of unmarked cars with tinted windows and several agents standing near them. It was the first day of ICE's enforcement surge in Maine, so I was immediately aware these could be ICE agents.

4. I decided to stop and record the agents' actions. I consider it a responsibility as a citizen to witness the actions of law enforcement, both to make them aware that people are watching and to help hold them accountable for any wrongdoing. I have felt this way ever since witnessing an incident in Boston where police violently slammed a young Black man against a sign.

5. I did not learn about this enforcement action through any group chat or organized alert. I came upon the agents while driving between clients.

6. I looped around the block and parked behind another woman who was filming the agents. I had been wearing a mask while working at the daycare that morning because I was sick, so I put the mask on again and exited my car.

7. By the time I arrived, the agents had completed their arrest, but they continued to stand around and speak to each other. I held my phone up and took a few photos of the agents and their vehicles.

8. I stayed at the scene for about five minutes or so. I did not interact with or verbally engage the agents at all, and I remained at least ten feet away from them at all times. No

agent told me to move back, to stop recording, or that I was doing anything unlawful. I did not interfere with, obstruct, or make physical contact with any agent.

9. At one point, I saw a female agent take a photo of the other observer's license plate. The agent was wearing a vest marked "POLICE HSI."

10. I soon left for work and called Carly, devastated and crying about the fact that federal agents were in our community, treating our neighbors this way.

11. I later viewed a video of the incident I had witnessed on Instagram. Near the very end of the video, an agent wearing a camouflage vest and a baseball cap can be seen holding up his phone and apparently recording the person who was filming the video. I believe I arrived on the scene while that video was being filmed, and I am concerned this agent may have filmed me as well.

12. After work that day, Carly told me about a strange and alarming phone call she had received from an unknown number that afternoon. She said the person on the call identified himself as being from the Department of Homeland Security and asked whether I had stopped at an incident that morning. She said the person warned her that I would be put on a domestic terrorist watchlist if I continued to go to things like that.

13. Carly was not present at the enforcement action I observed that morning. She was at home, on a work call. The only reason agents could have connected that morning to Carly is that I was driving her car, which is registered in her name.

14. Based on our subsequent experience at the border, described below, I am confident that the person who called Carly was a DHS agent. I believe the agent had access to Carly's phone number because he or another agent had scanned or photographed the license plate on Carly's car during my encounter with them earlier that day.

15. The fact that Carly had received a call from someone who clearly knew where I had been that morning made me feel very unsafe and exposed. It was frightening to know that someone had our personal information and could come to our home at any time. We took extra security measures at home after the call and discussed putting together a safety plan and possibly buying a gun for protection.

**The Effect on My Observation and Recording**

16. I have not observed or recorded ICE agents at any time since January 20, 2026.

17. Before that date, I had been a member of approximately five group chats on the messaging app Signal in which people shared information about potential opportunities to observe and record ICE activity in Maine. I was never an administrator of any of those chats.

18. After the phone call to Carly, I decided it was too risky for me to be involved in any observation or recording activities. I was concerned that I was putting myself, Carly, and the foster child we were then caring for at risk of our personal safety and of being placed on a government watchlist. That fear was compounded after the March 16 border detention described below, in which my fear of being on a government list that would affect my ability to travel and otherwise operate freely was confirmed.

**The March 16, 2026 Border Detention**

19. In March 2026, Carly and I took a trip to Quebec City, Canada, for our anniversary. We drove my Hyundai and crossed the border from Maine into Canada on March 13 without issue.

20. On the afternoon of March 16, 2026, we arrived at the Jackman Border Crossing to return to Maine. I drove into the only open lane and gave our passports to the CBP agent, who later told us his name was Brad Guay.

21. Agent Guay took the passports, looked at them in the booth, and then told us to pull into the first lane. I asked why, and he said something like, "It's just policy."

22. Agent Guay asked us to get out of the car, took our phones and car keys, and told us to wait inside the terminal. He went to a desk, typed on his computer, and called us up a few minutes later.

23. When we reached the desk, Agent Guay asked Carly whether she had her car registration with her. This immediately raised alarm bells for me, since we were driving my car and had said nothing about Carly having her own car. I suspected we were being questioned because of the January incident. I told Agent Guay we were driving my car, but he continued asking Carly about her car and license plate.

24. I felt very scared and unsafe throughout the encounter. My passport has an "X" gender marker, and I was aware how vulnerable we were in the terminal, with no other citizens present except the two of us and a truck driver. Carly and I discussed what we would do if we were separated and questioned.

25. At one point I asked to use the bathroom and was told something like, "I don't know what you're in for, so I need to check with him," meaning Agent Guay. I have crossed the border many times, and no one has ever used language suggesting I was "in for" something.

26. I had taken off my watch in the car, and Agent Guay had taken our phones, so I had no idea what time it was or how much time had passed. At one point we asked Agent Guay what was going on and reminded him we were citizens, but he just tapped our passports and said, "I can see that."

27. Agent Guay told us he was going to search our vehicle and asked if we had anything he should be aware of. We told him we had wine and food in the car, and he said he

didn't care about that. He then searched the car, opening all four doors, the trunk, and our bags as if we were criminal suspects. He said nothing about the food or wine.

28. Before we left, we asked Agent Guay what the incident had been about. He said something about an agricultural violation and asked Carly if she had ever brought a dog or dog food into the country. Carly said yes, she had brought a dog legally into the country in 2015. Carly and I have traveled internationally together multiple times since 2015, and no one had ever mentioned an agricultural violation on her record.

29. Agent Guay asked for our home address, our jobs, and where we had stayed in Quebec City. We asked why he needed this information, and he responded that he needed it to close his "report." After that, we were allowed to leave.

30. I was really shaken after this experience. Carly and I got in the car and immediately started driving before we could look up a map, because we were afraid of remaining at the border any longer than necessary.

31. I have continued to feel scared ever since. I strongly considered getting a new phone because I was worried the government might have been able to review the contents of my phone.

32. Our experience at the border confirmed to me that Carly and I are on a government list of some kind.

**Ongoing Effects**

33. I am aware from public reporting, and from living and working in my community, that ICE has continued conducting immigration enforcement operations in Maine since January 20, 2026, including operations that increased significantly in May 2026, and that such operations continue today.

34. Because my work takes me to daycares and to clients' homes across the Greater Portland area throughout the day, I regularly drive through neighborhoods where enforcement activity has been reported.

35. During the increase in enforcement activity beginning in May 2026, I wanted to exercise my First Amendment right to observe and record ICE, as I did on January 20. I did not because I continued to feel it was not safe for me to do so out of fear of what list I was on as a result of the January 20 encounter, the phone call to Carly, and the March 16 border detention.

36. I have stopped looking for opportunities to observe or record entirely. Because I stopped looking, I cannot estimate how many opportunities I would have taken since January 20, 2026 if not for these events. I know there would have been many.

37. I want to observe and record immigration enforcement activity in my community, and I would do so if I believed it were safe. If not for the January 20 encounter, the phone call to Carly, and the March 16 border detention, I would continue to stop and record when I come upon enforcement activity, as I did on January 20.

38. As an occupational therapist, I work closely with many children whose families have limited resources and whose immigration status I do not know. I am very worried that I am putting these families at risk because of their association with me.

39. I often see clients in their own homes. Because I am concerned that Carly's vehicle may have been monitored, I frequently drove my own Hyundai to clients' homes rather than Carly's Chevrolet Bolt, even though the Bolt is electric and substantially less expensive to operate for the amount of driving my job requires. When I do drive Carly's car, I park further away from my clients' homes. I made these changes specifically to reduce the risk of bringing government attention to my clients' homes.

40. This concern affects how I do my job, and it is deeply upsetting to me that I may have endangered my spouse, our foster child, and my clients simply because I did my civic duty by observing immigration agents and trying to keep my community safe.

41. I have worried about what these events mean for our ability to travel and whether Carly and I should expect to be stopped and questioned again.

42. In April 2026, Carly and I considered cancelling a domestic trip to the Outer Banks, North Carolina, out of fear of being detained at the airport. We ultimately chose not to cancel, but I was extremely nervous during both travel days that we would be detained.

43. I am even more concerned about international travel. Carly and I had been planning a trip to Canada with our friends this summer. After delaying a final decision for months, we decided not to travel internationally at all, out of fear of being detained while traveling or being prevented from reentering the United States. I am also afraid that traveling internationally with us would make our friends vulnerable to government scrutiny.

44. As part of a married gay couple, and as someone who is non-binary, it is particularly unsettling to know we are on the government's radar in this political environment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026.

*/s/ Polyxenia Pantos*
Polyxenia Pantos