**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 2:26-cv-00092-JAW |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 4

I. Enhanced Immigration Enforcement Operations .......... 4

A. Enhanced Operations in Other Jurisdictions .......... 4

B. Operation Catch of the Day (the Maine Operation) .......... 5

II. The Operational Environment During the Maine Operation .......... 5

III. The Policies and Guidance Governing Agents' Responses .......... 9

A. DHS Policy Protects First Amendment Activity While Permitting Collection of Information for Legitimate Law-Enforcement Purposes .......... 9

B. Personnel Were Warned About Operational Risks but Were Not Directed to Collect Information About Protestors .......... 10

IV. Plaintiffs' January Encounters .......... 10

A. January 20—Pantos and Williams .......... 10

B. January 21—Hilton .......... 12

C. January 23—Fagan .......... 14

V. The Broader Discovery Record Does Not Establish a Widespread or Officially Sanctioned Practice of Retaliation .......... 16

A. Agents Sometimes Recorded or Identified Individuals Based on Perceived Operational or Safety Concerns .......... 16

B. HSI Agent J.C. Alone Created ICM Subject Records for Individuals He Believed Had Aggressively Interfered or Impeded Arrests .......... 17

C. Some Teams Responded to Vehicles Following Them by Driving to the Vehicle's Registered Address .......... 18

VI. The Operation Ended and the Circumstances in Maine Materially Changed .......... 19

LEGAL STANDARD .......... 19

ARGUMENT .......... 20

I. Plaintiffs Do Not Have a Substantial Likelihood of Success on the Merits ......... 20

A. Plaintiffs' Retaliation Claims Based on the Collection of Identifying Information Will Fail .................................................................... 21

B. Williams' Retaliation Claim Based on Her ICM Records Will Fail ........ 26

C. Plaintiffs' Retaliation Claims Based on Alleged Intimidation Will Fail .. 30

D. Plaintiffs' Viewpoint-Discrimination Claims Will Fail ............................ 36

II. Plaintiffs Have Not Shown Likely Irreparable Harm ........................................... 38

III. The Balance of Equities and Public Interest Weigh Against an Injunction .......... 38

CONCLUSION ........................................................................................................ 40

## INTRODUCTION

Plaintiffs have substantially changed their claims in this case since the TRO stage. Plaintiffs initially alleged a sweeping theory: that the Department of Homeland Security ("DHS") had abandoned a policy against retaliation for First Amendment activity and replaced it with a policy of treating immigration enforcement observers as "domestic terrorists," collecting their biometric information, and placing or threatening to place them in government databases or watchlists merely because they observed and recorded federal officers from a safe distance. The Court permitted expedited discovery to determine whether those incidents reflected something broader than the actions of individual officers regarding that theory.

But that theory proved untrue in discovery. Despite Plaintiffs receiving over 2,600 documents, 14 interrogatory answers, four fact witness depositions, and two 30(b)(6) witness depositions, they found nothing to substantiate that Defendants secretly replaced their First Amendment policy to place people on a database for purely exercising their First Amendment rights. Instead, discovery revealed what Defendants said all along: that DHS's First Amendment policy remains effective and that even if some officers said that some persons would be placed on a database, no such database exists and no policy exists for officers to tell protestors that it does. Discovery also revealed that no Plaintiffs' faces were "scanned" to collect biometric information.

Now, Plaintiffs have several new theories. *First*, after bringing the TRO, Plaintiffs added two new Plaintiffs—Polyxenia Pantos and Carlyn Williams—based on a separate January encounter during the operation that led to a one-hour secondary inspection at a border crossing in March. Plaintiffs argue that an ICE Homeland Security Investigations ("HSI") agent created "false records" to retaliate against Williams because Pantos drove

Williams's car to a scene and protested there without interfering. That claim is incorrect on the facts. Agent J.C. was specific that his recollection was that the person at the scene—who he still believes was Williams behaved aggressively and interfered with his team's efforts to complete the arrest and depart safely, so he created an HSI Internal Case Management ("ICM") record documenting what happened. Plaintiffs now seek preliminary relief "archiving" that record, but they are unlikely to succeed on their claim that the record was created for a retaliatory purpose. And they have failed to plead any claim under the Privacy Act that may otherwise provide for relief from an allegedly inaccurate government record.

*Second*, Plaintiffs claim that Defendants "retaliated" against Plaintiffs by "collecting" biometric data, which is nothing more than photographs and videos taken by the officers using the camera app of their government-issued cell phones. Some of those photographs and recordings are gone, having been deleted before this lawsuit was filed. And the others were ordinary recordings not unlike what would be captured in body camera footage, much of which has continued to be preserved because of this lawsuit. And even if Plaintiffs were correct that there was nothing but peaceful activity at these locations, it is far from clear how taking videos and pictures of people in public in the event that those are needed for a future investigation violate anyone's First Amendment rights.

*Third*, Plaintiffs argue that DHS has two "intimidation" practices that violate their First Amendment rights. The first alleged practice is of ICE officers and agents threatening to place people on a "domestic terrorist" database. Despite all the extensive discovery Plaintiffs received, the only two instances they can show that happening are at the Home Depot where HSI Agent J.C. told that to Plaintiff Elinor Hilton, which he has now

acknowledged was not the best thing to say, and at the encounter with Plaintiff Colleen Fagan where ERO officer J.Y. told Fagan something similar. Plaintiffs claim that Agent J.C. told Williams something similar, but that is in dispute. They have confirmed that they did not know of this happening to anyone else. The second alleged practice is what Plaintiffs characterize as "drive-bys," in which ICE agents have occasionally attempted to disengage vehicles following and surveilling them by driving to the vehicle's registered address, essentially to drop it off at home. The First Amended Complaint ("FAC") does not allege that this happened to Plaintiffs, but Hilton recently submitted a declaration stating that this happened to her in June 2026. None of the Plaintiffs have standing to seek prospective relief against this alleged practice, and it is far from clear that this violates the First Amendment.

Simply put, Plaintiffs cannot seek prospective injunctive relief against federal agencies throughout Maine based on activity that happened almost exclusively eight months ago. They must establish entitlement to relief based on an ongoing or imminent injury attributable to an official policy or sufficiently widespread and sanctioned practice. The record developed through discovery does not make those showings. The January operation ended long ago; the teams and personnel whose conduct dominates Plaintiffs' motion have not conducted law enforcement operations in Maine since then; and Plaintiffs cannot transform a collection of discrete fact-specific encounters into an ongoing statewide or nationwide policy simply by lumping them under the labels "information collection" and "intimidation." Plaintiffs' motion should be denied.

## BACKGROUND

### I. Enhanced Immigration Enforcement Operations

#### A. Enhanced Operations in Other Jurisdictions

Shortly after President Trump returned to office, DHS began conducting a series of enhanced immigration-enforcement operations in particular jurisdictions. These operations have generally supplemented the personnel ordinarily assigned to a particular geographic area. The additional personnel deployed temporarily and then returned to their ordinary assignments.

Several such operations preceded the January 2026 operation in Maine. For example, in September 2025, DHS launched "Operation Midway Blitz" in the Chicago area. And in December 2025, DHS began "Operation Metro Surge" in Minnesota, which involved a substantial deployment of immigration enforcement personnel to the Minneapolis-St. Paul area. Those operations generated substantial public attention and spurred organized efforts to observe, protest, or interfere with federal immigration enforcement. In Illinois, for example, DHS reported incidents involving blocked access to an ICE facility, trespass, vehicle damage, and assaults on officers.[1] The Minnesota Operation that began in December 2025 and concluded in early 2026 presented similar tensions, drawing civil unrest and pronounced media attention on a nationwide scale. When the enhanced operation in Maine was announced in January 2026, federal agents and Maine community members both had this context in mind.[2]

[1] DHS Press Release, Violent Rioters Assault Law Enforcement at ICE Broadview Processing Center, Police under JB Pritzker's Sanctuary Jurisdiction Refuse to Answer Calls to Help Stop Assaults (Sep. 19, 2025), https://www.dhs.gov/news/2025/09/19/violent-rioters-assault-law-enforcement-ice-broadview-processing-center-police.

[2] *See, e.g.*, D.L. Dep. 106:23-107:3; Neff Decl. ¶ 4.

### B. Operation Catch of the Day (the Maine Operation)

On January 20, 2026, ICE began "Operation Catch of the Day," a Maine-specific initiative that substantially increased the federal immigration enforcement presence in the State. DHS publicly confirmed the operation shortly after it began.[3] As part of the operation, DHS deployed 159 additional ICE personnel, organized into fourteen joint strike teams ("JSTs") and ten special response teams ("SRTs").[4] The deployment also included personnel assigned to a Joint Operations Center ("JOC"), which coordinated the operation and communicated with teams in the field, and an intelligence function that provided operational support.[5]

## II. The Operational Environment During the Maine Operation

The increased ICE presence during the Operation prompted an organized community response. Community associations provided training for members of the community about how to observe and record law enforcement activity.[6] And community members organized to follow ICE officers, communicating with Signal and radios,[7] creating a spreadsheet to identify ICE vehicles by description and license plate number,[8] and putting ICE under constant countersurveillance[9] throughout the Operation.[10] Plaintiffs

---

[3] DHS Press Release, ICE Launches "Operation Catch of the Day" Targeting the Worst of Worst Criminal Illegal Aliens Across Maine (Jan. 21, 2026), https://www.dhs.gov/news/2026/01/21/ice-launches-operation-catch-day-targeting-worst-worst-criminal-illegal-aliens.
[4] Defs. MTD-Ex. A (DEFS000831), ECF No. 117-2.
[5] ICE 30(b)(6) Dep. 90:14-92:5, 58:16–59:17, 94:11–19, 95:10–13.
[6] Neff Decl. ¶¶ 3, 7, ECF No.105-4; Hilton Dep. 122:12-123:10; Fagan Dep. 59:2-15.
[7] Fagan Dep. 85:9-19 *see also* J.C. Dep. 167:22-24 (witnessing the use of radios).
[8] Hilton Dep. 38:4-9; Fagan Dep. 87:19-88:13.
[9] In using the term "countersurveillance," Defendants do not suggest that the individuals conducting it were themselves under surveillance. ICE carried out surveillance only on immigration targets. S.C. Dep. 97:4-16; J.C. Dep. 167:5-9.
[10] *See, e.g.*, Williams Dep. 68:5-7 (describing observing an ICE vehicle on January 22 and noticing "several other observers in their vehicles" apparently watching the same one).

were members of several "rapid response" groups created "[redacted][11]

The resulting network gave community members a means to identify suspected ICE vehicles, track reported enforcement activity, and rapidly communicate that information to others. How those efforts translated into particular encounters in the field varied considerably. In many instances, protestors did no more than observe, record, shout at, or criticize agents from a safe distance. In other instances, some protestors—sometimes called "aggressors" or "agitators" by law enforcement[12]—interfered with enforcement activity, creating threats and officer safety concerns.[13]

***Interrupting Surveillance***. Encounters with massive "rapid response" crowds frequently required agents to alter ongoing operations. When individuals located a team conducting surveillance of an immigration target, agents testified, crowds would descend to the reported locations[14] and alert the target to ICE's presence by blowing whistles and honking horns.[15] Disrupting ICE operations appeared to be their purpose: community groups provided trainings about how to use whistles and vehicle horns to notify targets of ICE surveillance.[16]

---

[11] Pantos Dep. 30:14-17; Hilton Dep. 40:20-23.

[12] As used by law enforcement, the terms "protestor" and "agitator" are not mutually exclusive. All agitators are protestors before they cross the line, but not all protestors are agitators. *See* ICE 30(b)(6) Dep. 286:16-288:8 (describing what an "agitator" is); *id.* 308:19-309:14 (explaining that use of the word "protestor" in a document "doesn't mean that the person didn't cross the line"); S.C. Dep. 303:22-305:23 (describing "agitator"); J.R. Dep. 50:21-51:6, 83:21-84:9.

[13] J.C. Dep. 167:22-24; S.C. Dep. 283:1-285:13.

[14] S.C. Dep. 121:1-5 (explaining how SRT assisted when crowds arrived), 129:9-12, 283:15-17; *see also* Hilton Suppl. Decl. ¶¶ 2, 7, ECF No. 105-3 (testifying that she found out about ICE's presence at the Home Depot through a Signal chat and that she and several other people were there within minutes)

[15] J.C. Dep. 167:4-24; D.L. Dep. 106:12-22; *see also* S.C. Dep. 96:18-97:11 (explaining how his team would conduct surveillance on arrest targets).

[16] Hilton Dep. 72:5-73:3; PI Opp Ex. 1, Whistle Training (PLAINTIFFS-000068).

***Following Law Enforcement Vehicles.*** ICE teams were frequently followed by vehicles during surveillance, arrests, and prisoner transports. Agents testified that some vehicles attempted to block their movements or followed them despite efforts to disengage, at times violating traffic laws.[17] These encounters complicated surveillance and prisoner transfers and raised safety concerns.[18] Agents could not necessarily determine the occupants' intentions while an encounter was unfolding, particularly when transporting an arrestee.[19] Whether intentional or not, encouraging the public to follow ICE officers when conducting law enforcement activity increased the threat level to officers and any persons in their custody.[20]

***Crossing Perimeters.*** Agents also encountered observers who crossed operational perimeters or refused instructions to move back while filming. At the Home Depot encounter, at least one person crossed a perimeter in his vehicle and parked next to law enforcement vehicles, ignoring orders to stop.[21] At other encounters, many claimed that because they were filming, it was their right to cross the perimeters, citing the training they received on their rights.[22] Agents testified that perimeters were established for operational and safety reasons, and any member of the public that comes too close to an ongoing arrest or prisoner transfer creates operational and safety concerns.[23]

***Escalating Encounters*** Some encounters went further. Agents describe individuals repeatedly appearing at enforcement locations, obstructing movements, or engaging in

[17] J.C. Dep. 165:14-22, 167:13-22, 171:16-21, 172:10-13, 174:19-22, 180:8-16; *see* S.C. Dep. 116:14-22, 117:21-118:4.
[18] S.C. Dep. 108:6-109:3, 291:15-21; J.C. Dep. 167:13-21, 171:22-172:2; D.L. Dep. 43:4-19.
[19] J.C. Dep. 173:19-24; D.L. Dep. 42:16-43:19 (officers were operating in a "very heightened environment" and "are not issued a crystal ball").
[20] J.R. Dep. 84:3-85:17; J.C. Dep. 68:1-5, 71:13-16, 71:21-22, 73:20-74:2, 149:4-5, 326:13-15, 333:16-18.
[21] J.C. Dep. 325:16-326:15.
[22] Neff Decl. ¶¶ 7-12.
[23] J.R. Dep. 104:12-17 ("The phone itself is not the threat." It "depends on how close they are.").

conduct agents perceived as threatening. At the Home Depot encounter, one person was dressed in what appeared to be military tactical gear and repeatedly kept returning to the trunk of his car, which Agent J.C. was concerned may mean the person had a firearm.[24] Plaintiff Hilton—in an incident separate from the one discussed in the Complaint—went right up to a person being arrested by ICE, got in between two ICE vehicles, refused to back up when instructed, and made physical contact with the arresting officer.[25] Further, agents on the Boston HSI joint strike team described repeatedly seeing a community member named [redacted] who carried a radio to coordinate rapid responses and engaged in threatening and obstructive conduct.[26] On one occasion, he and another individual positioned their vehicles so that an agent could not leave and other officers had to assist her.[27] The same female agent gave the man several warnings that his activity is impeding law enforcement.[28] At the same encounter, he told agent D.L. to "[g]et the fuck away from my car" and body checked him; D.L. testified that he "didn't know what [that man] was going to do."[29] On the last day of the Operation, [redacted] was monitoring ICE activity at a Market Basket grocery store and yelled in the parking lot and the grocery story about ICE's presence.[30] A chaotic scene ensued; an officer was assaulted by a bystander inside the store while pursuing the target, and, after J.C. apprehended another target outside, [redacted] attempted to "take the person" that J.C. had just put handcuffs on.[31]

[24] J.C. Dep. 306:9-10, 316:17-318:3.
[25] *See* Hilton Dep. 173:3-21; PI Opp. Ex. 11 (PLAINTIFFS-000210).
[26] J.C. Dep. 168:4-9.
[27] J.C. Dep. 162:12-14; S.C. Dep. 283:9-17; D.L. Dep. 43:4-8.
[28] PI Opp. Ex. 12 (DEFS000254).
[29] D.L. Dep. 139:2-5.
[30] J.C. Dep. 293:3-7, 312:8-314:15; S.C. Dep. 123:10-124:13.
[31] *See* J.C. Dep. 312:8-314:15.

***Personal Attacks.*** The atmosphere extended beyond the agents' time conducting arrests. Community members identified the hotels where ICE agents were staying and organized loud demonstrations outside of them, apparently with the purpose of disrupting the agents' sleep cycles.[32] Threats were posted on social media against the ICE agents, including by people claiming to be employed by their hotel.[33] Agent J.C. testified that a woman attempted to photograph his team at its hotel and then followed him to the gym, restaurants, and a grocery store while photographing him.[34] He also received threats that people would find him and his family and that they were "going to pay for it."[35]

Most people observing and criticizing officers do not interfere with enforcement. But agents encountered protected activity alongside conduct they reasonably perceived as obstructive or threatening. Thus, the relevant distinction during the Operation was not whether someone could be labeled as a "protestor"; instead, it was whether the person engaged in conduct reasonably understood as interference or creating a safety concern.

## III. The Policies and Guidance Governing Agents' Responses

### A. DHS Policy Protects First Amendment Activity While Permitting Collection of Information for Legitimate Law-Enforcement Purposes

DHS policy explicitly states that officers must ensure that First Amendment activity is protected.[36] Personnel may not collect, maintain, use, or disseminate information concerning an individual's exercise of First Amendment rights merely because the individual engaged in protected activity. They may, however, collect information relevant to authorized law enforcement activity, including information concerning conduct that

---

[32] PI-Ex. 33 at DEFS000621; S.C. Dep. 231:24-232:3.
[33] S.C. Dep. 138:17-139:3, 140:7-10.
[34] J.C. Dep. 315:13-18, 319:15-24.
[35] J.C. Dep. 144:22-145:1.
[36] TRO Opp'n Ex. B, DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019), ECF No. 18-4.

impedes operations or presents a safety concern.[37] All ICE personnel must receive recurring training every year on DHS's First Amendment policy, and CBP personnel are bound by the same policies.[38]

### B. Personnel Were Warned About Operational Risks but Were Not Directed to Collect Information About Protestors

Personnel deployed to Maine received situational-awareness information concerning tactics used to identify and monitor immigration agents and vehicles. An email advisory on this topic acknowledged that "much of" the conduct was constitutionally protected, while still explaining that the information was still relevant to officer safety, situational awareness, and vigilance.[39] Discovery has identified no directive associated with the Operation instructing personnel to create records about protestors, designate them as "domestic terrorists," place them on a watchlist, or take adverse action against them because they exercised First Amendment rights.[40]

## IV. Plaintiffs' January Encounters

### A. January 20—Pantos and Williams

On January 20, members of the Boston HSI team completed an immigration arrest in Portland. Pantos stopped nearby to observe and photograph the agents.[41] Agent J.C. testified that two individuals approached the officers, ignored instructions to move back,

---

[37] 5 U.S.C. § 552a(e)(7); ICE 30(b)(6) Dep. 244:15-245:5, 258:6-259:17, 281:14-282:2, 288:17-289:6, 290:9-21, 305:11-22, 319:13-24, 381:18-382:3.

[38] ICE 30(b)(6) Dep. 180:6-181:6; CBP 30(b)(6) Dep. 47:4-14, 47:23-48:4.

[39] PI-Ex. 33 at DEFS000621, 624. The specific intelligence information that was shared is protected under the Law Enforcement Privilege (LEP). *See id.* at DEFS000621-624 (containing LEP redactions); *see also* Order on Discovery Issues at 3-4, ECF No. 85 (upholding Defendants' privilege claim over the redacted material).

[40] *See, e.g.*, J.C. Dep. 318:4-14; S.C. Dep. 217:2-5; J.R. Dep. 74:17-76:18.

[41] Pantos Suppl. Decl. ¶¶ 4-8, ECF No. 105-5; PI Opp. Ex. 2 (PLAINTIFFS-000321); PI Opp. Ex. 3 (PLAINTIFFS-000320); PI Opp. Ex. 4 (PLAINTIFFS-000315); PI Opp. Ex. 5 (PLAINTIFFS-000316); PI Opp. Ex. 6 (PLAINTIFFS-000318); PI Opp. Ex. 7 (PLAINTIFFS-000317).

and interfered with the team's ability to leave safely with the arrestee.[42] Pantos disputes that account and maintains that they remained at a safe distance.[43] Video captures agents repeatedly directing one observer to move back[44] but does not depict Pantos, who arrived later.[45] J.C. testified that the available recordings do not capture the full encounter.[46]

Later in the day, J.C. used license-plate information to identify the individuals he believed were involved. He identified the owner of the first vehicle as Hilary Neff but concluded that Williams, the owner of the other vehicle, was the second observer.[47]

At 3:01pm, J.C. circulated Williams' photo to his team's Signal chat to ask if they thought she was "the protestor" from that morning, noting that she was the owner of the Chevy.[48] D.L. said he thought the person he and S.C. interacted with looked different and sent a photo from earlier.[49] J.C. clarified that the woman D.L. was referencing owned the Prius and sent Hilary Neff's license photo to the group. He said that the other woman (Williams) owned the Chevy and they were both there. D.L. agreed.[50]

At 3:17pm, J.C. telephoned Williams for an interview. He asked if she was present (she said no), if her car was present (she said no), or if she loaned her car to anyone (she said no).[51] Based on the information available to him and his recollection of the encounter, he did not believe Williams' blanket denials and believed she was the second person

---

[42] J.C. Dep. 70:17-71:23, 73:20-74:2.
[43] Pantos Suppl. Decl. ¶ 8.
[44] *See* S.C. Dep. 152:15-153:3 (noting that the woman was "trying to get . . . in between the arrest team" and appeared to be trying to get in his vehicle).
[45] PI-Ex. 08.
[46] J.C. Dep. 66:16-19, 70:18-19. J.C. testified that the second observer "was given multiple warnings to get back and wasn't listening," and "[k]ept getting in front of vehicles, getting too close," and "entering space that they shouldn't be in and making shouts and profanity toward law enforcement and others present." J.C. Dep. 71:5-23, 73:20-74:2.
[47] PI-Ex. 49 at DEFS001619-23; PI Opp. Ex. 8 (DEFS0001624-25).
[48] PI-Ex. 49 at DEFS001619).
[49] PI-Ex. 49 at DEFS001621.
[50] PI-Ex. 49 at DEFS001623;.PI Opp. Ex. 8 (DEFS00001624-25).
[51] J.C. Dep. 147:22-148:13, 149:6-12.

present.[52] J.C. warned Williams against interfering with federal law enforcement operations and ended the call.[53] Williams alleges that J.C.'s warning referenced a "domestic terrorism watchlist," which J.C. denies.[54]

Soon after that, J.C. created records in HSI's ICM system[55] about Williams and Neff.[56] He testified that he created the records to document conduct he believed constituted interference—"they were aggressive and acting in a manner that impeded our retreat from the arrest"—not because the individuals had merely observed or recorded ICE.[57] He did not nominate either person to a watchlist.[58] He did, however, recommend them for secondary inspection. He explained that he selected this for Williams based on his belief that she interfered with officers and his review of her border crossing history.[59] Williams was subsequently referred to secondary inspection at a Customs checkpoint when returning to the United States in March 2026.[60]

**B. January 21—Hilton**

On January 21, members of the Boston HSI team completed an immigration arrest and attempted to transfer the arrestee to a transport team. Agents testified that a Nissan

[52] J.C. Dep. 125:18-19, 126:10-12, 146:18-24, 319:2-9.
[53] J.C. Dep. 149:13-22. Williams alleges that J.C.'s warning referenced a "domestic terrorism watchlist," which J.C. has denied. Williams Suppl. Decl. ¶ 14, ECF No. 105-2; J.C. Dep. 177:15-178:6, 319:2-9.
[54] Williams Suppl. Decl. ¶ 14; J.C. Dep. 152:6-14, 177:15-178:6, 319:2-9.
[55] ICM is an internal HSI case-management system used to document information relevant to HSI investigative and law enforcement activities.
[56] J.C. Dep. 70:17-71:23; PI-Ex. 34; PI-Ex. 35; PI-Ex. 36; PI-Ex. 37.
[57] J.C. Dep. 70:3-7, 70:11-13, 71:2-23. 73:20-74:2. Neff submitted a declaration in which she asserts that she did not interfere or behave aggressively during the encounter. Neff Decl. ¶¶ 7, 11. Her declaration neglects to address her proximity to the ICE vehicles parked in the middle of the road or her behavior following the arrest, including what took place in the 5-minute span after the arrest and after Pantos arrived. Pantos's photos depict Neff standing in the middle of the street between two ICE vehicles while they are driving away and displaying aggressive body language. *See* PI Opp. Ex. 6 & Ex. 7; *accord* PI Opp. Ex. 8 (In reference to Neff: "I almost hit her driving off.").
[58] PI-Ex. 34; PI-Ex. 35; *see* J.C. Dep. 181:10-182:7.
[59] J.C. Dep. 89:9-17, 92:1-17; PI-Ex. 34; PI-Ex. 35.
[60] Williams Suppl. Decl. ¶ 31.

sedan persistently followed them as they changed routes and attempted to locate a safe transfer point, at times driving aggressively and breaking traffic laws.[61] The agents ultimately returned to a Home Depot parking lot to transfer custody. S.C. called in a special response team to provide backup assistance and additional security.[62] Hilton was the first observer to arrive and began filming. J.C. did not see Hilton exit the Nissan, but because she arrived first and the Nissan was nearby, he inferred that she had been one of its occupants.[63] Additional observers later arrived. J.C. also testified that other individuals disregarded the perimeter or engaged in conduct he viewed as presenting safety concerns.[64] He recorded the encounter and sought identifying information for the individuals he believed had participated in the vehicle pursuit or otherwise posed a safety concern.

In recordings produced in discovery, J.C. can be heard warning Hilton and others that they would be placed on a "terrorist watchlist" and telling Hilton that if she continued appearing at operations, officers might "see [her] at [her] house later tonight to arrest [her]."[65] At his deposition, J.C. acknowledged that nothing Hilton did on foot at the Home Depot encounter impeded his team.[66] But he believed Hilton was part of a group that chased him and interrupted with the prisoner transfer. He wanted to give Hilton and others in that group "a verbal warning in hopes that they just don't do that again."[67] He warned Hilton about a possible later arrest to convey that "[i]f you keep impeding law enforcement, chasing law enforcement across town, violating traffic laws, inserting yourself into arrests

---

[61] J.C. Dep. 165:14-22, 167:13-22, 171:16-21, 172:10-13, 174:19-22, 180:8-16; *see* S.C. Dep. 116:14-22, 117:21-118:4.
[62] S.C. Dep. 120:15-121:5; J.C. Dep. 185:4-6.
[63] J.C. Dep. 173:1-3, 172:20-23, 175:11-18.
[64] J.C. Dep. 184:16-24, 195:3-11, 199:1-6, 204:2-9, 326:6-15, 327:1-22.
[65] J.C. Dep. 177:19-178:1.
[66] J.C. Dep. 194:14-19.
[67] J.C. Dep. 180:9-16.

and transportation of prisoners, it may lead the agents to actually pursue criminal charges."[68] He acknowledged that the watchlist statement was inappropriate and untrue.[69] As for why he gave warnings rather than arresting anyone for interference, he explained, "Nobody on my team wanted to arrest anybody. We just wanted to leave. We just wanted to get the arrest warrant that we had and leave. We weren't interested in any citizens."[70] He testified that his purpose in giving the warnings was to deter further interference, not protected observation or criticism.

Consistent with that explanation, J.C. did not attempt to identify all six to eight people Hilton testified were present.[71] He sought identifying information for only the three individuals he believed had participated in the pursuit or created a safety concern,[72] and later created ICM records concerning those individuals.[73] He testified that he would have created a record naming Hilton had he learned her identity.[74]

### C. January 23—Fagan

On January 23, Fagan encountered two ERO officers from a team temporarily deployed from Utah. She encountered those same agents twice that morning. The first time, Fagan watched and videoed an arrest from a safe distance while shouting at the agents, calling them Nazis, and honking her horn, and the agents carried out the arrest without acknowledging her.[75] The second time, Fagan pulled over at an apartment complex and

---

[68] J.C. Dep. 183:14-18.
[69] J.C. Dep. 180:1-2, 182:20-183:3.
[70] J.C. Dep. 180:17-20.
[71] Hilton Suppl. Decl. ¶¶ 21-25.
[72] J.C. Dep. 196:8-18, 197:16-22, 201:8-10; *see* CBP 30(b)(6) Dep. 47:4-14 (explaining that CBP does not share information about people simply exercising their First Amendment rights); *id.* 47:23-48:4 (explaining that it is inappropriate to seek information about an individual who is exercising their First Amendment rights if that is the "sole reason" for requesting information).
[73] PI-Ex. 42; PI-Ex. 43; PI-Ex. 44.
[74] J.C. Dep. 166:15-8.
[75] Fagan Suppl. Decl. ¶¶ 2-7, ECF No. 104; J.R. Dep. 113:12-114:15; PI Opp. Ex. 13 (PLAINTIFFS-00032).

approached the two officers, who also walked toward her. When Fagan asked why Officer J.Y. was recording her, he responded that they had "a nice little database" and that she was "considered a domestic terrorist."[76]

Afterwards, J.Y. relayed to his supervisor, ERO officer J.R., that he was "trying to be funny."[77] J.R. told him that the joke obviously didn't land and provided verbal counseling to be more mindful of what he says. J.R. testified that he did not think what J.Y. said was appropriate, "[n]or was there any basis in truth to it."[78] J.R.'s supervisor (and J.Y.'s second-level supervisor), Steve Wells, also stated that he did not approve or condone J.Y.'s behavior and was considering whether disciplinary action would be taken.[79] J.Y.'s fellow ERO officer, R.N., attested that the statement J.Y. made "about putting her on a database and calling her a domestic terrorist" was "not factual" and said, "I don't know why [J.Y.] said that."[80] He explained that the reason they recorded the encounter was because Fagan and another observer both parked close to their operations, walked toward them, and were making heated verbal statements. R.N. recorded "in case either of them committed an act of violence or illegally interfered with our lawful investigation of the alien." And because "[u]ltimately, they did not engage in any violence or interference," R.N. had no need or use for the recordings and deleted them.[81]

---

[76] PI Opp. Ex. 15.
[77] J.R. Dep. 145:11-15.
[78] J.R. Dep. 133:21-134:1, 144:5-15.
[79] Wells Decl. ¶ 9, ECF No. 18-2; *see* J.R. Dep. 41:7-11.
[80] PI-Ex. 12, R.N. Decl. ¶ 9.
[81] PI-Ex. 12, R.N. Decl. ¶¶ 8, 10-12.

## V. The Broader Discovery Record Does Not Establish a Widespread or Officially Sanctioned Practice of Retaliation

### A. Agents Sometimes Recorded or Identified Individuals Based on Perceived Operational or Safety Concerns

No ERO or HSI agents present during the Operation were issued body cameras.[82] To protect themselves and enable the collection of potential evidence, some officers used the cameras on their government-issued phones to document encounters that presented a threat.[83] They made these assessments on-the-spot based on their own law enforcement experience and training, considering proximity, body language, and the nature of verbal statements to be relevant for situational awareness and threat assessment.[84]

Similarly, when they noticed cars closely tracking and counter-surveilling them, they did not know what the occupants' intentions were;[85] thus, some agents communicated in attempt to identify the people associated with the cars on their tail by taking down their license plates and using that to find their names and other basic information.[86] At a general level, communications about these individuals provided a "point of intelligence" in the event of repeated instances of interference and for purposes of officer and arrestee safety.[87] And for cars engaging in repeated interference, having the driver's name and other identifying information (addresses, dates of birth) would allow a quick search of their

---

[82] J.R. Dep. 152:2-4.
[83] J.R. Dep. 194:7-13.
[84] D.L. Dep. 56:18-57:2, 60:22-61:17; PI-Ex. 12, R.N. Decl. ¶ 9.
[85] D.L. Dep. 42:16-23, 106:12-22, 155:11-19; S.C. Dep. 231:21-232:4, 259:6-9,279:18-23; J.C. Dep. 317:3-318:3; J.R. Dep. 218:11-12,256:21-257:10, 263:9-15, 332:15-21.
[86] *See, e.g.*, S.C. Dep. 180:19-23.
[87] S.C. Dep. 182:15-16, 182:17-21, 176:20-177:2, 177:9-16; *see also* J.C. Dep. 69:16-20 ("People who, in my opinion, would be impeding, to know who they are, to pass along to future law enforcement that they are aggressive and they have impeded in the past is beneficial intelligence.").

systems to determine whether they had a history that reflected a heightened risk to law enforcement or a relationship to immigration crimes.[88]

There was no "instruction" to share intelligence about license plates and individuals impeding in operations, as sharing intelligence for situational awareness is commonly done in law enforcement, including in situations where officers observe counterintelligence operations being conducted.[89] As an example, HSI agent S.C. referenced his experience with similar situations in Title 3 wiretap investigations, where agents conducting surveillance on a target will commonly notice "counterintel" from "people that work as part of criminal organizations . . . or just people in the neighborhoods."[90] In those situations, "it is common to share intelligence among law enforcement agencies, especially in an investigative group."[91]

### B. HSI Agent J.C. Alone Created ICM Subject Records for Individuals He Believed Had Aggressively Interfered or Impeded Arrests

During the Operation, HSI Agent J.C. created records in HSI's ICM system to document his encounters with 6 people that he believed aggressively engaged in interference to impede arrests.[92] An ICM subject record is "used to document HSI interest in a person, place, or thing."[93] Creating an ICM record is at the individual agent's discretion, but supervisors must approve them.[94] HSI agent S.C. was J.C.'s team leader during the Operation but was not his direct supervisor at the time; he thus was not involved

[88] S.C. Dep. 190:18-23, 222:18-24, 247:3-7, 256:24-257:22, 301:12-14, 302:21-302:3; 30(b)(6) ICE Dep. 366:1-9, 432:5-23.
[89] S.C. Dep. 197:20-22; *see id.* 183:7-18, 186:16-187:3.
[90] S.C. Dep. 186:20-24.
[91] S.C. Dep. 187:1-3.
[92] J.C. Dep. 111:13-17; *see id.* (explaining that "[i]f future law enforcement comes into contact with them, [he] wanted that to be known.").
[93] S.C. Dep. 205:5-7.
[94] J.C. Dep. 108:24-109:4.

in the creation or approval of those records.[95] Nonetheless, after reviewing the records and the circumstances, he does not believe that J.C. violated DHS policy when he created them.[96]

J.C. did not create subject records to document people merely exercising their First Amendment rights, for protesting only, or for video recording only.[97] He created them to document activity that he believed interfered with his and his team's ability to safely and lawfully conduct arrests and transports of arrestees. And he did not document every such occurrence but only the worst ones.[98] If someone were to get hurt from such activity, he would "hope to God it was documented."[99]

### C. Some Teams Responded to Vehicles Following Them by Driving to the Vehicle's Registered Address

The discovery record also reflects that some teams used vehicle-registration information when attempting to disengage from vehicles that were following them during the Operation. Agents repeatedly encountered vehicles that followed enforcement teams after arrests or surveillance operations, sometimes continuing as agents changed routes or attempted to separate from them.[100] In some instances, personnel obtained the registered address associated with a following vehicle and drove to or past that address.[101] The record does not indicate that this was widespread or designed to intimidate people who recorded them.[102]

---

95 S.C. Dep. 30:4-20.
96 S.C. Dep. 210:13-23.
97 J.C. Dep. 322:7-12.; S.C. Dep. 233:1-23.
98 J.C. Dep. 320:15-23.
99 J.C. Dep. 274:2-4.
100 S.C. Dep. 259:6-260:2, 279:18-280:3, 283:9-17.
101 PI-Ex. 48 at DEFS001196, DEFS001288, DEFS001353.
102 *See* J.R. Dep. 220:17-222:6; 30(b)(6) ICE Dep. 366:1-370:11; J.C. 280:21-282:16.

## VI. The Operation Ended and the Circumstances in Maine Materially Changed

Operation Catch of the Day was temporary. The enhanced operation concluded in late January 2026, and the concentrated enforcement activity that brought large numbers of temporary personnel, multiple teams, and unusually frequent field operations to Maine did not continue after January. The additional personnel deployed to Maine for the Operation returned to their ordinary assignments, including the Boston HSI team and Utah ERO team involved in the encounters at issue.[103] The end of the Operation also produced a substantial change in the pace and character of immigration enforcement; the temporary deployment produced an equally temporary spike in enforcement activity. During the four-day period of the Operation, ICE made approximately 187 arrests in Maine—roughly 46 arrests per day; by comparison, there was approximately one arrest per day in Maine in the month preceding the Operation, and arrest rates returned to approximately that same level after the Operation concluded.[104]

DHS has not announced a continuation of Operation Catch of the Day or another comparable large-scale operation in Maine.

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). The movant must show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d

[103] J.C. Dep. 162:21-163:5, 174:1-6, 174:19-24; J.R. Dep. 45:6-17.
[104] MTD-Ex. F, ECF No. 117-6;.MTD-Ex. G, ECF No. 117-7.

439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). While all four factors are relevant, likelihood of success is the "main bearing wall" of the preliminary injunction framework. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (citation omitted). And the third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Do Not Have a Substantial Likelihood of Success on the Merits

Plaintiffs' First Amendment theories rest on three categories of conduct: the collection of identifying information concerning persons who observed or recorded immigration-enforcement activity; the creation and maintenance of ICM records concerning Williams; and allegedly intimidating conduct during particular encounters with federal officers. Plaintiffs also characterize the same conduct as viewpoint discrimination. None of those theories supports the extraordinary prospective relief Plaintiffs seek.

As an initial matter, Plaintiffs must establish Article III standing for the particular forward-looking relief sought on each claim. Past encounters, standing alone, do not establish a real and immediate threat of future constitutional injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-10 (1983). And Plaintiffs cannot manufacture imminence from a series of contingencies concerning whether they will encounter federal agents again, under what circumstances, and how those officers might respond. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-14 (2013). Those defects apply differently to the various theories Plaintiffs advanced and are addressed below with respect to each claim.

The claims also fail on the merits. The First Amendment does not transform every law-enforcement action taken in the presence of protected activity into retaliation.

Plaintiffs must establish an objectively adverse action and a causal connection between that action and the protected conduct. *See D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011); *Starr v. Dube*, 334 F. App'x 341, 342 (1st Cir. 2009). The record instead reflects legitimate operational explanations for the collection of identifying information and the creation of Williams' ICM records, and it does not establish an ongoing agency policy or practice of threatening persons because they observe or record immigration enforcement. Nor have Plaintiffs shown that Defendants treated individuals differently because of their views on immigration enforcement, as opposed to responding to conduct officers perceived as relevant to safety or ongoing operations.

Accordingly, Plaintiffs are unlikely to succeed on any of their First Amendment theories. Their information-collection claim fails because the mere collection of identifying information does not establish retaliation; Williams' ICM claim fails because she cannot show either an imminent future injury or retaliatory causation; the intimidation allegations do not establish a sufficiently likely recurrence or an ongoing retaliatory practice; and Plaintiffs' viewpoint-discrimination theory is unsupported by evidence that Defendants acted on the basis of viewpoint rather than conduct.

### A. Plaintiffs' Retaliation Claims Based on the Collection of Identifying Information Will Fail

Plaintiffs contend that Defendants violated the First Amendment by collecting photographs, names, license-plate numbers, and other identifying information while Plaintiffs were observing or recording immigration-enforcement activity. Pl. Br. at 26-27. They principally contend that the collection itself was retaliatory and has caused an ongoing chilling effect because they fear how the information might be used in the future,

and they therefore seek an order prohibiting Defendants from using information collected about them to their detriment. *Id.* at 32-33. Plaintiffs are unlikely to succeed on that theory because they lack standing for the prospective relief they seek and, in any event, cannot establish the elements of First Amendment retaliation.

**1. Plaintiffs Lack Standing**

Plaintiffs lack standing for prospective relief based on the mere collection of their identifying information. Plaintiffs bear the burden to establish standing by showing that an injury-in-fact was caused by the challenged conduct and can be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish an injury-in-fact, plaintiffs must establish "an invasion of a legally protected interest which is . . . concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citation omitted). To the extent a plaintiff seeks relief for a possible future injury, that injury must be "certainly impending," *Clapper*, 568 U.S. at 409 (emphasis omitted) (citation omitted), or there must be a "'substantial risk' that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

First, the allegedly unlawful collection and retention of Plaintiffs' information did not give rise to a concrete injury. Plaintiffs contend that "[a] person whose information the government collects because of her speech suffers a concrete, particularized injury *the moment the collection occurs*." Pl. Br. at 32 (emphasis added). That is plainly wrong. "[T]here is no support for plaintiffs' claim that the government's unlawful collection and retention of records alone gives rise to a concrete injury for purposes of standing." *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 995 (9th Cir. 2023) (involving claim that the government collected records about the plaintiffs in violation of the First Amendment).

Plaintiffs' references to cases involving surveillance are inapplicable here, where there is no evidence that Plaintiffs were surveilled. *See* Pl. Br. at 32-33.

Plaintiffs are also unable to establish a sufficiently concrete and imminent threat of future injury. *See Lyons*, 461 U.S. at 107 n.8; *Clapper*, 568 U.S. at 409-10. Plaintiffs' information is presently maintained subject to litigation-preservation obligations, and there is no evidence that Defendants are likely—much less imminently likely—to use that information against them in some future adverse manner. Aside from Williams, Plaintiffs do not allege any downstream consequences from the government's possession of photos of their faces and license plates. Nor have Plaintiffs uncovered any evidence that their information has been disseminated to a third party. *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Tincher v. Mullin*, 2026 WL 2797318, at *10 (D. Minn. Sept. 18, 2026) (applying *TransUnion* and concluding that the plaintiff has not alleged a concrete harm arising from his alleged inclusion in a "list of domestic terrorists").

In attempt to show a *potential* downstream effect, Plaintiffs pointed to the fact that information collected about Williams was used to create ICM records. Pl. Mot. at 27 n.141. But Williams's records were created on January 20, the same day as the encounter.[105] The same is true for the other ICM records that J.C. created.[106] The idea that information collected from Plaintiffs *months ago* will be used against them is based completely on speculation. Plaintiffs offer no evidence to suggest that officers are presently considering additional action based on previously collected information. Their concern that the government *might* someday use retained information to their detriment is unfounded and fails to establish an imminent injury.

[105] *See* PI Opp. Ex. 8.
[106] PI-Ex. 36 - 42

Nor can Plaintiffs manufacture standing by asserting that this uncertainty has chilled their present conduct. Self-censorship constitutes injury only where it responds to a credible threat of enforcement or other adverse action, not merely a subjective fear of what the government might do. *See Ramirez v. Sanchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006); *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996). And *Clapper* forecloses standing based on burdens Plaintiffs choose to undertake in response to a future injury that is itself not sufficiently imminent. 568 U.S. at 416. Because Plaintiffs have not shown a credible and imminent threat that their retained information will be used against them, their asserted chill cannot supply the missing injury and fact.

**2. Plaintiffs' Retaliation Claim Fails on the Merits**

Plaintiffs also cannot establish that collecting their identifying information constituted First Amendment retaliation. A First Amendment retaliation claim requires constitutionally protected conduct, an objectively adverse action, and a causal connection demonstrating that the protected conduct was a substantial or motivating factor. *See Esposito*, 675 F.3d at 43; *Barton*, 632 F.3d at 29. The collection of basic identifying information during active law-enforcement operations does not itself satisfy those requirements.

***No adverse action.*** First, having one's photo taken is not an adverse action. An adverse action is one that is sufficient to chill a "reasonably hardy" person, or "a person of ordinary firmness," from continuing to exercise their constitutional rights. *Barton*, 632 F.3d at 29. "'Ordinary firmness' is an objective standard." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1142 (D. Or. 2020) (quoting *Mendocino Env't. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). Some retaliatory acts are so de minimis that "they do not rise to the level of being constitutional violations." *Thaddeus-X*

*v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). Recording an interaction with a person, in public, who is *herself recording the same interaction* is de minimis, if anything at all.

***No causation.*** Furthermore, Plaintiffs fail to allege facts that plausibly demonstrate that the involved officers were motivated by retaliatory animus toward protected speech, rather than by the officers' understanding of their law enforcement duties. "If [a law enforcement officer's] response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" *Aldridge v. City of St. Louis*, 75 F.4th 895, 899 (8th Cir. 2023) (quoting *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022)). The record demonstrates that the officers involved in Plaintiffs' encounters collected information pursuant to their official duties rather than animus toward Plaintiffs' expression.[107]

The Operation took place in a "very heightened environment," coupled with an intense "operational tempo," which required vigilance to ensure the safety of the officers and people in their custody.[108] And because they did not have body cameras, agents recorded encounters on their government cell phones to ensure evidence would be available if what happened at that encounter became important later.[109] That recording was lawful. It is also legitimate for officers to identify people or vehicles that actively insert themselves into an enforcement situation—and to use basic investigative tools and their experience to assess whether they present safety or operational concerns. *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 412 (1997) (describing the government's interest in officer safety as "legitimate and weighty") (citation omitted).

---

[107] *Supra* Background, Parts II & V.A.
[108] D.L. Dep. 42:6-19.
[109] D.L. Dep. 42:24-43:19; *id.* 44:1-2 ("So absent a body camera, what would you have us do?"); PI-Ex. 12, R.N. Decl. ¶¶ 8, 10-12.

A person can engage in protected activity and still be engaged by law enforcement.[110] Plaintiffs argue that they were not "interfering," they presume that the standard for "interfering" must be that under 8 U.S.C. § 111 (requiring action "forcibly" taken), though there is nothing in *Glik* to suggest that the First Circuit meant to adopt § 111's standard. In any event, the probable cause threshold to *arrest* does not set the threshold to *gather information* about conduct that "impedes, intimidates, or interferes" an officer before such action might be "forcibly" taken. 8 U.S.C. § 111. Plaintiffs' suggestion to the contrary would impose an untenable standard that would prevent the gathering of evidence and prosecution of those crimes.

### B. Williams' Retaliation Claim Based on Her ICM Records Will Fail

As an offshoot of their broader information-collection claims, Plaintiffs contend that Defendants retaliated against Williams by creating ICM records about her and her vehicle. PI Mot. at 22. Their motion seeks an order "archiving" Williams' ICM record so that she will not automatically be referred to secondary inspection when she enters the United States. *Id.* at 32. Williams is unlikely to succeed on that claim because she has not established standing for the prospective relief she seeks and, in any event, cannot show that the records were created or maintained in retaliation for protected activity.

#### 1. Williams Lacks Standing

Williams has not established a sufficiently imminent injury from the continued existence of the ICM records. Her theory of injury depends on the possibility that, before the secondary-referral designation expires on January 20, 2027, she will travel internationally, return through a U.S. port of entry, and be referred to secondary inspection

[110] ICE 30(b)(6) Dep. 210:3-9.

because of the ICM entry. But the present record does not show that the first two steps of this sequence is likely to occur.

Williams's supplemental declaration states that she and Pantos previously planned to travel to Nova Scotia in September 2026 but ultimately decided not to do so. She identifies no international travel presently planned before January 20, 2027. To the contrary, she states that she has "decided not to travel internationally."[111] Without evidence that Williams intends to travel abroad and return through a U.S. port of entry before the referral designation expires (or would if the requested relief were granted), the alleged future injury remains contingent on events that may never occur. That is insufficient to establish an imminent injury for prospective relief. *Clapper*, 568 U.S. at 409-10.

Plaintiffs cannot cure that defect by pointing out that Agent J.C. theoretically could extend the referral period. The existence of authority to modify an ICM record does not establish that anyone is likely to exercise that authority here. Plaintiffs identify no evidence that J.C. intends to extend Williams's referral window, that his supervisor would approve an extension, or that any extension is otherwise under consideration. Standing cannot rest on a chain of possibilities requiring discretionary actions for which the record supplies no factual basis. *See id.*

### 2. Williams' Retaliation Claim Fails on the Merits

Williams also cannot show that the creation of her ICM records constituted First Amendment retaliation. As explained above, a retaliation claim requires not merely protected activity and an adverse consequence, but a causal connection between the protected activity and the challenged government action. *See Esposito*, 675 F.3d at 42. The

[111] Williams Suppl. Decl. ¶ 49.

record does not support an inference that J.C. created the ICM records to punish Williams for observing or recording immigration enforcement activity.

J.C. testified that he created the records because he believed Williams had interfered with an active enforcement operation and presented a potential concern in the event of future encounters with law enforcement.[112] Plaintiffs dispute that Williams in fact interfered with the operation, and J.C. was mistaken about aspects of Williams's identity. But a factual mistake does not establish retaliatory motive. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 267 (2016). The relevant question is why J.C. created the record. He testified that he believed the conduct warranted documentation for future law-enforcement awareness.[113]

Plaintiffs ask the Court to infer J.C.'s motive behind creating the ICM records by referring to the name of a folder on J.C.'s desktop computer—"Maine surge protestors"—where he saved supporting documents (e.g., ACCRUINT search results) that he referenced when creating the ICM records. Plaintiffs highlight the naming of the folder—referencing "protestors"—to suggest that J.C. created the ICM records to punish people for protesting. J.C. testified that the folder "would have been more accurately named 'aggressors,' 'agitators,' [or] 'interferers,'" but it was not created for public use, and he hadn't given it any thought to use precise terminology.[114] He made it clear that he "encountered more people than protestors" and that the folder documented what happened only with "the people who stood out."[115] The evidence does not suggest that he created the record because

---

[112] J.C. Dep. 70:3-7, 70:11-13, 71:2-23. 73:20-74:2.
[113] J.C. Dep. 70:3-7, 70:11-13, 71:2-23. 73:20-74:2.
[114] J.C. Dep. 269:24-270:2.
[115] J.C. Dep. 269:6-8, 269:22-24; *see* S.C. Dep. 233:17-23.

Williams (or the person he believed to be Williams) held or expressed an anti-ICE viewpoint, because she criticized officers, or because she was simply recording him.

The same deficiency applies to the "refer to secondary" designation. J.C. testified that he understood that designation to mean that CBP would have discretion to conduct a secondary inspection at the border, not that Williams necessarily would be subjected to one.[116] Defendants dispute that secondary inspection itself constitutes an adverse action sufficient to support a retaliation claim. But even assuming it does, Plaintiffs still must show that J.C. selected that designation for the purpose of retaliating against Williams's protected activity. The evidence does not support that inference.

The fact that protected activity formed part of the factual context surrounding the encounter does not mean that the resulting record was created *because of* protected activity with a retaliatory motive. In cases involving retaliatory arrest and prosecution claims based on First Amendment activity, the Supreme Court has fine-tuned the applicable causation standard and burden, recognizing that it is "wholly legitimate" to take law enforcement action because of speech if the "speech provides evidence of a crime or suggests a potential threat." *Reichle v. Howards*, 566 U.S. 658, 668 (2012); *see Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) ("Officers frequently must make 'split-second judgments' when deciding whether to arrest, and the content and manner of a suspect's speech may convey vital information.").

Accordingly, Williams has not shown either an imminent injury sufficient to support prospective relief or a substantial likelihood that the creation and maintenance of her ICM records violated the First Amendment.

---

[116] J.C. Dep. 87:23-88:11.

### C. Plaintiffs' Retaliation Claims Based on Alleged Intimidation Will Fail

Plaintiffs next contend that Defendants' officers retaliated against protected First Amendment activity "by engaging in two particularly egregious intimidation tactics to deter further protected activity: threatening a 'domestic terrorist' designation on a government 'watchlist' or 'database,' and looking up Hilton's home and driving her to her former home." Pl. Br. at 27. The relief they seek is "a tailored injunction that prohibits, within Maine, the practice of intimidating protestors and observers by: (1) threatening to place an individual on a 'domestic terrorist' watchlist or database; and (2) looking up an individual's home address and driving them to that home, in each case because the person engaged in protected activity by observing or recording immigration operations." *Id.* at 34. The discovery record does not support the broad prospective relief they seek over the agency. Plaintiffs have not shown that any of them faces a sufficiently likely threat of experiencing comparable conduct, and the isolated incidents identified in the record do not establish an ongoing retaliatory policy or practice.

#### 1. Plaintiffs Lack Standing

Plaintiffs' intent to continue observing and recording immigration enforcement does not establish a sufficiently imminent threat that they will again experience the particular conduct challenged here. A plaintiff seeking prospective relief must show more than a past constitutional injury and an intention to place herself in circumstances where similar conduct conceivably could recur. *Lyons*, 461 U.S. at 105-10. The question is whether each Plaintiff faces a "real and immediate" threat of the particular constitutional injury for which prospective relief is sought. *Id.*

***No policy or practice.*** To support standing, Plaintiffs must show that the challenged conduct was authorized or that it reflected a pattern sufficiently attributable to official

policy. *See id.* at 105-06, 110 n.9. The evidence shows neither. DHS policy instructs personnel not to "profile, target, or discriminate against any individual for exercising his or her First Amendment rights," and not to "collect, maintain in DHS systems, or use information protected by the First Amendment" unless an exception applies, such as when "that information is relevant to a criminal, civil or administrative activity relating to a law DHS enforces or administers."[117] ICE does not authorize conduct in violation of the First Amendment policy.[118] And ICE issued Maine agents a reminder of—and a request to adhere to—DHS's First Amendment policy.[119]

Nor does ICE sanction a purported "widespread" practice of intimidating individuals who are merely observing or recording from a safe distance. The "domestic terrorist" and "watchlist" remarks alleged in the FAC arose twice during the Operation, in the two instances that began this case.[120] At other times during the Operation, Plaintiffs engaged in multiple opportunities to observe and record ICE activity, and none allege First Amendment injuries during any of those other opportunities. The alleged "practice" where an officer has driven to the address of a car that has been driving behind them at length was not alleged to have been experienced by *any* Plaintiff in the FAC, demonstrating it was plainly not a widespread occurrence. Nor, as discussed below, did Hilton's alleged June 2016 encounter constitute First Amendment retaliation.

***Materially changed conditions.*** Plaintiffs cannot show that future injury is likely merely by pointing to the continued presence of immigration enforcement in Maine and

[117] TRO Opp'n Ex. B, DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019), ECF No. 18-4.
[118] ICE 30(b)(6) Dep. 244:15-245:5, 258:6-259:17, 281:14-282:2, 288:17-289:6, 290:9-21, 305:11-22, 319:13-24, 381:18-382:3.
[119] TRO Opp'n Ex. A, ECF No. 18-3.
[120] J.R. Dep. 326:8-20; J.C. Dep. 177:15-178:6, 319:2-9. *See infra* n.11.

stating that they intend to continue seeking out opportunities to observe. Their complaints arose during an enhanced operation involving an unprecedented spike of enforcement activity that then returned to ordinary levels. Plaintiffs' past exposure to allegedly unlawful conduct during exceptional circumstances does not establish likely future exposure under materially changed present conditions. *See, e.g.*, *Tincher*, 2026 WL 2797318, at *9 ("The past injuries Plaintiffs experienced are less indicative of a threat of imminent future harm given that they are less likely to be out protesting at-large immigration enforcement activities when fewer of those actions are taking place."); *id.* ("While Plaintiffs each allege troubling incidents of past harm, . . . they could no longer establish that they face an imminent risk of harm without the 'ongoing, persistent pattern' of misconduct that occupied [the Minnesota enhanced operation]."); *Chicago Headline Club v. Noem* 168 F.4th 1033, 1037 (7th Cir. 2026) (recognizing how the end of an "enhanced immigration enforcement initiative . . . could affect both the justiciability of this case and the propriety of injunctive relief.").

***Fact-specific circumstances.*** Any likelihood of future unconstitutional interference with the right to observe and record must turn on the circumstances of a likely future encounter.[121] For instance, officers are entitled to issue "reasonable orders to maintain safety and control," *even if* those orders "have incidental effects on an individual's exercise of the First Amendment right to record." *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012)); *see Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (the right to record is subject to "reasonable time, place, and manner restrictions"). Once a reasonable restriction has been imposed, the First

[121] *See* ICE 30(b)(6) Dep. 205:17-209:8 (outlining "myriad" relevant factors).

Amendment does not protect conduct exceeding it. *See id.*; *Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (concluding that the First Amendment did not protect the plaintiff's "conduct in refusing to move on after being directed to do so"). Plaintiffs apparently believe that they need not follow officers' instructions to move back from an established perimeter based on a First Amendment right to record.[122] Thus, in any future encounter where officers issue a reasonable order maintaining a safe perimeter,[123] Plaintiffs may decide not to comply based on their training. Their conduct after that would not fall within the scope of the First Amendment's protections, and any officers' conduct in response would not impose a constitutional injury. The speculation involved in assessing and weighing all those contingencies is untenable for prospective relief to rest on. *See Clapper*, 568 U.S. at 410-14.

***Hilton's June 2026 encounter.*** Finally, Hilton's more recent assertions about an ICE agent who allegedly drove to her former address do not cure Plaintiffs' standing defects. Standing must be established plaintiff-by-plaintiff and with respect to the particular injury for which relief is sought. *See TransUnion*, 594 U.S. at 431 ("Standing is not dispensed in gross."); *Friends of the Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Also, standing is assessed by "the facts as they existed at the time the [operative] complaint was filed." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023) (brackets in original) (citations omitted). None of the Plaintiffs claimed that an ICE vehicle came to their house in the FAC, and Hilton's recent conduct of following an ICE vehicle

[122] Ex. 11; Ex. 15; Neff Decl. ¶¶ 3, 7.
[123] Whether an order is appropriate for safety reasons depends on context. *See Glik*, 655 F.3d at 85. An order maintaining a strict perimeter during a traffic stop—"an 'inherently dangerous situation'"—should be assessed differently from an order doing so in a city park. *Id.* Officers face an "inordinate risk" during traffic stops, *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977), and require "'unquestioned command of the situation.'" to minimize the risk of harm to officers, people in the vehicle, and bystanders. *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).

for 45 minutes, not filming, differs materially from Plaintiffs' pleaded encounters involving face-to-face recordings of active enforcement operations.[124]

Even apart from that pleading problem, Hilton's allegations involving the June 2026 driving incident do not establish an imminent threat of future injury to herself or the other Plaintiffs for all the same reasons discussed with regard to the "database" comments above. The evidence does not establish that that this was pursuant to a policy or so widespread that it is imminently likely to recur.

Hilton's individualized allegation does not establish that the other Plaintiffs face a real and immediate threat of having ICE officers drive to their homes. Further, Hilton's personal circumstances materially diminish the asserted threat of future injury to herself, as she no longer resides in Maine, where the encounters underlying the operative complaint occurred and where Plaintiffs seek the scope of their injunction to extend.[125] Thus, none of the Plaintiffs have standing for the relief they seek.

**2. Plaintiffs' Retaliation Claim Fails on the Merits**

Plaintiffs' intimidation allegations also do not establish a likelihood of success on the merits. A First Amendment retaliation claim requires an objectively adverse action taken because of protected activity. *See Esposito*, 675 F.3d at 43. A tense or unpleasant law-enforcement encounter does not establish either element.

***Watchlist Comments.*** The isolated "domestic terrorist" and "watchlist" remarks did not rise to the level of adverse action. Although Hilton and Fagan have sworn that they experienced an alleged chilling effect as a result, their own documents show otherwise.[126]

---

[124] *See* Hilton Dep. 78:9-16 (stating that the last time she filmed law enforcement officers was May 2026).
[125] Hilton Suppl. Decl. ¶¶ 1, 63.
[126] Hilton was back out on "foot patrol," walking around Portland and looking for ICE two days after her encounter. Ex. 9 (PLAINTIFFS-000239); Hilton Dep. 152:19-22. Fagan ordered a whistle and ski mask

In any event, even if the comments were true and Plaintiffs were in fact placed on a watchlist, that would not have created a concrete injury in fact to support standing, let alone an adverse action. *See Tincher*, 2026 WL 2797318, at *10; *Flynn v. Verizon Wireless*, No. 3:22-CV-1065 (JAM), 2024 WL 2701676, at *5 (D. Conn. May 23, 2024) (applying *TransUnion* and concluding that a plaintiff who alleged that a government official labeled him a domestic terrorist lacked standing because he had "not alleged that [the official] disseminated any list that included him, nor that she communicated his alleged status as a domestic terrorist to anyone in any way"), *aff'd in part, appeal dismissed in part*, No. 24-1562, 2025 WL 1671271 (2d Cir. Feb. 13, 2025).

***Hilton' June encounter.*** Hilton's alleged June 2026 encounter with an ICE vehicle also does not satisfy the elements of a First Amendment retaliation claim. For one, Hilton's recounting of the incident does not demonstrate an "adverse action."[127] Plaintiffs' reference to *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 515 (D. Md. 2015) is unavailing. This was not a "gratuitous show of uninvited law enforcement interest": any officer would be interested in a car that, like Hilton's, was following behind it for at least 45 minutes. Nor was it "harassing," considering that this was one occasion that lasted around 20 seconds.[128] Further, this had no chilling effect, as Hilton continued attempting to observe ICE activity.[129] The impact of this encounter was de minimis.

Finally, the right to film police officers does not extend to tailing them on roadways. Plaintiffs rely on references to *Tincher* declarations and Eighth Circuit case law, *see* Pl.

---

from Amazon five days after her encounter, intending to use them to observe ICE activity. Ex. 10 (PLAINTIFFS-000037); Fagan Dep. 98:4-9.

[127] Hilton Suppl. Decl. ¶¶ 50-51; Hilton Dep. 182:8–24, 185:7–186:1.

[128] Hilton Suppl. Decl. ¶ 52.

[129] *Id.* ¶ 41.

Mot. at 17 n.95, 22, but the district court in *Tincher* rejected the plaintiffs' attempt to treat the "right to observe and record" as "coextensive" with a purported right to follow law enforcement vehicles. *See Tincher v. Noem*, 816 F. Supp. 3d 931, 967 n.24 (D. Minn. 2026) ("[N]one of the caselaw the Court has found clearly supports [the] conclusion" that "following law enforcement vehicles is protected by the First Amendment."); *id.* at 967 n.26 (addressing *Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020)). This Court should not become the first in the country to recognize such a right and need not consider whether to do so in this case because of Plaintiffs' standing deficiencies.

### D. Plaintiffs' Viewpoint-Discrimination Claims Will Fail

Plaintiffs also characterize Defendants' conduct as viewpoint discrimination, contending that officers targeted individuals who opposed immigration enforcement while treating supporters of immigration enforcement differently. Pl. Mot. at 28-30. That theory does not support preliminary relief. Plaintiffs are not challenging an alleged order or policy imposing content-based First Amendment restrictions but are instead challenging individual ICE officers' allegedly retaliatory conduct; these are simply repackaged retaliation claims and should be dismissed. *See* Motion to Dismiss at 19-20, ECF No. 117.

These claims also fail on standing grounds for the same reason as Plaintiffs' retaliation claims, as they have not shown a real and immediate threat of recurrence. The alleged future injury is particularly speculative because Plaintiffs identify no policy, directive, or instruction requiring officers to distinguish among observers according to viewpoint, and in fact, DHS's policy expressly prohibits this.[130] Plaintiffs' theory depends on how unidentified officers might violate DHS policy during future, fact-specific

[130] TRO Opp'n Ex. B.

encounters. That is too speculative and contingent to support standing. *See Clapper*, 568 U.S. at 410-14.

Plaintiffs' viewpoint-discrimination theory should not be reached on the merits, but if it were, it would also fail. Viewpoint discrimination ordinarily involves a government regulation or restriction of expression because of the viewpoint expressed. *See, e.g.*, *Chiles v. Salazar*, 607 U.S. 627, 641 (2026). Plaintiffs identify no regulation, prohibition, or order restricting what they may say or record. They also identify no regulation or directive that distinguishes between people who support immigration enforcement and people who oppose it. To the extent the officers' behavior can be assessed under a viewpoint-discrimination theory, the officers testified that their concerns focused on conduct affecting safety and operations, including the presence of unknown people and cars approaching operational areas, crossing established perimeters, following law enforcement vehicles, or otherwise engaging in conduct officers believed warranted attention.[131] Those explanations turn on people's actions, not on whether they supported or opposed immigration enforcement. Moreover, before the Operation, officers were advised about potential concerns arising from groups that may pose a threat to their safety or operations. The only group that agent S.C. could recall being informed about was one called "Pine Guard"[132]—which happens to hold pro-ICE views according to public reporting.[133] The fact that agents were informed about this group and the potential risks posed by them despite its pro-ICE

[131]J.C. Dep. 167:4-24, 169:18-24, 171:16-172:2, 184:21-24, 211:24-214:2; S.C. Dep. 183:7-18, 186:16-187:3, 190:18-23, 197:20-22, 222:18-24, 247:3-7, 256:24-257:22, 301:12-14, 302:21-302:3

[132] S.C. Dep. 58:16-59:6, 61:12-62:24, 62:21-250:8-18.

[133] *See, e.g.*, Maine Morning Star, *Amid reports of ICE activity, what we know about immigration enforcement in Maine* (Jan. 20, 2026), https://mainemorningstar.com/2026/01/20/amid-reports-of-ice-activity-what-we-know-about-immigration-enforcement-in-maine/

views demonstrates undermines Plaintiffs' theory that ICE would have treated pro-ICE counterprotesters any differently than protestors engaging in the same conduct.

Finally, the strict scrutiny framework is inapplicable, as this case does not involve a rule that, on its face, permits pro-ICE speech while prohibiting anti-ICE speech, or otherwise conditions access to a forum on ideological perspective. Plaintiffs challenge particular officers' conduct during particular encounters based on those officers' own training and experience rather than any directive. Those allegations are thus properly analyzed under the retaliation framework discussed above and should be rejected.

## II. Plaintiffs Have Not Shown Likely Irreparable Harm

Plaintiffs cannot obtain preliminary injunctive relief without showing that irreparable harm is likely in the absence of an injunction. A mere possibility of future injury is insufficient. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). And although the loss of First Amendment freedoms can constitute irreparable injury, Plaintiffs must first establish a sufficiently concrete threat that such a loss is likely to occur. Plaintiffs have not made that showing here. Their asserted claims arise principally from past encounters during the temporary enhanced enforcement operation in Maine. That operation has ended, the temporary personnel involved in the principal incidents are no longer deployed in Maine, and the record does not establish that comparable conduct is presently occurring. The continuation of immigration enforcement in Maine is not itself an irreparable injury. Plaintiffs must show that they are likely to experience the particular conduct challenged in this case, and the record does not support that inference.

## III. The Balance of Equities and Public Interest Weigh Against an Injunction

The remaining factors, which merge where the government is the opposing party, likewise weigh against preliminary relief. *Nken*, 556 U.S. at 435. Plaintiffs have not

demonstrated a likely future constitutional injury, so the asserted benefit of an injunction is necessarily limited. By contrast, the relief Plaintiffs seek would impose prospective judicial constraints on officers conducting inherently fact-dependent law enforcement operations and could interfere with officers' ability to make contemporaneous judgments concerning safety, control over the scene, and operational integrity.

That concern is particularly significant here because the constitutional line Plaintiffs ask the Court to draw cannot be reduced to the proposition that persons recording law enforcement activity may never be directed to move, step back, or disperse, and the Court cannot prohibit officers from gathering information about people they encounter who refuse to follow their directions and engage in other conduct that suggests the potential for escalation, as that is basic law enforcement activity. The First Amendment protects recording of law enforcement officers performing their duties in public, but it also permits reasonable time, place, and manner restrictions and reasonable orders necessary to maintain safety and control. *Gericke*, 753 F.3d at 7-8. Whether a particular restriction crosses the constitutional line or whether a particular person engages in interference by failing to heed such a restriction therefore depends on the circumstances of the encounter. An injunction untethered from those circumstances risks constraining lawful conduct along with unlawful conduct.

Nor is extraordinary equitable intervention necessary to establish the governing rule. DHS policy already instructs personnel to respect First Amendment activity and prohibits the constitutional violations Plaintiffs allege. Against that backdrop, and given the end of the enhanced operation and absence of evidence establishing likely recurrence, the public interest does not favor imposing an additional judicial mandate directed at

hypothetical future encounters. The balance of equities and public interest therefore weigh against preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: October 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER HAAS
Branch Director

/s/ *Natalie M. Villalon*
NATALIE M. VILLALON
J. STEPHEN TAGERT
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 860-9963
Natalie.M.Villalon@usdoj.gov
Stephen.Tagert@usdoj.gov

ANDREW B. BENSON
United States Attorney

JOHN G. OSBORN
Assistant United States Attorney
United States Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
John.Osborn2@usdoj.gov

*Counsel for Defendants*