# In the Matter Of:

*Elinor Hilton and Colleen Fagan vs*

*Kristi Noem, et al.*

---

ICE 30 (b)(6)

*August 18, 2026*

---

LEXITAS™

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

\- - -

ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS, on behalf of themselves and all others similarly situated,

Plaintiffs

v.

MARKWAYNE MULLIN, Secretary of Homeland Security, et al.,

Defendants.

CIVIL ACTION NO. 2:26-cv-00092 -JAW

CONFIDENTIAL
ATTORNEYS' EYES ONLY

\- - -

August 18, 2026

\- - -

Videotaped deposition of [redacted], 30(b)(6), taken pursuant to notice, was held at the law offices of Dunn Isaacson Rhee, LLP, 401 9th Avenue, NW, Washington, D.C., beginning at 9:36 a.m., on the above date, before Michelle L. Ridgway, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public.

\- - -

APPEARANCES:

PROTECT DEMOCRACY
BY: JANINE M. LOPEZ, ESQ.
BY: JoANNA SURIANI, ESQ.
(In person)
2020 Pennsylvania Avenue NW
Suite 163
Washington, DC 20006
202.870.2798
janine.lopez@protectdemocracy.org
joanna.suriani@protectdemocracy.org

- and -

DUNN ISAACSON RHEE LLP
BY: BENJAMIN J. CABRANES, ESQ.
(In person)
BY: TYLER MIKULIS, ESQ.
BY: YOTAM BARKAI, ESQ.
BY: L. RUSH ATKINSON, ESQ.
(Zoom)
401 9th Street, NW
Washington, DC 20004
202.240.2900
bcabranes@dirllp.com
tmikulis@dirllp.com
ybarkai@dirllp.com
ratkinson@dirllp.com
Representing the Plaintiffs

APPEARANCES: (Cont'd.)

U.S. DEPARTMENT OF JUSTICE
BY: STEPHEN TAGERT, ESQ.
(In person)
1100 L Street NW
Washington, DC 20005
202.860.9963
stephen.tagert@usdoj.gov

- and -

DEPARTMENT OF HOMELAND SECURITY
BY: BROOKE JENKINS, ESQ.
(In person)
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528
202.698.4350
brook.jenkins@hq.dhs.gov

- and -

U.S. IMMIGRATION CUSTOMS ENFORCEMENT
BY: KIRSTEN BAUMGARTEN, ESQ.
BY: JOHN CARTER, ESQ.
BY: ERIN KEELEY, ESQ.
(In person)
District Court Litigation Division
Office of Principal Legal Advisor
500 12th Street SW
Washington, DC 20024
kbaumgarten@ice.dhs.gov
john.carter@ice.dhs.gov
Erin.keeley@ice.dhs.gov
Representing the Defendants

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Gordon Thomas - Lexitas

ZOOM MONITOR:
Juan Torres - Lexitas

saying --
MR. TAGERT: Scope.
Speculation.
THE WITNESS: I could say Patricia was in charge of Operation Special Catch of the Day.
BY MS. LOPEZ:
Q. Is there an office that was in charge of Operation Catch of the Day?
MR. TAGERT: Objection. Scope.
THE WITNESS: What do you mean by "office"?
BY MS. LOPEZ:
Q. Which office led Operation Catch of the Day?
MR. TAGERT: Same objection.
THE WITNESS: One second. The binders have small hoops.
Office of Firearms and Tactical Programs.
BY MS. LOPEZ:

Catch of the Day about their responsibilities as agents and officers in connection with that operation?

MR. TAGERT: Objection. Scope.

THE WITNESS: This -- this is what went out to baseline everybody for what was going on.

This is what came out from OFTP and the Joint Operation Center, to level set the operation.

BY MS. LOPEZ:

Q. Is it common during an operation to have ongoing communication from OFTP or Joint Operation Center about the way the operation is being conducted?

MR. TAGERT: Objection. Speculation. Scope.

THE WITNESS: Is it common to?

BY MS. LOPEZ:

Q. Is it common for OFTP or

A. Can I see yours? I can't -- those numbers are tough to read in the bottom right.
Q. It is the --
A. See what it looks like.
Q. It's titled "Execution - Task Organization" at the top.
A. Okay. This one?
Q. Yes.
A. Okay.
Q. You testified earlier that OFTP led the Operation Catch of the Day.
A. Mmhmm.
Q. OFTP is within the ICE Office of the Director, correct?
A. Yes.
Q. Aside from -- I'm sorry?
A. They answer to the ICE Office of the Director.
Q. When this says, "This is an ICE Office of the Director-led operation" --
A. Yeah.
Q. -- do you have

understanding -- do you have an understanding of what that means, other than the fact that OFTP was involved in leading the operation?

MR. TAGERT: Objection. Scope.

THE WITNESS: No. It is. It's -- so I just want to make sure.

The ICE Office of the Director is over everybody, and then they designated OFTP to run it.

BY MS. LOPEZ:

Q. Are there operations that are not led by the ICE Office of the Director?

MR. TAGERT: Objection. Scope.

THE WITNESS: Yes.

BY MS. LOPEZ:

Q. Okay. The next line says, "The Joint Operation Center has been established at Boston Field Office's

Q. You referenced trainings about the Fourth and First Amendment. Is there a specific training covering the contents of this memorandum?

MR. TAGERT: Objection.

THE WITNESS: That -- that would be for officers. Officers are trained -- they will get trained on Fourth Amendment. It's titled Fourth Amendment, but also includes First Amendment.

So they will get trained on that a minimum of once a year as ERO officers, as a minimum. Some offices will do it more, up to once a quarter.

Agents will get this in the academy. However, they are always dealing with the U.S. Attorney's Office on criminal prosecutions and are always working with Fourth Amendment and First Amendment during their

prosecutions, to make sure you are not violating them.

So the training for an agent is -- is not needed as routinely since they are executing it on a routine basis.

BY MS. LOPEZ:

Q. Okay. Just so I'm clear. You referenced the ERO training for officers on the First and Fourth Amendments.

Do those trainings specifically train officers about the policies set forth in this memorandum?

A. They train them on Fourth Amendment. It is given by our Office of Principal Legal Advisor, our attorneys.

So our attorneys do what they know to be legally sufficient and adequate to our officers, that they would need to satisfy the requirements of this memo, whether they read the memo or not.

After all, the memo was

street.

On the other side of the street, there is a person standing there and watching.

Is that person engaged in First Amendment-protected activity?

MR. TAGERT: Objection. Vague. Speculation.

THE WITNESS: Standing? You just -- standing. You said they are just in a car.

So are they in a car or are they standing?

BY MS. LOPEZ:

Q. Well, does that matter to the analysis?

A. It's not -- it's not a science. It's an art. So you have to understand everything. It's the totality of the circumstances.

So it depends on everything. There's a myriad of factors that goes into an officer and agent's frame of reference of what's going on at

answer.

I -- it all depends.

Protected activity is somebody -- somebody can still be protected and have protected activity and still be engaged by law enforcement. It doesn't infringe on their protected activity.

BY MS. LOPEZ:

Q. Okay. So do you agree that the person who is in their vehicle across the street is -- is engaged in protected activity, separate from the question of whether the officer could reasonably engage that person and ask them to move or otherwise engage them?

MR. TAGERT: Objection.

BY MS. LOPEZ:

Q. Is the person engaged in protected activity?

MR. TAGERT: Objection. Vague. Speculation. Legal conclusion.

then again, that would then go right back to impeding a federal officer.

If they are a foot from their face, not allowing them to move, blocking them at every -- at every -- at every turn, is that officer -- are those officers or agents -- are they on their way to execute a final order?

So it could be. Again, it depends on the -- it depends on the factors surrounding it.

The thing it always comes back to is pretty, pretty basic, is everybody's First Amendment rights are protected. They can do it. They can execute how they see fit, until it crosses the line that they are impeding or interfering with a federal law enforcement operation or enforcement action or are

threatening. At that point, it
crosses the line and is no
longer protected activity.
Before that line, it's
protected activity.
BY MS. LOPEZ:
Q. And is the department's
position that there are no categories
for which a bright line rule can be
drawn?
Are there any categories
that categorically fall on the side of
protected activity or unprotected
activity?
MR. TAGERT: Objection.
Vague. Speculation. Legal
conclusion.
THE WITNESS: Yeah. What
do you mean by "bright line"?
That's -- that's -- my
interpretation of that could be
different than yours. Please --
please expand on that.
BY MS. LOPEZ:

BY MS. LOPEZ:

Q. I understand. But from the perspective of the DHS personnel, who is charged with complying with this memo.

A. Yeah.

Q. It says they cannot collect information about First Amendment activity.

Does that include DHS personnel taking photos of people who are engaged in First Amendment activity?

MR. TAGERT: Objection. Vague.

THE WITNESS: Yeah. They "shall not collect, maintain in DHS systems, or use" in any protected by the First Amendment.

"Unless that information is relevant to a criminal, civil, or administrative activity or relating to a law DHS enforces or administers. In addition, DHS personnel shall

not pursue by question, research, or other means, information related to how an individual exercises their First Amendment rights."

So, yes, we wouldn't collect that or keep it. Or we wouldn't collect it unless it is pertaining to a relevant criminal, civil, or administrative activity to law enforcement -- to DHS law enforcement, which would include interfering with a law enforcement operation, impeding law enforcement, or threats to law enforcement.

BY MS. LOPEZ:

Q. Okay. Looking at the bottom of the third page, there's a reference -- the final paragraph -- to the acting secretary tasking CRCL and the DHS Privacy Office "to review existing guidance and develop new

I thought I saw the one --
I can't find it at this point in time.

BY MS. LOPEZ:

Q. To the extent you are thinking of policies that discuss collection of information about First Amendment activity, is it fair to say you only have in mind policies that are in your binder of materials you've reviewed in preparation for today?

MR. TAGERT: Objection.

THE WITNESS: Clarification on the policies, that they are not defined on how to collect people executing their First Amendment rights.

It defines that they will not collect on people executing their First Amendment rights, with the exception if the person exercising their First Amendment rights crosses the line and infringes or impedes a federal

operation, threatens a federal
officer.
BY MS. LOPEZ:
Q. With that clarification --
A. So yes.
Q. -- fair to say you are
only --
A. So yes.
Q. -- thinking of the policies
that you have in your binder in front of
you?
A. Yes. Unless I'm -- unless
I'm reminded of another policy that has
slipped my mind.
Q. Does the department have a
position on who counts as an agitator?
MR. TAGERT: Objection to
the form of the question.
THE WITNESS: As an
agitator? In what context?
BY MS. LOPEZ:
Q. I'm asking you. Is that a
term you've used before?
MR. TAGERT: Objection.

agitator/protestor but no arrest, summarize the event."

Do you see that?

MR. TAGERT: Same objection.

THE WITNESS: Where do you see that?

BY MS. LOPEZ:

Q. Number 5 on the intel collection form.

A. Oh, okay.

Q. So does the department have a position on who counts as an agitator?

MR. TAGERT: Objection. Scope. Speculation. Vague.

THE WITNESS: Yes. An agitator would be somebody that has crossed the line from their First Amendment-protected activity into something that is seen by the officer on the ground to inhibit the law enforcement -- the execution of their law enforcement duties.

BY MS. LOPEZ:

Q. Is it --

A. By the mere definition of agitator, it would seem to imply that since this is something that -- it would seem to imply that -- that the person wasn't -- was beyond the scope of their First Amendment-protected activity and had engaged with law enforcement professionals in a way that would deem appropriate for them to engage the person, to execute the law enforcement mission.

Q. Just to make sure I understand. Is an agitator someone who has actually committed a violation of a federal criminal law by impeding an operation?

MR. TAGERT: Objection. Scope. Speculation. Vague.

THE WITNESS: What I'm saying is they would not be encountered by law enforcement if they were not impeding the

execution of the law enforcement operation or the law enforcement duties or threatening a law enforcement, where the person deemed -- that the law enforcement officer or agent deemed it appropriate to interact with that individual.

BY MS. LOPEZ:

Q. Has the department explained the meaning of the term "agitator" to agents operating in the field?

MR. TAGERT: Objection. Speculation. Vague. Outside the scope.

THE WITNESS: The need for explanation of agitator is not necessary. Since, if the person is following the First Amendment -- utilizing their First Amendment-protected rights, we don't interact with them.

So an agitator, if they
crossed the line, would be
engaged by law enforcement if
they were impeding or -- or
interfering with lawful -- law
enforcement activity.
BY MS. LOPEZ:
Q. Is someone who stands
10 feet away from an operation and films
an operation as it's taking place an
agitator?
The only answers here to my
question are, "Yes," "No," or "It
depends."
Do you have an
understanding of whether a person who
stands and films an agitator -- films an
operation counts as an agitator?
MR. TAGERT: Objection.
Speculation. Vague. Outside
the scope. Argumentative.
THE WITNESS: What are my
three options for answers?
BY MS. LOPEZ:

Q. "Yes," "No," or "It depends."

A. It depends.

Q. Has the department ever instructed agents to collect information about agitators?

MR. TAGERT: Objection. Vague. Speculation. Scope.

THE WITNESS: Well, based on what you handed me as an -- as an exhibit, it does reference agitators.

But, again, somebody that is classified as a agitator, which is not executing their -- has stepped beyond the line of executing their First Amendment right and has, in some way, shape, or form, interfered with the law enforcement operation and how he is performing it.

BY MS. LOPEZ:

Q. And what's the purpose of obtaining information on agitators?

they've gotten a -- if it is a -- if it's on a phone, has it been -- it goes back to the is it a PDF. Is it a Java. Did somebody write a script, write a Python script, to actually create this?

So it could be -- it could be outside of many different policies with as broad as it is.

However, it still goes back to, and doesn't change, that if the protestors are executing their First Amendment rights and they don't -- they don't cross that line to impede a federal law enforcement operation, or any law enforcement operation, to that matter, that we are enforcing, and they don't threaten a law enforcement officer, then...

BY MS. LOPEZ:

Q. The position of the

Vague. Speculation. Outside the scope.

THE WITNESS: It's the context in which you're saying it.

You can say this is -- if you're saying that if they had any action with an agitator or protestor, but no arrest, summarize the event.

So, again, it goes back to the original. They would have an interaction with a protestor, should the protestor have crossed that line and the officer or agent deems it appropriate to interact with them.

You would still -- you could still call them a protestor so people understand instead of Subject 1, Subject 2, Subject 3, Subject 4, Subject 5, Subject 6, and so on.

But it doesn't mean that the protestor -- just because it says protestor, doesn't mean that the person didn't cross the line, which is what all the agents and officers are trained to, that you don't interact and don't -- you don't infringe on the protestors' protected First Amendment rights unless they cross the line and are impeding a federal action, law enforcement operation, or threatening.

BY MS. LOPEZ:

Q. What level of suspicion would a person -- would an agent need to have in order to submit information about them to a form like this?

MR. TAGERT: Objection. Speculation. Vague. Scope.

THE WITNESS: What levels of suspicion are you referring to?

Vague.

THE WITNESS: Can you rephrase that, please.

BY MS. LOPEZ:

Q. Were agents, at any point, advised that it was a good practice to collect information, such as photos or license plate information, about members of the public who were protesting or recording their operations?

MR. TAGERT: Objection. Vague.

THE WITNESS: Agents were instructed to let people executing their First Amendment rights execute their First Amendment rights.

Do not engage with the protestors unless they cross the line and -- and they are impeding a law enforcement operation or threatening a law enforcement officer, which would be a law that we enforce.

physically touch the officers. Another protestor, however, shoves an ICE officer attempting to clear the entrance."

Under that case study is the question, "Which actions are protected under the First Amendment?"

We don't have the department's speaker notes or other information about the responses that were presented to agents.

Do you, sitting here today, know what the department's position on which activities are protected under the First Amendment here is?

MR. TAGERT: Objection. Speculation. Scope.

THE WITNESS: Yeah. The department's -- what's protected under the First Amendment is anybody that is executing their First Amendment rights and not impeding a law enforcement officer during the execution of

his duties or threatening a law enforcement officer or -- yeah.

Go ahead.

BY MS. LOPEZ:

Q. On the facts presented here, do you have an understanding of at what point the conduct violates 18 U.S. Code 111?

MR. TAGERT: Same objections.

THE WITNESS: What you're looking at is a case study, and what you're asking for is discussion points.

So when they do a case study like this, they started off with a baseline, and they keep asking and changing the scenario. Similar to what you were doing earlier. They keep changing the scenario to see how everybody interacts and see what it is.

So this right here would

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, [redacted], have the opportunity to read and sign the deposition transcript.

MICHELLE L. RIDGWAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public
Dated: August 20, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)