**In the Matter Of:**

*HILTON v*

*MULLIN*

---

*Confidential - Attorneys' Eyes Only*

*D. L.*

*July 18, 2026*

---

LEXITAS™

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil Action No. 2:26-cv-00092-JAW

- - - - - - - - - - - - - - - - - - -X
ELINOR HILTON, et al., :
Plaintiffs :
:
VS :
:
MARKWAYNE MULLIN, Secretary of :
Homeland Security, et al., :
Defendants :
- - - - - - - - - - - - - - - - - - -X

CONFIDENTIAL

ATTORNEYS' EYES ONLY

Videotaped deposition of [redacted] taken at the Mystic Marriott Hotel, 625 North Road, Groton, Connecticut, before Clifford Edwards, Certified Shorthand Reporter and Notary Public, in and for the State of Connecticut on Saturday, July 18, 2026, at 8:30 a.m. EDT.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

L. Rush Atkinson, Esq.
Benjamin J. Cabranes, Esq.
Tyler Mikulis, Esq.
Jeannie S. Rhee, Esq. (via Zoom)
DUNN ISAACSON RHEE LLP
401 9th Street, NW
Washington, DC 20004
+1 202.240.2900
ratkinson@dirllp.com
bcabranes@dirllp.com
tmikulis@dirllp.com
jrhee@dirllp.com

Janine M. Lopez, Esq.
PROTECT DEMOCRACY
2020 Pennsylvania Avenue NW
Suite 163
Washington, DC 20006
janine.lopez@protectdemocracy.org

JoAnna Suriani, Esq. (via realtime stream)
Joanna.suriani@protectdemocracy.org

Ori Lev, Esq. (via realtime stream)
ori.lev@protectdemocracy.org

Elias Boujaoude, Esq. (via realtime stream)
elias.boujaoude@protectdemocracy.org

Kenneth Parreno, Esq. (via realtime stream)
kenneth.parreno@protectdemocracy.org

ON BEHALF OF THE DEFENDANTS:

Natalie M. Villalon, Esq.
Federal Programs Branch, Civil Division
DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 860-9963
Natalie.M.Villalon@usdoj.gov

Kirsten Baumgarten, Esq. (via Zoom)
District Court Litigation Division
Office of Principal Legal Advisor
US IMMIGRATION CUSTOMS ENFORCEMENT
500 12th St. SW
Washington, D.C. 20024

ALSO PRESENT:

Brooke Jenkins, attorney advisor, Office of the General Counsel, Department of Homeland Security brooke.jenkins@hq.dhs.gov (via Zoom)

Kevin Marth, videographer

A Did agents record video of --

Q Protesters?

A Yes.

Q Were you instructed to do so?

A No, sir.

Q How did that come about? How did you come to record protesters?

A I mean, a few months before this operation you had people in Texas that shot up the sally port and killed two people in custody, which I think they all just got convicted of.

And then I -- I don't remember exactly when the first shooting in Minnesota occurred, but it was right before or maybe right when we got to Maine.

So you had a very heightened environment that we were operating in, coupled with the operational tempo, coupled with people in vehicles that appeared to be following us around because they would -- very similar-looking vehicles. And people would pop up at different places and act almost as provocateurs to get people to surround us and blow whistles.

I don't know if you guys have ever been shot at or had airmail launched at you. I have.

You don't know -- you are not issued a crystal ball so you don't know what's going to be important or germane later.

And we are also responsible for the people in our custody. So we were getting not only surrounded during the operation, but when we would hand off detainees to the prisoner transport folks, they were surrounding us there.

And that was my bigger concern because if something happens there, guess who's responsible? Right?

So that's why we didn't have body cameras. We didn't have the support of the state or the local police. And then there was a couple instances where they passed us by and didn't everyone slow down to say, Are you guys okay?

So that's why I recorded when we got out. Because if something happened, then at least you would have a place to start.

Because I know the U.S. Attorneys Offices in New York where I worked because I went through this in 2020 with antifa. And they were declining or downgrading charges because there's no body cam footage because they are not going to get a conviction.

So absent a body camera, what would you have us do?

Q So did you discuss recording -- making recordings with others before the operation?

A No, sir, I didn't. It was based on my experience.

Q Did you -- did you discuss recordings with any other members during the operation?

A No. I don't believe so.

Q How about recording license plates numbers, do you remember doing that?

A Yes.

Q And did you record license plates numbers of vehicles believed to be used by protesters?

A Yes.

Q Were you instructed to do that?

A No, I was not, sir.

Q What would you do with the license plate numbers, after you took them down?

A Nothing.

Q Did you ever send them to -- to another agent for a records check?

A I don't believe I did. No, sir.

(Whereupon, there was a discussion

is, I guess it is.
Q Well, let me ask: Based on that interaction, that video, was the civilian that was filmed doing anything illegal, that you observed?
A No.
Q I guess I should ask you. Did you recognize yourself in that video, as well?
A I -- unfortunately, I did. Yes.
Q And my apologies. I'm going to have to ask you to --
A That's okay.
Q What, if any, action based on those two videos would indicate to you that that civilian posed a threat to officer safety?
MS. VILLALON: Objection. Lacks foundation.
BY MR. ATKINSON:
Q Did you think that that individual that you engaged with posed a threat to officer safety?
A No. But there's always the potential, right?
She's -- you know, you could see, she was this far away from my GOV.
Q But nothing specific, other than the proximity to you?

that, Sometimes [sic] after the vehicle stop on January 20th, Special Agent [redacted] received video footage from Agent 3.

That's you.

A Okay.

Q So do you have any reason to think that's not true?

A No.

Q If you were going to send Agent [redacted] video, how would you have done it?

A They -- probably, either text or e-mail it, you know.

Q What would have the purpose have been of sending Agent [redacted] video?

A He either requested it or the person involved was -- their level of involvement was raised or heightened to this -- maybe we've seen them on another thing.

I mean, it's kind of an open-ended question. I don't know who you're, in particular, you're speaking about.

Q Would the individual who we saw in your proximity, would that have been heightened, in your mind?

A No.

Q The -- oh.
The text or e-mail that's referenced in this response to the interrogatory has not been produced in the case. Do you know why?
A No.
Q And if -- if somebody had been engaged in what you described as heightened activity, what would you have expected Agent [redacted] to do with the information after he received it?
A To -- probably to figure out who they are. Because again, going back to the environment we were operating in, it was relayed to us that they were out looking for us.
They knew where we were staying and they were looking at either physically harm us in the parking garage or damage the vehicles so that they couldn't be used.
Q Do you remember who told that to you?
A I don't remember specifically. But it probably came down from the JOC, the Joint Operations Center.
Q How would they have communicated that to you?
A They probably would have reached out, maybe to Sean.

Q And "high side" refers to the classified systems that, typically, are used by law enforcement agents?

A Right.

But HSI doesn't run a red side and a green side, that's the FBI.

Q All right. So --

A So I -- yeah, I don't...

Q You -- you said "the constant drumbeat," but then you kind of trailed off.

Can you just finish the thought?

A The constant drumbeat of -- again, there were vehicles and people who appeared to be the same vehicles and people following us around. Whether they were using radios or some kind of encrypted app, I don't know.

But they would follow us around and, kind of, call in -- they'd act as provocateurs, right? Like, they'd call in these people to try to interfere, just disrupt what you were doing by blowing whistles. And -- so you don't know what people are going to do.

Again, you know, I referenced a -- the shooting in Texas, where people just got like 400 years in jail. And then the Renee Good shooting

was all, kind of, packed into one tense environment, into a really small operational area up in Maine.

And that's what we had to contend with, with -- with no outside law enforcement help.

Q So just to be clear, you called them "provocateurs."

Blowing whistles, I think we -- your testimony earlier was that that's not unlawful activity?

A No, it's not.

Q And public -- publicly observing arrests is not unlawful activity?

A I didn't say it was. No, sir.

Q I just want to make sure what you --

A Yeah.

Q "Provocateur" doesn't necessarily mean it's criminal. Is that fair?

A That's fair. Yeah.

Q Let's go to the -- the next video, which is going to be Plaintiff's 13.

And we are -- I'm going to show you two -- I'm going to show you 13 and 14 in quick succession because they are overlapping --

A Sure.

to recollect off of watching the video.
I didn't know what he was going to do.
Q Do you remember him physically touching any agent?
A Yeah. Me.
Q He -- you recall him touching --
A Yeah.
Q -- initiating --
A He verbally said, "Get the fuck away from my car."
And he -- he checked me. And that's --
Q Okay. Did you report that as a --
A No.
Q -- assault?
He certainly made crude result -- crude agents -- or crude -- made crude comments to agents. But that's not a federal crime, is it?
A No.
And I'm five, six, for the record.
Q Do you recall doing anything with the video after you made -- after you made that?
A No.
Q Do you recall running his license plate?
A No, I didn't.

A No, sir.
Q In terms of SuperQuery checks, did you -- did you receive any training or guidance as to when you could use -- run a SuperQuery check?
A No.
Q Did you believe you needed to have some sort of reasonable suspicion or could it be done without suspicion?
A I think it depends on the situation.
Q Can you explain that?
A Well, particularly in this environment, again, where I'm -- you know, I'll just use this gentleman as an example -- where they show up repeatedly at different places.
You know, why are they following us around?
It's their right to do it. We are not stopping you from doing it, but at least find out who the -- who the guy is.
Because we didn't know, on any given day again, if you'd walk in the parking garage and all your tires on your GOV are slashed and -- at least you would have -- you -- you did investigations -- at least you'd have something to start with, you know?

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to any of the parties to said suit, nor am I an employee of any party to said suit, nor of any counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 21st day of July, 2026.



Clifford Edwards

Connecticut Notary Public No. SNPC.0129714

My commission expires: 9/30/2026