**In the Matter Of:**

*ELINOR HILTON, et al. V.*

*MARKWAYNE MULLIN*

---

*OFFICER J. R.*

*August 11, 2026*

---

LEXITAS™

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

------------------------------

ELINOR HILTON, et al.,

Plaintiffs,

V. Civil Action No.

MARKWAYNE MULLIN, Secretary of 2:26-cv-00092-JAW

Homeland Security, et al.,

Defendants.

------------------------------

CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEO-RECORDED DEPOSITION OF

OFFICER [redacted]

Tuesday, August 11, 2026

9:10 AM EASTERN TIME

JOB NO.: 2026-1034004

Reported by: Denise Dobner Vickery, CRR, RMR

Tuesday, August 11, 2026

9:10 AM EASTERN TIME

Video-Recorded Deposition of OFFICER [redacted], held at the offices of:

DUNN ISAACSON RHEE LLP
401 9th Street NW
Washington, DC 20004

Pursuant to notice, before Denise Dobner Vickery, Certified Realtime Reporter, Registered Merit Reporter, and Notary Public in and for the District of Columbia.

APPEARANCES:

Representing the Plaintiffs:

DUNN ISAACSON RHEE LLP
BY: BENJAMIN J. CABRANES, ESQ.
BY: L. RUSH ATKINSON, ESQ.
401 9th Street NW
Washington, DC 20004
202.240.2900
bcabranes@dirllp.com
ratkinson@dirllp.com

PROTECT DEMOCRACY
BY: ORI LEV, ESQ.
2020 Pennsylvania Avenue NW, Suite 163
Washington, DC 20006
ori.lev@protectdemocracy.org

TYLER MIKULIS, ESQ. (Via realtime stream)
tmikulis@dirllp.com
YOTAM BARKAI, ESQ. (Via realtime stream)
ybarkai@dirllp.com

APPEARANCES: (Continued)

Janine M. Lopez, ESQ. (Via realtime stream)
janine.lopez@protectdemocracy.org
JoAnna Suriani, Esq. (Via realtime stream)
joanna.suriani@protectdemocracy.org

Representing the Defendants:

U.S. DEPARTMENT OF JUSTICE
BY: STEPHEN TAGERT, ESQ.
1100 L Street NW
Washington, DC 20005
202.860.9963
stephen.tagert@usdoj.gov

U.S. IMMIGRATION CUSTOMS ENFORCEMENT
BY: KIRSTEN BAUMGARTEN, ESQ.
District Court Litigation Division
Office of Principal Legal Advisor
500 12th Street SW
Washington, DC 20024

APPEARANCES: (Continued)

ALSO PRESENT:

David Campbell - Videographer

Ishan Lal - Paralegal, Dunn Isaacson Rhee

ALSO PRESENT VIA ZOOM:

Ileana Gomez, Assistant Chief Counsel, Customs and Border Protection

Brooke Jenkins, Attorney Advisor, Office of the General Counsel, Department of Homeland Security

Brandon Smith, Esq., Office of Chief Counsel, Customs and Border Protection

Rachel McDonald, Esq., Office of Chief Counsel, Customs and Border Protection

Bailey Tietz - Legal Projects Assistant, Dunn Isaacson Rhee

Q. I'll rephrase the question.
Were you the Strike Team supervisor entire time they were conducting professional responsibilities in Maine during Operation Catch of the Day?
A. Yes.
Q. And was your supervisor the same throughout that entire operation as well?
A. I believe so, yes.
Q. And who was that supervisor?
A. Steve Wells.
Q. And was he -- I'll withdraw.
Who -- based on what you know, who was in charge of operating Operation Catch of the Day?
A. I have no --
MR. TAGERT: Objection. Speculation.
THE WITNESS: I have no idea.
BY MR. CABRANES:
Q. Do you know whether Operation Catch of the Day was organized in teams?
MR. TAGERT: Objection.

Q. What about the CBP officers?
A. No, not that I'm aware of.
Q. And what about members of the Office of Firearms and Tactical Programs?
A. I have no idea.
Q. Are you aware of whether other Operation Catch of the Day teams -- withdrawn.
Did ERO teams have the same role in Operation Catch of the Day as agents from other units?
MR. TAGERT: Objection. Speculation. Vague.
THE WITNESS: I have no idea.
BY MR. CABRANES:
Q. What was your primary role during Operation Catch of the Day?
A. I was supervisor over team from Utah.
Q. Do you know what CBP's role was in Operation Catch of the Day?
A. I have no idea.
Q. Did ERO operate under the same JOC as -- as other components during Operation Catch of

THE WITNESS: Theoretically, yes.
BY MR. CABRANES:
Q. Are you aware of what quick reaction force is?
A. I am.
Q. What's the difference between quick reaction force and a -- and a special response team?
A. I don't know if there is a difference. I think SRT members were part of a quick reactionary force.
Q. When you were in Maine, were you part of a quick reactionary force?
A. I was not.
Q. What is your understanding of what the purpose is of a quick reactionary force?
A. To deploy to rescue teams in the event that they get surrounded by protesters or agitators, or if there's an incident involving any kind of use of force or -- well, severe uses of force or something.
Q. What is an agitator?
A. Somebody that tries to interfere with

our arrest.

Q. And is that different than a protester?

MR. TAGERT: Objection. Vague.

THE WITNESS: I -- not -- I mean, nah. Yes, I guess. I don't know. Protests can turn into agitation quickly. So.

BY MR. CABRANES:

Q. So, so you used both terms in response to my question, which was, what is your understanding of what the purpose is of a quick reactionary force.

Your response was to deploy to rescue teams in the event that they get surrounded by protesters or agitators, or if there's an incident involving any kind of use of force.

A. That is not all I said, but sure.

Q. Or severe uses of force or something.

A. I clarified that, you know, not any use of force requires the deployment of a quick QRF.

Q. Fair enough. That's helpful.

So when you describe the purpose of a quick reactionary force, is your understanding the

Q. A nongovernmental employee.
A. Nongovernmental employee.
Q. Such as -- such as someone protesting you, for instance?
A. Oh. Have I ever had a protester while I was conducting operations? Yes.
Q. Is that something you've encountered more than once?
A. Yes.
Q. Is that something you encountered in Minneapolis?
A. In Minneapolis, yes.
Q. Is it something you encountered in Minneapolis more than once?
A. Encountered in Minneapolis.
Yes.
Q. Did you receive any instruction, written or oral, from anyone about how to handle protesters who might show up to observe your enforcement operations in Minneapolis?
A. Specifically to observe? No.
Q. Did you receive any instruction,

written or oral, about how to handle protesters who might show up to film your enforcement operations in Minneapolis?

A. No.

Q. Did you receive any instruction --

A. Not that I recall.

Q. -- about someone who might show up to demonstrate with a sign, say?

A. Not that I recall.

Q. How about protesters generally? Were you given any general instructions about how to handle protesters that might appear while you were conducting immigration enforcement?

MR. TAGERT: Objection. Vague.

THE WITNESS: Handle protesters. I -- I guess I don't understand your -- what you mean by "handle."

BY MR. CABRANES:

Q. When you're conducting immigration enforcement operation and a protester is present, are you aware of any rules that apply to what you may or may not do?

A. Not that I can think of.
Q. So you're not aware of any rules that apply when you're conducting immigration enforcement and a protester is present?
A. Nothing's come to mind.
Q. Do you receive any instruction regarding protesters following ICE officers while they're conducting immigration enforcement operations?
A. Following ICE officers while they're conducting. Instructions.
I don't -- not that I recall. Instructions? No.
Q. Do you recall receiving any instructions about collecting information about protesters that came while you were conducting immigration enforcement operations?
A. Protesters. No.
Q. So I think we mentioned earlier that you use Signal chat during Operation Catch of the Day; is that correct?
A. That is correct. You mentioned that.

A. I don't recall. Whoever was running the operation.
Q. Supervisors of some kind?
A. I'm assuming so.
Q. And can you explain, what did they want you to document?
A. I think they just wanted -- I think they just wanted us to film --
Q. And what --
A. -- for possible prosecutions. I believe it was DOJ that specified that they wanted video evidence of any kind of interference with operations.
Q. And --
A. Again, I want to be very clear. We don't consider agitators and protesters the same thing.
Q. And who is "we" when you say speaking?
A. Okay. I'm going to speak for myself.
Q. Okay.
A. I don't consider agitators and protesters the same thing.

Q. So what's the -- what's the difference, in your opinion?
A. An agitator is someone that's interfering with a law enforcement operation. A protester is someone exercising their rights.
Q. And what constitutes interference, in your opinion?
A. There's a lot of things that can constitute interference.
Q. Does filming a law enforcement operation constitute interference?
A. It depends on how close they are.
Q. So sometimes it can constitute interference, in your view?
A. Yes.
MR. TAGERT: Objection.
THE WITNESS: Sorry.
BY MR. CABRANES:
Q. Is interference criminal?
A. It can be.
Q. How close is too close to film an operation?

A. I don't know. I don't think there's a specified distance.

Q. Is that something that's left in the officer's discretion to determine in the field?

A. Can be.

Q. If someone filming an operation from too close a vantage point, what would be your typical response to that?

A. I'd ask them to step back.

Q. Would you arrest them?

A. If they didn't comply, possibly.

Q. And what would the crime be in that case?

A. 18 USC 111.

Q. And is that -- have you ever arrested someone under that statute before?

A. I have.

Q. Do you recall -- do you recall -- withdrawn.

So going back to the difference between protesters and agitators, is the word "agitators" synonymous with criminal, in your mind?

Q. My question was: Do you recall conducting immigration enforcement operations?
A. It's a very broad term, but yes, I guess.
Q. Did you interact with members of the public during the first three days of Operation Catch of the Day?
A. I'm sure --
MR. TAGERT: Objection. Vague.
THE WITNESS: I'm sure I did.
BY MR. CABRANES:
Q. Generally speaking, is a member of the public taking out a phone while you're conducting immigration enforcement operations a -- would you consider that a threat?
A. Again, depends on how close they are. The phone itself is not the threat.
Q. If you're conducting operations on a public street and the person is in their car across the street, would you consider that a threat?
MR. TAGERT: Objection. Hypothetical. Speculation.

MR. CABRANES: All right. I'm going to introduce now our first video. It's an exhibit that was produced by plaintiffs in this matter. It's PLAINTIFFS-00032.

MR. TAGERT: So refresh the page I think.

MR. CABRANES: And we're introducing it now, and my paralegal Ishan is going to make sure that the tech is working on your end.

(Video marked for identification as [redacted] Exhibit 6.)

(Whereupon, a video started playing.)

(Screaming heard).

FEMALE VOICE: Help her. Nazis.

(Screaming heard).

(Car honking).

MALE VOICE: You got it?

2ND MALE VOICE: I got it.

(Screaming heard).

2ND FEMALE VOICE: You touched my hair.

MALE VOICE: Let's go. Let's go.

(Car honking).

MALE VOICE: No, let's go.

(Screaming heard).

FEMALE VOICE: Pieces of shit.

(Screaming heard).

MALE VOICE: Get in the car.

2ND FEMALE VOICE: Yes, I am trying. I'm trying.

BY MR. CABRANES:

Q. Is the video concluded?

A. No.

Q. Oh, I'm sorry.

(Whereupon, the video stopped playing.)

THE WITNESS: Now it has.

BY MR. CABRANES:

Q. Thank you.

Is that your team that you -- on the video?

A. Yes.

Q. Who do you recognize?

A. I did not.

Q. Do you know why Officer [redacted] photographed the woman or took out their phone to record the woman?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I don't know why.

BY MR. CABRANES:

Q. Do you know why Officer [redacted] took out their phone to record the woman?

A. I don't.

Q. Did you think there was anything unusual about the reaction of either of Officer [redacted] or [redacted] in this video?

A. No. Well, in this entire video? Yeah, I mean, the comment about the domestic terrorist was probably over the top.

Q. What do you mean by "over the top"?

A. I think he thought he was being funny. I think she thought it was funny. She laughed. But -- so, yeah, I don't think it was appropriate for him to say that.

Nor was there any basis in truth to it. So.

Q. The woman recording says, "It's not illegal to record."

Do you agree with that statement?

A. Yes, to record from a safe distance without interfering with an arrest is legal.

Q. Did it appear that Officer [redacted] also agreed?

A. I don't know what Officer [redacted] agreed with.

Q. I'll just represent to you that his response in the video that we just watched was, "Exactly," after she said --

A. Same --

Q. -- "It's not illegal to record."

A. And so what's your question?

Q. Do you agree that it appears he agreed with her that it's not illegal to record?

MR. TAGERT: Objection. Speculation.

THE WITNESS: Yeah, it appears

Q. Do you recall when you had that conversation?

A. It was shortly after I saw the video that Steve Wells sent me.

Q. What discipline did Officer [redacted] receive as a result of not watching what he said?

A. I don't know if it would be considered discipline, but he received verbal counseling from myself.

Q. And is that the conversation that you just referenced? Is that the verbal counseling?

A. Yes.

Q. Was that one conversation you had with Officer [redacted] or multiple?

A. It was one conversation.

Q. And was it during -- while you were still in Maine?

A. Yeah. Yeah. It was last time saw him.

Q. So what instruction did you specifically give Officer [redacted]?

A. I don't recall.

Q. I think -- okay. Your testimony was

"to be more mindful."

A. Generally, that's what I said to him. I don't recall exact words.

Q. Yeah, I understand you're not -- you're not -- you're not recounting verbatim.

Sitting here today, what do you take "be more mindful" to mean? Like what message were you trying to get across?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I believe I was just trying to tell him to watch what he says. He knows that he was. He explained to me that he was trying to be funny. The joke didn't land clearly. And I said just watch what you say.

BY MR. CABRANES:

Q. Are you aware of whether during Operation Catch of the Day other officers made similar statements to members of the public?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I was made aware of

A. Correct.
Q. Did you wear body cams during Operation Catch of the Day?
A. No.
Q. Is it correct you did not have your phone out recording at all times while you were in the field during Operation Catch of the Day, correct?
A. That's correct.
Q. So if you were conducting immigration operations during Catch of the Day in public and someone just happened to be walking by, they wouldn't necessarily have been captured by you or a member of your team?
MR. TAGERT: Objection. Speculation.
THE WITNESS: I have no idea.
BY MR. CABRANES:
Q. Is it fair to say that everyone in the vicinity of your immigration enforcement operations during Operation Catch of the Day were not recorded?
MR. TAGERT: Objection.

BY MR. CABRANES:

Q. Were you given any instruction or guidance by anyone about recording license plates of people that were not immigration targets during Operation Catch of the Day?

MR. TAGERT: Objection. Vague.

THE WITNESS: Like I said, we were told to record operations that could result in criminal charges for 111 cases, and part of recording I would imagine would be part of the license plate to identify a person, or any other kind of identifiable information about the person perpetrating the crime.

MR. CABRANES: We've been going for about an hour since our last break.

MR. TAGERT: Probably close, yeah.

MR. ATKINSON: Why don't we take five minutes.

MR. CABRANES: Five minutes.

We can go off the record.

THE VIDEOGRAPHER: Off the record at 1:42.

Q. Did -- are you aware of whether ICE agents in Minneapolis drove to the homes of anyone who protested them while they were conducting immigration enforcement?

MR. TAGERT: Objection. Speculation.

THE WITNESS: Define protesting.

BY MR. CABRANES:

Q. Of anyone who was observing?

MR. TAGERT: Objection.

THE WITNESS: I'm not going to characterize following an ICE agent as observing.

BY MR. CABRANES:

Q. I didn't -- I don't think I said anything about following an ICE agent so, but explain what you mean by that?

A. Well, what are -- what are you saying? You said --

Q. I asked: Are you aware whether ICE agents drove to the homes of anyone who protested them while they were conducting immigration enforcement.

Q. Are you aware of whether anyone on your team ever did that?

A. I think one time that one of our guys did something similar.

Q. Do you remember which of your guys?

A. I don't.

Q. This is one of your guys in Minneapolis?

A. I don't recall where it was at. I just -- in the past, I remember it being discussed or something.

Q. Was it in Maine?

A. I don't remember.

Q. So you said "something similar." One of your guys did something similar.

How is it similar?

A. I think they did the same thing. Somebody -- somebody was following one of my guys, and I don't remember who was driving, but they took them. They were following them around town while they were doing immigration enforcement, and eventually I think they looked up the license plate,

got the address and drove them to their house.

Q. And what was the purpose of that?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I don't know. I think it was -- I don't know -- just to show them that we knew who they were.

BY MR. CABRANES:

Q. Was the message -- withdrawn.

Was the intent to stop the person from following them around?

A. Yes.

MR. TAGERT: Objection. Speculation.

THE WITNESS: I would -- I would assume, yes.

BY MR. CABRANES:

Q. To intimidate them to not do that again?

MR. TAGERT: Objection. Speculation. Argumentative.

THE WITNESS: Again, to let them

know that, you know, what they were doing was interfering with them and could be construed as a 111 violation if they were interfering with immigration operations. So it was a subtle way of letting them know, and from what I recall it worked. The person stopped following them.

BY MR. CABRANES:

Q. Did -- so is that analogous to kind of warning someone like, step back, you're -- you're going to be interfering?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I have no idea. Sure.

BY MR. CABRANES:

Q. Was it a common practice, as far as you know?

A. I -- like I said, I think I saw the one video of it. Then I knew -- I was aware of one, somebody on my team that did it. Again, I don't remember which one it was but...

Q. Was it -- is there any policy that's

were deployed in Maine?

A. No.

Q. Same for Minneapolis.

A. I just answered that.

Yes, she was arrested.

Q. So the arrest was by your --

A. Yes.

Q. -- team?

And was that person -- withdrawn.

Did -- earlier you mentioned hearing about one of your team members in Minneapolis driving to an individual's house, correct?

A. Yes.

Q. Do you recall if that person was reported for a threat?

MR. TAGERT: Objection. Vague.

THE WITNESS: A threat?

BY MR. CABRANES:

Q. Do you recall if that person was reported as having threatened an ICE officer?

A. How would they report? How would they threaten the ICE officer? They were in a vehicle.

So no. The answer to your question is no. There was no verbal communication.

Q. So you're thinking of threats when you're talking about threats --

A. Again, there's two different types of threats, yes.

Q. Got it.

A. You would only report if somebody is verbally threatening or physically threatening an ICE officer I suppose.

Q. So that individual driving around whose house you went to was not threatening the ICE officer; is that correct?

MR. TAGERT: Objection. Speculation.

THE WITNESS: I don't know what they were doing.

MR. CABRANES: Okay. I'm going to introduce Plaintiffs' Exhibit 17. It's defendants -- single page document Defendants 468.

(Document marked for identification as [redacted] Exhibit 17.)

Q. Based on your experience in the field, having been deployed in three different cities in the previous four months, what do you -- just based on your experience, how can you -- what would you point to as evidence of coordination?

A. I've seen them --

MR. TAGERT: Objection. Speculation. Vague.

THE WITNESS: I've seen them speaking on radios and, like, having spotters. So they'll have a spotter outside of the ICE facility on a radio, radioing to vehicles to, I'm guessing, coordinate following ICE officers during operations and so on, and reporting ICE officers sightings throughout the communities.

BY MR. CABRANES:

Q. So they'll have a spotter and then what happens?

A. I have no idea.

Q. Is the concern that the ICE officers will be followed?

A. That is a concern, yes.

MR. CABRANES: Okay. That's all. That's all the questions I have I think.

EXAMINATION

BY MR. TAGERT:

Q. Okay. So, thank you, Officer [redacted] I've got a few questions for you.

So if you'd return to -- well, first question: In Maine, other than Officer [redacted] did you know of any other ERO officer who said something about databases to protesters?

A. Were there any other.

Just the one we talked about. I think the agents say agents, but that was attorney-client privilege.

Q. And do you know of any other ERO officer who --

A. Oh, ERO.

Q. -- said something about a database to protesters?

A. No. No. No.

Q. Okay. So would you pull out Exhibit 14 for me. I'll let you do that. It's a policy dated

BY MR. TAGERT:
Q. Okay. And you discussed earlier that you were aware of a team member who drove by a person's house when that agent was being followed; is that right?
A. Yes.
Q. Do you know how long that person had followed the ICE officer?
A. I don't.
Q. Okay. Do you have an estimate?
A. Probably several miles.
MR. CABRANES: Objection. Speculation.
BY MR. TAGERT:
Q. Okay. But it wasn't normal practice that if a vehicle followed for a few minutes to -- to drive by a person's home; is that right?
A. Correct. If they stopped following, then we would continue with our operations. But at that point, somebody is following a vehicle, they're interfering with our operations.
Q. Okay. And earlier you testified about

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 2026.

____________________________________

OFFICER [redacted]

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA )

I, Denise Dobner Vickery, Certified Realtime Reporter, Registered Merit Reporter and Notary Public, do hereby certify [redacted] was first duly sworn by me to testify to the truth; that the said deposition was recorded by me and thereafter reduced to printing under my direction; and that said deposition is a true transcript of my original stenographic notes.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and I am not financially interested in this action.

Denise Dobner Vickery

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires: March 14, 2028