**In the Matter Of:**

*HILTON v*

*MULLIN*

---

*Highly Confidential - Attorneys' Eyes Only*

*J. C.*

*August 13, 2026*

---

LEXITAS™

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

Civil Action No.

2:26-cv-00092-JAW

-----------------------------------------x

ELINOR HILTON, et al.,

Plaintiffs

vs.

MARKWAYNE MULLIN, Secretary of

Homeland Security, et al.,

Defendants

-----------------------------------------x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF [redacted]

Thursday, August 13, 2026 9:06 a.m.

WilmerHale

60 State Street, Boston, MA 02109

Reported by:

Janet McHugh, RMR, CRR, CLR

JOB NO. 2026-1034005

August 13, 2026

9:06 a.m.

Videotaped deposition of [redacted], held at the offices of WilmerHale, 60 State Street, Boston, Massachusetts, pursuant to Agreement, before Janet McHugh, a Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and a Notary Public within and for the Commonwealth of Massachusetts.

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
Jeannie S. Rhee, Esq.
Benjamin J. Cabranes, Esq.
Tyler Mikulis, Esq.
L. Rush Atkinson, Esq. (via realtime stream)
Yotam Barkai, Esq. (via realtime stream)
DUNN ISAACSON RHEE LLP
401 9th Street, NW
Washington, DC 20004
+1 202.240.2900
jrhee@dirllp.com
bcabranes@dirllp.com
tmikulis@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com

JoAnna Suriani, Esq.
Janine Lopez, Esq. (via realtime stream)
Ori Lev, Esq. (via realtime stream)
Ella Barzel, Esq. (via realtime stream)
PROTECT DEMOCRACY
2020 Pennsylvania Avenue NW

APPEARANCES: (Continued)

PROTECT DEMOCRACY (Continued)
Suite 163
Washington, DC 20006
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org
joanna.suriani@protectdemocracy.org
ori.lev@protectdemocracy.org
ella.barzel@protectdemocracy.org

ON BEHALF OF THE DEFENDANTS:

Stephen Tagert, Esq.
Federal Programs Branch, Civil Division
DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 860-9963
stephen.tagert@usdoj.gov

- Continued -

APPEARANCES: (Continued)

Kirsten Baumgarten, Esq. (via Zoom)
District Court Litigation Division
Office of Principal Legal Advisor
US IMMIGRATION CUSTOMS ENFORCEMENT
500 12th St. SW
Washington, D.C. 20024

Brooke Jenkins, Esq. (via Zoom)
Brandon Smith, Esq. (via Zoom)
DEPARTMENT OF HOMELAND SECURITY
3801 Nebraska Ave NW
Washington, DC 20016
brooke.jenkins@hq.dhs.gov
brandon.smith@hq.dhs.gov

ALSO PRESENT:
Brian Koshulsky, Counsel at the Office of the
Principal Legal Advisor - Boston
Craig Fear, videographer

Q. Okay. And you can see the person in front of Agent [redacted] with a phone held up?

A. Yes.

Q. Do you see that? As if she is recording?

A. Is there a way to zoom in on her face?

Q. Yeah. Absolutely. Well, I think so. Let's see if we can assist you on that.

A. Thank you.

Q. Do you see that?

A. Yes.

Q. Okay. And do you recognize this individual?

A. Yes.

Q. Okay. And who is that?

A. A very aggressive person.

Q. Okay. And why do you say that?

A. That clip does not depict her activity over the totality of the -- of what happened.

Q. When you say the totality of what happened, are you --

A. Oh, I heard a lot of profanities. I heard threats. Remember, I'm on the arrest side. I'm not on the perimeter. And my attention is

Being told to step back is reasonable. In law enforcement, when you're pulling security for someone else, it's best to give yourself some buffer space. I wouldn't have wanted her that close to one of my peers making an arrest.

Q. Okay. Anything else?

A. No.

Q. Okay. So let's look at another video. Same encounter, if that is okay. All right?

A. Yeah.

Q. Okay. And this is going to be [redacted] Exhibit 4.

(Video Bates-stamped "HILTON-MAINE2026-DEFS000342" marked Exhibit 4.)

MS. RHEE: And, again, for the record, this was also produced from Agent [redacted]'s phone, and this is DEFS000342.

THE WITNESS: It's going to be number 4?

MR. MIKULIS: You may need to refresh the page.

THE WITNESS: Okay. I'll try it again. Okay.

(Video played.)
THE WITNESS: That was fast.
BY MS. RHEE:
Q. Okay. You're welcome to look at it again. And I would represent that just so I can direct your attention, Mr. [redacted] it's zooming in on a Chevy with the license plate 1668R.
Do you see that in the video?
A. Yes.
Q. Okay. Okay. So why zoom in on a license plate that is in the vicinity of an arrest that you're executing?
MR. TAGERT: Objection. Calls for speculation.
Q. You can answer.
A. People who, in my opinion, would be impeding, to know who they are, to pass along to future law enforcement that they are aggressive and they have impeded in the past is beneficial intelligence.
Q. And is that for every car that's in the vicinity, or is it for the car that you believe is associated with somebody who is engaged in some activity you believe to be impeding?

MR. TAGERT: Objection. Vague.

Q. You can answer.

A. I remember that car and the people that were associated with it. So it's hard to detach that to your question. Law enforcement and the team, that I recall, only made records of people who interfered.

Q. Okay. So what do you remember about the occupant or occupants of that particular car with the license plate 1668R?

A. That they were aggressive and acting in a manner that impeded our retreat from the arrest.

Q. Okay. And when you say "they," do you remember more than one occupant of that car?

A. I don't recall how many occupants were in the car. I remember two females. You showed me one of them. There was an additional female who was far more aggressive than the first one.

Q. Okay. So when you say "the first one," that's the person in the hat that we saw?

A. Yes.

Q. Okay. And you say there was a second female?

A. Yes.
Q. Okay. And when you say the second female was far more aggressive than the first one, what do you mean?
A. From a divided point of view, as I was making an arrest, that person was given multiple warnings to get back and wasn't listening. And for my teammates struggling with security for us to just want to leave, we just wanted to arrest the person and leave, they were impeding that. Kept getting in front of vehicles, getting too close.
Unable to turn your back and walk away on somebody who is being aggressive is not safe. Law enforcement don't turn their back on people who are being aggressive.
Q. Okay. So when you say that person was being aggressive, was that because the person was given multiple warnings to get back and was not retreating?
A. Profanities. Their demeanor. They're not listening to law enforcement commands. Totality of everything, from my recollection.
Q. Okay. So let's -- I just want to break

all of this down to try to identify what is the totality, if that's okay. All right?

So first is you recall repeated warnings to step back or to retreat; is that right?

A. Yes.

Q. Okay. Did you make those warnings?

A. No.

Q. Okay. Who do you remember making those warnings?

A. I heard them on the video. I didn't recall before the video.

Q. Okay. You mean the first video that we looked at?

A. Yes.

Q. The one with the audio?

A. Yes.

Q. Okay. You also then said profanities. Is that part of the totality that you're talking about?

A. Yes.

Q. Okay. What profanities did you hear?

A. From anywhere, from --

Q. From that individual, the female you said was --

A. Specific profanities --
Q. -- was more than --
A. -- recollection doesn't serve me. I remember profanities. It was a very nasty, aggressive person.
Q. Okay. And this is female number two, you're saying?
A. Yes.
Q. Okay. So you don't remember any specific profanities?
A. I know what I heard overall, but I can't say for 100 percent certainty --
Q. Okay.
A. -- that that was that person at that time that said it. I would love a recording, and then I could answer your question.
Q. Okay. When you say demeanor as part of the totality, what do you recall about demeanor? I'm trying to understand what you mean by that.
A. Demeanor, as in ignoring law enforcement commands. Demeanor, as in entering space that they shouldn't be in and making shouts and profanity toward law enforcement and others present, which slows the departure and/or the

arrest to leave the scene for the prisoner transport.

Q. Okay. So by "demeanor," as well as "totality," what you mean is getting repeated warnings to step back or retreat and them staying still; is that right?

MR. TAGERT: Objection.

MS. RHEE: You can answer.

MR. TAGERT: Misstates testimony.

A. Additionally, I heard, "Don't touch me." And I heard "You're touching me."

Q. Okay.

A. So apparently people were touching each other. I didn't recall that.

Q. Okay. And then, again, you remember profanities in their totality, but you don't remember any specifics for --

A. I was --

Q. -- female two?

A. I was told a lot of profanities while I was in Maine. To segregate it is hard.

MS. RHEE: Now, let's go to video three of this incident. And that is going to be marked for identification as [redacted] Exhibit 5. Again,

And here, what got entered is "2 - escort to secondary."

Do you see that?

A. Yes.

Q. What is a primary action code?

A. It is just part of the records. Customs does not have to adhere to it. It's a drop-down thing as well.

Q. Okay. And what are some of the other options for what could be a primary action code?

A. The main one I remember is "not on primary," "escort to secondary." I don't remember the others.

Q. Okay. So what you remember most of this drop-down menu is this "escort to secondary"?

A. Or "not on primary."

Q. Oh. "Not on primary." What does "not on primary" mean?

A. Not on primary. When they come through a Customs checkpoint on the primary inspection that they're not inspected.

Q. Ah. Okay. And then what is this other option, "escort to secondary"?

A. That Customs sees that, and they can either determine to or not to escort to secondary.

Q. What does it mean to escort to secondary?

MR. TAGERT: Objection. Speculation.

Q. You can answer.

A. Customs may or may not interview them, may or may not ask them questions about who, what, where, when or why they're crossing the border. That's the start of a secondary exam.

Q. Okay. So when you put into an ICM record that the primary action code should be "escort to secondary," does that mean, at least as you're creating this record, you believe that this suspect should be, at a checkpoint, escorted to secondary?

A. If they cross a checkpoint, yes.

Q. Okay. And underneath that, you have "start date" and "end date." And the start date here is January 20, 2026?

A. Yes.

Q. Okay. And you have as an end date, January 20, 2027. Are those dates that you

selected?
A. Yes.
Q. So help us understand. Why did you, when creating this record for this particular vehicle that you saw on this video footage, make a recommendation that at a checkpoint there should be an escort to secondary for a period of a year?
A. I chose that because of my observances of how they were acting by interfering with law enforcement. I conducted a super query search in a database and, to my recollection, I remember border crossings.
In connection with interfering with arrests, that I determined that it was advantageous for a future investigation potentially to look into the border crossings.
Q. Okay. When you say you conducted a super query search in a database, what do you mean by that?
A. It provides their criminal history, border crossings, if criminal history exists, and potentially any records if they exist.
Q. Okay. And is that a term of art,

Q. Okay. What you do remember, though, is that part of the return was border crossings? That was your testimony?

A. Part of the return, border crossings, yes.

Q. Okay. And because of the return of your SuperQuery search that that car had prior border crossings, you thought that it made sense to then put into ICM the escort to secondary for a period of a year?

MR. TAGERT: Objection. Misstates testimony.

Q. You can answer.

A. And in addition to what I witnessed is why I did that. People who are actively interfering with the arrest and transport of a person who is arrested for immigration crimes.

Q. Okay. So let's keep going through all of these fields. Is that okay?

A. Sure.

Q. Okay. So you got to the ownership field. And "Ownership type: Individual."

Do you see that?

A. Yes.

understanding of, you know, when you go ahead and create an ICM versus when you don't?

A. I was taught to document person, places or things.

Q. Okay.

A. And it doesn't have to be a negative documentation. There can be witnesses. There can be subjects. There can be victims. There is a whole list of different categories to document records under.

Q. Okay. So I take it that it was your practice, when you were deployed to Maine, to be thorough in documentation. Is that fair?

MR. TAGERT: Objection. Go ahead.

A. Yes. Because I didn't document everybody. I only documented those who I felt impeded the operation under the circumstances I experienced.

Q. Okay. And you did that with the knowledge and approval of your supervisor on the ground, Agent [redacted]?

MR. TAGERT: Objection. Speculation.

Q. You can answer.

A. No. Subject records are at agent

discretion to generate.
Q. Okay.
A. No supervisor approval needed, necessary.
Q. Okay. Did Agent [redacted] know that you were doing this when you were deployed in Maine?
MR. TAGERT: Objection. Speculation.
MS. RHEE: You can answer.
A. Before the fact, no. After the fact, yes.
Q. Okay. When you say "after the fact, yes," how so?
A. I talked with my supervisor about everything. [redacted] wasn't my supervisor at the time.
Q. Okay. So did you talk to [redacted] about all of this?
A. I don't recall. I was transferred to [redacted]'s group shortly thereafter.
Q. Okay. And so when you were transferred to [redacted]'s group, did you talk to [redacted] about all of the recordkeeping that you were doing?
A. Yes.
Q. Okay. And when you were -- so exactly

Q. When you say "if I had anything," what does that mean?

A. If I generated a new criminal case, it would require her approval.

Q. I see. Okay. Now, the incident that we were just going through and the videos, where you described -- well, and we saw female one and you described female two, did you generate a new criminal case in connection with either of them?

You can answer.

A. No.

Q. Okay. Why not?

A. It was just a subject record generated because it's -- they are a threat -- potential threats to law enforcement. If future law enforcement comes into contact with them, I wanted that to be known.

I didn't go into a criminal case because, honestly, the ladies that I encountered were the least of my worries. I got in a fight, a foot chase, and other things later that I was more focused on than what you're asking me about.

Q. Okay. So I now want to just turn to what we're going to mark as [redacted] Exhibit 7,

A. Yes.
Q. Okay. And, again, based on the other searches and pulls you had already done?
A. Yes.
Q. Okay. We've already gone through the subject record information, although this one is a little bit different, so let me dwell on subject record category. Here, you have "IN-INS CASE."
Do you see that?
A. Yes.
Q. What does that mean?
A. The drop-down that populated that, it's an immigration case-related, to my -- to the best of my knowledge.
Q. Okay. And why would you select that it's immigration-related?
A. Because I believed her to be interfering with an arrest and the transportation of a person who had immigration crimes.
Q. Okay. The next one, different primary action code. Here, I take it this is a selection out of a drop-down menu, but the primary action code is 5, "Refer to Customs."

What does that mean?
A. To my knowledge, it's to -- that Customs can make a decision what they do with her.
Q. And --
A. I don't know more than that.
Q. Okay. But this is your -- your selection to recommend essentially a referral to Customs; is that right?
A. She didn't meet the "not on primary," because I wanted to come back and investigate her later. I just wasn't afforded the opportunity to.
Q. Okay. So this is you saying that you wanted someone to look into her?
A. Just --
MR. TAGERT: Objection. Speculation.
Q. Is that right?
A. She's just being referred to Customs.
Q. Well, when you say "referred to Customs," what does that mean?
A. The status itself is just -- it's option number 5. It's a drop-down menu. 1 through -- I can't recall how many, but 5 is on

identifying HSI agents to potentially dox them."

Do you see that?

A. Yes.

Q. Now, I mean, this is the woman in the video. So help me understand, on what basis did you have reason to believe that what she was filming was for the purpose of potentially doxing HSI agents?

A. I can go off of my notes and what I vaguely remember. And the notes are accurate for the time that I created the record, that statements made, the aggressiveness of the person present. The video is a fraction what they did there. That's -- we were there longer than a few minutes.

Q. Okay. So what is not captured on the video that led you to believe that she was there with the purpose of identifying the HSI agents to potentially dox them?

A. So --

MR. TAGERT: Go ahead.

A. While I was in Maine, from multiple different locations, I heard multiple times that people were going to find me and my family, and

from us so we could just leave.

The goal of the whole time that we were there with the team was to just make the arrest and leave. We didn't want to deal with the public. And that's what we tried to do. We made ten arrests. And of the ten arrests, there wasn't a problem at every single one.

Q. And you successfully made all ten arrests?

A. Yes. I didn't do all ten. I did -- I put handcuffs on eight of ten. That's what I recall.

Q. Fair to say that Agent [redacted] was much closer to Ms. Neff for the entirety of that operation?

MR. TAGERT: Objection. Speculation. But go ahead.

A. Agent [redacted] was walking around. So were the people present that were aggressive. I can't honestly say one way or the other if he directly dealt her the whole time. I specifically remember two people who were extremely nasty, combative, and did not follow any order whatsoever.

MS. RHEE: Okay. And then for completeness' sake, I'm also going to show you what's been marked as [redacted] Number 12. And this is DEFS000657.

(Document Bates-stamped HILTON-MAINE2026-DEFS000657 through -0660_Redacted marked Exhibit 12.)

BY MS. RHEE:

Q. And do you see that this is a related ICM record, this time of the car, which is the Toyota Prius that we saw in the video parked to the side?

A. Yes.

Q. And notwithstanding where it was parked, you write in the remarks here "The vehicle was used to interrupt an HSI arrest."

Do you see that?

A. Yes.

Q. Okay. And those are your -- that's the free text field, so those are your words?

A. Yes.

Q. Okay. All right. Now, after that arrest operation on the morning of January 20th, sometime in the afternoon, you actually made a

call to the number associated with that South Portland address, correct?

A. I made a phone call, yes.

Q. And why did you do that?

A. For a telephonic interview purposes to further establish whether the person was there or not, admission -- potential admissions of guilt, anything of that nature.

Q. When you say "potential admissions of guilt," what did you have in mind?

A. I was just going to talk to her. Interview, excuse me. Interview her, the registered owner.

Q. Okay. And so you placed the call?

A. Yes.

Q. Okay. And did you identify yourself by name?

A. Yes.

Q. Okay. And did you identify yourself by your title?

A. Yes.

Q. And who you worked for?

A. Yes.

Q. And what did you say was the reason you

were calling?
A. I was following up on a complaint.
Q. And what complaint was that?
A. Was she present, inserting herself aggressively into a law enforcement arrest.
Q. So what do you remember of the call? Just tell us everything that you remember.
A. I recall asking her if she was present, to which she denied. I recall asking her if her vehicle was present, to which she denied. I recall asking her if she loans out her vehicle to anyone else. She stated no.
I -- and then after a brief phone call, it wasn't very long, I realized I was getting nowhere with the telephonic interview because she denied any of it, that I told her that she'd be given a warning; that if she continued that, that she would be arrested in the future.
Q. And what warning did you give her?
A. Exactly that. You will be arrested in the future. Not to aggressively assert yourself into arrests.
Q. Did you make any mention of a database?
A. No, I did not.

what you believed to be interference?

A. No, I did not receive guidance. Telephonic interviews is something that law enforcement does, and I've experienced it through the course of my career.

Q. During that phone call, did you make mention at any point in time of domestic terrorism?

A. Not to my recollection.

Q. Is it possible that you made reference to that term?

A. I don't recall it, so I don't believe it is possible. I just don't recall it. It was a short phone call. Very short.

Q. During the phone call, did you make any mention at any point in time of a watchlist?

A. Not to my recollection.

Q. In addition to your putting in ICM entries, to your knowledge, did others also, based on what they observed, make ICM entries of people who may have been interfering in law enforcement operations?

MR. TAGERT: Objection. Calls for speculation.

says, "Stay back." Do you know who that agent is?

A. I have -- no.

Q. Okay. Is it because you can't remember from the video or you just can't remember who the agent is?

A. Do you want to realign it? I can show you where they came from.

Q. Okay.

A. They're not part of my team.

Q. So this is at 35 seconds, I think.

A. So if you watch, as the black car pulls in to block the view, they're coming from the transport vehicle -- vehicles.

Q. I see. Okay. So different team?

A. Different team.

Q. And what team is that?

A. They were the transport team --

Q. Okay.

A. -- that I was meeting.

Q. Okay. And is the transport team HSI or ERO or something totally different?

A. From my understanding, they were ERO agents.

Q. Okay. Okay. And so the person who says "stand back" in response to "I can record," "Absolutely, you can. I didn't say you couldn't," is that one of the ERO agents?
A. I believe so.
Q. Okay. Got it. And then another agent comes by and says, "Hey, ma'am, do me a favor. You have like five friends on Facebook. Nobody wants to see you. Just go back over there."
A. I'm going to try to find him so I can see his face.
Q. It's at about --
A. I remember who said it. It's the guy in the green Carhartt jacket.
Q. Yeah.
A. I never met him before.
Q. So you don't know who that is?
A. I don't know who that is.
Q. Okay. And then do you see yourself in this video towards the end?
A. Yes. And in the middle.
Q. Okay. And are you the person who approaches towards the end, holding a phone up and says, "Which cars did you get out of?"

Q. Okay. Got it. That's what you mean by "unmarked"?

A. Yes.

Q. Okay. When various agents who you were not able to identify tell Hilton -- Ms. Hilton more than once that they can record, you heard the comments, "Absolutely, you can. I didn't say you couldn't. Yeah, you can film. Just let them do their thing," you understood that that was an accurate statement of protesters' First Amendment rights to record? Yes or no?

MR. TAGERT: Objection. Calls for a legal conclusion and speculation.

Q. You can answer.

A. So you saw me walk up to Ms. Hilton. It wasn't just a female recording. Prior to that, she got out of the vehicle that chased me across two towns while I had a prisoner in the back of my car. And so she was trying -- she was part of a group of people who were trying to interfere with the transportation of a prisoner who was wanted for immigration crimes.

Q. And so how do you know that it was Ms. Hilton?

A. I didn't know who she was at the time, other than the car that they got out of was the car that chased us, one of.

Q. Okay. And do you remember which car it was?

A. I believe it to be the Nissan.

Q. Okay. Did you create an ICM record of Ms. Hilton?

A. No.

Q. Why not? Based on what you just told me.

A. I did not find her, from just a photograph. I don't have facial recognition anything. And the car was a dead end.

Q. So it's your testimony that you would like to have created an ICM record of Ms. Hilton, but you weren't able to identify her?

A. Absolutely.

MR. TAGERT: Objection.

THE WITNESS: I'm sorry.

MR. TAGERT: Yeah.

BY MS. RHEE:

Q. Okay. So your answer is "absolutely." Okay.

A. Am I allowed to state why, or you don't care?

Q. Yes, of course. No, of course.

A. Prior to that, there was a group of organized people who were responding to law enforcement surveillance that intentionally interrupted the surveillance for people who law enforcement officers, me, had an arrest warrant for, to alert the person that we're looking for that we're present by honking the horns, blowing the whistles and then; in other words, ruining our surveillance.

In addition to that, they would chase us across towns. Blowing traffic lights, violating traffic laws in a dangerous manner to chase a law enforcement vehicle is not normal because I know they knew that we were law enforcement because we used our emergency equipment lights on our vehicles to bypass intersections to ditch them so we could continue surveillance somewhere else and/or arrest or transportation of prisoners.

They were well organized, working together to interrupt investigative efforts, arrests, and transportation of prisoners.

and pass it along, yes. But I'm not going to travel to Maine -- it makes no sense for me to travel from Boston to Maine.

Q. Understood. But why didn't you create an ICM record, if you heard what you heard? Wouldn't you want a record of what you had heard in the ways that you've already walked us through the ICM records that you created for Neff and for Williams?

A. That car and that encounter was covered by an officer who was penned in, asking for help. And that's how I encountered them. I wasn't originally on the scene. I wasn't the officer chased. That was her occurrence. I supported her and so, therefore, it shouldn't have been my report. It should have been hers. Whether she generated one or not, I have no clue.

I showed up to support her. She felt threatened. She was boxed in by two angry people who were shouting profanities at her. They had a car behind her and a car in front of her, not allowing her to leave, and standing outside her door screaming at her. She was scared, asked for help, and I showed up. That's when I encountered

A. Yes.
Q. Okay. Was one of them -- was one of those cars the Nissan?
A. I don't recall the exact cars. There's a video of the footage of me arriving after the fact, at the end. You could relay to the video footage -- rely on the video footage.
Q. And was Ms. Hilton --
A. Ms. Hilton wasn't connected to that. That was an experience that lead to prior knowing that these people -- that people are being dispatched to law enforcement surveillance with the intention to interrupt it.
Q. Okay. But you don't know if Ms. Hilton is part of that group of people?
A. She chased me in a car with others, with what intentions, I don't know, bypassing intersections, blowing traffic lights, creating almost traffic accidents to keep up with the law enforcement vehicle that uses its police equipment.
The reason we used our police equipment to try to ditch the people who were chasing us is Enforcement Removal Operations will not meet us

with a congo line of angry people. It's a security risk.

Q. When you say that Ms. Hilton chased you in a car with others, what car was she chasing you in?

A. There was a Nissan sedan specifically behind my car. I watched it in the mirror along with having a prisoner in my back seat.

Q. Okay.

A. My divided attention is more on my immediate security of the prisoner sitting behind me than all the movements and who is driving the car. I remember the Nissan sedan.

Q. Okay. So you remember the sedan. And is it your testimony that Ms. Hilton, you remember -- you distinctly remember Ms. Hilton as being in that sedan that chased you?

MR. TAGERT: Objection.

Go ahead.

A. That was the first vehicle that showed up. And she was the first person that showed up. It's not rocket science that it's the only car sitting nearby that she didn't get out of it.

She didn't get out of my car. She didn't

pop out of the woods. We were behind Home Depot. Behind Home Depot. Not in the front. In a place where the public doesn't go. You don't go behind Home Depot to enter the front of Home Depot. It led me to -- the circumstances led me to believe that she got out of that car.

Q. Okay. So I want to just make sure I'm following.

Your testimony is that you had a prisoner in your car; is that right?

A. Yes.

Q. Okay. And you were transporting -- let me not use the word "transporting."

You were conveying that prisoner in your car to the Home Depot parking lot?

A. The word "conveying," I'm not sure that I would use that word. My word would be "transporting."

I am responsible for the security of that prisoner. I'm not going to stop my car and get in a confrontation with someone who is chasing me, not knowing their intentions, especially when my safety is involved and the prisoner that's sitting behind me.

Q. Okay. I just want to make sure that I'm understanding. Okay. You've got a prisoner in your car, and you are transporting them to the Home Depot parking lot to hand over to ERO; is that right?

A. Yes.

Q. Okay. Now, when you say that you are being chased, was the Nissan behind you at the scene of the arrest?

A. I don't recall.

Q. Okay. Is it your testimony, just as you were getting close to the Home Depot or entering the Home Depot parking lot, you were being followed behind by the Nissan?

A. No.

Q. Okay. So when --

A. The Nissan --

Q. -- did the Nissan come into --

A. -- followed me specifically more than 5 miles through several traffic lights, through an illegal U-turn, through a gas station, around Home Depot once, to around Home Depot twice. I didn't want to go back to Home Depot, but that was where ERO met me. And they showed up.

Q. I see. Okay. So now your testimony is you did not see Ms. Hilton specifically in the Nissan at the time that it was behind you for that 5 miles or so, but when you got to the Home Depot parking lot, you were the first to arrive to that parking lot. As you were pulling in, the Nissan was behind you. And as you got out of the car, the first person you saw was Ms. Hilton?

A. No.

Q. Okay. What did I get wrong?

A. I was up front. The Nissan parked short of my perimeter at that time. Multiple people got out. And I don't recall who they all were or her seating position in the car. And of the multiple people that were there, they were part of the group that chased us. And currently there was one car. I mean, she didn't just walk up.

Q. So you're surmising that she had to be somebody who got out of the Nissan; is that right?

MR. TAGERT: Objection. That's not his testimony.

You can answer the question.

know, for a warning, we're putting you into a watchlist. The more you show up to these --

SPEAKER: Take a picture of this guy. We'll put him in the watchlist.

SPEAKER: He's got a video.

SPEAKER: How you doing today? Don't be scared now.

BY MS. RHEE:

Q. Do you see yourself in this video, Mr. [redacted]?

A. No. I don't know who that is.

Q. Do you -- were you able to hear the audio of this?

A. Yes.

Q. Okay. And so did you hear, "Just so you know, for a warning, we're putting you into a watchlist"?

A. Yes.

Q. Okay. "The more you show up at these, you will be -- well, you'll see us at your house later to arrest you"?

A. Yes. I heard that.

Q. Okay. And do you know who that was who said that?

A. That was me.
Q. That was you? Okay. Is what you said along the lines of what you said to Ms. Hilton -- I'm sorry, Ms. Williams when you called the residence?
A. No.
Q. Okay. So when you said it here in the parking lot, who was it directed at?
A. Unknown to me at the time, a female in an orange scarf, I believe she was wearing, or something orange.
Q. And was that statement directed at the female in the orange scarf?
A. Yes.
Q. Okay. And then there was another agent who said, "Take a picture of this guy." And then was it you who said, "It doesn't matter. I can get your eyes. Terrorist watchlist for you as well, just FYI"?
A. I'm unsure.
Q. Do you want to watch it again?
A. I'm hearing a voice. I'm unsure if that's me. If they did an analysis, it could be. I don't recall that.

It was, regretfully so, not the best statement to have made.

Q. Why do you say that?

A. We do have a watchlist. You saw it on my paper. I didn't know who she was. She didn't get put in any system. And the "regretfully so" is my after the fact sitting here.

I look at the totality of what happened. You had a person that was part of a group that chased me to interrupt my transport and handoff of a prisoner, who was willing to violate traffic law, potentially a security risk to law enforcement. I would have loved to find out their identity, but I was unable to. And so giving them a verbal warning in hopes that they just don't do that again.

Nobody on my team wanted to arrest anybody. We just wanted to leave. We just wanted to get the arrest warrant that we had and leave. We weren't interested in any citizens.

Q. Okay. So when you talk about the watchlist and you say, "You saw it on my paper," is that the ICM record? I'm just trying to understand what you mean when you said, "We do

have a watchlist. You saw it on my paper."

So what you've handed me is what has been marked as [redacted] Exhibit 11. And it is the person ICM record for Hillary Neff. And it is the code associated in that ICM, "referred to Customs"?

A. Let me get another one.

MR. TAGERT: No.

Q. I'll give it back to you.

A. If you look at it, "nominate to watchlist, no."

Q. I see. Okay. I see. Okay.

So in that field, what is the watchlist that is referenced there?

A. It's, to my knowledge, related to terrorism and/or severe law enforcement security risks.

Q. I see. Okay. And if you nominate an individual in ICM to that watchlist, that person is placed there?

MR. TAGERT: Objection. Calls for speculation.

Q. You can answer.

A. I imagine, because I've never done it,

that it opens a door to something I've never done.

Q. And what does it open a door to?

A. A lot more fields that I need to fill out and more information that I need to give, and probably reports that are required to do to submit the record.

Q. Okay. And what is the consequence of being placed on that watchlist in that field?

MR. TAGERT: Objection. Calls for speculation.

Q. If you know.

A. I don't know.

Q. Okay. Given what you just testified about the impediments that these protesters presented to your enforcement activities in Maine and, in particular, at the Home Depot parking lot, why do you say that the threat you made, the warning you gave is regrettable?

A. So in law enforcement, law enforcement officers throughout my career don't always have to be truthful with the public. And with the public, sometimes you can use a ruse. And instead of dealing with her, in my mind, it was

better to give her a warning that she felt that she should just leave so I don't have to deal with her. And that's why I said it. The "regretfully so" was after the fact. Because some opinions are for, some are against.

Q. And then when you said, "The more you show up at these, you'll see us at your house later to arrest you" --

A. I think you're forgetting "if." If you keep showing up at these.

Q. Okay. Well, what did you mean with "you'll see us at your house later to arrest you"?

A. If you keep impeding law enforcement, chasing law enforcement across town, violating traffic laws, inserting yourself into arrests and transportation of prisoners, it may lead the agents to actually pursue criminal charges.

Q. And that's what you meant by "showing up at these"?

A. Yes. Standing there doing nothing is totally acceptable. The aforementioned facts that I stated, being chased, interrupting surveillance, interrupting arrests, interrupting

transports, that's not acceptable. That's not acceptable behavior.

Q. And when you or somebody also on the ground there at the Home Depot parking lot said, "It doesn't matter. I can get your eyes. Terrorist watchlist for you as well," was that also a threat?

MR. TAGERT: Objection. May call for speculation. It's not necessarily the statement.

MS. RHEE: You can answer.

A. I don't recall saying that, I mean, but if it's my voice, I don't know. I don't know what to tell you. I just don't. I know I said -- know I had that initial contact with her. And as far as the others, I don't recall. There was more than just the female present. There was multiple males. One was wearing a military-style uniform that was ducking in and out of the trunk of his car, the Nissan, in and out of the Nissan trunk regularly with tactical gear in the car.

With the totality of being chased, trying to interfere with the transportation of a prisoner, and then ducking in and out of a carful of tactical gear, I should pay attention to that.

And so I know that there were several people present.

Q. Okay.

A. The incident itself merited a special response team to show up and try to provide additional security.

Q. Yeah. Why don't we go to what we're going to mark as [redacted] Exhibit 15. And this is DEFS000235.

(Video Bates-stamped HILTON-MAINE2026-DEFS000235 marked Exhibit 15.)

THE WITNESS: Is this going to be a video or a paper?

MS. RHEE: Video.

THE WITNESS: And that would be number 15, correct?

COURT REPORTER: Yes.

(Video played.)

SPEAKER: I'm going to do the same thing. Just so you know, for a warning, we're putting you into a watchlist. The more you show up at these, you will be -- well, you'll see us at your house later to arrest you.

That's funny enough, right? I want to thank you all for being somewhat nice. Not mean or yelling at me. I do appreciate that. Cold out here today. Negative 1? Can you hold your shoulder that long? In due time, we will find out.

A. I think your video stopped.

Q. Okay. All right. So what we just watched, which was [redacted] Exhibit 17, which was footage produced by plaintiffs from Elinor Hilton's phone, was 11 minutes of videotaped footage of the transport occurring in the Home Depot parking lot. We can agree on that, right?

A. Yes.

Q. Okay. And in that over 11-minute clip that you just sat through and watched in its entirety, did you see anything that Elinor Hilton did, as she was filming, that was impeding the transport of a suspect?

A. On the video, no.

Q. In the over 11-minute video footage that you saw of the transport in the Home Depot on January 21st, did you see anything that any other protester who was present there did to impede the transport of the suspect?

MR. TAGERT: Objection. Speculation.
Q. You can answer.
A. There was a vehicle parked next to mine. It was a dark SUV that had bypassed the police perimeter that was part of the group that chased us.
If you look at the silver Nissan, to the left of it, I was dealing with them. That's why you didn't see me on the screen. They drove right past the police saying "stop," right up to my car.
Q. And the videos that we saw earlier, for example, Defendants' 235, which I believe was [redacted] 16 -- I'm sorry, [redacted] 15, Exhibit 15, that was you dealing with some individuals; is that right?
A. I had walked around. Yes.
Q. Okay. And that's when you were on videotape saying, "Just so you know, for warning, we're putting you into a watchlist. The more you show up at these, you will be -- well, you will see us at your house later to arrest you"?
A. Yes.
Q. Okay. And, similarly, it was with

respect to those individuals that you said, "It doesn't matter. I can get your eyes. Terrorist watchlist for you as well, just FYI"?

A. Yes.

Q. Okay. Now, neither of those people on that video footage was Ms. Hilton, correct?

A. No.

Q. Now, again, in the interrogatory responses, the answers that the government provided to questions posed, represent that you reached out to Officer [redacted] following up on this encounter; is that right?

A. Yes.

Q. Okay. Who is CBP Officer [redacted]?

A. He was an intel analyst assigned to HSI to assist HSI that I met previously to this encounter.

Q. Okay. So how had you met him previously to the Maine encounter?

A. We worked together on a drug strike force.

Q. Okay. So you knew him?

A. Yes.

Q. Okay. And what does it mean to be an intel analyst assigned to HSI?

MR. TAGERT: Objection. Speculation.

Q. You can answer.

A. His job in total, I don't know it. I just know he assists HSI with Customs aspects.

Q. And when you say "Customs aspects," what do you mean?

A. Customs system, Customs databases. Things that HSI agents would not be familiar with.

Q. Okay. So he had access as a Customs analyst to databases that you at HSI can't otherwise access?

A. Yes.

Q. Okay. And so when you contacted him following the Home Depot encounter, was it for purposes to get him to query Customs systems and databases that you, as an HSI agent, couldn't otherwise search yourself?

A. Specifically, I wanted him to check the pictures. Because I didn't know who they were.

Q. Okay. So let's go to the pictures that you sent over. Let's go to what we're going to

Q. Okay. And was this an individual who you saw coming out of the Nissan or otherwise that you associated with the Nissan?
A. That's the individual that I saw enter the trunk of the Nissan multiple times, wearing the military jacket and military knit cap.
Q. Okay. And was that the person who had the face mask on where you said, "It doesn't matter. I can see your eyes. Terrorist watchlist for you as well, just FYI"?
A. Yes.
Q. Okay. Now, let's also go to what we're going to mark as [redacted] Exhibit 19. And this is DEFS000003.

(Document Bates-stamped HILTON-MAINE2026-DEFS000003 marked Exhibit 19.)

BY MS. RHEE:
Q. Are these additional photographs of individuals and their faces that you sent over to Officer [redacted]?
A. Yes.
Q. Okay. And do you recognize those individuals?

A. I believe so. Yes.

Q. And you wrote at the top of the photos, these additional photos that you sent to Officer Mahoney "Let me know what you find"?

A. Oh, here, same sheet?

Q. Yeah.

A. Yes.

Q. And what were you hoping Officer [redacted] would be able to provide for you?

A. Their identity.

Q. All right. So let's go to DEFS000004.

(Document Bates-stamped HILTON-MAINE2026-DEFS000004 marked Exhibit 20.)

BY MS. RHEE:

Q. All right. So Officer [redacted] writes back the Nissan is registered to [redacted], and I take it then provides a date of birth, 9/9/97?

A. I see that. Yes.

Q. Okay. Needless to say, [redacted] is not Elinor Hilton? Yeah?

A. I'm sorry?

Q. [redacted] is not Elinor Hilton?

A. No.

Q. Okay. So the Nissan is registered to Ms. [redacted]?

A. According to this, yes.

Q. Okay. And then the guy with the black denim jacket -- and I take it the guy with the black denim jacket is who we see in [redacted] Exhibit 19?

A. Yes.

Q. Okay. And then "No match on mustache guy." And the mustache guy is who we see in the photo in [redacted] Exhibit 18?

A. Yes.

MS. RHEE: Okay. Then we're going to finally introduce [redacted] Exhibit 21.

(Document Bates-stamped HILTON-MAINE2026-DEFS000005 marked Exhibit 21.)

MS. RHEE: And this is DEFS000005.

BY MS. RHEE:

Q. And here, you see that Officer [redacted] says, "The guy in the black jacket was driving the above plate." And -- and -- I'm sorry. You write that; is that right?

A. I believe so.

Q. Okay. And then Officer [redacted] writes to you, "The [redacted] guy," who was the guy in the black denim jacket, "crossed the land border in Maine in the vehicle."
Do you see that?
A. Yes.
Q. You write back, "Nice."
What did you understand Officer [redacted] to be telling you that you responded "Nice" to?
MR. TAGERT: Object to the extent it calls for speculation.
Q. You can answer.
A. The response "Nice" was in regards to him finding something; like their identity and their vehicles.
Q. And was there any significance to you of the fact that this [redacted] guy crossed the border in Maine?
A. At this point, no. But he is participating in immigration arrests by bypassing our security and sitting next to me.
Q. So when you say that he was bypassing your security, it seems to be a reference to you had a sense of what a perimeter was?

A. Yes.
Q. Okay. And what is your understanding of where a perimeter -- where the lines are?
A. From --
MR. TAGERT: Objection. Vague.
But go ahead.
A. From what I watched, and my understanding is if you have a law enforcement officer telling you not to cross, you don't cross.
Q. And so if you have a law enforcement officer that says you have to stay on, you know, the opposite side of the street, which is the distance of a football field, that is the perimeter?
MR. TAGERT: Objection. Calls for speculation.
A. How officers determine what is deemed safe is individual. It depends on the circumstances. A football field may be necessary.
Q. Okay. So here, how did you define the perimeter?
A. I didn't set the perimeter. I was on

A. I don't recall.

MR. TAGERT: We've been going over an hour.

THE WITNESS: Yeah. Can I use the restroom again?

MS. RHEE: Yeah, of course.

THE VIDEOGRAPHER: This is the end of Media Number 4. We are going off the record. The time is 2:11 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 5. We are going back on the record. The time is 2:23 p.m.

BY MS. RHEE:

Q. Mr. [redacted] before we went on the break, you had identified your voice on the video recording, making threats about a watchlist or arrest. You remember those statements, right?

A. Yes.

Q. Okay. Was that the first time you said something along the lines of a watchlist or a database?

A. To my recollection.

Q. Okay. And so what was it about the

morning of January 21st that made you say something along those lines for the first time?

A. Starting out from the beginning, I'm sitting on surveillance. We have an arrest warrant for a subject. And people show up blowing whistles, honking their horns, screaming at us, interfering with the attempt to locate and arrest the subject. It's frustrating. It's -- perfectly honest.

So we determined, well, we can't sit here. And the subject is not going to leave their house. And I'm not going to enter a residence under the search warrant that I had -- or the arrest warrant that I had. So we determined to leave.

And then the same people tried to follow us all day, honking their horns, blowing their whistles to further impede my job. That's frustrating too.

So after being followed and/or chased, when you do make an arrest, you get accosted, threats are made, people are very angry. They're very passionate.

And it doesn't matter what kind of arrest

you're doing. It's all immigration, regardless of what your warrant is for. Nobody cares. You're just a pair of eyes, a big, mean machine. You're going to arrest everybody. So that's an additional frustration.

And so then you've got to look at the security aspect of how you're being treated. Not only do I have to operate in that environment, I've now got to worry about people who are passionate and/or aggressive towards me about making arrests for somebody who I have a valid arrest warrant for. That's frustrating as well.

And so then they decide to chase me. And now I'm being chased. I'm using my police equipment to evade these people so I can meet with ERO, because I just want the prisoner gone. And they feel that they can chase me. And they do.

They find me in the Home Depot parking lot. I believe I contact who I saw. And the warning I gave, regretfully so, should have been nicer. I can't say that at the level of frustration and at the time that the -- you know, had I not encountered A, B, C, D, E, F, and G, I would have

responded differently. It was frustrating, to say the least, of what I experienced.

Q. Other than the occasion that you were captured on video, did you make statements along those lines?

A. To others?

Q. Mm-hmm.

A. Not to my recollection.

Q. Did you ever hear other agents making statements along those lines?

A. Oh, I don't recall. I can't say no. But I can't say I recall -- I can't say I recall a specific incident.

Q. After you made that statement, did anybody come up to you and say something to the effect of, it's regrettable that you said that, maybe you don't want to say something like that again?

A. No.

MR. TAGERT: Objection.

THE WITNESS: I'm sorry. Go ahead.

Q. That's okay. Go ahead and answer.

A. No.

Q. Did anybody talk to you after the fact

A. That sounds accurate.

Q. Okay. Why did you put together a folder titled "Maine surge protesters"?

A. The folder is for my personal use on my government laptop for -- to refresh my recollection of what happened. The word "protesters" is not synonymous to anything important. It's just what I selected to type in there. New folder type, protesters. It's not like I'm trying to appropriately label my own folder to not hurt people's feelings. It's my folder. It's just how I labeled it. There was no specific intention whatsoever.

Q. Okay. So it's your choice to title it whatever you want?

A. Yes.

Q. Okay. And what you chose to title it was "Maine surge protesters"?

A. Correct.

Q. Okay. So you chose the word "protesters"?

A. I encountered more people than protesters. That's why I chose -- it's the people who stood out. It would have been more

accurately labeled "aggressors," "agitators," "interferers."

But, to me, it's like I come back later, I'm not going to -- agitator, I don't know what this is. That's why I put "Maine" and put "protesters." It's just how I remembered it. It was nothing specific or important.

Q. Okay. But you're the one who made the decision to label it "protesters" and not "aggressors," "agitators," "interferers"?

A. Correct.

Q. Okay. And in your mind, is there any distinction between the term "protesters" versus "aggressors," "agitators," and "interferers"?

A. There's a big difference, if you were to English dictionary it. However, words are always up to interpretation of the person that receives it. And as I looked at it, obviously, an aggressor would have been a less controversial title to label a folder, but it's my folder, not for public use.

Q. Okay. So when you say that there's a big difference between the word "protester" versus an agitator or interferer, what is that

doing that.

In circumstances of this, no one was hurt. There's been circumstances where people were hurt, and I hope to God it was documented.

Q. Okay. But I take it that you did not receive any training, guidance, instruction about keeping that kind of documentation?

MR. TAGERT: Objection. Speculation.

Q. You can answer.

A. No.

[redacted]

A. A lot.
Q. Yeah. So tell me about what you can get there.
A. Arrest -- arrest records, the arresting agencies, potentially the courts that handled the case, potentially the case numbers. What have I seen?
Q. Dispositions of those arrests?
A. Arrest warrants, wanted notices, red notices, stolen items, firearms. A lot.
Q. Okay. And so through a SuperQuery, you can access NCIC?
MR. TAGERT: Objection. Speculation.
A. Not always.
Q. Okay. When you say "not always," what are the constraints?
MR. TAGERT: Objection.
A. If the records are supplied to that system I'm using, then, yes, I have access. Not all records are supplied.
Q. Okay.
A. Not all states in the United States comply.
Q. Because that is by state choice, right?

was in the neighborhood, and thereby not -- thereby alerting the people in the neighborhood that the subject didn't depart the residence.

Q. Okay. Did you interact with him at any other time?

A. Yes.

Q. What other interactions did you have?

A. So in addition to the video footage that we watched about [redacted], I interacted with him at the Market Basket for an arrest. [redacted] -- to begin, it's just best to tell the story from the beginning because he appears multiple places.

We were at Market Basket with a -- someone on the team ran a license plate. I don't recall who. The license plate came back to the registered owner as an illegal alien with fraud-related problems, fraud document problems. So it was determined by the team lead to stay and arrest that person.

[redacted] and others, before we could set up a perimeter around the vehicle, alerted the person that we were present. He began to ran. So we didn't get -- we didn't get to

make -- to box in the vehicle and do it safely.

So the two subjects in the vehicle bolted in the Market Basket parking lot. One of them got in a wrestling match with an ERO agent and [redacted]. I chased the driver into the Market Basket, where the driver was throwing items and attempting to allude arrest.

Ultimately, inside the Market Basket, one of the agents was assaulted. And I chased the subject outside the Market Basket, where I tackled him on the concrete outside.

While I tackled him on the concrete outside, [redacted] and others specifically were trying to take the person from my custody that I had put handcuffs on that I tackled in the parking lot.

We're yelling at them to get back. It was me, [redacted], and an ERO officer. I can't remember his name. He was the one that was shoved into the cash register by a bystander. Was trying to just get him to the car and leave. And I ran into him again trying to put my subject in the vehicle to leave the scene.

Q. So is that the Market Basket incident

you mentioned earlier in your deposition where you did an investigation?

A. Yes.

Q. Okay. What did you learn in your investigation from the Market Basket?

A. I learned from an interview of the Market Basket manager that [redacted] knew that we were there, and he went around inside the store to the employees to tell them to leave their shifts, that ICE was going to arrest them. And that approximately -- the manager told me approximately 15 employees departed their duties and left their job, just up and left. And there's a report that exists on such that I wrote.

Q. Okay. Okay. So now I'm going to turn to a document related to [redacted]. Can you pull up Exhibit number 25. That's the one. DEFENDANTS001818 is the start. So I'm going to have you turn to the next page. DEFENDANTS001819.

Do you recall earlier testifying about the final text message of this page, "He's getting food"?

A. Of me not knowing specifically what they're asking.

Q. Do you know whether that could have been related to a target instead of [redacted]?

MS. RHEE: Objection. Speculation.

Q. Do you -- is it -- do you know who this is discussing?

A. I didn't follow [redacted]. At times, I ended up at multiple locations.

Q. Could --

A. I was at a grocery store. A lady followed me.

Start at my hotel. A lady sat in my hotel to try to get pictures of me and my team, and she followed me around personally. She followed me to the gym. She followed me to restaurants. I have -- I had taken pictures of her. And I noticed her at a grocery store buying food. And I believe that's in reference to a potential target at the grocery store that we were looking into.

Q. Okay. But it could be somebody other than Mr. [redacted].

Is that fair to say?

MS. RHEE: Objection. Calls for speculation.
A. Yes. That's my understanding.
Q. Okay. So we've discussed your interaction with Ms. Hilton. You recall who Ms. Hilton is; is that right?
A. Yes.
Q. Okay. And you did tell her that you -- that she could be put on a domestic terrorist watchlist if she kept going to events; is that right?
MS. RHEE: Objection. Mischaracterizes testimony.
A. Or so thereabouts. Yes.
Q. Yes. Was that a mistake to tell her that?
A. In hindsight, it's great to look back and say, hey, you shouldn't have done that, buddy. And at the time where I've been chased -- because you've got to understand from reasonable prudence of what I'm experiencing, I have a person that I arrested for an immigration crime. I was verbally accosted and treated like garbage at the arrest scene by bystanders, which,

whatever, I left. They stayed, but some chased us.

They chased us across multiple towns, blowing traffic lights, following me with a prisoner in my car. That's not normal human behavior. People don't act that way. The only reason they would do something is usually it ends in about three-tenths.

So after following me, blowing traffic intersections, without being an emergency vehicle, doing an illegal U-turn, almost causing a wreck, following me through Home Depot, not once but twice, and then I recognize the car that is behind me as the first car there, and several individuals get out, and I believed one of them to be Ms. Hilton, I was very frustrated.

Could I have chosen better words? Absolutely. It's not my first go-to, but to be human, I was pissed off. I mean, people don't act or behave that way. I'm expecting I'm going to get a vehicle assault. In my prior life, I was a deputy marshal and state police officer. The weakest link of the custody chain is during transport, and I'm having people aggressively

pursue me during prisoner transport. That's not normal. And so just in my life experience, that's never been good.

Q. Okay. But no one -- did anyone direct you to tell people that they could be put on a watchlist?

A. Absolutely not.

MS. RHEE: Objection to the form of the question.

Q. You -- can just state your answer again.

A. Absolutely not.

Q. Okay.

A. I was not directed to say that, no.

Q. Okay. So pertaining to -- do you recall the name Carlyn Williams?

A. Carlyn Williams, yes. She's throughout here.

Q. Did you -- you conducted a phone interview with her?

A. Yes.

Q. Did she ever admit to you that her car was at the scene where you said it was?

MS. RHEE: Objection to the form of the

question.
A. I specifically recall she said she wasn't present, her car wasn't present, and she didn't know what I was talking about. I didn't have much to go off of, and continuing a confrontational phone call where someone is not admitting anything didn't seem fortuitous to me. So I gave her a warning; if you continue to do this, you'll be arrested. And I hung up.
Q. But did she tell you that her car was there ever?
MS. RHEE: Objection to the form of the question.
A. No. She did not.
Q. Okay. And did you think you were being followed while you were in Maine?
MS. RHEE: Objection to the form of the question.
A. I was followed, to certainty.
Q. Why did you think that?
A. The lady was at my hotel in the lobby. I went to the gym. I'm at Planet Fitness, and there she is taking pictures of me at Planet Fitness. I'm like, "Are you kidding me?"

Q. Did you ever see that person again?
A. Yes, I did.
Q. When?
A. At a supermarket collecting groceries, and then which led me to run her plate. And from recollection, it was an LLC that delivers groceries for potentially noncitizens.
Q. Okay.
A. Part of a group that delivered groceries. They posted it on social media, "Hey, while ICE is in town, we'll get your food for you and take it to your door." That's what I remember, running the plate, running the lady and seeing.
Q. Okay. Did you upload every person who interfered with operations in Maine that you observed?
MS. RHEE: Objection.
A. No.
Q. Was it only the really bad experiences?
MS. RHEE: Objection to the form of the question.
A. Yes.
Q. Do you recall who your immigration

violation of such, and do them as soon as possible.

Q. Certainly. Did you make any arrests for people who were merely exercising their First Amendment rights?

A. No.

Q. Did you put anybody in a database merely for exercising their First Amendment rights?

A. No.

Q. For protesting only?

A. No.

MR. CABRANES: Objection. Leading question.

Q. For video recording only?

A. No. I can recall incidents where a guy almost jumped on my back, and I yelled at him, pulled out the pepper spray and I was ready to hit him. He backed off and left, and that was the end of it. I didn't feel the need to further -- I accomplished what I needed to accomplish. People who were more difficult than that, they got my attention.

MR. TAGERT: Okay. I move to strike

question.

A. No, I did not.

Q. Okay. And you don't know what happens after -- what would happen later if you had clicked "yes"?

MS. RHEE: Objection to the form of the question.

A. In the past, I've clicked "yes," with curiosity of what would populate because I have to click "save and submit." And there's a lot of boxes that I would have to fill out in a report that I would have to write, and it's something that would get bounced to a lot higher people than me that it's not worth it unless it's serious enough to check the box "yes."

Q. Okay. And do you recall the name [redacted]? I believe we talked about [redacted] earlier.

A. Yes.

Q. And are you aware that his ICM entry said "threat to law enforcement, professional protester"?

A. Yes.

Q. Does that fully encompass what he did?

MS. RHEE: Objection to the form of the question.

A. No.

Q. Can you describe why he was put on the ICM?

A. I would not have encountered [redacted] unless he hadn't done what he did, had he not been part of the group that chased us, bypassed our security and parked next to me, and I'm wondering who this is. Talking to my coworkers they're, like, no, he just drove right by us after being warned not to.

Bypassing law enforcement, security, in the midst of a prisoner transport is not a good thing. It's a security risk.

Q. And if you could pull out Exhibit 18, which I actually think is right in front of you.

A. Yes.

Q. So the second picture, the man there, my recollection is you testified about him reaching into the back of a trunk; is that correct?

A. Yes.

Q. What was your concern?

A. In totality of what happened, you've got to look at the beginning. Just to be chased by somebody, and the car that I believed to a certainty that chased me has a male subject wearing military-style clothing -- I served, I recognize the clothing -- ducking in and out of the trunk of a vehicle, I was severely concerned about what he may pull from that vehicle after chasing me.

And so it gathered a lot of my attention that I wasn't able to focus on some of the other people present with the transportation of the prisoner that I had.

Q. Was your concern that he could have --

A. Produce a weapon.

MS. RHEE: Objection to the form of the question.

A. Specifically --

MS. RHEE: Calls for speculation. You've got to stop leading the witness. I'm not going to say it again.

MR. TAGERT: Okay. I'm almost done.

THE COURT REPORTER: I'm sorry. Did you finish your answer?

about [redacted] interfering with your surveillance of a suspect, that's information that you knew as to what you were doing, that you were conducting a surveillance, correct?

A. Yes.

Q. Now, that's not information that you publicly share, correct?

A. No.

Q. So when a protester or somebody in the public comes upon any number of ICE agent cars, they don't know that you are conducting a surveillance at that moment in time, do they?

MR. TAGERT: Objection. Calls for speculation.

Q. You can answer.

A. Common sense would dictate something, that law enforcement is there for a purpose. They don't hang out for no reason.

Q. Okay. But, again, they are not privy to your operations. So they don't know at that moment that you are parked where you're parked for purposes of conducting surveillance, correct?

MR. TAGERT: Objection. Speculation.

MS. RHEE: You can answer.

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. McHugh, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT [redacted], the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability; that before completion of the deposition review of the transcript was requested.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2026.

JANET M. MCHUGH
Notary Public

My Commission Expires:
July 16, 2028