**In the Matter Of:**

*Elinor Hilton and Colleen Fagan vs*

*Kristi Noem, et al.*

---

*S. C.*

*August 14, 2026*

---

LEXITAS™

-CONFIDENTIAL-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

- - - - - - - - - - - - - - - - - - x

ELINOR HILTON, ET AL.

Plaintiff,

v. Civil Action No.

2:26-cv-00092-JAW

MARKWAYNE MULLIN, Secretary of

Homeland Security, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION of [redacted]

Friday, 14th of August, 2026

9:06 a.m. EST

WilmerHale

60 State Street

Boston, Massachusetts

Court Reporter: Katherine A. Tevnan, CSR #129093

Registered Merit Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

DUNN ISAACSON RHEE LLP
Benjamin J. Cabranes,
401 9th Street, NW
Washington, DC 20004
(202)240-2900
bcabranes@dirllp.com

PROTECT DEMOCRACY
JoAnna Suriani, Esq.
Genevieve Nadeau, Esq.
2020 Pennsylvania Avenue NW
Suite 163
Washington, DC 20006
joAnna.Suriani@protectdemocracy.org
genevieve.nadeau@protectdemocracy.org

ON BEHALF OF THE DEFENDANTS:

Stephen Tagert, Esq.
Federal Programs Branch, Civil Division
DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
(202) 860-9963
stephen.tagert@usdoj.gov

Brian Koshulsky, Esq.
United States Immigration

Craig Fear, Videographer

Present via realtime link:
DUNN ISAACSON
Tyler Mikulis, Esq.

PROTECT DEMOCRACY
Janine Lopes, Esq.
Ori Lev, Esq.

A. I believe it was "Catch of the Day."
Q. When you're activated, does it -- does it typically come through via e-mail, like that?
MR. TAGERT: Objection. Speculation.
But go ahead.
A. Usually. Usually something like that, yes.
Q. Okay. What do you remember about the e-mail that told you you were going to be assigned or activated to an operation in Maine?
A. Just travel dates and the basic information. Usually the travel dates will tell you the length of the TDY, where to report, where to report when, and whether you had, you know, reporting responsibilities or be in contact later.
Q. And forgive me, it just may seem like a silly question, do you volunteer, or are you told that you're being assigned and being sent?
A. For the JST, the team?
Q. You personally.
A. For -- I was asked to be the team leader for the team, and I agreed, but I could have been assigned anyway. But for when the assignment

Q. Sure.
You said that there was -- strike that.
What do you recall about the subjects that the U.S. Attorney's Office representative briefed you on during the MS Teams briefing?
A. I remember going over a couple legal sections, and -- from Title 18, and the process if we needed to utilize them.
Q. Okay. You said someone mentioned during the briefing that there were groups who may or may not be preparing for the operation in Maine?
A. Yes.
Q. Can you walk me through what you recall about that?
A. I don't remember who we gave that portion. We were informed that there were, they expected us to have -- whether interference or people impeding our operations, but they also -- I can't remember if they were all named groups or there were some named groups. But there was a group specifically, I think it was named like Pine Guard or something like that -- that was a question of -- there was a question of whether they were against the government or wanted to

observe operations, whether they were armed or if they weren't armed.

There were a lot of questions, but there was a designated group, if we seen people, there was potential, you know, potential officer safety issues from multiple angles actually.

Q. Do you recall any specific named groups that were mentioned during the briefing?

A. Like I said, I think it was -- what I remember is something like Pine Guard or something like that. But I don't remember any other names.

Q. Pine Guard?

A. I think so. But I don't really remember specifically. It was something like that. That was one of the, that was like a subversive group that was like a question mark.

Q. What is a subversive group in your understanding?

A. A group that's against the government, the way they describe it. Like, could be against the United States government.

Q. I think I'm just trying to understand, when you say "against the United States

aspect of the briefing.

Q. Do you remember who that was?

A. I do not.

Q. Do you remember what office they were from?

A. I do not. It was probably enforcement removal operations, but I'm not sure.

Q. Was it a lawyer or a non-lawyer?

A. I don't remember. I don't think it was a lawyer, but I don't remember.

Q. Okay. Other than the group Pine Guard, do you remember any other groups being described as a part of the briefing?

A. Named groups, I don't remember any.

Q. What about unnamed groups? I'm curious why you keep using that term.

A. The -- I don't know, did I use it first, or did you use it first?

Q. I think you used it first. I can confirm it if you want.

A. I just remember the Pine Guard being the one that was like a named thing. That's why I'm calling it like a group or a difference. I don't remember any other specific group or organization

targets; is that right?

MR. TAGERT: Objection.

A. I believe that this talks about is -- would be people potentially unlawfully in the United States.

Q. The next thing it says be prepared to do is "Execute Final Orders of Removal." Did you do that on the Maine operation?

A. I can't remember if our targets, any of our -- the people we arrested, had a final order of removal or not.

Q. Okay. It's not listed here, but related is conducting arrests. Is that something that you and your JST did on this operation?

A. Yes.

Q. Okay. "Conduct surveillance," what did you understand that function?

A. We did conduct surveillance. That would be usually sitting in a vehicle, watching a house or for a person or vehicle or something of that nature for a potential target in the investigation.

Q. Can you walk me through the types of investigative steps that you would take in that

scenario?

A. In which scenario, for surveillance?

Q. Yes.

A. If we had target enforcement of somebody we already knew, we would park in an area, look for if there are vehicles associated to a person or a house or something associated to a person, conduct record checks and queries of our systems, through multiple systems to determine if a person is, you know, illegally present in the United States and able to be arrested.

Q. On this operation, did you ever conduct surveillance on anyone who was not an immigration target?

MR. TAGERT: Objection.

A. I don't believe so.

Q. Okay. Try to move through the rest of this. We are going to slip ahead to the slide that says "Execution-Arrest Tracking."

Do you see that slide?

A. Yes.

Q. It says, "Complete Microsoft Form via link as soon as safe to do so (within 1 hour) after an apprehension (link will be sent to

operations, like what did you observe about the vehicles -- vehicle or vehicles, that led you to believe that they were interfering?

A. Well, there was --

MR. TAGERT: Objection.

A. There was situations where vehicles were chasing after us, trying to block us, trying to block us from our movements. There were many instances of people in vehicles blocking the transport vans, chasing the transport vans, preventing them from stopping at areas, things of those natures -- those -- that nature.

Q. So you personally saw vehicles chasing after you?

A. Yes.

Q. Can you describe what you recall about that incident -- or those incidents?

A. We -- after one arrest, vehicles followed us, were trying to block us, were screaming. We're trying to safely take the arrestee to a location for a transport vehicle. And for them following us, trying to block us in, get between our vehicles. And we had to move locations because the transport vehicles were getting the

same thing, they had to keep moving their location so we could safely meet and transfer custody of the arrestee.

Q. We'll get back to some of that a little later.

So the next line down says, "Enforcement Team TL/ATLs should have access to Maine Op. SRT TLs should have access to both groups."

What's -- when it says "access to Maine Op. SRT," what does that mean?

MR. TAGERT: Objection. Speculation.

A. I'm not sure.

Q. Was there a Maine Op SRT communication channel you were aware of?

A. I don't remember being a member of one. I believe I contacted the JOC when I needed SRT support.

Q. And that would have been via Maine Op Catch of the Day Signal chat?

A. Either that or through a radio. In those situations, I think I used radio.

Q. Any reason you choose radio over the Signal chat?

A. Didn't have -- through the situation at

A. I believe I was there five.

Q. And you mentioned some of -- instances of what you would call civil disturbances?

A. Yes. I don't think I used that terminology, but yes.

Q. What would you have called it?

A. Groups impeding our enforcement actions.

Q. How many specific instances of groups impeding your enforcement efforts do you recall?

A. Where I called the JOC on the radio, I believe it was two or three.

Q. Let's walk through those. What's the first one that you recall?

A. The first one I recall was when we conducted an arrest, one or more vehicles followed us, chased us. When we went through multiple -- I believe we went through multiple cities on the highway, off the highway to meet with an enforcement removable operations transportation team, and after -- we ended up linking up with them at a Home Depot in I think it was South Portland.

Q. Is there a difference between "following" and "chasing"? You used both words.

A. Throughout the -- shortly after arriving at Home Depot to the JOC, requesting assistance and throughout the remaining time we were at Home Depot to the JOC, yes.

Q. Who did you speak to at the JOC?

A. I'm not sure who the person was on the other side of the radio.

Q. Do you remember what their title was or what role they were fulfilling?

MR. TAGERT: Objection.

A. I do not know.

Q. Did you make any specific requests over the radio during or after that encounter for assistance?

A. Throughout that encounter, I did, yes. I called the JOC and requested a quick reaction force, forces to come to our location to assist us.

Q. Did one come?

A. I think two vehicles of SRT personnel came. I'm not sure if that was one team or two teams. I'm not exactly sure how the teams are broken up, but they did arrive and assist.

Q. What did they do to assist?

A. They got out of their vehicle, gave extra personnel to assist with the crowd of people. The SRT personnel also had additional use of force levels of equipment with them, if necessary.
Q. And who were the SRT personnel who came?
MR. TAGERT: Objection.
A. I'm not sure. I'm not sure if they are HSI or ERO. I'm not sure. I don't know them.
Q. Was anyone arrested?
A. No. Other than the people already under arrest, there was nobody arrested.
Q. By "the people already under arrest," do you mean the enforcement target that you or another team had apprehended?
A. Yes. There was no new probable cause arrests conducted at the scene.
Q. Why is that?
MR. TAGERT: Objection. Speculation. You can answer.
A. I believe we were able to safely contain the situation and prevent it from getting worse and causing that.
Q. That's one incident of, I think, what you

remember if it was before or after, before or during the operation.

People from there even followed us were blocking us in that parking lot, interfering, followed us to other areas after. That was, I think, the third time. I don't really remember requesting it again.

Q. Where was this last incident, you mentioned a parking lot?

A. It was at a grocery store. I can't remember if it was a -- I can't remember the name of it. It is owned by the Demoulas family. I can't remember the actual name of the chain.

Q. Does Market Basket sound right?

A. That sounds right.

Q. Okay. Do you remember what day of the operation that occurred on?

A. That happened on Friday. I don't remember what day it was. I don't remember the date.

Q. Did you arrest anyone coming out of that encounter?

A. We arrested two people.

Q. Were they immigration targets that you

arrested?
A. Yes.
Q. Did you arrest any members of the public?
A. We did not conduct any probable cause arrests on the scene, no.
Q. And why is that?
A. The -- I did not know exactly what happened in every part of the situation there, and the goal was to safely get out of that environment and secure all personnel and the people under arrest, ensure all of our personnel was safe and accounted for and outside of a situation that had become hostile.
Q. Okay. Let's go to the end of the slide deck. Oh yeah, you mentioned, I think we counted three. Any others that you relayed to the JOC?
A. Any other?
Q. Civil disturbances.
MR. TAGERT: Objection. Form of the question.
A. Larger ones like that where I requested QRF, I don't believe I did.
Q. Were there any smaller ones?
A. I did send, as I said earlier, I did send

you have any discussion with Mr. [redacted] about what you would do or were expected to do with respect to members of the public who you believed to be impeding your operation?

A. I don't remember talking about that.

Q. Did you discuss any incidents that you believed merited a QFR [sic]?

A. I don't remember talking to him about any QRF incidents.

Q. Okay. And then the third individual you said was [redacted]?

A. Yes. He was also in the same hotel as me.

Q. And what do you recall about conversations you had with him before, during, or after the Maine operation?

A. Basically the same thing. Most of it was social in the hotel and some of the daily operations. The -- we did get protesters, people banging -- I don't know, creating a disturbance in front of the hotel on Friday night. Or was it Thursday night? I think Thursday night it was. I think it was Thursday. And there was alleged threats posted on social media against people in

the hotel against us. So I might have communicated with them about that. I think I did communicate with them about that prior.

But I don't -- and I might have -- I think I did tell them that there -- well, I did request QRF actually another time for the hotel situation, but that was -- so that would have been a fourth time. I communicated with them I believe about that so we could safely leave the hotel on Friday.

But other than that, I don't remember any other conversations.

Q. That was with Mr. [redacted]?

A. I believe I told [redacted] and [redacted] and my teams, they could relay to their team. I don't remember exactly how, if it was by text or e-mail, with each HSI leadership.

Q. Sorry. I didn't follow just that last part. You communicated with [redacted], [redacted], and HSI leadership about what?

A. So there was another situation where I did request QRF. Our hotel, it had been released to the media that ICE personnel were staying in multiple hotels in Portland, and I encountered

people following me through my hotel into the elevator.

My team had people following them around. They were going through the garage taking pictures of our vehicles, et cetera. I notified I believe it was ASAC [redacted] of this, and I can't remember who explained to me. But there was some potential threat on social media where it's possible that people would attack us leaving our hotel in the morning.

Due to the safety of that, in communication with leadership, I believe they offered to have QRF present in case something happened at the hotel to address it to maintain safety so we could leave the hotel and the garage safely and leave the area.

So they were staying at the hotel. So they were a part of the communication. I don't remember exactly how I communicated, if it was through e-mail, text messages, or I believe there was text exchanged, but I don't remember exactly how.

Q. Do you know if any arrests were made out of that incident?

A. A portion.

Q. And this is one of the videos that you took in response to your agent saying that there was an individual interfering at this encounter?

A. No. No. That was -- I took this myself based on her actions. I took a picture of a license plate after, another vehicle --

Q. But you took --

A. -- based on that. I observed her and dealt with her.

Q. You took this video in response to behavior that you personally observed?

A. Yes.

Q. What was that behavior?

A. He -- she approached us. She was -- she approached us. She was trying to get around us to go to the -- you know, to get in between the arrest team. That's when I also thought she was going to get in my vehicle. She was -- I don't remember exactly what she was saying, but she was, you know, not very happy with what we were, you know, there to do.

And Agent [redacted] broke off to initially prevent her from trying to interfere with the

arrest. And then my thought, she was going to get in my vehicle, I broke off from that too, to prevent her from doing that.

Q. Did she actually get to the vehicle with the arrestee?

A. She did not, no.

Q. And did she actually get into your vehicle?

A. No.

MR. TAGERT: Objection.

MS. SURIANI: I'm going to introduce another short video. This one's going to be Defendant's 000335, as produced by the government in this case. And this will be Exhibit 5.

(Exhibit 5, video clip, marked for identification.)

(Discussion off the record)

THE WITNESS: This one (indicating)?

MR. TAGERT: Um-hmm.

(Playing video.)

A. I -- it's -- it's over.

Q. Do you recognize this video?

A. I do.

Q. It's a short video of a car, and it zooms

Q. Why did you determine that this was something they would want to be notified about?

MR. TAGERT: Objection. Speculation.

A. They were -- personnel were commonly sending pictures of license plates or people that they were having encounters with to intel notifying of -- you know, notifying of warnings being given to the people for impeding operations or documenting it for, you know, officer safety issues to the JOC.

Q. Do you think that your message was the first one in the intel chat sending this kind of information to the JOC?

MR. TAGERT: Objection. Speculation.

A. Yeah, I'm not sure.

Q. What did you understand that the JOC would do once they received these images?

A. I wasn't sure what they would do. I wasn't sure if they had -- I wasn't entirely sure what they would do. I think my -- some of my assumption was that, you know, if this continued -- if they continued to have problems with these individuals, if they were going to look to potentially prosecute them or take

action, they would see that there was multiple encounters with those people.

Q. Okay. That's interesting. So it's your understanding that they were look -- looking for patterns over time of different individuals?

MR. TAGERT: Objection. Speculation. Misstates testimony.

A. I don't necessarily know if they were looking for that, but in all law enforcement operations, you would have: This is a person that interrupted the scene, or if something happened, just notify other people if they see them -- if they see them at their location. It's -- you know, it also plays into officer safety and the safety of the people we are trying to arrest.

Q. You -- on the first page that we looked at, 4690, you described them as "Two agitators," and I don't see any other detail that you provide to the intel chat alongside these messages; is that right?

A. Yes.

Q. Why did you use that descriptor?

A. I believe the woman I encountered was an

Q. Did you --
A. I wasn't sure how they were catalog -- catagor- -- cataloging or dealing with this, with those types of things.
Q. Okay. I guess I'm just trying to trace it through. So you're sending these photos. You're not sure what they're going to use it for. You're not sure if and how they're going to catalog it. Is there a reason you used the word "catalog"?
MR. TAGERT: Objection. Speculation.
A. No. Just the choice of word I use.
Q. When you said it was common for this operation, what part of this is common?
A. Throughout --
Q. Go ahead. I'm sorry.
A. I mean, you can finish.
Q. No, I'm done.
A. Throughout this operation, it was common for this intel chat for people to -- you know, agents and officers to put vehicle information or person information that was interfering with our operations. It's intelligence.
Q. And was there a common response to the

you've been in law enforcement for something like over 20 years?

A. Yes.

Q. This form of intelligence that you're talking about is about folks who might be interfering in operations.

Why is that of specific -- why is it your understanding that that's of specific interest to the intelligence desk of this particular operation?

A. The -- as intelligence, you would push the information up so that if this -- if they continued seeing the same things happen and somebody above determined something had to be done to address it, it's just a -- it's a point of intelligence.

Intel is a broad topic. You know, this could be sent for law enforcement safety. Cops usually exchange information on things that they, you know, suspect could be of intelligence importance or just basic intelligence.

Q. Can you provide me a couple of examples over the course of your career where intelligence about individuals interfering with operations is

something that you provided?

MR. TAGERT: Objection. Speculation.

A. Provided to who?

Q. Provided to whoever was running intelligence on the case.

MR. TAGERT: Objection.

A. I would say commonly as criminal investigations. Like if you have a Title 3 wire tap investigation and, you know, we're following people and we have -- there's people that do counterintelligence on our operations. If we're trying to do a buy bust, there'll be vehicles driving around, tying to find us. We'll send those -- we'll take pictures of those vehicles, send them to group, "Hey, this person could be counter-surveillance." For the -- things of that nature, so it's pretty common to share information and intel.

Q. Can you give me a couple of examples in like the last three years of when you would have taken photos or vehicles of -- photos or videos of vehicles that you wanted to provide intelligence regarding for an operation?

MR. TAGERT: Objection.

Q. Okay. You can answer.

A. Cape Cod. I don't remember what city. Maybe in March.

Q. 2026?

A. Yes.

Q. Okay.

And do you remember any specific example of taking photos and videos of any individual that you believe to be interfering with your operations prior to the Maine operation?

MR. TAGERT: Objection.

Q. You can answer.

A. Yes.

Q. And what's the -- what's that specific example?

A. The -- I've had a number of Title 8 enforcement actions in the last year that had similar situations in other investigations. It's not a -- it's pretty common, like I said, in the Title 3 wiretap investigation, that goes on for a long period of time. You can be watching. They could have -- they have personnel or people that work as part of criminal organizations that is will be counterintel or just people in the

neighborhoods that -- it is common to share intelligence among law enforcement agencies, especially in an investigative group.

Q. Do you remember any specific example of taking photos and videos of any individual you believe to be interfering in your operations prior to 2025?

A. Prior to 2025?

MR. TAGERT: Objection. Speculation. Relevance.

A. I'd say that we've done it. I can't think of a specific -- specific situations right now.

Q. Okay. So did anyone else in your recollection send non-immigration target intel to the intel chat during the Maine operation?

MR. TAGERT: Objection. Speculation.

A. Can you ask the question again?

Q. Sure. Do you recall seeing anyone else send non-immigration target intelligence to the intel chat during the Maine operation?

A. What do you mean by non-immigration target?

Q. My understanding is there's -- well, let

A. I'm there, yes.

Q. Okay. Great. Do you see at the top of this page, a user called [redacted] sends an attachment that appears to be a very small picture of the back of a vehicle?

A. I -- it does kind of look like that.

Q. And then the next message is from the same user, [redacted], and the text is "Agitator honking during knock and talk"?

A. Yes, I see it.

Q. Okay. Now another page, this is going to be 4750, a few pages beyond. The bottom image is another attachment that look -- from -- sent by the user [redacted]. And the image looks like the license plate of a vehicle.

A. It looks like it could be the front of a vehicle.

Q. And then if you flip the page, the same user writes, "Agitator following Team 14 at the rear of Kohl's parking lot. Please run plate."

He then writes that they have now -- then writes, "Not sure if you can make out the plates."

A user named [redacted] SDDO writes,

speculation.

A. As I said, it was commonly done to notify -- to push that intel up. You know, at one point they were told to move from the JOC because they wanted to keep that communication channel open.

Q. Tell me what you recall about that. When did that happen, and what was it in response to?

A. I don't remember when, but there was, probably multiple times throughout, there was -- wanted to keep that lane, that chat, and also the radio open for direct communications with the JOC. The JOC was not the intel chat.

Q. And you never received, you and team leaders never received an instruction to send this information to the intel chat?

MR. TAGERT: Objection. Speculation.

A. I don't remember instruction or not. I don't -- I'm not saying we didn't get an instruction to do it or not do it. I just really don't remember instruction. It was commonly done.

Q. We are going to look at another message back in Exhibit 7, the intel chat. This one is

Q. What is it?
A. It is a subject record, a TECS subject record.
Q. And what's a TECS subject record?
A. It is -- a subject record is something used to document HSI interest in a person, place, or thing.
Q. And do you see under "Appearance," this states that the vehicle, make and model and color is a blue Chevrolet Bolt?
A. Yes.
Q. At the very end of the document, the last page --
A. Yes.
Q. -- it shows the metadata as having the author and owner as Agent -- Special Agent [redacted]. Do you see that?
A. Yes.
Q. So this is a text or ICM record that was entered with respect to the blue Chevy Bolt in the encounter that we were just discussing.
A. Yes. Yes.
Q. And I should say, is there a difference between a TECS record and an ICM record?

A. Can you ask the question one more time?
Q. Sure. Are you aware of anyone directing you or your agents to add protesters or observers to ICM?
A. No.
Q. So yesterday, Mr. [redacted] [sic] testified that, "[redacted] knew I was documenting people before the fact, no. After the fact, yes."
Sounds like that's consistent with your recollection?
A. You said [redacted] knew. So [redacted] spoke yesterday. I'm [redacted]
Q. I apologize. The two C names are getting me. Mr. [redacted]
A. We look a lot different though.
Q. They are different. You are right. You got me.
Yesterday, Mr. [redacted] testified, "[redacted]knew I was documenting people before the fact, no. After the fact, yes."
Sound like that's consistent with your recollection as well?
A. Yes.

"Was this the protestor?"
A. Yes.
Q. And then the next one, "She is the registered owner of the car"?
A. Yes.
Q. Should I take anything from the fact that he's using the term protester instead of interferer or agitator?
MR. TAGERT: Objection.
A. I think it was poor choice of words on his part.
Q. Why do you say that?
A. There were many protesters throughout Maine every operation we went to -- or every enforcement action we took. It just wasn't the protester. It would be somebody we felt was, you know, interfering or impeding operation.
Q. Would it have been improper for him to run checks and add to ICM individuals who were nothing more than protesters?
MR. TAGERT: Objection.
A. I don't believe he would have, so I'm not -- I think he would have a reason to do that more than somebody being a protester.

A. Yes.
Q. Who at HSI leadership would have been on this operation?
A. I'm not really sure the context of this. The operation would be ASAC, the assistant special agent in charge, [redacted] and the chief of staff, [redacted]. But I'm not sure exactly the context of what I mean by this.
Q. Yeah. And I am just asking generally, if you were sending information to Mr. Barbero or Mr. [redacted] how would you have done that?
A. I'm not 100 percent sure by the context of this, but I don't know if it would be by e-mail.
Q. Do you remember sending them e-mails related to any protesters or alleged interference that you or your team experienced on the Maine operation?
MR. TAGERT: Objection to the form of the question.
A. I did send them an e-mail. I did send I think [redacted] on the -- the people that were going around the garage videoing our vehicles, some of the intel that I think was put out to us

about people discovering we where at the hotel and potential threats to us and people following us through the hotel, including myself. I did send him an e-mail related to that.

And at the conclusion of the operation, I contacted the resident agent in charge for HSI Portland. I believe it was by phone. I can't remember if I e-mailed him.

Q. Okay. To the extent we don't have that e-mail, we'll be making a demand for it. I'll just let your counsel know that.

MR. TAGERT: Okay.

MS. SURIANI: One more section, and then we'll take a break.

Q. 3670. And this is going to be starting with Mr. [redacted]'s message on the bottom of 3670. And I'll just ask you to read until the next page, 3671.

(Pause.)

A. To the end of the next page, 3671?

Q. That's right.

A. Okay. I'm done.

Q. This is, again, Mr. [redacted] noting that he's "Still working on protesters" late in the

evening Eastern Time on 1/22. Does that sound accurate?

MR. TAGERT: Objection. Speculation.

A. Yes.

Q. Still working on -- do you know what he was still working on with respect to protesters?

MR. TAGERT: Same objection.

A. Let me see. I think at some point I directed him to send information on to the people prior -- or at least one of the persons prior to create a record on them -- on him. So I can't remember specifically if it was that person, who was not a protester. He was an agitator that was impeding our operations. So I'm not sure exactly what he means by this.

Q. Okay.

A. Again, it's a, you know, poor choice of words for saying "protester."

Q. And why do you say that?

A. Because it would be putting in records on people who are impeding our operations or interfering. There were many protesters at every single arrest we had, and we didn't document.

Q. Okay. On the next page, 3671, you write,

other places who have different applications they can use.

Q. Have you in the last two years sent images or videos of anyone asking them to run facial recognition technology on them?

A. I believe I have. I just don't remember specifics.

Q. Anything related to any individual alleged to have interfered with law enforcement?

A. Not that I can remember. Not that I can remember specifically. I haven't really been doing those types of investigations, so not that I can remember on that.

Q. Are there specific types of investigations on which facial recognition technology is used?

MR. TAGERT: Objection. Speculation.

A. For the most part, I have not been investigating -- conducting actual investigations for impeding or 18 U.S.C. 111 charges, is what I mean.

Q. Are those the types of investigations on which facial recognition technology is used?

MR. TAGERT: Objection. Speculation.

A. Not that I remember.
Q. Did you have any discussion with anyone on the Maine operation about domestic terrorism?
A. Not that I can remember. Not that I can remember specifically.
Q. Anything that you can remember generally?
MR. TAGERT: Objection. Speculation.
A. The only thing would be that Pine Guard or whatever group, the potential threat from them, but I don't remember it being referred to as domestic terrorism.
Q. Okay. Help me understand how you just connected the two as an answer to my question.
A. The only thing was that there was a potential. The way that it was explained to us, as the -- that group, is that they were a domestic group that could potentially be of harm to us or the operation or not. So that's the only way I would correlate the two.
For a domestic group that travels into state that could potentially possess weapons to interfere with police investigations, that would follow more along the line of domestic terrorism.
Q. What's your understanding of the

myself because he was near me. The female I don't believe I saw when I was there. And -- or if I did, it was at a distance. The other two I've seen at a distance when I was present on that scene.

Q. When you were present on the scene of Home Depot parking lot, where were you physically present for the duration of the encounter?

A. It's kind of hard to describe. I was more of the middle near -- I was right in front of this person in the bottom right on the -- 13. I was right in front of his vehicle, near the enforcement removal operations transport van and in that area.

So there was a -- there was two entrances to that area, so I was more towards the middle back of that. These other two were more towards the left or front entrance.

Q. Other than the individual at the bottom of 13, how physically close would you say you were to the other two?

A. I don't think it was closer than 25, 30 yards.

Q. Okay. Are you aware that Mr. [redacted]

asked Mr. [redacted] to run searches in biometric index searches related to these vehicles and individuals?

MR. TAGERT: Objection. Speculation.

A. I became aware later.

Q. You didn't know it at the time of the Maine operation?

A. I did not.

Q. What did you become aware of later?

A. That he, that he sent messages to Kevin Mahoney to conduct searches.

Q. Do you recall what each of these individuals did that prompted Mr. [redacted] to ask Mr. [redacted] to run a biometric index search on them?

MR. TAGERT: Objection. Speculation.

A. I believe the first two people were in the vehicle that had pursued us from one of our arrests to the Home Depot, preventing us from -- we had to move from one gas station because of them to the Home Depot. They were a part of that.

And as we were, after we safely transferred custody of our person under arrest,

Q. But you don't recall the color, make, or model?

A. No.

Q. What do you recall personally observing about that vehicle's behavior?

A. As I said earlier, they were following us, running red lights. They were trying to block us off. You know, definitely unsafe driving.

Q. Was this vehicle behind you at all times?

A. I don't know about all times. We had made multiple turns ourselves to get away from these people, also trying to find the transport van. So I can't say they were behind us at all times. I'm not sure.

Q. Were they ever in front of you driving?

A. I don't remember. I don't remember if they were in front of me.

Q. I'm wondering how this vehicle blocked you off.

A. We were trying to pull into one of the gas stations. I know they were at the gas station. I can't remember the specific interplay the entire time. We had a convoy of -- there was

five of us with the arrestee trying to bring him to the drop-off.

Q. Did you alert local law enforcement to a vehicle driving dangerously?

A. I did not.

Q. Do you normally coordinate with local law enforcement when you think state law is being violated?

A. With Title 8 enforcement, they will not help.

Q. And do you or any member of your team, to your knowledge, have any video or written record of the dangerous driving?

A. Not that I'm aware.

Q. You mentioned there was intelligence about flooding ICE. Can you just tell me more about that?

A. I can't remember which chain it was put over, in the Signal chat, or which one. I do remember there was -- somebody put over something from social media where they said -- it was said that whatever put it over -- I don't know if it was a group or a person, I don't know -- that people would try to flood ICE locations to

A. Yes.
Q. Where the user writes, "We are taking her for a cruise around Portland."
A. Yes.
Q. Do you recall seeing that message?
A. I might have seen it. I don't recall these messages.
Q. Do you recall hearing about other agents taking drivers on a cruise around Portland?
A. Yes, I remember to an extent, yes.
Q. What do you remember?
A. When people are following them, and they would just continue to keep driving out of the city, or in any direction they were going.
Q. Drill down on that for me for a second. When which people were following who? Who did what?
A. If -- I specifically remember times when the transport vans were being chased, which happened daily, so they could prevent stopping at certain locations. And the SRTs or the QRFs were called regularly to try to free them from people following them and interfering with them.
And there were times when, if they wanted

to -- if these people wanted to follow one of the ICE vehicles, they would just keep driving. That was my understanding of it.

Q. In that instance, do you recall the agents relaying what they were witnessing the vehicles do that made them feel that they were being chased?

MR. TAGERT: Objection. Speculation.

A. In this instance, I'm not sure.

Q. You don't recall them mentioning violations of traffic laws, speeding, anything of that nature?

MR. TAGERT: Same objection.

A. I -- the transport vans were being, that was happening to the transport vans multiple times daily. So I didn't really pay much attention to it. My function with that was just trying to find them when I had an arrest, when I had an arrest, locate them to transport to transfer custody.

Q. Okay. What was your understanding of the purpose of looking up the home address of someone who was following an ICE vehicle and driving them past their own house?

MR. TAGERT: Objection. Speculation.

A. I don't understand why people are doing that.

Q. Can you say more?

A. Just I don't -- I think, at the time, I had heard of it happening at other places, but a lot of stuff in the news about Chicago and all that stuff. So I think I had heard of it, but I don't see the point of doing that.

Q. Why not?

A. The -- me personally with all the Title 8 enforcement operations I do, I just want to execute the operation, safely take the person into custody, and get out of the scene to avoid any negative interactions. That's the way I like to run these operations.

Q. And driving people past their own houses would get in the way of that objective in what way?

MR. TAGERT: Objection. Speculation.

A. Just a tactic I would not prefer to do.

Q. Does it serve an enforcement priority to engage in that tactic?

MR. TAGERT: Objection. Calls for legal

conclusion and opinion.
A. I'm not sure what the thought process is in the people doing it.
Q. What other places did you hear of this tactic occurring in that you mentioned?
A. I think I had seen on the news being alleged in Chicago or something. One of the other places that was having Title 8. If that was -- if that was even during Chicago, I think it was. But I'm not really sure exactly where I heard it occurring. But I had heard it occurring, so...
Q. Had you heard it occurring more than once?
A. I'm not really sure. I don't think it was widespread.
Q. Were you aware of whether anyone on your team engaged in drive-bys of protesters' houses?
MR. TAGERT: Objection to the form of the question.
A. I think we were driving by their houses. There was an instance where one of our agents was encircled by multiple people, was followed, tried blocking, et cetera, where I had to send my team.

We ended the target enforcement operation that we planned to meet up with her to free her from multiple people following her.

Q. Do you remember which agent?

A. Special Agent [redacted].

Q. And what do you recall Agent [redacted] telling you about what this individual had done that made you want to go back her up?

A. Multiple people went. There was a large male that was trying to block her car in. And I believe it was multiple people that were following her through that neighborhood or Westbrook, I'm not really sure what that is, if it's a neighborhood or a city.

A large crowd gathered on her and was surrounding her. Blowing the whistles, and all that stuff, blocking her in, and following her.

Q. How did that encounter conclude?

MR. TAGERT: Objection. Speculation.

A. I brought the team members that we had to this location where she was, where she had stopped, which I believe later on determined was one of the people's houses, or in the area. And I set my vehicle so that she could go around me

and get out of the area, and they would not be able to follow us or follow her.

Q. I just want to make sure I'm following. So is Agent [redacted] relaying to you that she's in her vehicle and that she is being blocked by another vehicle?

A. The person was on foot at one point. Trying to block her from leaving from where she was. I don't remember the specifics of where the motor vehicle was or the motor vehicle was blocking her as well. Once the person got out of her way, she left that scene, instead of being surrounded.

Q. Was that individual forcibly moved out of her way, or did they move out voluntarily?

MR. TAGERT: Objection. Speculation.

A. From what she said to me, it was not forcibly. She didn't get out of her vehicle at that scene. And I don't know exactly how the person walked out of the way. It was not forcibly though. She didn't get out of her vehicle, and we weren't there so...

Q. And that's not the portion that occurred in front of the protester's residence. It is

from there, Agent [redacted] is able to leave, and she does so?

A. She left and was followed.

Q. And what did she tell you about that portion, the encounter?

A. At the time she said she was being followed. We canceled the enforcement action where we were because of -- multiple people were coming to that scene, flooding the area on us.

And as I was leaving, she said they were following her. And I directed the team to meet up with her so that we could all safely leave the area.

Q. Then Agent [redacted], in fact, leaves the area, she is being followed, and what happens next?

MR. TAGERT: Objection. Speculation.

A. She stops -- I am not sure how far away it was. I don't think it was very far -- on a street. We came to that location. Set up my vehicle. She got out of her vehicle, gave a warning to one or both of the people that followed her.

[redacted] got out. I think [redacted] got

MR. TAGERT: Objection. Speculation.
A. I'm not really sure what she means by it.
Q. In the course of your Title 8 enforcement are you supposed to --
(Reporter requested clarification.)
A. In the course of your Title 8 enforcement operations, are your agents supposed to play games with members of the public to scare them off?
MR. TAGERT: Objection.
A. If it's -- playing games is characterized as tactics, but not playing games with people, no.
Q. I'm not sure I understand what you mean.
A. Is this tactics to lose people who are following you or trying to impede our operation, we're going to try to, you know, evade or break contact with those people. You can characterize that as playing games with them. But, you know, we're not playing games with them. We're just trying to effectively complete our operations.
Q. But Agent [redacted] characterized it as playing games, right?
MR. TAGERT: Objection. Speculation.

"Team 6 do u need SRT? What's ur location/area?" And Venema replies, "We're good. She decided to disengage."

A. I see that.

Q. What do you understand taking her back to her house in the first message to mean?

MR. TAGERT: Objection. Speculation.

A. Not exactly sure. I assume that it was possibly back to her residence.

Q. [redacted]

A. I do.

Q. [redacted]

MR. TAGERT: Objection. Speculation.
Q. That's what he wrote.
A. That's what I assume it indicates.
Q. You said you've at least had a few personal conversations with Mr. [redacted]?
A. I have, yeah.
Q. Did you discuss the Maine operation with him?
A. We shared a hotel, so we discussed some parts of the operation.
Q. Do you recall discussing this incident?
A. I don't believe so.
Q. Do you recall discussing this tactic with him?
A. I don't believe so.
Q. Help me understand that it is not just your team, it is multiple teams who are asking the JOC to run plates of individuals following them so that they can drive them by their houses.
Is it something you saw discussed routinely in the Signal chats?
MR. TAGERT: Objection. Speculation.
A. I think we have seen it referred to in the Signal chats. It has been discussed or

referenced. I'm not sure the extent that it was done.

Q. And your testimony is that other than the conversation you had with Agent [redacted] we already discussed, you didn't have a discussion of this tactic with anyone outside the Boston JST?

A. I don't remember having a discussion about this with anybody outside. Not that I remember. I don't know.

Q. Do you remember having any discussions with Mr. Barbero about it?

A. I do not remember that, no.

Q. Anyone else on the JOC?

A. I don't believe so.

Q. Did you ever see an agent, officer, or team leader receive an instruction from the JOC to cease this practice during the Maine operation?

A. Not to my knowledge.

Q. What's the difference between an agitator and someone who is impeding in your mind?

A. It is a very similar thing between the both. I guess it would just come down to my personal observation. The short answer,

agitators are blowing whistles and other stuff. You can argue they are also impeding our operations, but just in my observation, it would be people blocking us, people preventing us from actually -- impeding would be preventing from us accomplishing the mission.

Q. Is it a matter of degrees where for someone to be legally impeding you have to have reasonable suspicion, but an agitator may be something less than that?

MR. TAGERT: Objection. Legal conclusion. Speculation. Expert opinion testimony.

A. Yeah. I think it's getting into the weeds of -- I think I would have to see each situation to give like a blanket explanation.

Q. I am asking for your personal understanding about that, as someone who has to make these judgment calls in the field.

MR. TAGERT: Same objection.

Q. So --

MR. TAGERT: Sorry.

Q. -- I just want to understand your own terminology.

A. Okay.

Q. When you say "agitator," does that include people who might impede?

MR. TAGERT: Same objection.

A. I would lean towards agitators are people impeding our operation.

Q. But it's not the same as someone who has, in fact, impeded the operation?

MR. TAGERT: Same objection.

A. I would lean towards they are impeding our operations.

Q. So agitator and someone who is impeding, you personally use those interchangeably?

A. I guess I have to see the context --

Q. I am just asking how you --

A. -- of the way I say it.

Q. -- personally use the term.

A. The way I use the term?

Like I said, I lean towards agitators are people preventing us from accomplishing our task and would be impeding our operation. That's what I would lean towards. It would depend on the situation.

Q. Okay. Let's look at one more chat. This

C E R T I F I C A T E

I, [redacted], do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below):

Page Line Correction

[redacted]

Sworn to and subscribed before me this day of , 2026.

Notary Public
My commission expires:

COMMONWEALTH OF MASSACHUSETTS)
)
SUFFOLK, SS. )

I, Katherine A. Tevnan, Registered Merit Reporter, Certified Shorthand Reporter No. 129093 and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that [redacted], the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 15th day of August, 2026.

Katherine A. Tevnan

Katherine A. Tevnan,
Registered Merit Reporter
CSR # 129093

Notary Public
My commission expires March 10, 2028