**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS,<br>on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>Defendants. | Case No. 2:26-cv-00092-JAW |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

Expedited discovery has confirmed what Plaintiffs feared: they and other Mainers have been targeted for the exercise of First Amendment rights, recorded, and, for some, entered into a government database for further investigation. All of this gives Plaintiffs standing to seek relief that unwinds ongoing harm from Defendants' prior unconstitutional acts and injunctive relief that shields them from future violations.

Defendants' motion to dismiss entirely ignores one of the principal forms of relief Plaintiffs seek—the expungement of records unlawfully created by federal agents in response to their First Amendment activities. Agents captured images and license plate information about observers; circulated that information through official government channels; maintained the information as official government records; and designated certain observers in databases as "[redacted]" to be tracked or searched. Defendants admit that one such database record "led to the March 2026 border stop" of Plaintiffs Williams and Pantos. MTD 9. Plaintiffs have standing to challenge the creation, maintenance, and dissemination of these records.

Plaintiffs also have standing to seek prospective injunctive relief against the policies and practices described in the First Amended Complaint, most notably because expedited discovery confirmed that what happened to Plaintiffs reflects practices sanctioned at multiple levels of the chain of command. Plaintiffs did not encounter "rogue" agents. To the contrary, Defendants authorized, ratified, and, at times, directed agents to collect and maintain information about individuals engaged in protected activity, and Defendants sanctioned the widespread, well-known practice of intimidating and threatening observers to deter their protected activity. Expedited discovery also established that the years-old First Amendment policy memorandum Defendants continue to point to was never actually followed by agents, who were mostly

unaware of it even during depositions. A policy treated as meaningless paper by Defendants' agents and leadership alike cannot foreclose injunctive relief.

Defendants also point to the end of Operation Catch of the Day to seek dismissal. Yet they do not and cannot dispute that immigration enforcement continues at high levels in Maine, conducted by the same ICE offices—ERO Boston and HSI New England—that were integral to executing Operation Catch of the Day. Agents continue to arrest individuals in communities across the state, and concerned residents seeking accountability continue to observe and record their actions. Under these circumstances, the chance of a future encounter between Plaintiffs and agents is far from "remote." MTD 12. And because the challenged actions are all consistent with officially sanctioned policies and practices, the likelihood of recurrence is far from speculative. Indeed, that likelihood is demonstrated by the fact that Plaintiff Hilton was *again* unlawfully retaliated against and harassed by ICE agents while she engaged in First Amendment activity in Maine this summer. The Court should deny the motion to dismiss.

## FACTUAL BACKGROUND

Defendants' motion to dismiss the First Amended Complaint ("FAC") mounts a factual challenge to Plaintiffs' standing to seek prospective relief. Motion to Dismiss (ECF No. 117) ("MTD") at 4. But they repeatedly mischaracterize the record developed to date, which is set out in full in Plaintiffs' preliminary injunction motion. ECF No. 132 ("PI Mot.") at 3–18. The facts and allegations most relevant to Defendants' motion are summarized below.

### I. The First Amended Complaint Adequately Alleges Plaintiffs' Standing to Challenge Defendants' Unconstitutional Policies and Practices

Plaintiffs are four individuals who exercised their First Amendment rights to observe and record the actions of federal agents in their communities. Agents responded by recording Plaintiffs, collecting their license plate information, and threatening to add them to a "database"

or "watchlist" for "domestic terrorists." FAC ¶¶ 39–52, 56–70, 76–85. All Plaintiffs either stopped observing ICE or significantly curtailed their protected activity in response to these incidents. FAC ¶¶ 181–95. Records created after their encounter also directly caused Plaintiffs Pantos and Williams's detention at the Canadian border in March, and as a result they have abandoned international travel for the foreseeable future. FAC ¶ 193.

The FAC also alleges that the agents' actions reflect DHS policies or officially sanctioned practices. *First*, the FAC alleges a policy and practice of collecting and maintaining records about observers. The FAC identifies reports of agents photographing and recording observers in Maine, Minneapolis, and elsewhere, FAC ¶¶ 94–95, 107–116, as well as reporting in which government officials confirm DHS directives to collect information about "agitators," "protestors," and any person filming them, FAC ¶¶ 111–16. The FAC notes that Plaintiffs Williams and Pantos's detention at the border was compelling evidence that their information had been logged in a database. FAC ¶¶ 137–41. And the FAC explains that agents' actions naturally flowed from oft-repeated claims by senior DHS officials that anyone who observes or films ICE operations somehow engages in criminal conduct. FAC ¶¶ 144–50, 158–66. Taken together, these actions and statements made clear that Defendants had effectively abandoned a 2019 policy memorandum that prohibited DHS personnel from maintaining records on First Amendment activity. FAC ¶¶ 151–53.

*Second*, the FAC alleges a "nationwide pattern and practice" of agents making verbal threats and engaging in other intimidation tactics meant to deter observers from engaging in protected activity. FAC ¶¶ 228–29. Plaintiffs detail not only their own experiences, but also numerous public reports of Maine observers who had been led to their homes in a show of intimidation. FAC ¶¶ 96–106. And the FAC identifies sworn accounts of similar drive-bys and

other intimidation tactics against observers in Minneapolis as further evidence that the agents' conduct was consistent with a broader pattern across DHS. FAC ¶¶ 170–72.

Defendants appear to concede that the FAC plausibly alleges policies and practices that violate the First Amendment and mount only a factual challenge to the existence of those policies and practices. *See* MTD 4 (characterizing their standing challenge as factual). Defendants rely on facts learned during discovery to argue that the record has "showed the opposite" of an "ongoing retaliatory policy or practice." MTD 4, 7. The record simply does not reflect Defendants' version of events. *See* PI Mot. 12–18; *infra* pp. 5–10. But Defendants' factual argument is also premature, as Defendants cannot ask the Court to resolve merits-based factual disputes in their favor at the motion to dismiss stage.

## II. Limited Expedited Discovery Has Confirmed The Allegations in the FAC

Expedited discovery has largely centered on the handful of agents who interacted directly with Plaintiffs during the January encounters.[1] Even that limited discovery confirms the allegations in the FAC. Despite their formal policy pronouncements, Defendants authorize—and repeatedly encourage—agents to retaliate and discriminate on the basis of viewpoint against individuals who exercise their First Amendment rights.

---

[1] Defendants misleadingly cite the total number of pages produced, MTD 3, without, for example, disclosing that more than 12,000 of the 20,000 pages are essentially blank pages of a 13,793-page spreadsheet ("Copy of Agitator Master List.xlsx" (DEFS006788–020580), described at PI Mot. 14–15 n.84). Several thousand more pages are duplicate versions of Signal messages originally produced in an unusable form. More importantly, these page counts have no bearing on the scope of discovery, which Defendants strictly limited, producing almost no material at all from several of the agents who interacted with Plaintiffs, nor the vast majority of of the mobile phone data that Judge Nivison ordered Defendants to make reasonable efforts to produce more than six weeks ago (*see* ECF No. 50 at 2–3; ECF No. 83 at 2). Plaintiffs also have not yet obtained discovery from the officials who led Operation Catch of the Day, the intelligence analysts who helped agents identify and target observers, the many other agents in Maine who have engaged in surveillance and intimidation, or the agents who lead immigration efforts in Maine today. The extension of the expedited discovery period (MTD 4) was primarily due to Agent J.C.'s unavailability to sit for deposition until August, as well as Defendants' repeated efforts to obstruct discovery, *see, e.g.*, ECF Nos. 50, 56, 83.

### A. DHS Agents Routinely Record and Collect Information About Observers at Defendants' Direction or With Their Acquiescence

Discovery has confirmed a widespread practice of capturing photos, video recordings, and other information about observers. Operation Signal chats confirm that many agents across teams shared observers' images and license plate information on official channels, with the knowledge and acquiescence of high-level officials.[2] These documents make clear that Plaintiffs are far from the only Mainers recorded because of their protected activity and that the practice is, at minimum, officially sanctioned. In similar operations elsewhere, Defendants have specifically *directed* agents to capture the same information about "agitators" and "protestors."[3] Months later, no agent has been reprimanded for collecting information about Plaintiffs and other observers, and no agent has been instructed not to do so in similar circumstances. Supervisors defended these practices as consistent with Defendants' policy.[4]

Defendants attempt to minimize this conduct, suggesting that agents merely "used basic license plate searches to make on-the-spot determinations about potential risks to their safety and the integrity of their operations." MTD 10. Every aspect of that representation is false. As just one example, Agent J.C. sent observers' photographs to a CBP colleague for identification; that colleague used a biometric image search to identify Hilton and then queried her name, *after* the encounters with observers occurred.[5] J.C. also extensively investigated observers, their family

---

[2] ECF No. 103-7 (PI Ex. 48 at DEFS001272, 1295–96, 1393–94); PI Mot. 3, 13 & n.74.
[3] ECF No. 103-13 (PI Ex. 54 at DEFS020621); ECF No. 132-26 (PI Ex. 55 at DEFS020639); PI Mot. 14–15 & n.84.
[4] PI Mot. 14; ECF No. 104-6 (J.R. Dep. 141:5–143:15); ECF No. 104-9 (S.C. Dep. 310:19–311:16).
[5] ECF No. 134-4 (J.C. Dep. 197:17–22; 199:19–22; 201:2–10); ECF No. 103-20 (PI Ex. 61 at 28–29).

members, and, in at least one case, [redacted], well *after* the encounters passed.[6] This was sustained targeting, not random "on-the-spot" license plate checks.

Contrary to Defendants' suggestion that agents who collect this information always have "legitimate reasons" for doing so, MTD 10, the record establishes that Plaintiffs engaged in purely protected activity at the time agents recorded them, PI Mot. 19–22. The record also shows agents: (1) audibly threatening observers while recording, (2) admitting during depositions that recording and threats were intended to get observers to leave the area, and (3) continuing to conduct retaliatory investigative steps—logging observers into databases and taking other actions—after encounters ended.[7] If anything, Defendants' position that what happened was "legitimate" only confirms what the FAC alleges—that Defendants treat the act of recording as inherently threatening and regard virtually all lawful observers of ICE activity as engaged in criminal activity. FAC ¶¶ 145–49; PI Mot. 12–13.

### B. Defendants Have a Policy of Maintaining Information Collected About Observers in Official Government Records

Discovery has also confirmed that Defendants maintain information collected about observers. As Defendants acknowledge, Plaintiff Williams and several other observers in Maine now have records in HSI's Investigative Case Management (ICM) database. MTD 9 & n.12. Each of these individuals has been designated a "[redacted]," and each ICM record refers in some way to their protest and observation activity.[8] ICM subject records [redacted] to

---

[6] J.C. Dep. 116:15–117:2, 139:14–140:3, 251:2–23; 253:11–18; 254:14–255:23. Excerpts from depositions cited to herein that are not otherwise in the record are attached.

[7] *E.g.*, ECF No. 134-4 (J.C. Dep. 195:12–196:4; 316:4–14 (threatening Hilton with watchlisting and home visits and arrest)); ECF No. 104-3 (D.L. Dep. 98:15–24;113:9–114:24 (standard practice to threaten observers "to get rid of them").

[8] ECF No. 102-9 (PI Ex. 35 at DEFS000650–51); ECF No. 102-11 (PI Ex. 37 at DEFS000657–58); ECF No. 102-12 (PI Ex. 38 at DEFS000662–63); ECF No. 102-13 (PI Ex. 39 at DEFS000666–67); ECF No. 102-14 (PI Ex. 40 at DEFS000669–70); ECF No. 103 (PI Ex. 41 at DEFS000672–73); ECF No. 103-1 (PI Ex. 42 at DEFS000675–76); ECF No. 103-2 (PI Ex. 43 at DEFS000680–81); ECF No. 103-3 (PI Ex. 44 at DEFS000683–84).

TECS, a CBP database used to screen travelers at the border. ECF No. 102-6 (PI Ex. 32 at DEFS000587). CBP policy requires [redacted], which is exactly what happened to Plaintiffs Williams and Pantos as a direct result of Williams's ICM record.[9] J.C. (who created these particular records), his supervisor, and their fellow agents all maintain that the creation of these ICM/TECS records is and was entirely consistent with DHS policy.[10] And given the limited scope of discovery to date, the total number of ICM/TECS records created about observers in Maine over the past year may be significantly higher.[11]

Defendants also maintain information about Plaintiffs Hilton, Fagan, and Pantos. At this point, Defendants have not produced ICM/TECS records associated with them, but Plaintiffs' claim has never turned on whether their information is maintained in any particular database. The crux of their claim is that it violates the First Amendment for their personal information to be maintained in *any* form *because of* their protected activity. And then-Acting ICE Director Todd Lyons has admitted that "any information collected" during encounters between ICE and observers—including encounters, like Plaintiffs', that do not result in arrest or detention—"is treated as an official government record."[12] The information subject to that policy is not limited to ICM or TECS records; it also encompasses the photos and videos captured of Hilton and

---

[9] ECF No. 101-22 (PI Ex. 20 at DEFS000318–19); ECF No. 102-8 (PI Ex. 34 at DEFS000645–48); ECF No. 102-9 (PI Ex. 35 at DEFS000650–51); ECF No. 104-1 (CBP 30(b)(6) Dep. 146:7–147:10); *see* MTD 9.

[10] *E.g.*, S.C. Dep. 216:9–22 (J.C.'s supervisor testifying that creating Williams's ICM vehicle record was [redacted]); ECF No. 104-3 (D.L. Dep. 68:3–18 (adding protestors to ICM database is not "[redacted]" and is "[redacted]"); ECF No. 134-4 (J.C. Dep. 108:24–109:23 (subject records are generated at agents' "discretion" and here were discussed with and approved of by his supervisor S.C. after the fact).

[11] The fact that observers tracked by Defendants elsewhere have been referred to secondary inspection (*see* Ex. 12) suggests that Defendants' practice of creating ICM/TECS records extends far beyond Agent J.C.

[12] ECF No. 132-30 (PI Ex. 65 at 2).

Fagan and the vehicle driven by Pantos. It also encompasses the Signal messages in which agents circulated some Plaintiffs' photos and information, since Operation leadership directed that those messages be "[redacted]" as well.[13] Regular discovery is likely to reveal that information about Plaintiffs has been maintained in other forms as well, given that, during the larger-scale operation in Minnesota, HSI agents maintained an official "Agitator Master List" with personal details about individuals viewed as protesting or observing ICE operations, as well as a similar "Agitator Log" even after the larger-scale operation wound down.[14]

### C. There Is a Widespread Practice of Agents Threatening and Intimidating Observers, Often with Defendants' Express Approval or Acquiescence

As Plaintiffs' preliminary injunction motion recounts at length, discovery has also confirmed the allegations in the FAC regarding a widespread pattern and practice of intimidating observers. Defendants' own documents establish that agents frequently sought to deter protected activity by threatening observers or leading them back to their homes. PI Mot. 15–18. Members of the JOC *encouraged* agents to "[t]ake em home" and even supplied agents in the field with observers' home addresses. *Id.*[15] Agents who made threats and engaged in drive-bys were not disciplined, and the Department's Rule 30(b)(6) witness testified that both tactics were permissible and within the scope of agents' duties.[16]

---

[13] *See, e.g.*, PI Mot. 7, 15 n.85; ECF No. 103-7 (PI Ex. 48 at DEFS001272) (supervisor S.C. circulating a photo of Pantos's vehicle under the label "two agitators"); *id*. at DEFS001295–96 (agent circulating photo of Hilton's vehicle); ECF No. 102-4 (PI Ex. 30 at DEFS000499) (instructing that "[redacted]").

[14] ECF No. 103-13 (PI Ex. 54 at DEFS020621); ECF No. 132-26 (PI Ex. 55 at DEFS020639); ECF No. 103-15 (PI Ex. 56 at DEFS020672); Ex. 12 (detailing "Agitator Log" with entries from April through June 2026); *see* PI Mot. 14–15 & n.84.

[15] *See* ECF No. 103–6 (PI Ex. 47 at DEFS001196); ECF No. 103–7 (PI Ex. 48 at DEFS001393–94).

[16] ECF No. 104-8 (ICE 30(b)(6) Dep. 363:10–365:10; 368:13–369:12). Defendants' reliance on a generalized statement in the pre-discovery Wells declaration, MTD 8 n.7, to disclaim responsibility for agents' comments is particularly unavailing, given that multiple supervisors and the Department's own 30(b)(6) representative testified the opposite under oath: that the conduct alleged in the FAC is consistent with DHS policy. *E.g.*, ECF No. 104-6 (J.R. Dep.

Defendants largely sidestep this evidence, MTD 11, arguing that "no Plaintiff claimed" in the FAC to have been led to their homes. That misses the point: each Plaintiff alleges that they were subjected to Defendants' pattern and practice of threatening and harassing individuals who observe and record ICE activity. Drive-bys are one way that agents have implemented that practice; threatening a "domestic terrorist" designation is another, as are other threats designed to send the message that agents know where observers live (*e.g.*, threatening to show up at Hilton's home). As discussed further below, that Hilton and others have *also* been led to their homes in recent months supports—but is not essential to—Plaintiffs' standing. *Infra* pp. 22–23.

### D. Defendants Mischaracterize Their First Amendment Trainings and "Reminder" Email to Agents

To counter this evidence, Defendants point to the 2019 DHS policy memo discussed in the FAC. MTD 7–8. That memo directs DHS personnel not to "collect, maintain in DHS systems, or use information protected by the First Amendment" unless, among other limited exceptions, "the information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers."[17] Defendants ask the Court to accept without foundation that agents invariably are trained on and follow this policy, only collecting and maintaining information about observers when there is an "appropriate law enforcement purpose." MTD 7–8. But extensive evidence—including Plaintiffs' own experiences—proves that is not the case.

It is not surprising that agents routinely flout the 2019 policy memo. Discovery has shown that Defendants' representation that "[a]ll ICE officers must receive regular training on the First Amendment Policy at least once per year" (MTD 7) is wrong. The Department's 30(b)(6) witness did not identify any training that covered the prohibition on maintaining First

141:5–145:15; 150:1–20; 222:16–223:13); ECF No. 104-9 (S.C. Dep. 310:19–311:16); ECF No. 104-8 (ICE 30(b)(6) Dep. 363:10–365:10; 368:13–369:12).

[17] ECF No. 101-13 (PI Ex. 11 at 2).

Amendment records,[18] and the privacy training materials Defendants produced (after his deposition) confirm that neither the First Amendment nor the 2019 policy is even mentioned, let alone explained in any depth.[19] No agent could recall ever having received any training on the policy; indeed, they were either unaware of it or unable to say whether it remains operative today.[20] And though the DHS 30(b)(6) witness also referenced an annual Fourth Amendment training that he suggested covers the First Amendment, that seems misleading at best; the only Fourth Amendment training produced by Defendants does not discuss the 2019 policy and has only a short section on "[redacted]" that addresses [redacted].[21]

Defendants' representation that "ICE issued a reminder of the First Amendment Policy to all agents and officers in Maine" "[a]fter the January incidents," MTD 8, is also both wrong and a bald attempt to cover up the lack of training that preceded this litigation. The reminder email was sent on March 10, weeks after the incidents but mere hours before Defendants filed their TRO opposition. ECF No. 18-3. It was sent only to the ERO Boston Field Office, not to any agents from HSI or CBP, even though it was *HSI* agents, not ERO, who recorded Plaintiffs Hilton and Pantos and created the ICM records about Williams.[22] Agents confirmed that there have been no policy changes or updated training related to interactions with protestors and observers since January.[23]

---

[18] ICE 30(b)(6) Dep. 188:22–193:12; 193:3–12; *see also* ECF No. 117-9 (ICE 30(b)(6) Dep. 180:6–181:6).

[19] PI Mot. 30 n.150; ECF No. 132-27 (PI Ex. 60 at DEFS022135–145)

[20] *E.g.,* D.L. Dep. 168:8–21 ([redacted]); S.C. Dep. 223:1–19 ([redacted]); ECF No. 104–6 (J.R. Dep. 237:12–239:5) (no training on 2019 memo or [redacted]).

[21] Ex. 1 (DEFS000833.001 at DEFS000833.011–.017).

[22] ECF No. 103-21 (PI Ex. 62 at 27–29).

[23] ECF No. 104-6 (J.R. Dep. 315:10–21, 318:21–319:4).

### E. Immigration Enforcement Continues in Maine, Led by the Same Offices That Sanctioned the Challenged Practices

Defendants' motion to dismiss also relies heavily on the end of Operation Catch of the Day to suggest that Plaintiffs' experiences are unlikely to recur. But federal agents have continued to arrest immigrants in communities across the state, and concerned residents like Plaintiffs have continued to organize in order to document and bear witness to their actions.

Even before Operation Catch of the Day began in January 2026, the federal government had significantly escalated its immigration enforcement efforts across the state. ICE made 308 arrests in 31 Maine towns in 2025—a dramatic increase over the previous year's 168 arrests across 20 towns.[24] Border Patrol, too, expanded its traffic-stop and work-site enforcement, including far from the border.[25] In October 2025, advocacy groups responded to this heightened enforcement by announcing a hotline for individuals to report ICE and Border Patrol activity.[26]

Operation Catch of the Day led to a spike in arrests in Maine, with approximately 200 in January 2026. ECF No. 117–7 (MTD Ex. G at 2–3). But immigration enforcement has continued at an elevated pace and in a similar fashion since the operation ended. The overwhelming majority of immigration arrests in Maine are "at-large" arrests, meaning they take place in the community rather than another detention facility.[27] In April 2026, the month Plaintiffs filed the FAC, ICE made more arrests in Maine than in any other month since January 2025 aside from January 2026.[28] And those numbers have continued to climb, with significant jumps this past summer, each month exceeding any month of arrests in 2025. Defendants' Exhibit G—which

[24] Ex. 2; *see* ECF No. 117-7 (MTD Ex. G) at 2–3 (showing a 2025 average of 0.9 arrests per day, up 87% from 2024); *see also* MTD 13.
[25] Ex. 3.
[26] Ex. 4.
[27] Ex. 5 (Maine Arrest and Detention Data, Fig. 8 at 11); Ex. 6 (Deportation Data Project, Arrests in Maine by month and apprehension method).
[28] Ex. 7 ; *see also* Ex. 8.

focuses solely on comparing January and February 2026 and omits the later increases—thus presents a highly misleading snapshot of recent enforcement efforts in Maine. ECF No. 117–7 (MTD Ex. G at 2–3).[29]

### F. Plaintiffs Intend or Wish to Continue Observing and Recording the Actions of Federal Agents in Their Communities

Because of ICE's ongoing efforts in Maine, members of the community have continued mobilizing to observe and record ICE activity.[30] Plaintiffs are among many individuals observing ICE activity (or would be if not for Defendants' conduct in this case). Plaintiffs Hilton and Fagan have explained that they observe ICE less often than they otherwise would have, with Hilton sometimes taking extra precautions like observing in other people's vehicles.[31] Pantos and Williams have both stopped observing entirely—Pantos stopped after they learned about Agent J.C.'s call to Williams, and Williams stopped after the March border stop made clear that the government had created records about her.[32] Each Plaintiff deeply believes in the importance of observing ICE and holding agents accountable for misconduct, and each Plaintiff would do so more freely but for Defendants' conduct.[33]

---

[29] Defendants suggest, without evidence, that agents involved in Catch of the Day are unlikely to return to Maine. That is both irrelevant and false. ERO Boston is responsible for enforcement in Maine, and many ERO Boston officers participated in the surge. ECF No. 117-2 (MTD Ex. A at 4). Depositions made clear that "strike team" personnel [redacted]. *See* ECF No. 104-9 (J.C. Dep. 32:13–23); ECF No. 104-8 (ICE 30(b)(6) Dep. 70:6–20); ECF No. 104-6 (J.R. Dep. 319:5–10).

[30] *E.g.*, Ex. 9; Ex. 10.

[31] PI Mot. 33 & nn.155–58; ECF Nos. 132–40 (Hilton Decl. ¶¶ 35–41, 55–61), 132–37 (Fagan Decl. ¶¶ 21–28).

[32] ECF No. 132-42 (Pantos Decl. ¶¶ 16, 18, 35–39); ECF No. 132-39 (Williams Decl. ¶¶ 23, 29, 43–47).

[33] ECF Nos. 132-40 (Hilton Decl. ¶ 63); ECF Nos. 132-37 (Fagan Decl. ¶ 28); ECF Nos. 132-42 (Pantos Decl. ¶ 37); ECF No. 132-39 (Williams Decl. ¶ 47).

## LEGAL STANDARD

On a factual challenge under Rule 12(b)(1), the Court may consider extrinsic evidence and resolve disputed jurisdictional facts. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). But if a jurisdictional issue is "intertwined" with the merits of the plaintiff's claim, the Court instead applies the summary judgment standard and leaves genuinely disputed material facts to the trier of fact. *Id.* at 364 n.3; *Torres-Negrón v. J & N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007); *Gonzalez v. United States*, 284 F.3d 281, 287 (1st Cir. 2002). For Defendants' Rule 12(b)(6) challenge to Counts II and IV, the Court accepts well-pleaded factual allegations as true, draws all reasonable inferences in Plaintiffs' favor, and asks whether the facts alleged state a plausible claim. *NRA v. Vullo*, 602 U.S. 175, 181 (2024).

## ARGUMENT

### I. Defendants' "Factual Challenge" to Plaintiffs' Standing Is Intertwined with the Merits and Should Be Reviewed Under the Summary Judgment Standard

Defendants' motion to dismiss asks the Court for merits determinations that go to the heart of this case. They contend, for example, that the agents who routinely collected information about Plaintiffs and other observers had legitimate law enforcement reasons to do so and acted consistent with DHS policy. MTD 7–11. Defendants try to minimize agents' "domestic terrorist" remarks, *id.* at 9, and the practice of driving observers to their homes to intimidate them by arguing they do not occur regularly. *Id.* at 11. These are all (at best) disputed facts,[34] and the Court cannot properly resolve these merits-based factual disputes against Plaintiffs on a Rule

[34] Defendants' description of the record (*e.g.*, MTD 9 & nn.10–13) is selective and misleading, as Plaintiffs' preliminary injunction motion makes clear. It is untrue, for example, that agents made "domestic terrorist" and "watchlist" remarks only "twice" during the surge. J.C.'s own video confirms he made threats to at least two additional observers at the Home Depot. ECF No. 132-15 (PI Ex. 17); ECF No. 134-4 (J.C. Dep. 185:19–24; 195:12–23; 199:7–11). And Williams's testimony (dismissed by Defendants) establishes yet another threat he made. ECF No. 132-39 (Williams Decl. ¶ 14); *see* MTD 9 n.11.

12(b)(1) motion. As the First Circuit has explained, a court considering a factual challenge under Rule 12(b)(1) must first "determine whether the relevant facts, which would determine the court's jurisdiction, also implicate elements of the plaintiff's cause of action." *Torres-Negrón v. J & N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007). If so, the court "should grant the motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* If the plaintiff has presented "sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial." *Id.* Defendants come nowhere close to meeting their burden under the appropriate standard.

## II. Defendants' Motion to Dismiss Does Not Dispute Plaintiffs' Standing to Seek Expungement of the Records Causing Them Ongoing Harm

Plaintiffs' FAC requests an order expunging all records "collected or maintained about Plaintiffs . . . based on their exercise of First Amendment rights." FAC ¶ 244; *see also* PI Mot. 30–32. Defendants' maintenance of these records, confirmed through discovery, is causing Plaintiffs ongoing, concrete harm. Take, for example, the ICM and TECS records about Williams and her vehicle. These records have already led to Williams's (and Pantos's) detention once and [redacted], at least through January 2027.[35] In response, Williams has given up international travel, including a planned trip to Nova Scotia.[36] Courts have recognized these harms as sufficient to confer standing. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (enhanced screening at the border); *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 261–70 (E.D.N.Y. 2021) (enhanced scrutiny and retained records); *AAUP v. Rubio*, 802 F. Supp. 3d 120, 178–79 (D. Mass. 2025) (altered travel plans).

Defendants' maintenance of information about Plaintiffs[37] also causes *all* Plaintiffs

---

[35] *See* ECF No. 104-1 (CBP 30(b)(6) Dep. 146:7–147:10).

[36] ECF No. 132-39 (Williams Decl. ¶ 49).

[37] Defendants concede that any information collected about individuals during their encounters with ICE is maintained as a "government record." ECF No. 132-30 (PI Ex. 65 at 2). The absence

ongoing, concrete harm in the form of self-censorship.[38] *See supra* pp. 12–13. As courts have recently held, self-censorship in response to past misconduct is the kind of "continuing, present adverse effect" sufficient for standing. *L.A. Press Club v. Noem*, 171 F.4th 1179, 1187–88 (9th Cir. 2026). It is objectively reasonable for Plaintiffs to fear that Defendants will misuse the information collected in response to their First Amendment activity and still maintained, *e.g.*, by subjecting them to baseless investigations or even criminal prosecutions. PI Mot. 14–15 & n. 86, 26–27 & n.140, 31–33; *see also* ECF No. 129 at 6–8 & nn.7–13. Their self-censorship in response to these fears is thus sufficient to establish standing to seek expungement of the records and other appropriate relief. *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 56–58 (1st Cir. 2003); *Ozonoff v. Berzak*, 744 F.2d 224, 228–29 (1st Cir. 1984).

Defendants' motion makes no real attempt to argue that Plaintiffs lack standing to seek expungement of these records or other appropriate relief.[39] Because the records cause *ongoing* harm, Plaintiffs' standing does not depend on whether they "will be subjected to the same activity" again, MTD 6 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Defendants' principal standing arguments are thus beside the point. Even the recent *Tincher*

---

of identified formal database records about Hilton, Fagan, and Pantos at this early stage in the litigation thus is not dispositive. That is particularly true given that Defendants agreed to conduct only very limited database searches, excluding many of the databases discussed in the FAC.

[38] *See* ECF No. 132-40 (Hilton Decl. ¶¶ 35–41, 55–63); ECF No. 132-37 (Fagan Decl. ¶¶ 21–28); ECF No. 132-42 (Pantos Decl. ¶¶ 16–18, 35–39); ECF No. 132-39 (Williams Decl. ¶¶ 23–29, 43–47).

[39] *Phillips v. U.S. Customs & Border Protection*, cited by Defendants in their preliminary injunction opposition, ECF No. 133 at 22–23, is distinguishable in multiple respects. 74 F.4th 986, 992–96 (9th Cir. 2023). *Phillips* rejected standing based on the retention of records "alone" where the plaintiffs failed to show any concrete injury tied to the records. Here, the records continue to [redacted] and brand her a "[redacted]" and an "aggressive woman [who] interject[ed] herself into an arrest." PI Mot. 8. Hilton is similarly described as an "agitator" in Defendants' Signal chat. ECF 103-7 (PI Ex. 48 at DEFS001295). The relief Plaintiffs seek would redress both the concrete harm caused by the records' actual and threatened adverse use, and the objectively reasonable continuing chill from Defendants' collection and maintenance of their information.

decision cited by Defendants illustrates this: there, the court explained that one plaintiff could have standing to challenge his alleged placement on a domestic terrorist "watchlist" if he could demonstrate concrete harm. MTD Ex. E (ECF No. 117-5) at 22. The court considered this claim "separately because there is no indication that such an allegation is impacted by the end of [Operation Metro Surge]"—*i.e.*, because the plaintiff did not need to make any showing that the relevant misconduct would likely recur. *Id.* So, too, here.

## III. Plaintiffs Have Standing to Seek Prospective Relief Enjoining Defendants' Intimidation and Information-Collection Practices

The bulk of Defendants' motion offers a "factual challenge" that Plaintiffs cannot establish standing to seek prospective injunctive relief because standing cannot arise singly from "[p]ast exposure to illegal conduct." *Lyons*, 461 U.S. at 102. But that is not what is happening here for two reasons: (1) Plaintiffs' self-censorship in response to Defendants' retaliation is an ongoing injury that supports injunctive relief, and (2) Plaintiffs' injuries are likely to recur. Defendants cannot carry their burden to show there is no genuine dispute of material fact on either issue. *Torres-Negrón*, 504 F.3d at 163.

### A. Plaintiffs' Self-Censorship Is an Ongoing Concrete Injury

This case, unlike *Lyons*, is a First Amendment retaliation case. The crux of Plaintiffs' claim is that Defendants took actions *specifically designed* to chill the First Amendment-protected activity of Plaintiffs and other observers in Maine. Plaintiffs are experiencing exactly that harm: they have either stopped observing and recording ICE activity entirely or substantially reduced such activity, have limited their online presence, and have changed their travel plans or their behavior while traveling. PI Mot. 31–33. Thus, by design, Plaintiffs are still experiencing "continuing, present adverse effects" from Defendants' misconduct—namely, the ongoing chilling of their First Amendment rights. *Lyons*, 461 U.S. at

102; *see also L.A. Press Club*, 171 F.4th at 1187–88. Another court recently reached this conclusion in a case involving ICE retaliation for protected activity: "Defendants' *Lyons* argument misapprehends the nature of [the plaintiff's] asserted injury," which is "the loss of his freedom to engage in political speech now because the threat of such an investigation or prosecution looms over him like the sword of Damocles" and causes him to self-censor. *Streever v. Mullin*, 2026 WL 2720475, at *14 (D.D.C. Sept. 15, 2026). In this context, it makes little sense to apply *Lyons* and require Plaintiffs to show a likelihood that they will "again be wronged in a similar way." 461 U.S. at 111.

Defendants make two misguided arguments in response. *First*, Defendants briefly suggest that neither Hilton nor Fagan has "experienced an ongoing chilling effect." MTD 17. Plaintiffs' sworn declarations refute that assertion.[40] Defendants incorrectly suggest—without citation—that a plaintiff must forgo protected activity entirely in order to establish an actionable chilling effect, but that is not the law. *E.g.*, *L.A. Press Club*, 171 F.4th at 1187–88; *Media Matters for America v. Paxton*, 138 F.4th 563, 579–82 (D.C. Cir. 2025) (reporting curtailed, not stopped entirely). And in any event, Pantos and Williams *have* completely stopped observing and recording ICE—a fact Defendants ignore.[41]

*Second*, Defendants claim that the chill Plaintiffs have experienced is based on "subjective apprehension alone," analogizing this case to *Laird v. Tatum*, 408 U.S. 1 (1972).

---

[40] Defendants point to Judge Nivison's observation that community group messages "lack any information to suggest that members of the group have refrained from their monitoring activities." ECF No. 99 at 2; *see* MTD 17 n.27. But the chats are hardly dispositive of anything and say nothing about whether *Plaintiffs specifically* have curtailed their protected activity. To the contrary, Plaintiffs' sworn declarations make clear that they have.

[41] ECF No. 132-42 (Pantos Decl. ¶¶ 16, 35–37); ECF No. 129-9 (Pantos Dep. 87:3–14); ECF No. 132-39 (Williams Decl. ¶¶ 43–47). Hilton's temporary move to Boston, MTD 17, also does not eliminate the chill. She plans to return to Maine for school next year, visits often in the meantime, and plans to continue observing ICE activity when here. ECF No. 132-40 (Hilton Decl. ¶¶ 1, 63). Moreover, Hilton still lived in Portland when Plaintiffs filed the FAC. *Id.* ¶ 1.

MTD 17–18. The suggestion that Plaintiffs' apprehension is merely "subjective" is belied by the record of retaliation against lawful observers. Observers, for example, have faced enhanced screenings, revocation of trusted-traveler privileges, initiation of criminal investigations, agents visiting their homes, and other responses—all of which underscore the reasonable and non-speculative nature of Plaintiffs' fears.[42]

Moreover, Defendants' reliance on *Laird* is misplaced. The plaintiffs there relied on subjective chill from the *existence* of a government surveillance program, with no evidence that their information had been gathered or a threat of specific future harm. *See Laird*, 408 U.S. at 3 (plaintiffs did not allege any "specific action of the [government] against them"); *Ozonoff*, 744 F.2d at 229 (explaining that *Laird* involved plaintiffs' failure to allege that the government's "information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way"). The Supreme Court likewise has distinguished *Laird* where the government specifically targeted the plaintiff with a subpoena. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184–85, 192–93 (2026). *Laird* is thus inapposite here, where there is no dispute that agents intentionally collected Plaintiffs' information and Plaintiffs have shown concrete harms *and* objectively reasonable self-censorship arising directly from the challenged conduct.

### B. Plaintiffs Are Likely to Experience the Same Misconduct Again

Plaintiffs also have amply shown a substantial risk that they will be "wronged in a similar way" again, meaning they could separately establish a likelihood of recurrence. *Gray v.*

[42] ECF No. 132-39 (Williams Decl. ¶¶ 30–42); ECF No. 132-42 (Pantos Decl. ¶¶ 19–29); ECF No. 132-41 (Neff Decl. ¶¶ 20–22); ECF No. 132-40 (Hilton Decl. ¶¶ 50–53); ECF No. 132-38 (C. Jagger Decl. ¶¶ 3–15); ECF No. 132-43 (R. Jagger Decl. ¶¶ 9–18); ECF No. 102-9 (PI Ex. 35 at DEFS000650–51); PI Mot. 23 & nn.127–30, 26–27 n.140. *See also* ECF No. 117-5 (MTD Ex. E at 24) (describing Cleland's sworn allegation that her trusted-traveler status was revoked three days after agents targeted her) (citing *Tincher v. Noem*, No. 0:25-cv-4669, ECF No. 98 (D. Minn. Jan. 21, 2026), Cleland Decl. ¶ 15)).

*Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (quoting *Lyons*, 461 U.S. at 111). Defendants make three primary arguments: (1) DHS has policies prohibiting the retaliatory acts that Plaintiffs experienced; (2) Plaintiffs are unlikely to encounter federal agents again, largely because Operation Catch of the Day has ended; and (3) the Court must conduct a "highly fact-specific assessment" of every potential future encounter to evaluate the likelihood of recurrence. MTD 7–16. None holds up.

**1. Defendants have authorized and sanctioned the practices at issue**

A plaintiff has standing to seek injunctive relief when there is reason to believe that law enforcement will repeat the challenged conduct—for example, evidence that the government "ordered or authorized" that conduct. *Lyons*, 461 U.S. at 105–06; *see Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 33 (D.D.C. 2025) ("Courts generally agree that when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again…."); PI Mot. 35.

Defendants actively encouraged and, at minimum, acquiesced in both of the policies and practices Plaintiffs challenge—the collection and maintenance of information about observers and the practice of threatening and intimidating them to deter protected activity. Agents regularly recorded observers in response to their protected activity and often shared their information on Signal chats. *Supra* pp. 5–6.[43] Agents also routinely intimidated observers by issuing "warnings" and traveling to their homes. Supervisors not only knew about these practices, but even directed and facilitated them by, for example, providing observers' home addresses. *Supra* pp. 8–9.[44]

As the Court previously noted, the proper response where "a few agents" acted "contrary to agency policy" would likely entail training and discipline. ECF No. 24 (TRO Order at 25).

---

[43] PI Mot. 13 & n.74; ECF No. 103-7 (PI Ex. 48 at DEFS001272, 1288, 1352–53).
[44] PI Mot. 17 nn.97–101, 35 n.160; ECF No. 103-6 (PI Ex. 47 at DEFS001196); ECF No. 103-7 (PI Ex. 48 at DEFS001288, 1393–94).

Defendants have done neither. No agent could recall receiving training on the appropriate way to interact with protestors.[45] No agent was told *not* to threaten observers or protestors with a "domestic terrorist" watchlist.[46] Agents have not been reprimanded or disciplined for deliberately leading individuals to their homes, despite substantial public attention to this issue in Maine and Minneapolis and its discussion on official government channels. PI Mot. 17–18 & nn.102–04.

Against all of this evidence, Defendants point only to the 2019 memo. Even if that policy expressly prohibited all of the challenged conduct, it would not shield Defendants from injunctive relief to remedy the widespread violation of the policy. *See, e.g.*, *L.A. Press Club*, 171 F.4th at 1189; *Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (en banc) (government cannot "avoid liability by pointing to a pristine set of policies"); *Ware v. Jackson County*, 150 F.3d 873, 882 (8th Cir. 1998) ("the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced"); *Tardiff v. Knox County*, 397 F.Supp. 2d 115, 131 (D. Me. 2005) (written policy was constitutional as written but irrelevant where not followed). After all, according to Defendants, the policy remained operative at all relevant times, yet it did not stop agents from recording or threatening Plaintiffs and countless other Mainers. Nor has it stopped agents across the country from continuing to engage in these practices.[47] The record instead points to the impotence of the 2019 policy under this administration: the Department's own Rule 30(b)(6) witness maintained that threatening observers with a "domestic terrorist" designation was an appropriate "deescalation" technique consistent with DHS policy.[48]

---

[45] *E.g.*, ECF No. 204-6 (J.R. Dep. 315:10–21; 318:21–319:4). J.C. Dep. 278:23–280:10.

[46] *E.g.,* ECF No. 104-3 (D.L. Dep. 115:9–15). At most, a supervisor told one officer to "be more mindful" of what he said; the supervisor also clarified he did not consider that conversation a form of discipline. ECF No. 117-11 (J.R. Dep. 144:5–145:15); *see* PI Mot. 16 & n.94.

[47] *E.g.*, Ex. 11 (on September 21, ICE agents in New Jersey used their vehicle's speaker to broadcast the home address of an observer who was recording an arrest).

[48] ECF No. 104-8 (ICE 30(b)(6) Dep. 363:10–365:10).

Plaintiffs have produced more than enough evidence of unconstitutional policies and practices to preclude dismissal at this stage. The 2019 policy alone cannot justify dismissing Plaintiffs' claims, particularly when—contrary to Defendants' assertions—most agents are unaware of the policy, never received training on it, and do not believe their behavior violates it.

**2. Plaintiffs are likely to encounter ICE agents again**

The only remaining question under *Lyons* is whether Plaintiffs themselves are likely to encounter ICE agents again. Here, Defendants make much of the end of Operation Catch of the Day, but they acknowledge that "ICE continues to conduct regular enforcement activity." MTD 13–15. As explained, immigration enforcement continues at an elevated pace compared to past years. Critically, "at-large" arrests in the community continue to be common, including in the areas where Plaintiffs live, work, and have observed (and wish to continue to observe). *See supra* pp. 11–13.[49] Plaintiffs Hilton and Fagan have continued to intentionally make efforts to observe and document ICE activity.[50] Pantos and Williams would do the same if not for Defendants' conduct.[51] As described below, Hilton in fact came in contact with ICE agents in June while observing. The chances are far from "remote" that Plaintiffs would once again "locate an ICE arrest happening in Maine's public spaces." MTD 12.[52]

---

[49] Moreover, Defendants' focus on overall arrest numbers misses the point. Plaintiffs and others often exercise their right to observe agents engaged in official duties whether or not they are executing an arrest, as Hilton's June encounter demonstrates. Defendants cannot dispute that ICE personnel still operate throughout the state and are regularly seen in the neighborhoods where Plaintiffs want to observe. *E.g.*, ECF No. 132-39 (Williams Decl. ¶¶ 45–47); ECF No. 132-40 (Hilton Decl. ¶¶ 37–41, 50–54, 62); ECF No. 132-42 (Pantos Decl. ¶¶ 33–37); ECF No. 132-37 (Fagan Decl. ¶¶ 24–28). *See also* Ex. 5 at Figure 10 (noting 51 arrests in Portland and 64 arrests in South Portland in 2026 through August 6, 2026).

[50] ECF No. 132-40 (Hilton Decl. ¶¶ 2, 37–41, 62–63); ECF No. 132-37 (Fagan Decl. ¶¶ 25–28).

[51] ECF No. 132-37 (Pantos Decl. ¶¶ 34–37); ECF No. 132-39 (Williams Decl. ¶¶ 45–47).

[52] That Plaintiffs are engaging in entirely lawful, protected activity is also relevant under *Lyons*. The Court there declined to assume that the plaintiff would again encounter police and "illegally resist arrest or detention." *Lyons*, 461 U.S. at 106. But here, no one has to assume that Plaintiffs will break the law. *E.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (finding standing where plaintiffs could not avoid the challenged detentions by avoiding criminal conduct).

Indeed, the preliminary injunction record shows not only that individuals continue to observe ICE activity in Maine but also that the unconstitutional practices continue. Hilton herself encountered ICE agents in June and was led to her father's home—the address still on her driver's license and registration—after she followed an ICE vehicle in order to observe and document its actions.[53] And the Jaggers report multiple instances of intimidation after Operation Catch of the Day—including an ICE vehicle following them for several miles on March 22 and another vehicle leading them to their home in June.[54] It makes sense that agents continue to engage in these unconstitutional intimidation tactics. As explained, Defendants *have not told* agents to stop and continue to defend these tactics in sworn testimony. *Supra* pp. 20–21. HSI and ERO personnel continue to conduct immigration enforcement in Maine, and ERO Boston and HSI New England remain the two offices primarily responsible for those efforts.[55] ERO Boston's Deputy Assistant Director led Operation Catch of the Day, and HSI New England and ERO Boston both contributed strike-team personnel and participated in the JOC that engaged in and approved the challenged practices.[56]

These facts distinguish the district court's recent dismissal in *Tincher*. There, the court found that plaintiffs in Minnesota lacked standing to seek the requested relief because Operation

[53] ECF No. 132-40 (Hilton Decl. ¶¶ 50–53).

[54] ECF No. 132-38 (C. Jagger Decl. ¶¶ 2–15); ECF No. 132-43 (R. Jagger Decl. ¶¶ 4–18). Defendants argue, MTD 11, that standing must be assessed as of the time the FAC was filed in April, before some of these instances of intimidation. But the First Circuit has explained that "courts have been careful not to import the time-of-filing rule indiscriminately" in federal-question cases like this one, as opposed to diversity cases. *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 3, 5–6 (1st Cir. 2015). Here, the later events confirm the challenged practice and the continuing threat Plaintiffs face. Plaintiffs do not rely on them to erase the requirement of standing at filing, but rather, to corroborate what the record in April had already made clear: that Defendants' officially sanctioned practice of intimidating observers was highly likely to continue so long as agents were conducting immigration arrests in Maine. If the Court finds that Plaintiffs' standing depends on events that postdate the FAC, Plaintiffs respectfully request leave to file a supplemental pleading under Rule 15(d). *See id.*

[55] *See* ECF No. 104-8 (ICE 30(b)(6) Dep. 168:13–169:11).

[56] *See* ECF No. 104-8 (ICE 30(b)(6) Dep. 100:3–21); ECF No. 117-2 (MTD Ex. A at 4).

Metro Surge had ended. The scale of that operation vastly exceeded Operation Catch of the Day, making the end of the operation far more significant as a practical matter. Most of the approximately 3,000 immigration officers deployed to Minnesota left, and crucially, the White House Border Czar announced a "tactical change" in which DHS would largely replace at-large arrests with custodial arrests. ECF No. 117-5 (MTD Ex. E at 20). Here, although the 159-person deployment to Maine (MTD 1) led to a spike in arrests, at-large arrests continue across the state. *Supra* pp. 11–13. Defendants make no attempt to argue otherwise. Notably, the statistics Defendants cite in their motion omit the months after February—even though federal data establishes that enforcement has risen significantly since then, *supra* n.27.

### 3. Defendants' practices apply blanket suspicion to protected activity and do not involve highly fact-specific determinations

Finally, the likelihood that Plaintiffs' injuries will recur does not require a "highly fact-specific assessment" of every potential future encounter. MTD 15–16. The record shows agents repeatedly treated the protected activity of observing itself as sufficient justification to engage in the threats and information collection that Plaintiffs challenge. The Signal chats reflect agents motivated by the fact that individuals were, for example, "recording" or "following" them. PI Mot. 13 & n.74. The agents who sent those messages did not report threatening conduct or interference. Indeed, they sometimes even confirmed they did not need assistance—yet proceeded to take action against observers anyway. PI Mot. 17. Plaintiffs' own encounters likewise confirm that agents made no "fact-specific assessments" before retaliating against them. Instead, agents filmed and threatened *all* observers on the scene soon after the individuals began observing and recording, regardless of whether they had disobeyed orders or interfered with operations.[57] The dispositive "fact" was the observer's protected activity, as some agents all but

[57] *E.g.*, ECF No. 134-4 (J.C. Dep. 194:7–19); ECF No. 104-3 (D.L. Dep. 100:2–20, 115:24–116:4); ECF No. 104-5 (J.C. Dep. at 182:20–183:3).

admitted at their depositions.[58] And Defendants continue to defend and deploy these practices, making it likely that Plaintiffs will once again face retaliation as a result of this categorical suspicion of observers exercising their First Amendment rights.[59]

### IV. Counts II and IV State Plausible Claims That Defendants Burdened Plaintiffs' Speech Based on Viewpoint

Counts II and IV allege that Defendants (1) collect and maintain information about observers and (2) seek to deter their protected activity by threatening and harassing them, and that these practices are intentional efforts to suppress speech that are not narrowly tailored to any governmental interest. FAC ¶¶ 216–24, 233–42. Defendants' motion incorrectly argues that these counts "plead retaliation again." MTD 19. Viewpoint discrimination and retaliation claims are doctrinally distinct, and Defendants provide no support for their suggestion that plaintiffs cannot plead both claims based on the same actions or evidence.

Plaintiffs have alleged policies and practices of (i) collecting and maintaining information *only* about individuals who observe and record federal agents for the purpose of expressing opposition to their conduct and holding them accountable, and (ii) threatening and intimidating *only* those same individuals. *See* FAC ¶¶ 150, 218–23, 235–41; *supra* pp. 3, 5–9. Bystanders not perceived to hold this viewpoint are not targeted; indeed, Defendants have actively invited friendly journalists to observe and record their activities. FAC ¶ 150.

---

[58] ECF No. 104-3 (D.L. Dep. 70:15–71:2; 98:21–24). R.N. likewise acknowledged no violence or interference in Fagan's encounter, and no need for an investigation. ECF No. 132-12 (PI Ex. 12, R.N. Decl. ¶¶ 8–10). S.C. also admitted he did not see the driver of Williams's vehicle and did not recall specific details of any interference. ECF No. 104-9 (S.C. Dep. 147:1–22, 149:8–150:4); ECF No. 104-3 (D.L. Dep. 41:24–42:3, 44:13–16, 70:19–71:2, 171:5–21).

[59] The fact that officers can issue "reasonable orders" to address legitimate safety concerns, MTD 15–16 (quoting *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014)), is thus irrelevant. Defendants are likely to subject observers to the same retaliatory treatment regardless of whether the observer complies with any such orders. Again, the government's deponents conceded (and video evidence corroborates) that Plaintiffs did not disobey orders or otherwise impede agents' operations, yet they were recorded and threatened for their protected activity. *See* PI Mot. 7–12.

Defendants insist that Plaintiffs identify a "regulation, prohibition, or order restricting what [Plaintiffs] may say or record." MTD 19. But a government practice that burdens speech is just as susceptible to a viewpoint discrimination claim as an explicit ban or restriction on speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011) (content-based burdens on speech must undergo the "same rigorous scrutiny" as content-based bans); *NRA v. Vullo*, 602 U.S. 175, 191–94, 198–99 (2024) (plausible viewpoint discrimination claim based on government conduct that did not formally restrict speech). The fact that no agent ordered Plaintiffs to stop filming, MTD 19, is beside the point. Plaintiffs challenge the viewpoint-based collection and maintenance of observers' information and the targeting of observers for harassment and intimidation—both practices that substantially (and intentionally, not incidentally) burden speech. *Supra* pp. 16–17. Plaintiffs' Counts II and IV should not be dismissed for failure to state a claim.[60]

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

---

[60] Defendants also argue the FAC fails to state claims or identify relief at issue for the unnamed agents. MTD 20. But each of the four counts runs against "All Defendants," FAC Counts I–IV; ¶¶ 244(4)–(5), and the Court may award meaningful relief against them (*e.g.*, agents could be ordered to (i) refrain from using the unlawfully collected information about Plaintiffs to their detriment, (ii) refrain from engaging in the challenged intimidation tactics, and (iii) in J.C.'s case, take specific actions regarding Williams's records, such as not extending the [redacted]). If the Court finds the identification of the agent Defendants insufficient, Plaintiffs request an opportunity to address that deficiency before dismissal. *See Martínez-Rivera v. Sánchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007).

Dated: October 9, 2026

Respectfully submitted,

*/s/ JoAnna Suriani*

JoAnna Suriani*
Janine M. Lopez*
Ori Lev*
F. Elias Boujaoude*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org
ori.lev@protectdemocracy.org
elias.boujaoude@protectdemocracy.org

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
101 Glen Lennox, Suite 300
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*
Yotam Barkai*

John Paredes*
Benjamin J. Cabranes*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com

**Pro hac vice*